**LESOWITZ GEBELIN LLP**
Scott M. Lesowitz (SBN 261759)
　scott@lawbylg.com
Steven T. Gebelin (SBN 261507)
　steven@lawbylg.com
8383 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90211
Telephone: (310) 341-3072; Facsimile: (310) 341-3070

**JOHNSON & RAWI PC**
Jeffery W. Johnson (SBN 133467)
　jjohnson@johnsonrawi.com
99 South Lake Avenue, Suite 208, Pasadena, California 91101
Telephone: (626) 585-5663; Facsimile: (626) 239-3630

*Attorneys for Defendants* Pablo Morales, Savino Morales, Sergio Escamilla, and Legacy Wholesale Group, LLC

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PERRIN BERNARD SUPOWITZ, LLC, dba INDIVIDUAL FOODSERVICE,<br><br>Plaintiff,<br><br>v.<br><br>PABLO MORALES, LEGACY WHOLESALE GROUP, LLC, SAVINO MORALES, SERGIO ESCAMILLA, and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. 2:22-cv-02120 ODW(JEMx)<br>[Assigned to the *Honorable Otis D. Wright, II*]<br><br>**DECLARATION OF SAVINO MORALES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR:**<br>**(1) TEMPORARY RESTRAINING ORDER and SCHEDULING HEARING ON PRELIMINARY INJUNCTION; (2) PRESERVATION OF EVIDENCE; AND**<br>**(3) EXPEDITED DISCOVERY** |

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)

**Savino Morales Decl. ISO Opposition to *Ex Parte* Application for TRO, etc.**

# DECLARATION OF SAVINO MORALES

I, Savino Morales, declare as follows:

1. I am an adult over 21 years of age, a defendant in this action, and I make this declaration in support of Defendants' Opposition to the Ex Parte Application of Plaintiff Perrin Bernard Supowitz, LLC dba Individual Foodservice ("IFS") for (1) Temporary Restraining Order, and Scheduling Hearing on Preliminary Injunction; (2) Preservation of Evidence; and (3) Expedited Discovery. I make this Declaration of my own personal knowledge, and if called upon to do so, I could and would testify as to the matter set forth herein.

2. As laid out more below, I do not believe that I currently possess, have access to, or have knowledge of any of the following: (a) the prices IFS pays to obtain items, (b) the current prices IFS sells items to its customers (other than information appearing on my earnings statements detailing my pay, the most recent of which IFS provided me after IFS terminated me), (c) a complete list of IFS's customers, (d) the items that IFS is selling to any customers (other than information appearing on my earnings statements detailing my pay, the most recent of which IFS provided me after they terminated me), (e) any formulas or calculations IFS may use to set the prices at which its sales people can sell items, (f) IFS's profit margins, or (g) IFS business or marketing plans, or research. I note that while working for IFS, I did not have access to internal information about IFS customers that I did not work with. I did not have access to, and do not have access to, the identity of all of IFS's customers (although the identity of many IFS customers can be obtained through publicly available sources).

3. I had been a salesperson working for IFS and various prior affiliated or predecessor businesses that were subsequently bought and sold during my tenure as a salesperson since February 1997. My compensation was commission-based. I never held any type of executive or management position with IFS.

4. When I started working for IFS, I was required to create my own book

*IFS v. Morales, et al.*  
USDC, Case No. 2:22-cv-02120 ODW(JEMx)  
1  
**Savino Morales Decl. ISO Opposition to** *Ex Parte* **Application for TRO, etc.**

of business by finding potential new clients in the food service industry. Such clients included both "end-user" clients that used IFS products to provide and serve food (*e.g.*, restaurants) and "distributor" clients that would act as middle-men between IFS and "end-users" making food sales. At the time, my brother Pablo Morales had already been working as a salesperson for IFS for almost two years, and he provided some mentorship to me in finding and developing clients.

