**LESOWITZ GEBELIN LLP**
Scott M. Lesowitz (SBN 261759)
    scott@lawbylg.com
Steven T. Gebelin (SBN 261507)
    steven@lawbylg.com
8383 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90211
Telephone: (310) 341-3072; Facsimile:  (310) 341-3070

**JOHNSON & RAWI PC**
Jeffery W. Johnson (SBN 133467)
    jjohnson@johnsonrawi.com
99 South Lake Avenue, Suite 208, Pasadena, California 91101
Telephone: (626) 585-5663; Facsimile:  (626) 239-3630

*Attorneys for Defendants* Pablo Morales,
Savino Morales, Sergio Escamilla, and
Legacy Wholesale Group, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERRIN BERNARD SUPOWITZ, LLC, dba INDIVIDUAL FOODSERVICE,<br><br>Plaintiff,<br><br>V.<br><br>PABLO MORALES, LEGACY WHOLESALE GROUP, LLC, SAVINO MORALES, SERGIO ESCAMILLA, and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. 2:22-cv-02120 ODW(JEMx)<br>[Assigned to the *Honorable Otis D. Wright, II*]<br><br>**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [Declarations of Steven Arroyo, Savino Morales, Pablo Morales, and Sergio Escamilla, Statement of Uncontroverted Facts and Conclusions of Law, and Proposed Order filed concurrently]**<br><br>Hearing Date: November 7, 2022<br>Hearing Time: 1:30 p.m.<br>Hearing Courtroom: 5D |

## **MOTION AND NOTICE OF MOTION**

TO ALL PARTIES AND COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that, pursuant to Federal Rule of Civil Procedure 56, on November 7, 2022, at 1:30 p.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 350 W. 1st Street, Los Angeles, CA. 90012 - Courtroom 5D, 5th Floor, Defendants Pablo Morales, Legacy Wholesale Group, LLC, Savino Morales, and Sergio Escamilla will and hereby do move the Court for partial summary judgment on the ground that there are no genuine issues as to any material facts and that they are entitled to judgment as a matter of law as to Count 1 of Plaintiff's First Amended Complaint for Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*), Count 2 of Plaintiff's First Amended Complaint for Violation of the California Uniform Trade Secrets Act (California Civil Code § 3426, *et seq.*), Count 6 of Plaintiff's First Amended Complaint for Conversion, and Count 9 of Plaintiff's First Amended Complaint for Unfair Competition. Therefore, Defendants move pursuant to Federal Rule of Civil Procedure 56 that the Court dismiss with prejudice Counts 1, 2, 6, and 9 of Plaintiff's First Amended Complaint.

Namely, there is no genuine issue of material fact as to any necessary elements of any trade secret-related claim. Plaintiff cannot produce admissible evidence that (a) any information at issue in this case constitutes a legally protectable trade secret, (b) that Defendants possess any trade secrets of Plaintiff, or (c) that Defendants have used, disclosed, or misappropriated in any way Plaintiff's trade secrets. Further, there is no genuine issue of material fact that Defendants returned all property belonging to Plaintiff.

Furthermore, Defendants move for partial summary judgment as to Plaintiff's First Prayer for Relief (regarding injunctive relief) and all other requests by Plaintiff for injunctive relief related to any claim, issue, or dispute involving trade secret law or alleged misappropriation of trade secrets. Defendants request that the Court

dismiss and/or strike all of Plaintiff's requests for an injunction (whether temporary, preliminary, or permanent) involving or relating to misappropriation of alleged trade secrets (including the acquisition, use, and dissemination of trade secrets). For example, Defendants move for partial summary judgment as to Plaintiff's request for injunctive relief pursuant to 18 U.S.C. section 1836(b) (see Paragraphs 47 and 50 of the First Amended Complaint and Paragraph 1 of the Prayer for Relief) and Plaintiff's request for injunctive relief under California trade secret law (see Paragraphs 57 and 61of the First Amended Complaint and Prayer 1 of the Prayer for Relief). To be clear, Defendants request that even if the Court finds that there are triable issues of fact as to whether Defendants misappropriated trade secrets in the past, Defendants still request that the Court grant partial summary judgment as to Plaintiff's request for injunctive relief. Even if there is sufficient evidence of past trade secret misappropriation (we argue that there is not), there is certainly insufficient evidence of possible future misappropriation that would justify injunctive relief relating to any trade secret claim or issue.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declarations of Steven Arroyo, Savino Morales, Pablo Morales, Sergio Escamilla, and Scott Lesowitz, all pleadings and papers on file in this action, upon all matters upon which the Court may take judicial notice, and any evidence and argument provided in reply and at the hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on September 2, 2022.

Dated: October 3, 2022

/s/ *Scott Lesowitz*
Attorney and Partner
For Lesowitz Gebelin LLP, Counsel for Defendants

# **Table of Contents**

I.    INTRODUCTION ..................................................................................7

II.   STATEMENT OF FACTS ......................................................................8

      A.         Background on IFS' Business and Vendors.....................8

      B.         IFS' Employment of Savino and Pablo.............................9

      C.         Pablo and Savino Received Only Limited
                 Information         9

      D.         IFS' Customers, Vendors, and Suppliers Did
      not Have Confidentiality Agreements, and Frequently Share
      Information         11

      E.         How Savino, Pablo, and IFS Obtain
      Customers, and Savino and Pablo's Acknowledged Right to
      Compete Against IFS ................................................................11

      F.         Savino, Pablo, and Escamilla Start Legacy...................12

      G.         IFS Terminates Pablo and Savino, and
      Continues to Share Customer and Pricing Information with Them..............13

      H. IFS Devices         Savino and Pablo Acted Diligently to Return
      their IFS Devices   14

III.  ARGUMENT ONE: IFS' TRADE SECRET CLAIMS FAIL ....................14

      A.         Elements of a Trade Secret Misappropriation
      Claim         14

      B.         IFS Has Insufficiently Articulated the Trade
      Secrets that Defendants Allegedly Misappropriated......................................15

      C.         IFS Has not Established It Took Necessary
      Measures to Maintain the Secrecy of the Alleged Trade Secrets ................18

            1.         IFS Has Provided Only Conclusory
                       Assertions ...............................................................18

            2.         IFS Has Publicized the Alleged Trade Secrets .............18

            3.         IFS Did Not Require Confidentiality of
            Customers and Suppliers........................................................19

      D.         IFS's Customer List and Pricing Information
      Lack Value         21

            1.         IFS's Customer List.........................................................21

2.      Pricing and Vendor Information ....................................23

3.      Dart Competitive Pricing Agreement.............................24

E.        There Is no Evidence Defendants Used Any
Alleged Trade Secrets or that Any Usage Damaged IFS ..............................25