5. During my time working with IFS, in my experience (and certainly with customers that I worked with) IFS sold a wide-variety of food-service related products to customers that virtually any restaurant, market, or food seller would need to purchase, such as bulk food and beverage products (rice, grains, cereals, flour, coffee, soft drinks, oil, sugar, spices, and so on), food packaging, plates, soap dispensers, cookware, food service clothing (such as gloves, aprons, masks, and hair nets), utensils, forks, bags, napkins, test strips, ladders, safety and first aid equipment, lids, carts, platters, freezers, janitorial products, and more. During my time working with IFS, IFS sold products to both end-users such as restaurants and markets as well as wholesalers who in turn serviced the end-users. Virtually any restaurant, market, or food seller would be a potential customer of IFS or one of IFS's competitors. Similarly, any wholesaler of those types of items to restaurants, markets, and food sellers would be a potential customer of IFS or one of IFS's competitors. Many IFS customers purchased items from IFS as well as competitors of IFS.

6. Over the years, my brother Pablo Morales and I have both been very successful for developing clients for IFS. Part of our success derived from IFS having told us long ago that it would not take or reassign our clients, allowing us to put our own time and effort into maintaining the relationships with clients. Just last month IFS paid for me and my wife and Pablo and his wife to attend a conference in Cabo San Lucas, Mexico to receive an award in recognition of our outstanding sales.

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)

2

Savino Morales Decl. ISO Opposition to
*Ex Parte* Application for TRO, etc.

7. The process of finding clients for IFS is no secret and one that I understand to be widely known in the industry and likely the same as many other sales positions in various industries. Using publicly available sources, I would seek out restaurants and distributors and ask them about their current vendors for food and food service packaging items that IFS carried, difficulties that they had with the vendors, the prices that they paid for items, and see if IFS could resolve those issues by providing better service at the same or lower prices than the current vendor. It was commonplace for clients to use multiple vendors across their various needs to run their businesses, so they would often provide me and other salespeople information about the pricing of competitors to secure the best fit for their business. Based on my background and fluency in Spanish, and the products distributed by IFS (which are publicly disclosed on its website), this included many Mexican and Latin American restaurants and similar food service companies in Central and Southern California.

8. As a salesperson, I did not have access to, or knowledge of, the "true cost" paid by IFS for any of the products sold or the formula or methods IFS would use to calculate the prices that clients could be charged by salespeople to customers.

9. In the industry, and especially over the last two years of COVID-19 related disruptions in the supply chain and rapid changes in market-price of supplies and commodities, pricing for items sold by IFS have been changing rapidly. Even if I knew some information about IFS's pricing of a certain item previously, that information is likely already outdated.

10. IFS heavily promotes the identities of its suppliers and vendors, prominently listing many on its public facing website and on promotional materials provided to clients, such as its annual calendar. IFS's website lists specific products it has available for sale, including brand names. As IFS does not rebrand products that it distributes, the suppliers and manufactures are readily known to anyone working in the industry and to all of its clients. Those clients then turn around and

*IFS v. Morales, et al.*  
USDC, Case No. 2:22-cv-02120 ODW(JEMx)  
3  
**Savino Morales Decl. ISO Opposition to**  
*Ex Parte* **Application for TRO, etc.**

ask competitors to match or beat pricing for the same or similar products.

11. I did not have a written employment agreement in effect heading into March 2022. During the height of the COVID-19 pandemic in 2020, a private equity group purchased IFS (I do not know the structure or nature of the transaction), and I refused to sign an employment agreement proposed to me.

12. In or about late 2020, my brother Pablo and I had the idea to expand our books of clients outside of Southern and Central California to cover businesses in Arizona. I brought the idea of expanding to serve more businesses in Arizona to new IFS management at the time, Jeremy Shapiro and Ken Sweder. They told me that IFS was not interested in such an expansion into Arizona. Prior to that, we had asked our former VP of Sales, Steven Arroyo.