F.        California Has a Strong Policy in Favor of
Free Competition Against a Former Employer ...............................................25

G.        The Court Should at Least Grant Partial
Summary Judgment to Plaintiff's Request for an Injunction
related to Trade Secrets ........................................................................................26

IV.   ARGUMENT TWO: IFS' CLAIMS FOR CONVERSION AND
UNFAIR COMPETITION FAIL FOR REASONS INCLUDING
PREEMPTION ..............................................................................................27

A.        IFS' Unfair Competition Claim......................................27

B.        IFS' Conversion Claim....................................................28

V.    CONCLUSION ....................................................................................30

1

## **Table of Authorities**

2

**Cases**

3

*Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 1, 19 (1991).................................21

4

*Agricultural Labor Relations Bd. v. Richard A. Glass Co.*, 175 Cal.App.3d

5
    703, 715 (1985).........................................................................................17

6

*American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal.App.3d

7
    1318, 1326 (1986).....................................................................................22

8

*Amgen Inc. v. Health Care Services*, 47 Cal.App.5th 716, 735 (2020)...........................19

9

*ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts,*

10
    *Inc.*, 402 F.3d 700, 714-15 (6th Cir. 2005)...............................................22

11

*Copart, Inc. v. Sparta Consulting, Inc.*, 277 F.Supp.3d 1127, 1159 (E.D. Cal.

12
    2017)...........................................................................................................29

13

*Davis v. Farmers Ins. Exchange*, 245 Cal.App.4th 1302, 1326-27 (2016).....................28

14

*Dowell v. Biosense Webster, Inc.*, 179 Cal.App.4th 564, 575 (2009)...........................26

15

*Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945 (2008)...............................25

16

*Fortna v. Martin*, 158 Cal.App.2d 634, 639 (1958)..................................21, 23

17

*Fremont Indemnity Co. v. Fremont General Corp.*, 148 Cal.App.4th 97, 123

18
    (2007).........................................................................................................29

19

*IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583 (7th Cir. 2002)...............16

20

*Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-67 (9th Cir.

21
    1998)...........................................................................................................16

22

*In re Providian Credit Card Cases*, 96 Cal.App.4th 292, 305 (2002)...........................20

23

*InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir.

24
    2020)...........................................................................................................15

25

*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*,

26
    171 Cal.App.4th 939, 961 (2009)............................................................27

27

*Lee v. Luxottica Retail North America, Inc.*, 65 Cal.App.5th 793, 802-03

28
    (2021).........................................................................................................28

*Munns v. Kerry*, 782 F.3d 402, 411-12 (9th Cir. 2015).....................................26

*Way.com, Inc. v.* Singh, 2018 WL 6704464, at *10 (N.D. Cal. Dec. 20, 2018) ............... 20

*Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1458-59 (2002) ................................ 25

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279 (11th Cir. 2018) ......................................................................................................................... 24

*Zhang v. Superior Court*, 57 Cal.4th 364, 371 (2013) ....................................................... 28

**Statutes**

Cal.Civ.Code § 3426.1(b) ................................................................................................... 15

CC  § 3426.7 ......................................................................................................................... 27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Perrin Bernard Supowitz, LLC, dba Individual FoodService's ("IFS") previously filed an application for a temporary restraining order and a motion for preliminary injunction seeking to bar Defendants from using IFS' purported trade secrets. The Court denied the application for a temporary restraining order and did not issue a substantive ruling on the motion for preliminary injunction, as it was mooted by the filing of the First Amended Complaint.

IFS was unable to articulate any trade secrets that Defendants may have misappropriated. As the Court held in denying the TRO application, IFS's evidence "consists of conclusory, boilerplate averments regarding the existence of trade secrets and Defendants' use of them. For all these conclusory allegations, however, IFS submits no evidence regarding what Defendants are actually doing with the devices, electronically stored information, or trade secrets that is causing IFS financial or other harm." Doc. no. 22, pp. 2-3 (internal citations omitted).

In its discovery responses, IFS has provided vague and absurdly overbroad assertions of what trade secrets Defendants allegedly misappropriated. IFS is implausibly claiming that virtually all of IFS' information constitutes a trade secret in order to prevent Savino and Pablo from competing against IFS.

IFS is a reseller of a large variety of common items to a large variety of restaurants and food sellers. Defendants Savino and Pablo Morales previously worked for IFS as commissioned salespeople who were not under contract. They were not executives or managers. They had limited access to information. IFS executive Jeremy Shapiro, who also acted as a supervisor of Savino and Pablo Morales, acknowledged at deposition that Savino and Pablo did not have access to or receive IFS' actual costs to obtain items that IFS resold. Mr. Shapiro acknowledged that IFS did not disclose to Savino or Pablo how IFS determined the minimum suggested price that salespeople could re-sell items. Mr. Shapiro testified

that IFS has no set process or formula to determine its "office costs" or "lowest net costs" and that what expenses are included in such calculations varies. He also testified that IFS did not provide Savino or Pablo any breakdown of what costs were included in any "office cost" or "lowest net cost" calculations or specify individual costs of IFS related to any item.

There are no trade secrets at issue; there is nothing at issue that has sufficient value from not being generally known. IFS simply resells a wide variety of goods that are commonly purchased by virtually any foodservice company. The industry is highly competitive. Many foodservice companies make purchases from multiple companies. IFS does not have exclusive dealings agreements with its manufacturers, distributors, suppliers, or customers. IFS does not require its manufacturers, distributors, suppliers or customers to enter into confidentiality agreements. Customers are free to publicize what they purchased from IFS and what they paid for those items. It is undisputed that customers do publicize such information. And IFS executive Jeremy Shapiro admitted that, post-employment, IFS has no policy preventing Savino or Pablo from contacting customers they serviced at IFS.

Furthermore, IFS is attempting to claim trade secret protection for information that it has posted on its website, that it voluntarily provided to Defendants Savino and Pablo Morales after their termination from IFS without any indications that the information was confidential, and information that it has publicly filed in this case.

The Court should grant Defendants' request for partial summary judgment. This case should be limited to what it is: a lawsuit regarding alleged breaches of the duty of loyalty by Savino and Pablo Morales.

## II. STATEMENT OF FACTS

### A.    Background on IFS' Business and Vendors

IFS sells a wide-variety of food-service related products to customers that virtually any restaurant, market, or food seller would need to purchase, such as bulk

food and beverage products, food packaging, plates, soap dispensers, cookware, gloves, aprons, utensils, forks, bags, napkins, test strips, ladders, safety and first aid equipment, lids, carts, platters, freezers, janitorial products, etc. Savino Decl. ¶ 5; Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 27:3-22.