13. Still interested in the Arizona market, by early 2021 my brother Pablo and I agreed to start a food distribution business based in Phoenix, AZ, with Sergio Escamilla, an attorney who was our friend and had relocated to the area from Los Angeles many years prior. This business was formed as Legacy Wholesale Group, LLC ("Legacy") in March of 2021 but did not start sales until August 2021. We started developing Legacy's business on our own time and without the use of information or money from IFS. In fact, my understanding is that IFS only had minimal operations in Arizona through a sister company, Brady. I do not have and have not received from IFS any of Brady's sales information for its Arizona territory or customers.

14. We also were careful not to take any business opportunities for Legacy that IFS would have done. Legacy would sell products to IFS customers when IFS did not sell the type of item or IFS would not meet the customer's price demand. Of the more than a hundred clients in my book at IFS, only around 17 also did business with Legacy. For example, a frequent issue was that IFS did not want to sell Styrofoam food containers due to their bulk and low margins; Legacy was offering those products and filled the gap. I assume that this gap-filling preserved clients for

*IFS v. Morales, et al.*  
USDC, Case No. 2:22-cv-02120 ODW(JEMx)  
4  
**Savino Morales Decl. ISO Opposition to** *Ex Parte* **Application for TRO, etc.**

IFS, rather than them moving to a competitor that would sell both the items IFS was providing and those others IFS would not provide. Similarly, there were other times that IFS customers would only purchase an item at a certain price; in those situations, we first offered the opportunity to IFS; if IFS refused to sell at that price, and Legacy could meet the price, then Legacy would do the business.

15. Furthermore, during the short time that Legacy has been in operations, my client base at IFS continued to grow and prosper in the same way that it always had. As a salesman compensated via commissions, it was the practice that I had a flexible schedule, flexible hours, and IFS did not concern itself with how many hours I worked or when I performed my work.

16. Legacy has sold products to, or has estimates to sell products for, 75 customers. Only 17 of those 75 customers are customers that anyone working with Legacy sold products to previously through IFS. (Eight of those customers were serviced by me, and nine by Pablo.) We knew of these customers because we personally worked with them.

17. At no point have I used any confidential IFS information to benefit Legacy and take away an opportunity from IFS. Nor have I provided any confidential IFS information to Legacy to help it compete against IFS.

18. On March 29, 2022, I traveled to the IFS offices for what I understood to be a meeting to ensure that my clients and accounts would be appropriately serviced during an upcoming vacation. Instead, I was ambushed with allegations that I had been stealing from IFS (through Legacy) and told that I had to sign a confidential agreement to stay with IFS for 3 years and to stop working with Legacy or I would face criminal prosecution and an expensive lawsuit that would lead to the depositions of all of my family, the wasting of all of my assets, and completely stopping me from working and earning a living. At the time, I felt that I had no alternative to signing the agreement, even though I was not able to review it carefully or allowed to present it to an attorney as it was "confidential". As such,

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)          5          **Savino Morales Decl. ISO Opposition to**
*Ex Parte* **Application for TRO, etc.**

and despite the false statements in the agreement, I broke down and signed out of fear of what IFS threatened it would do if I did not sign. Shortly after the ambush meeting, I sent an email to Jeremy and Nigel revoking my agreement to the abusive and unfair agreement, making clear that I had not actually provided Legacy with any confidential information from IFS. Attached hereto as **Exhibit A** is a true and correct copy of my email message from March 29, 2022. I also went into the office and told IFS executives Jeremy Shapiro, Ken Sweder, and Nigel Kershaw that I revoked the agreement because I felt coerced and threatened. I also tried to discuss with them working out an amicable solution.