It is no secret which vendors IFS uses. IFS lists over 8,000 items it offers for sale on its website along with the brand and a description of the product. Escamilla Decl. ¶ 15. As of June 2021, IFS simply displayed a list of approximately 213 vendors and brands it did business with, on a page listed under "Vendors & Catalogs," that starts with the text, "Individual FoodService is proud to partner with the following vendors." Escamilla Decl. ¶ 19 & Exh. J.

### B. IFS' Employment of Savino and Pablo

IFS hired brothers Pablo Morales and Savino Morales as salesmen in 1995 and 1997. Savino Decl. ¶¶ 3-4; Pablo Decl. ¶¶ 3-4. During their tenure at IFS, Pablo and Savino worked on commissions and primarily developed and serviced their own customers. Id; Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 35:3-25. Neither Pablo nor Savino worked under a written employment agreement. Savino Decl. ¶ 12; Pablo Decl. ¶ 11.

### C. Pablo and Savino Received Only Limited Information

Pablo and Savino only had access to information from IFS about their own clients. Savino Decl. ¶ 2; Pablo Decl. ¶ 2. Even for Pablo and Savino's own clients, IFS did not provide them with the prices IFS paid to obtain the products IFS resold, instead using an opaque profit formula that considered supposed office and other internal costs. Arroyo Decl. ¶ 7; Savino Decl. ¶ 8; Pablo Decl. ¶ 8; Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 55:18-24, 73:6-75:10, 104:7-105:1, 107:12-14.

IFS set minimum prices at which salespeople like Pablo and Savino could charge customers for given items without authorization, but this was not the actual break-even point for IFS. Arroyo Decl. ¶ 7; Savino Decl. ¶ 8; Pablo Decl. ¶ 8; Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 107:12-14. Pablo and Savino

could ask IFS management for special permission to sell an item below that minimum price. Savino Decl. ¶ 8; Pablo Decl. ¶ 8. However, even when Pablo and Savino would seek such permission to sell a product below the minimum price, IFS management would not tell them what IFS' actual costs were for the product or what IFS' break-even point would be for the product. Id; Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 73:6-75:10. Neither Savino nor Pablo had access to what price IFS paid a manufacturer for an item or even what IFS paid for freight. Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 55:18-24.

Any information that Savino or Pablo had access to was further made worthless because IFS had no set formula or practice for setting any internal cost numbers provided to salespeople. Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 73:6-75:10, 104:7-105:1, 107:12-14. As IFS executive and supervisor of Savino and Pablo Morales, Jeremy Shapiro testified, about how IFS set its "office cost" for a given product, "There is no structure to it. There is no formula;" and later, "There is a variety of factors. Again. There is no structure to it." Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 104:7-105:1, also 15:12-17 (that he was their supervisor).

As Jeremy Shapiro of IFS testified at deposition, even when he would orally provide Savino or Pablo IFS' "lowest net cost" for a product, the "lowest net cost" figure that he would provide was not the amount that IFS paid to obtain the product. Rather, "lowest net cost" would include multiple costs. Mr. Shapiro did not inform Savino or Pablo of any costs that were included in the "lowest net cost," and IFS did not even employ a consistent method to determine IFS' "lowest net cost" of an item, anyway. Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 73:6-75:10.

Especially recently, the prices for the items that IFS sold has changed often. Savino Decl. ¶ 9; Pablo Decl. ¶ 9. Even if Savino and Pablo knew IFS's prior pricing information, that information would be outdated.  Id.

**D.  IFS' Customers, Vendors, and Suppliers Did not Have Confidentiality Agreements, and Frequently Share Information**

As Steven Arroyo, Savino and Pablo's long-time supervisor at IFS, wrote in his declaration in this case, "Throughout my tenure in the industry, the food service distribution industry has been very competitive, with customers generally able to select among many different distributors to supply their needs.  Those customers readily share information with salespeople looking to earn their business, frequently showing invoices with their purchases and prices from competitors.  IFS has 10 or more competitors that its customers can move their business to and buy the same products." Arroyo Decl. ¶ 3. Jeremy Shapiro of IFS testified that IFS has "many" competitors. Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 19:9-25.

IFS management acknowledges that IFS customers are free to purchase products from competitors of IFS. Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 29:3-5. IFS management further acknowledges that IFS has hired salespeople from competitors partially with the hope they would bring IFS clients from their former employer; such salespeople have in fact brought such customer to IFS. Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 39:15-40:1, 43:6-44:7.

**E.  How Savino, Pablo, and IFS Obtain Customers, and Savino and Pablo's Acknowledged Right to Compete Against IFS**

Pablo and Savino's process for finding customers for IFS did not involve any type of insider information. As is common in the industry, Pablo and Savino would use publicly available sources to identify and contact restaurants and food distributors. They would ask these potential customers about their current vendors, what difficulties they had with the vendors, and what prices they paid for items; Savino and Pablo would see if they could offer better terms. Savino Decl. ¶ 7; Pablo Decl. ¶ 7. It was commonplace for clients to use multiple vendors. Id. Jeremy Shapiro of IFS acknowledged at his deposition that he receives information on what

IFS competitors charge customers (such as copies of invoices of competitors). Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 20:8-13, 23:22-24:19.

In IFS executive Jeremy Shapiro's deposition testimony, he agreed that he believes that following their date of termination from IFS, Savino and Pablo "have a right to solicit" their IFS customers. Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 39:19:40:1. At Jeremy Shapiro's deposition, the following testimony was given:

> Q.  But would you agree that just knowing which -- who the customers were that someone serviced at IFS and would not be confidential?
> A.  It depends, but if there was a customer that a salesperson had serviced, knew where the location was and knew the person that was there, I would assume that they would know where to go and who to speak to.
> Q.  And to your knowledge IFS doesn't prohibit former employees from using that knowledge that you just spoke about?
> A.  IFS prohibits employees or anybody using confidential proprietary information of any type of IFS that are no longer employees. If someone knows, has a relationship or like knows a person that they used to work with while employed with IFS, we do not prohibit them from going and seeing that person.

Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 46:17-47:12.

**F.**   **Savino, Pablo, and Escamilla Start Legacy**

In late 2020, Pablo and Savino wanted to expand their book of clients into Arizona. Savino Decl. ¶ 13; Pablo Decl. ¶ 12. First, Pablo and Savino went to IFS management and told IFS management that they wished to expand their business into Arizona; IFS was not interested. Id.; Arroyo Decl. ¶ 12.