19. I am aware that IFS has attached the "Confidential" agreement that I signed to Mr. Kershaw's declaration, and I have now had the opportunity to review the document more closely. The document was prepared by IFS or its attorneys without my input. Had I any chance to consider the its terms, I would have made sure it did not falsely state that I:

> "Provided Legacy with certain IFS vendor and customer confidential contact information, purchase histories, and product availability information, pricing information, sales histories, credit worthiness and preferences, purchase volume, margin and profit information; and diverted sales and customers from IFS to Legacy"

20. After I told IFS that I stood by my rescission of the contract that IFS drafted and had me sign under duress, IFS turned off both my email access and cell phone service and officially terminated me. IFS emailed me an email attachment at 7:48 a.m. on March 31, 2022, notifying me that my "employment with Individual Foodservice Company is terminated, effective immediately." The email attachment also included an Earnings Statement. A true and correct copy of this March 31, 2022, email attachment (with a document regarding unemployment insurance removed for brevity sake) from Zoyla Rice from IFS to me (via my personal email account) is attached hereto as **Exhibit B**.

*IFS v. Morales, et al.*  
USDC, Case No. 2:22-cv-02120 ODW(JEMx)  
6  
**Savino Morales Decl. ISO Opposition to**  
***Ex Parte*** **Application for TRO, etc.**

21. The March 31, 2022, email demanded on the first page of the attachment that I "immediately return all of IFS' property, including any….confidential information." However, that very same email attachment then included the Earnings Statement included in Exhibit B, and it was sent to me via Federal Express the next day as well. IFS did not mark the Earnings Statement as confidential. The Earnings Statement, like other Earning Statements sent to me throughout my tenure at IFS, breaks down certain IFS sales to the customers that I serviced during the relevant period for calculating my commissions. The document lists certain items IFS sold to the customers during the covered period and what the customer paid. I do not believe that I have any information about IFS sales other than what is contained on the Earnings Statements that have been provided to me. I need the Earnings Statements for tax and personal accounting reasons. Also, I need the Earnings Statements because I am consulting with attorneys regarding likely violations by IFS regarding employment law, reimbursements, and calculation of my commissions. Please note that I did not use the Earnings Statements for servicing customers or soliciting business, and I do not think that the Earnings Statements would be useful for either purpose going forward.

22. Pablo and I both worked remotely and did not keep our computers in the office. We were not in an IFS office when we were terminated immediately. Pablo Morales, Sergio Escamilla, and I quickly sought counsel in order to assist Pablo and me in making the appropriate arrangements to return my IFS laptop and cell phone and Pablo's IFS laptop, as well as a small amount of money that Pablo had collected for IFS from one of his clients.  Shortly after hiring counsel, we handed the devices and money over to counsel to be transferred back as soon as possible to IFS as directed by its attorneys.

23. When IFS terminated me, I did not copy or transfer any files from my IFS computer, IFS cell phone, or any other IFS device. To my knowledge, nobody made any such copies. While working for IFS, I did not copy or transfer (or have

*IFS v. Morales, et al.*  
USDC, Case No. 2:22-cv-02120 ODW(JEMx)  
7  
**Savino Morales Decl. ISO Opposition to**  
*Ex Parte* **Application for TRO, etc.**

someone else copy or transfer) any IFS files from any IFS device (*e.g.*, a laptop or cell phone) with the intention to use them for Legacy.

24. Prior to IFS ambushing me about Legacy, in February of 2022, I sent a copy of a contact list of my IFS clients prepared by a former assistant by email to my wife so that she could print it for me. I was unable to print the file on my IFS computer. I wanted the hard copy because my assistant at IFS was changing yet again (turnover was high especially since COVID-19) and I wanted a full list that I could refer to when talking to the newly hired replacement and making sure that the accounts were being serviced appropriately. This list of contacts was comprised of the business name, IFS client ID number, contact information typically a name (sometimes first and last, sometimes first only) plus phone numbers that could be for the office, cell, fax, or other contact point. Two of my larger IFS clients, Bufadora and Castanedas, also had separate sheets identifying the IFS client ID number for the respective individual locations. The list does not, and did not, contain any information about the clients' purchase history or preferences, pricing information, or information on IFS' profits or margins for these clients.