Since IFS was not interested in their servicing of customers in Arizona, and since Savino and Pablo were commission-based salesmen with no employment contracts, they decided to start a business reselling food industry-related items that would target the Arizona market. Savino and Pablo started Defendant Legacy Wholesale Group, LLC, an Arizona limited liability company, with their friend and

attorney who had relocated to the Phoenix, AZ, area, Defendant Sergio Escamilla. Savino Decl. ¶ 13; Pablo Decl. ¶ 13.

Defendants were careful not to take any clients or business opportunities from IFS. Savino Decl. ¶ 15; Pablo Decl. ¶ 16; Escamilla Decl. ¶ 7. They serviced newly developed customers in the separate Arizona market. Id. IFS benefited because Legacy purchased items from IFS at a profit to IFS and then resold the items to customers in Arizona that IFS had already said it was not interested in having them service directly. Savino Decl. ¶ 15; Pablo Decl. ¶¶ 14-16. IFS management told Pablo that Legacy was a good customer. Pablo Decl. ¶ 14.

At times, Legacy sold items to IFS customers in California that IFS either could not provide at all or could not provide at the price the customer demanded. Savino Decl. ¶ 14; Pablo Decl. ¶ 16. This was an infrequent occurrence.

The revenues that IFS received from Savino and Pablo's sales improved after Legacy was up and running. Savino Decl. ¶ 17; Pablo Decl. ¶ 18. Both had especially good performance in March 2022, their last month at IFS. Id.

### G. IFS Terminates Pablo and Savino, and Continues to Share Customer and Pricing Information with Them

On March 31, 2022, IFS terminated Pablo and Savino, who worked remotely. After their termination, Savino and Pablo did not copy or transfer files from any of their IFS computers, phones, or other devices. Savino Decl. ¶ 23; Pablo Decl. ¶ 22.

IFS emailed Savino and Pablo a letter on the morning of March 31, 2022, that stated that their "employment with Individual Foodservice Company is terminated, effective immediately" and demanded the immediate return of all of IFS's "confidential information." Savino Decl. ¶ 23 & Exh. B; Pablo Decl. ¶ 21 & Exh. E.

Those email attachments IFS sent to Savino and Pablo post-termination contained Savino and Pablo's most recent earnings statements. The earnings statements list IFS sales to the customers that they serviced during the most recent pay period, including what items were sold and what the customer paid. Savino

Decl. ¶ 23 & Exh. B; Pablo Decl. ¶ 21 & Exh. E. IFS did not indicate that the earnings statements were confidential or constituted trade secrets. Id.

On April 29, 2022, IFS again sent Savino and Pablo new sets of earnings statements that contained the same types of customer, pricing, and vendor information. Savino Decl. ¶ 25 & Exh. C; Pablo Decl. ¶ 23 & Exh. F. Once again, the documents were not marked confidential and were not redacted. Id.

Defendants filed the March 31 and April 29 earnings publicly. Only later, IFS belatedly claimed that the earnings statements were confidential.

On May 11, 2022, IFS filed an application to seal the earnings statements. ECF No. 48. On May 17, the Court denied IFS' application to seal. The Court held, "Plaintiff simply describes the contents of the purportedly confidential material without explaining how or why the secrecy of any particular piece of information gives Plaintiff a competitive advantage or would otherwise harm Plaintiff if available to the public.  In short, Plaintiff fails to persuade the Court that any of the purportedly confidential information qualifies as a trade secret." ECF No. 57 at p. 2.

### H.   Savino and Pablo Acted Diligently to Return their IFS Devices

After their termination, Savino and Pablo did not copy or transfer files from any of IFS' computers, phones, or other devices. Savino Decl. ¶ 27; Pablo Decl. ¶ 25. Pablo and Savino returned their IFS devices by April 7, 2022. Savino Decl. ¶ 26.

## III.   ARGUMENT ONE: IFS' TRADE SECRET CLAIMS FAIL

### A.   Elements of a Trade Secret Misappropriation Claim

The California Uniform Trade Secrets Act defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal.Civ.Code § 3426.1(d).

1   Trade secret "misappropriation" is "(1) Acquisition of a trade secret of
2   another by a person who knows or has reason to know that the trade secret was
3   acquired by improper means; or (2) Disclosure or use of a trade secret of another
4   without express or implied consent by a person who: (A) Used improper means to
5   acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew
6   or had reason to know that his or her knowledge of the trade secret was: (i) Derived
7   from or through a person who had utilized improper means to acquire it; (ii)
8   Acquired under circumstances giving rise to a duty to maintain its secrecy or limit
9   its use; or (iii) Derived from or through a person who owed a duty to the person
10  seeking relief to maintain its secrecy or limit its use; or (C) Before a material change
11  of his or her position, knew or had reason to know that it was a trade secret and that
12  knowledge of it had been acquired by accident or mistake." Cal.Civ.Code §
13  3426.1(b).

14      Courts "have analyzed [federal and California trade secret misappropriation]
15  claims together because the elements are substantially the similar." *InteliClear, LLC*
16  *v. ETC Global Holdings, Inc*., 978 F.3d 653, 657 (9th Cir. 2020).

17      **B.    IFS Has Insufficiently Articulated the Trade Secrets that**
18          **Defendants Allegedly Misappropriated**

19      IFS has insufficiently identified or articulated the trade secrets that
20  Defendants allegedly misappropriated. The Declaration of Jeremy Shapiro in
21  support of IFS' motion for a preliminary injunction identified ill-defined purported
22  trade secrets such as "product availability," "IFS' confidential personnel
23  information," and "employee performance and other analyses." Doc. no. 30, ¶ 3. It
24  is unclear what such information consists of or why any of it would qualify as a
25  trade secret. As the Court stated when denying IFS' application for a TRO, "IFS's
26  showing otherwise consists of conclusory, boilerplate averments regarding the
27  existence of trade secrets and Defendants' use of them." Doc. no. 22 at p. 3.

28

In its discovery responses, IFS' identification of the trade secrets it contends that Defendants misappropriated is overly vague and lacks the required specificity and precision. IFS' response is simply a long list of unduly broad categories such as "customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories, sales volume, product assortment , manufacturer's names for each item, and trends that could be used to promote greater sales."[1] Lesowitz Decl. Exh. L, Supplemental Response to Interrogatory No. 1.