25. I have reviewed the anonymous "declaration" purporting to be from an IFS salesperson that also made sales for Legacy. From the contents, it appears to be referring to my interactions with Hugo Mesa, who was named in IFS' motion as a target of their restraining order. Dkt. No 11 at p. 6:6-7. While some of the described events did happen, the characterization and key details are wrong. For example:

*IFS v. Morales, et al.*  
USDC, Case No. 2:22-cv-02120 ODW(JEMx)  
8  
**Savino Morales Decl. ISO Opposition to**  
*Ex Parte* **Application for TRO, etc.**

(a) I did happen to meet with Hugo during a weekend at a food truck. The meeting was not planned, and Hugo approached me to complain about his pay and policies of IFS that he believed were preventing him from making additional sales. I told Hugo about Legacy and that it was seeking to grow its client base as a business separate and apart from IFS. He asked to try and increase his income by also selling for Legacy in the Arizona market, outside of his area in Southern California where he made sales for IFS. I told him he could try and make sales on the weekends and on his own time, but I told him he was not to do anything that might take any customer away from IFS.

(b) Hugo was responsible for any dealings with Carlos Catering. Hugo pursued any business with them, and I did not know about Carlos Catering doing business with IFS. Legacy does not do business with Carlos Catering and plans not do so in the future.

(c) The characterization of a dinner in Phoenix is wrong. Pablo and I did not tell Hugo Mesa to use his IFS phone number to conduct Legacy business or provide a "Code Name." It was the reverse. We told Hugo to make sure to keep separation between any activities he was doing for Legacy separate from IFS.

(d) I saw that the "declaration" attaches what is said to be a "IFS Janitorial Supplier List," including categories for "Manufacturer," "Contact Name," "Email Address" and "Phone #." I have no idea what this document is or was. I never asked Hugo or anyone else at IFS to obtain it for Legacy. Nor would it have made sense to do so, as the identity of the manufacturers/suppliers for Janitorial Supplies sold by IFS are public knowledge and points of contact for purchasing by a distributor would be trivial to find out- simply looking up the company online and making a phone call or sending an email would obtain information just

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)

9

**Savino Morales Decl. ISO Opposition to**
*Ex Parte* **Application for TRO, etc.**

as useful. I note that it does not appear that I was sent the document by email- it was sent to a Gmail address.

26. In addition to the reference to Hugo Mesa in IFS' application, I am aware that IFS has named Jesus Trujillo as a target of its request for a restraining Order. [Dkt. No. 11 a p. 6:7] Jesus is my nephew (by marriage) and the other salesperson at IFS that Pablo and I have talked to about working in Arizona to solicit clients for Legacy. As with Hugo, we instructed Jesus to be very careful not to take any opportunities or clients from IFS, and to only seek new clients outside their coverage area for IFS. I understand that Jesus was also coerced into signing some deal with IFS requiring him to remain at the company for many years or face a steep penalty.

27. Hugo and Jesus Trujillo both no longer work with Legacy. While Pablo and I were working with IFS, we did not discuss Legacy, or potential opportunities with Legacy or in Arizona, with any other IFS employees other than Hugo and Jesus.

28. I also saw that Mr. Kershaw attached as Exhibits 9 and 11 an email chain in which I forwarded a copy of competitor pricing information that Nonstop Food Service, one of my IFS distribution clients, had provided to me concerning prices from Karat and Restaurant Depot in January of 2022. I sent this information on to Pablo so he would be aware of market pricing as appropriate. I did not provide this document to anyone at Legacy, nor would it be of any use to anyone at Legacy at this point, being months out of date.

I declare under penalty of perjury of the laws of California and United States that the foregoing is true and correct. Executed this 12th Day of April 2022.

_____
Savino Morales