In *Imax Corp. v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1164-67 (9th Cir. 1998), the Ninth Circuit affirmed the Northern District of California's granting of summary judgment against the plaintiff's trade secret misappropriation claims on the grounds that the plaintiff failed to identify the trade secrets at issue with sufficient precision. The Ninth Circuit held, Plaintiff "failed to indicate precisely which dimensions and tolerances were trade secrets. Under these facts, reasonable specificity could only be achieved by identifying the precise numerical dimensions and tolerances as trade secrets." *Id.* at 1167. The Ninth Circuit explained that the "plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist. The plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from

---

[1] The entirety of the substantive portion of IFS' response to the interrogatory asking IFS to identify "and describe in detail all IFS trade secrets YOU contend Defendants misappropriated" is the following: "internal communication of pricing and sales strategies; sales data reports detailing confidential customer data including customer name, customer contact or contacts, decisionmaker, decisionmaker's contact information, direct dial, cell phone, customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories, sales volume, product assortment , manufacturer's names for each item, and trends that could be used to promote greater sales ('Customer Lists'); prospective client contact information; presentation materials; confidential manufacturer communications specific to IFS, including inventory allocations, contracts between IFS and manufacturers and vendors, and special purchases unique to IFS; vendor contacts, vendor reliability, vendor quantities, product qualities, allocations, and other information ('Vendor Lists'); IFS' employee performance information; Private label brand manufacturers, products and training; IFS' financial information and data, and IFS' product catalogue, pricing schedules, and selling resources; and warehouse organization." Lesowitz Decl. Exh. L, Supplemental Response to Interrogatory No. 1.

1  matters of general knowledge in the trade or of special knowledge of those persons

2  skilled in the trade." *Id*. at 1164-65 (internal citations and quotation marks omitted).

3      In *IDX Systems Corp. v. Epic Systems Corp*., 285 F.3d 581, 583 (7th Cir.

4  2002), the Seventh Circuit affirmed the trial court's granting of summary judgment

5  of a trade secret claim. The Seventh Circuit found that the plaintiff failed to

6  "demonstrate that [the purported trade secret was] valuable, not known to others

7  who might profit by its use, and has been handled by means reasonably designed to

8  maintain secrecy….[The plaintiff] has been both too vague and too inclusive,

9  effectively asserting that all information in or about its software is a trade secret.

10  That's not plausible—and, more to the point, such a broad assertion does not match

11  up to the statutory definition." *Id.*

12      *See also Agricultural Labor Relations Bd. v. Richard A. Glass Co*., 175

13  Cal.App.3d 703, 715 (1985) (holding in the context of a discovery dispute,

14  "Glass/DMB failed to meet its burden proving either the existence of trade secrets or

15  how disclosure would injure its business….[Its manager's declaration] refers to only

16  one type of information that he considers a trade secret. This information consists of

17  the costs of Glass/DMB's processes and the price Glass/DMB charges for its

18  services. [He] contends if the competition knew Glass/DMB's costs it could

19  underbid Glass/DMB and attract Glass/DMB's customers. This statement is

20  conclusionary and unsupported by factual data.")

21      IFS' identification of its trade secrets is unduly vague and lacks the required

22  specificity and precision. Furth amplifying this problem, it is wholly unclear what

23  information Savino or Pablo could have that would constitute a trade secret.

24      As laid out in the Statement of Facts, Savino and Pablo had only limited

25  access to information as non-managerial salespeople. For example, Savino and

26  Pablo did not have access to the costs IFS paid to vendors for products. Savino Decl.

27  ¶¶ 2 & 8; Pablo Decl. ¶¶ 2 & 8; Arroyo Decl. ¶ 7. As IFS executive Jeremy Shapiro

28  testified, IFS never provided Savino or Pablo the actual prices that IFS paid to

purchase an item, and IFS never provided Savino or Pablo IFS' actual, broken-down costs for items. Lesowitz Decl. Exh. K (Shapiro transcript), pp. 55:18-24, 104:7-105:1, 107:12-14. IFS resells a large variety of commonly sold items to a wide variety of food sellers without any type of exclusive-dealings agreements or confidentiality agreements. IFS itself hires salespeople from competitors partly so that they will bring customers from their former employers. IFS presumably contends that its own practice does not constitute trade secret misappropriation.

### C. IFS Has not Established It Took Necessary Measures to Maintain the Secrecy of the Alleged Trade Secrets

#### 1. IFS Has Provided Only Conclusory Assertions

In IFS' papers for a motion for preliminary injunction, it provided only conclusory and inadequate evidence regarding the efforts it made to safeguard the secrecy of its purported trade secrets. See Paragraph 3 of Jeremy Shapiro's Declaration in Support of the Motion for Preliminary Injunction, ECF No. 30. IFS' interrogatory response regarding its measures to safeguard secrecy is also unduly conclusory and provides insufficient substantive evidence. Lesowitz Decl. Exh. L, Supplemental Response to Interrogatory No. 2.

#### 2. IFS Has Publicized the Alleged Trade Secrets

##### a. Earnings Statements

Ironically, most of the IFS information that Defendants possess is contained in their earnings statements. In the same email that IFS notified Savino and Pablo that they were terminated and demanded a return of all confidential information, IFS sent Savino and Pablo their most recent earnings statements. IFS did not claim that the earnings statements were confidential or secret. (Only roughly six weeks later their litigation attorneys made an unsuccessful attempt to have the documents filed under seal). The earnings statements list certain IFS customers that Savino and Pablo serviced that recently purchased items, lists items that those customers purchased, and lists the price that IFS charged the customers for those items. Savino

Decl. ¶¶ 22-23 & Exh. B; Pablo Decl. ¶¶ 21-22 & Exh. E. That information has been disclosed and cannot constitute a trade secret.

On April 29, 2022, IFS sent Savino and Pablo new sets of earnings statements that contain the same types of customer and pricing information. Savino Decl. ¶ 24 & Exh. C; Pablo Decl. ¶¶ 23 & Exh. F. Once again, IFS took no steps to redact information on the earnings statements or to mark them as confidential (until the belated unsuccessful attempt by IFS counsel to have the documents filed under seal). IFS cannot now credibly claim that this information is secret.

b. <u>Dart Competitive Pricing Agreement</u>

IFS has attempted to claim that its competitive pricing agreements with Dart Container Corporation are trade secrets. However, on April 25, 2022, IFS publicly filed in this case a copy of an IFS competitive pricing agreement with Dart that was in effect through February 28, 2022. ECF No. 30-5.

c. <u>IFS' Website and Other Sharing</u>

IFS lists its vendors and the specific products sold on its website. Savino Decl. ¶ 10. IFS' website currently contains listings of over 8,000 items it offers for sale along with descriptions and brand names for the vast majority of items. Escamilla Decl. ¶ 15. Before filing this lawsuit, IFS displayed a list of approximately 213 vendors and brands it did business with, on a page listed under "Vendors & Catalogs." Escamilla Decl. ¶ 19 & Exh. J.

Furthermore, IFS shared pricing and other supposedly confidential information without using non-disclosure agreements with its competitor, All American, as part of a joint bid process. Lesowitz Decl. Exh. K (Shapiro transcript) pp. 78:3-10, 156:20-157:7, 176:3-8.

3.   <u>IFS Did Not Require Confidentiality of Customers and Suppliers</u>

IFS did not require its customers or suppliers to enter into confidentiality agreements. Savino Decl. ¶ 37; Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 50:23-51:5. Defendants are free to simply ask potential customers what prices they

paid for IFS products or what prices they charged IFS for products. *See Amgen Inc. v. Health Care Services*, 47 Cal.App.5th 716, 735 (2020) (In finding that price increase notice was not a trade secret stated, "Amgen provided no evidence that the recipients of the price increase information, whether registered purchasers or purchasers contracting with pharmacy benefit managers, were under any contractual obligation to maintain its confidentiality, nor does Senate Bill No. 17 impose any confidentiality obligations."); *In re Providian Credit Card Cases*, 96 Cal.App.4th 292, 305 (2002) (telemarketer scripts cannot be trade secrets because by using the scripts on potential customers the content of the scripts are disclosed to the public).

In *Way.com, Inc. v.* Singh, 2018 WL 6704464, at *10 (N.D. Cal. Dec. 20, 2018), the court denied a preliminary injunction after it evaluated the evidence on the existence of a trade secret. The court concluded the customer list was " 'readily ascertainable through public sources,' namely Way's own website" listing customers ("partners"); that "contact information of partners' key decision makers is not likely difficult enough to obtain," and "Way's competitors would likely gain little by learning the businesses with whom Way partners because it is evident that all businesses with parking lots might choose to sell those spots through an online marketplace like Way." Furthermore, that "parking partners do not have to sign nondisclosure agreements" and were "free to share with others the fact of their partnership with Way along with the precise details of the agreement—from structure to price to number of spots" indicated that the plaintiff did not adequately protect the information as secret. *Id.* at *11.

As Pablo and Savino's long-time supervisor at IFS states in his declaration, "Throughout my tenure in the industry, the food service distribution industry has been very competitive, with customers generally able to select among many different distributors to supply their needs.  Those customers readily share information with salespeople looking to earn their business, frequently showing invoices with their purchases and prices from competitors." Arroyo Decl. ¶ 3.

### D.   IFS's Customer List and Pricing Information Lack Value

Partial summary judgment should also be granted due to the lack of evidence of the value of the alleged trade secrets from not being generally known.

#### 1.   IFS's Customer List

IFS resold a large variety of items that any foodservices company would need. Savino Decl. ¶ 5; Pablo Decl. ¶ 5. Virtually any company in the food services industry is a potential customer of either IFS or Legacy. Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 27:3-22. Additionally, many of IFS's customers purchase products from multiple sources, not just IFS, and the market is highly competitive. Savino Decl. ¶ 7; Pablo Decl. ¶ 7; Arroyo Decl. ¶¶ 3-7. IFS' customers are free to purchase products from competitors of IFS. Lesowitz Decl. Exh. K (Shapiro transcript) at pg. 29:3-5.

California law does not protect customer lists when it is easy to determine who the potential customers are for the product being sold. *Fortna v. Martin*, 158 Cal.App.2d 634, 639 (1958) ("The identity of Fortna's customers cannot be considered confidential…. [B]oth realtors and financial institutions are often in a position to give termite inspection firms leads to business or to give them business. Certainly any person engaged in the business would consider both banks and real estate companies as potential sources of business and contact them. The names and addresses of such firms are found in the yellow pages of any telephone directory. Their identity cannot be confidential.")

California law only potentially protects customer lists in the narrow circumstance where the plaintiff services a niche market within an industry and it is difficult and expensive to determine who the potential customers are within the larger industry; also, California law is unlikely to find that a customer list is a trade secret where customers use multiple vendors. *Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 1, 19 (1991) ("By itself, knowledge of the identities of the businesses which buy from a particular provider of goods or services is of no particular value to

that provider's competitors. However, that information is valuable to those competitors if it indicates to them a fact which they previously did not know: that those businesses use the goods or services which the competitors sell."); *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal.App.3d 1318, 1326 (1986) ("While the information sought to be protected here, that is lists of customers who operate manufacturing concerns and who need shipping supplies to ship their products to market, may not be generally known to the public, they certainly would be known or readily ascertainable to other persons in the shipping business. The compilation process in this case is neither sophisticated nor difficult nor particularly time consuming. The evidence presented shows that the shipping business is very competitive and that manufacturers will often deal with more than one company at a time. There is no evidence that all of appellant's competition comes from respondents' new employer.").

Jeremy Shapiro of IFS acknowledged that virtually any restaurant or food seller could be a customer of IFS. Lesowitz Decl. Exh. K (Shapiro transcript), pg. 27:3-22.

A court should grant summary judgment where, as here, the plaintiff fails to provide sufficient evidence that its customer list warrants trade secret protections. *E.g. ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714-15 (6th Cir. 2005) (affirming the granting of summary judgment of a misappropriation of trade secrets claim, stating, "As the district court found, ATC can point to no evidence that the identities of transmission parts customers contained on its customer list was obtained through great effort or expense, or that the names on the list were not discoverable from a telephone book or similar legitimate source. Even the name of the person at each transmission shop responsible for buying parts, to which ATC ascribes great importance, can be ascertained simply by calling each shop and asking.") (citing approvingly, and basing its holding in part on, *Morlife v. Perry,* 66 Cal.Rptr.2d at 735).

1     IFS executive Jeremy Shapiro acknowledged at his deposition that which

2 customers an IFS salesperson serviced is not confidential, that he believes Savino

3 and Pablo Morales, post-employment with IFS, are free to solicit business from the

4 IFS customers that they previous serviced, and that no IFS policy prohibits

5 salespeople post-employment from contacting the clients they serviced while at IFS.

6 Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 39:19-40:1, 46:17-47:12.

7                    2.     Pricing and Vendor Information

8     The prices of the products IFS offer for sale change rapidly. Pricing

9 information quickly becomes stale. Pablo Decl. ¶ 9; Savino Decl. ¶ 9. IFS publicly

10 filed in this case a competitive price agreement from Dart Container Corporation

11 that had expired less than two months earlier. ECF No. 30-5.

12    There is nothing indicating that IFS uses any special or unique methods to

13 determine its pricing (in fact, Jeremy Shapiro's testimony indicates that pricing was

14 set in an arbitrary and inconsistent manner), and even if it did, Savino and Pablo

15 were never privy to that information. *Fortna v. Martin*, 158 Cal.App.2d 634, 640

16 (1958) ("Fortna also claimed that his methods of pricing and bidding were secret.

17 The evidence does not show that Fortna devised any secret or improved method of

18 making estimates or computing costs. At most, the evidence discloses that Fortna

19 utilized a system which considered his costs, but any successful business man must

20 do the same.")

21    Additionally, it is unclear why IFS has a trade secret interest in what other

22 vendors charge it. Even if Defendants knew the actual, final prices vendors charged

23 IFS for products (they did not and do not know), that does not mean that the vendors

24 would charge Defendants those prices. Joe DeBilio, IFS' purported expert for its

25 motion for a preliminary injunction wrote that vendors charge preferential prices to

26 larger customers like IFS. Doc. no. 33, ¶ 8.

27    Furthermore, the identity of IFS' vendors and the suppliers of its products are

28 not valuable trade secrets. IFS provided a large variety of goods typically sold to

1   food businesses from well-known sources; IFS did not have exclusive dealings

2   contracts with its vendors; IFS identified most of its vendors on its website, and IFS

3   did not require vendors or customers to sign confidentiality agreements. IFS has

4   prominently listed the vendors it does business with in the past and currently lists

5   over 8,000 items it has for sale along with descriptions and brand names for the vast

6   majority of items. Escamilla Decl. ¶¶ 15-20 & Exhs. G-K.

7       Where, as here, there is a lack of evidence that the identity of the vendors or

8   the prices charged by the vendors constitute trade secrets, the Court should grant

9   summary judgment. In *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d

10  1279 (11th Cir. 2018), the Eleventh Circuit affirmed the granting of summary

11  judgment against the plaintiff's misappropriation of trade secrets claims. The court

12  affirmed the findings that (a) the identity of the plaintiff's suppliers of materials and

13  components for its boats were not trade secrets and (b) that "the prices Yellowfin

14  negotiated with its suppliers were also not trade secrets." *Id.* at 1297-99. As to the

15  identity of the suppliers, "the identities of Yellowfin's suppliers are typically well

16  known," and the defendant conceded that they are not secret in deposition. *Id.* at

17  1298. As for why pricing information was not a trade secret, three reasons were

18  provided, (1) "the negotiated prices were based on the volume of [the plaintiff's]

19  boat production," (2) "discounts were based in part on the relationships it cultivated

20  with its vendors," and (3) one of the defendants "learned [the plaintiff's] production

21  costs in the ordinary course of working at [the plaintiff]." *Id.*

22          3.    Dart Competitive Pricing Agreement

23      IFS has unpersuasively attempted to claim that its competitive pricing

24  agreements with Dart Container Corporation are trade secrets. However, IFS filed a

25  copy of one such competitive pricing agreement publicly in this case. ECF No. 30-5.

26      Furthermore, even absent the public disclosure, the Dart competitive pricing

27  agreements do not contain information that could be deemed a trade secret. The

28  competitive pricing agreements do not contain the entirety of the pricing agreements

between Dart and IFS and do not indicate the final compensation that passes between Dart and IFS. IFS has a separate rebate agreement with Dart in which IFS receives certain rebates for the items sold; Savino and Pablo have never had copies of these rebate agreements. Lesowitz Decl. Exh. K(Shapiro transcript), pp. 84:7-85:10, 86:11-13, 88:2-89:11; Savino Decl. ¶ 19; Pablo Decl. ¶ 20.

Regardless, this is a red herring as Legacy has never purchased items from Dart. Savino Decl. ¶ 19; Pablo Decl. ¶ 20; Escamilla Decl. ¶ 8. Furthermore, Dart would not simply automatically provide Legacy the same prices it charged IFS, especially prices that were charged in months past during a time of high inflation.

### E. There Is no Evidence Defendants Used Any Alleged Trade Secrets or that Any Usage Damaged IFS

Even if Defendants can show that some information Defendants obtained from IFS constituted a trade secret (we argue that IFS cannot), IFS lacks evidence that Defendants either used such information or that such usage damaged IFS. Defendants state in their declarations that they have not used IFS information to obtain business for Legacy or in a manner that would harm IFS. Savino Decl.  ¶¶ 19, 24; Pablo Decl. ¶¶ 20, 22; Escamilla Decl. ¶ 8. Furthermore, post-termination from IFS, they have not used the documents that they still possess with IFS information for any business-related purpose. Id.

### F. California Has a Strong Policy in Favor of Free Competition Against a Former Employer

California has a "settled public policy in favor of open competition." *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945 (2008).

Unlike other jurisdictions, California rejects the "doctrine of inevitable disclosure" under which "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Whyte v. Schlage Lock Co*., 101 Cal.App.4th 1443, 1458-59 (2002). "[T]he doctrine of inevitable disclosure creates a

1  de facto covenant not to compete and runs counter to the strong public policy in

2  California favoring employee mobility." *Id.* at 1462 (internal citations omitted).

3       In, *Dowell v. Biosense Webster, Inc.*, 179 Cal.App.4th 564, 575 (2009), the

4  Court of Appeal cautioned against the use of trade secret law to prohibit people from

5  competing against their former employers. *Dowell* even doubted whether post-

6  *Edwards* trade secret law could ever justify barring an employee from competing

7  against his or her former employer (a position it noted is not universal). *Id.* at 577.

8  In *Dowell*, the court held that, even if trade secret law could theoretically be used to

9  prohibit competition against a former employer, the agreement at issue was invalid

10  when it prohibited the former employee from using "the names of customers,

11  customer preferences, needs, requirements, purchasing histories or other customer-

12  specific information" learned during employment was invalid. *Id.* at 578 The court

13  noted that, "Given such an inclusive and broad list of confidential information, it

14  seems nearly impossible that employees like Dowell and Chapman, who worked

15  directly with customers, would not have possession of such information." *Id*. This is

16  the type of information upon which IFS is trying to base its trade secret claims.

17      **G.**   **The Court Should at Least Grant Partial Summary Judgment to**

18           **Plaintiff's Request for an Injunction related to Trade Secrets**

19       Even if the Court were to find that there are triable issues of fact as to whether

20  Defendants previously misappropriated IFS' trade secrets, the Court should still

21  grant summary judgment as to IFS' request for injunctive relief related to future

22  trade secret misappropriation. See Paragraphs 47, 50, 57, and 61 of the First

23  Amended Complaint and Paragraph 1 of Plaintiff's Prayer for Relief. Fed. R. Civ. P.

24  56(a) ("A party may move for summary judgment, identifying each claim or

25  defense--or the part of each claim or defense--on which summary judgment is

26  sought.")

27       Following Pablo and Savino's termination from IFS, the only IFS information

28  they still have is old and stale. There is no chance of future acts of misappropriation.

*See Munns v. Kerry*, 782 F.3d 402, 411-12 (9th Cir. 2015) ("Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a real or immediate threat that he will again be wronged in a similar way. Despite being harmed in the past, the family members must still show that the threat of injury in the future is certainly impending or that it presents a substantial risk of recurrence for the court to hear their claim for prospective relief.") (internal citations and quotation markings omitted).

Furthermore, IFS fails to show that it would suffer irreparable injury if an injunction is not granted and fails to show that the balance of harms weighs in its favor. Once again, there is doubt under California law whether an employer can ever resort to trade secret law to prevent a former employee from being able to compete against it. *Dowell*, 179 Cal.App.4th at 575-78. In contrast, the threat of injunctive relief acts as a real detriment to Savino and Pablo, scaring businesses from working with them.

## IV.   ARGUMENT TWO: IFS' CLAIMS FOR CONVERSION AND UNFAIR COMPETITION FAIL FOR REASONS INCLUDING PREEMPTION

### A.   IFS' Unfair Competition Claim

Here, IFS' cause of action for unfair competition under California Business and Professions Code section 17200 et seq., seems to be predicated solely on Defendants' alleged misappropriation of trade secrets.

Even if the Court were to find that IFS has provided sufficient evidence of trade secret misappropriation (the Court should not do so), the Court should still grant summary judgment as to IFS' Unfair Competition cause of action. This is because the unfair competition cause of action would still be preempted by the California Unfair Trade Secrets Act. "A claim for common law or even statutory unfair competition may be preempted under CC [ ] § 3426.7 if it relies on the same facts as the misappropriation claim…. [T]rade secret protection is itself but a branch

1  of unfair competition law." *K.C. Multimedia, Inc. v. Bank of America Technology &*
2  *Operations, Inc*., 171 Cal.App.4th 939, 961 (2009).

3      IFS might argue that its UCL claim may be premised on Defendants' alleged
4  breaches of duty of loyalty by allegedly having Legacy take opportunities to sell
5  items to customers from IFS and instead having Legacy make such sales. However,
6  that argument would fail. IFS no longer employs any of the Defendants, having fired
7  Savino and Pablo Morales at the end of March 2022. Therefore, there is no
8  possibility of breaches of duty of loyalty occurring in the future that could justify
9  injunctive relief. "In order to grant injunctive relief under the UCL, there must be a
10 threat that the wrongful conduct will continue." *Davis v. Farmers Ins. Exchange*,
11 245 Cal.App.4th 1302, 1326-27 (2016) (internal quotation marking omitted).

12     Furthermore, IFS would not be eligible to seek the only monetary remedy that
13 can possibly be available under the UCL: restitution. "Prevailing plaintiffs [under
14 the UCL] are generally limited to injunctive relief and restitution. Plaintiffs may not
15 receive damages ... or attorney fees." *Zhang v. Superior Court*, 57 Cal.4th 364, 371
16 (2013) (internal quotation marking omitted) (citation omitted). "A restitution order
17 against a defendant thus requires both that money or property have been lost by a
18 plaintiff, on the one hand, and that it have been acquired by a defendant, on the
19 other. Compensatory damages are not recoverable as restitution." *Id*. (internal
20 citations and quotation marks omitted). "[C]ompensation for a lost business
21 opportunity is a measure of damages and not restitution to the alleged victims. *Lee v.*
22 *Luxottica Retail North America, Inc*., 65 Cal.App.5th 793, 802-03 (2021).

23     **B.     IFS' Conversion Claim**

24     To the degree that IFS' conversion cause of action focusses on Defendants
25 wrongfully obtaining, using, or disclosing IFS' trade secrets, the claim fails for three
26 separate sets of reasons: (1) there was no trade secret misappropriation, (2) the
27 conversion claim is preempted by the California Uniform Trade Secret Act, and (3)
28 any alleged conversion did not involve sufficiently tangible property.

"[I]t appears that the action of trover or conversion lies only for the wrongful appropriation of goods, chattels or personal property which is specific enough to be identified, and not to such indefinite, intangible and uncertain property rights as the mere goodwill of a business, or trade secrets." *Fremont Indemnity Co. v. Fremont General Corp.*, 148 Cal.App.4th 97, 123 (2007).

"[W]hen the property and the alleged trade secret are distinguishable, and the property's value is not tied to the trade secret, CUTSA does not preempt the conversion claim; when they are indistinguishable, and the property's only source of value is the trade secret information, CUTSA preempts." *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F.Supp.3d 1127, 1159 (E.D. Cal. 2017).

IFS' Complaint was filed on March 31, 2022, the same day IFS fired Savino and Pablo Morales. IFS included allegations that Savino and Pablo failed to return their IFS devices and funds. However, it is undisputed that by April 7, 2022, Savino and Pablo had returned their IFS devices and all cash that belonged to IFS. Defendants' counsel quickly acted to return the items to Plaintiff. Johnson Decl. Considering that Savino and Pablo worked remotely, quickly hired counsel to return the property, and the property was returned within seven days of termination, there is no basis for liability of conversion due to IFS being deprived of the value and use of the devices.

Furthermore, after Defendants returned the devices to IFS, IFS proceeded to lose them (along with the favorable evidence for Defendants that the devices contained). As IFS acknowledged in its unsuccessful application to continue the briefing dates for the motion for a preliminary injunction, IFS' forensic consultant shipped the devices to yet another consultant via UPS. However, "the Devices have not been delivered and were lost within UPS' system. No analysis has been undertaken." Doc. no. 23, p. 2 (internal citation omitted). Counsel for IFS recently confirmed that all the devices are still lost. Undisputed Fact 25. Therefore, IFS

1    cannot blame Defendants for being deprived of the use of the devices, as IFS

2    quickly proceeded to lose them after their return.

3    **V. <u>CONCLUSION</u>**

4         The Court should grant summary judgment against IFS' claims for trade

5    secret misappropriation, conversion, and unfair competition and dismiss them with

6    prejudice.

7         Respectfully submitted.

8    Dated: October 3, 2022          <u>/s/ *Scott Lesowitz*</u>
                                     Attorney and Partner
9                                    For Lesowitz Gebelin LLP, Counsel for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28