**LESOWITZ GEBELIN LLP**
Scott M. Lesowitz (SBN 261759)
scott@lawbylg.com
Steven T. Gebelin (SBN 261507)
steven@lawbylg.com
8383 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90211
Telephone: (310) 341-3072; Facsimile: (310) 341-3070

**JOHNSON & RAWI PC**
Jeffery W. Johnson (SBN 133467)
jjohnson@johnsonrawi.com
99 South Lake Avenue, Suite 208, Pasadena, California 91101
Telephone: (626) 585-5663; Facsimile: (626) 239-3630

*Attorneys for Defendants* Pablo Morales, Savino Morales, Sergio Escamilla, and Legacy Wholesale Group, LLC

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

PERRIN BERNARD SUPOWITZ, LLC, dba INDIVIDUAL FOODSERVICE,

Plaintiff,

V.

PABLO MORALES, LEGACY WHOLESALE GROUP, LLC, SAVINO MORALES, SERGIO ESCAMILLA, and DOES 1 through 20, inclusive,

Defendants.

Case No. 2:22-cv-02120 ODW(JEMx)
[Assigned to the *Honorable Otis D. Wright, II*]

**DECLARATION OF SAVINO MORALES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)

**Savino Morales Decl. ISO Defendants' Motion for Summary Judgment**

**DECLARATION OF SAVINO MORALES**

I, Savino Morales, declare as follows:

1. I am an adult over 21 years of age, a defendant in this action, and I make this declaration in support of Defendants' Motion for Summary Judgment against Plaintiff Perrin Bernard Supowitz, LLC dba Individual Foodservice ("IFS"). I make this Declaration of my own personal knowledge, and if called upon to do so, I could and would testify as to the matter set forth herein.

2. After my termination on March 31, 2022, from IFS, I performed what I believe is a reasonably diligent search and inquiry for any possible documents that I may have containing IFS information (such as information regarding IFS' customers, sales, pricing, revenues, margins, vendors, item-availability, employees, business, transactions, etc.) As part of this search, I performed what I believe is a reasonably diligent search of all devices (including phones and computers), email accounts, and text messages, that are in my possession, custody, or control that I believe might contain documents with IFS information, including all devices, email accounts, and text messaging services that are in my possession, custody, or control that I used to conduct IFS or Legacy-related business. After doing this, I have determined that I do not currently possess, have access to, or have knowledge of any of the following: (a) the prices IFS pays to obtain items, (b) the current prices IFS sells items to its customers (other than information appearing on my earnings statements detailing my pay, the most recent of which IFS provided me after IFS terminated me), (c) a complete list of IFS's customers, (d) the items that IFS is selling to any customers (other than information appearing on my earnings statements detailing my pay, the most recent of which IFS provided me after they terminated me), (e) any formulas or calculations IFS may use to set the prices at which its sales people can sell items, (f) IFS's profit margins, or (g) IFS business or marketing plans, or research. I note that while working for IFS, I did not have access to internal information about IFS customers that I did not work with. I did not have

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)
1
**Savino Morales Decl. ISO Defendants' Motion for Summary Judgment**

access to, and do not have access to, the identity of all of IFS's customers (although the identity of many IFS customers can be obtained through publicly available sources). To the best of my recollection, besides the password to access my work cellphone or work computer generally, I never had, used, or needed any passwords to access any IFS files or systems.

3. I had been a salesperson working for IFS and various prior affiliated or predecessor businesses that were subsequently bought and sold during my tenure as a salesperson since February 1997. My compensation was commission-based. I never held any type of executive or management position with IFS.

4. When I started working for IFS, I was required to create my own book of business by finding potential new clients in the food service industry. Such clients included both "end-user" clients that used IFS products to provide and serve food (*e.g.*, restaurants) and "distributor" clients that would act as middle-men between IFS and "end-users" making food sales. At the time, my brother Pablo Morales had already been working as a salesperson for IFS for almost two years, and he provided some mentorship to me in finding and developing clients. While working for IFS, I do not recall IFS ever reassigning one of my clients to a different salesman without my agreement. Due to my compensation structure, I would not have tolerated working for IFS if customers that I developed were re-assigned without my permission.

5. During my time working with IFS, in my experience (and certainly with customers that I worked with) IFS sold a wide-variety of food-service related products to customers that virtually any restaurant, market, or food seller would need to purchase, such as bulk food and beverage products (rice, grains, cereals, flour, coffee, soft drinks, oil, sugar, spices, and so on), food packaging, plates, soap dispensers, cookware, food service clothing (such as gloves, aprons, masks, and hair nets), utensils, forks, bags, napkins, test strips, ladders, safety and first aid equipment, lids, carts, platters, freezers, janitorial products, and more. During my

time working with IFS, IFS sold products to both end-users such as restaurants and markets as well as wholesalers who in turn serviced the end-users. Virtually any restaurant, market, or food seller would be a potential customer of IFS or one of IFS's competitors. Similarly, any wholesaler of those types of items to restaurants, markets, and food sellers would be a potential customer of IFS or one of IFS's competitors. In my personal experience, many IFS customers purchased items from IFS as well as competitors of IFS.

6. Over the years, my brother Pablo Morales and I have both been very successful for developing clients for IFS. Part of our success derived from IFS having told us long ago that it would not take or reassign our clients, allowing us to put our own time and effort into maintaining the relationships with clients. In March 2022, IFS paid for me and my wife and Pablo and his wife to attend a conference in Cabo San Lucas, Mexico to receive an award in recognition of our outstanding sales.

7. The process of finding clients for IFS is no secret and one that I understand to be widely known in the industry and likely the same as many other sales positions in various industries. Using publicly available sources, I would seek out restaurants and distributors and ask them about their current vendors for food and food service packaging items that IFS carried, difficulties that they had with the vendors, the prices that they paid for items, and see if IFS could resolve those issues by providing better service at the same or lower prices than the current vendor. It was commonplace for clients to use multiple vendors across their various needs to run their businesses, so they would often provide me and other salespeople information about the pricing of competitors to secure the best fit for their business. Based on my background and fluency in Spanish, and the products distributed by IFS (which are publicly disclosed on its website), this included many Mexican and Latin American restaurants and similar food service companies in Central and Southern California.

8. As a salesperson, I did not have access to, or knowledge of, the "true cost" paid by IFS for any of the products sold or the formula or methods IFS would use to calculate the prices that clients could be charged by salespeople to customers. I did not know what IFS' actual profit margins were (and still do not know). IFS set minimum prices at which salespeople like me could charge customers for given items. I could ask IFS management (such as Jeremy Shapiro) for special permission to sell an item below that minimum price IFS set for the salespeople. However, even when I would seek permission to sell a product below that minimum price IFS set for the salespeople, IFS management (such as Jeremy Shapiro) would not tell me what IFS' actual costs were for the product or what IFS' actual profit margins were or what IFS' break-even point would be for the product. Instead, IFS management would simply say whether I had permission to sell the product below the minimum sale-price IFS had set for the salespeople, and if so, at what price I could sell the product. I would still not know how much actual profit IFS would make on the sale or what IFS' actual costs were for the product.

9. In the industry, and especially over the last two years of COVID-19 related disruptions in the supply chain and rapid changes in market-price of supplies and commodities, pricing for items sold by IFS have been changing rapidly. Even if I knew some information about IFS's pricing of a certain item previously, that information is likely already outdated.

10. IFS heavily promotes the identities of its suppliers and vendors, prominently listing many on its public facing website and on promotional materials provided to clients, such as its annual calendar. IFS's website lists specific products it has available for sale, including brand names. The suppliers and manufactures are readily known to those working in the industry and to the clients. Those clients may then, and often do, turn around and ask competitors to match or beat pricing for the same or similar products. In my experience and understanding, when IFS would label an item sold through a private label, IFS would not have an exclusive deal with

the manufacturer and any other company could buy the same product from the manufacturer.

11. I know from working at IFS that IFS bought and sold products from companies that IFS competes against, including Restaurant Depot.

12. I did not have a written employment agreement in effect heading into March 2022. During the height of the COVID-19 pandemic in 2020, a private equity group purchased IFS (I do not know the structure or nature of the transaction), and I refused to sign an employment agreement proposed to me.

13. In or about late 2020, my brother Pablo and I had the idea to expand our books of clients outside of Southern and Central California to cover businesses in Arizona. I brought the idea of expanding our books to serve more businesses in Arizona to new IFS management at the time, Jeremy Shapiro and Ken Sweder. They told me that IFS was not interested in such an expansion. Prior to that, we had asked our former VP of Sales, Steven Arroyo.

14. Still interested in the Arizona market, by early 2021 my brother Pablo and I agreed to start a foodservice distribution business based in Phoenix, AZ, with Sergio Escamilla, an attorney who was our friend and had relocated to the area from Los Angeles many years prior. This business was formed as Legacy Wholesale Group, LLC ("Legacy") in March of 2021 but did not start sales until August 2021. We started developing Legacy's business on our own time and without the use of information or money from IFS. In fact, my understanding is that IFS only had minimal operations in Arizona through a sister company, Brady. I do not have and have not received from IFS any of Brady's sales information for its Arizona territory or customers.

15. We also were careful not to take any business opportunities for Legacy that IFS would have done. Legacy would sell products to IFS customers when IFS did not sell the type of item or IFS would not meet the customer's price demand. Of the more than a hundred clients in our books at IFS, only around 17 also did

business with Legacy. For example, a frequent issue was that IFS would not bring in certain Styrofoam items due to their bulk and low margins. Customers wanted the products in bulk, especially our distributor accounts. Legacy was offering those products and filled the gap. I assume that this gap-filling preserved clients for IFS, rather than them moving to a competitor that would sell both the items IFS was providing and those others IFS would not provide. Similarly, there were other times that IFS customers would only purchase an item at a certain price; in those situations, we first tried to run the opportunity through IFS, and if wasn't approved or could not be offered, then we would see if Legacy could do the business. Our goal was to service our accounts and provide the opportunity to IFS; if IFS refused to sell at that price, and Legacy could meet the price, then Legacy would do the business. Jeremy Shapiro referenced in prior declarations that IFS could have made certain sales that Legacy made. While IFS might have theoretically been able to make certain sales, IFS had a practice of at times not being willing to allocate items it had in stock for a customer that I serviced.

16. Furthermore, during the short time that Legacy has been in operations, my client base at IFS continued to grow and prosper in the same way that it always had. As a salesman compensated via commissions, it was the practice that I had a flexible schedule, flexible hours, and IFS did not concern itself with how many hours I worked or when I performed my work. Additionally, I do not recall receiving special compensation for originating business (bringing in an account) for IFS. What was important for my compensation, success, and value to IFS was the revenues and especially profits from my IFS sales, not the total amount of items that I sold. IFS has previously referred to "case sales." "Case sales" is an irrelevant statistic. What matters for IFS and for salespeople like me and Pablo were the revenues and (especially) profits generated from sales, not the number of items sold. I do not recall "case sales" being used as a measure for my performance or my compensation.

17. I looked at commission and pay documents IFS provided me to determine my monthly gross sales and commissions from January 2021 through March 2022. My totals were as follows (and as can be seen, my best month both in terms of gross sales and net commission is March 2022):

January 2021: $1,834,936.38 gross sales, $43,066.48 net commissions

February 2021: $1,996,876.61 gross sales, $45,870.25 net commissions

March 2021: $2,321,844.62 gross sales, $48,557.22 net commissions

April 2021: $ 2,425,624.60 gross sales, $52,354.20 net commissions

May 2021: $ 2,323,900.15 gross sales, $ 48,944.82 net commissions

June 2021: $ 2,377,513.73 gross sales, $52,357.40 net commissions

July 2021: $2,275,083.44 gross sales, $46,851.35 net commissions

August 2021: $2,251,555.99 gross sales, $47,960.04 net commissions

September 2021: $2,321,504.64 gross sales, $50,304.46 net commissions

October 2021: $2,195,949.86 gross sales, $46,520.68 net commissions

November 2021: $2,392,682.36 gross sales, $50,985.89 net commissions

December 2021: $2,446,834.54 gross sales, $52,198.45 net commissions

January 2022: $2,074,518.80  gross sales, $41,741.93 net commissions

February 2022: $2,125,357.60  gross sales, $44,454.63  net commissions

March 2022: $2,585,695.87 gross sales, $58,886.47 net commissions.

18. Legacy has sold products to, or has estimates to sell products for, 75 customers. Only approximately 17 of those 75 customers are customers that anyone working with Legacy sold products to previously through IFS. (Seven of those customers were serviced by me, and nine by Pablo.) We knew of these customers because we personally worked with them.

19. At no point have I used any confidential IFS information to benefit Legacy and take away an opportunity from IFS. Nor have I provided any confidential IFS information to Legacy to help it compete against IFS. IFS showed me various documents that I emailed my wife, Cynthia Morales, while I

was employed at IFS, such as documents with certain sales and pricing information and spreadsheets (though nothing containing the actual costs or actual profit margins of IFS) that I sent her Cynthia to print for me at home for my work at IFS. I did not use such documents I emailed to Cynthia to further Legacy business or in a manner that would have harmed IFS. I did not use any documents that I emailed Cynthia that contained IFS information after IFS terminated my employment. To the extent I even saw those documents post-termination was for litigation purposes (such as being shown them at deposition or in communications with counsel). I did not use any of the documents for any business purpose. I am unaware of Pablo Morales or Sergio Escamilla or anyone else at Legacy using any of those documents or the information on those documents for any business purpose. To my knowledge, Legacy has never done any business and has never purchased any items from Dart Container Corporation, and to my knowledge I have never had a copy of a rebate agreement between IFS and Dart. Note that I spoke to people from Amapola Markets about the possibility of doing business with Legacy, but nothing came of it, and Legacy has never done business with Amapola Markets, and I anticipate Legacy will not do business with Amapola Markets in the future.

20. On March 29, 2022, I traveled to the IFS offices for what I understood to be a meeting to ensure that my clients and accounts would be appropriately serviced during an upcoming vacation. Instead, I was ambushed with allegations that I had been stealing from IFS (through Legacy) and told that I had to sign a confidential agreement to stay with IFS for 3 years and to stop working with Legacy or I would face criminal prosecution and an expensive lawsuit that would lead to the depositions of all of my family, the wasting of all of my assets, and completely stopping me from working and earning a living. At the time, I felt that I had no alternative to signing the agreement, even though I was not able to review it carefully or allowed to present it to an attorney as it was "confidential". As such, and despite the false statements in the agreement, I broke down and signed out of

fear of what IFS threatened it would do if I did not sign. Shortly after the ambush meeting, I sent an email to Jeremy and Nigel revoking my agreement to the abusive and unfair agreement, making clear that I had not actually provided Legacy with any confidential information from IFS. Attached hereto as **Exhibit A** is a true and correct copy of my email message from March 29, 2022. I also went into the office and told IFS executives Jeremy Shapiro, Ken Sweder, and Nigel Kershaw that I revoked the agreement because I felt coerced and threatened. I also tried to discuss with them working out an amicable solution.

21. I am aware that IFS attached the "Confidential" agreement that I signed to Mr. Kershaw's declaration with IFS's application for a temporary restraining order. IFS did not submit the "Confidential" agreement with their motion for a preliminary injunction. If IFS attempts to use the contents of the "Confidential" agreement against me again, I reassert the denials I made regarding the contents of the "Confidential" agreement that I stated in my declaration in support of Defendants' opposition to the application for a temporary restraining order. (See Paragraph 19 thereto.)

22. I note that the March 29, 2022, "Confidential" agreement states in Paragraph 3.2, "The negotiations and terms of this Agreement are to remain confidential as mediation privileged under Evidence Code section 1119, except as may be necessary to enforce the Agreement."

23. After I told IFS that I stood by my rescission of the contract that IFS drafted and had me sign under duress, IFS turned off both my email access and cell phone service and officially terminated me two days later on March 31, 2022. IFS emailed me an email attachment at 7:48 a.m. on March 31, 2022, notifying me that my "employment with Individual Foodservice Company is terminated, effective immediately." The email attachment also included an Earnings Statement. A true and correct copy of this March 31, 2022, email attachment (with a document regarding unemployment insurance removed for brevity sake) from Zoyla Rice from

IFS to me (via my personal email account) is attached hereto as **Exhibit B**. IFS and Ms. Rice and did not indicate that this Earnings Statement was confidential or contained trade secrets when they sent it to me.

24. The March 31, 2022, email demanded on the first page of the attachment that I "immediately return all of IFS' property, including any….confidential information." However, that very same email attachment then included the Earnings Statement included in Exhibit B, and it was sent to me via Federal Express the next day as well. IFS did not mark the Earnings Statement as confidential. The Earnings Statement, like other Earning Statements sent to me throughout my tenure at IFS, breaks down certain IFS sales to the customers that I serviced during the relevant period for calculating my commissions. The document lists certain items IFS sold to the customers during the covered period and what the customer paid. I do not believe that I have any information about IFS sales other than what is contained on the Earnings Statements that have been provided to me. I need the Earnings Statements for tax and personal accounting reasons. Also, I need the Earnings Statements because I am consulting with attorneys regarding likely violations by IFS regarding employment law, reimbursements, and calculation of my commissions. Please note that I did not use and have not used the Earnings Statements for servicing customers or soliciting business, and I do not think that the Earnings Statements would be useful for either purpose going forward.

25. On or about April 29, 2022, IFS sent to me via Federal Express a new Earnings Statement with my March 2022 commissions check and once again did not indicate that the contents were confidential. Attached as **Exhibit C** is a true and correct copy of documents that I received from IFS on or about April 29, 2022, via Federal Express. This Earnings Statement had very similar types of information regarding customers, sales, and prices as the Earnings Statement IFS provided me on March 31, 2022.

26. Pablo and I both worked remotely and did not keep our computers in

the office. We were not in an IFS office when we were terminated immediately. Pablo Morales, Sergio Escamilla, and I quickly sought counsel in order to assist Pablo and me in making the appropriate arrangements to return my IFS laptop and cell phone and Pablo's IFS laptop, as well as a small amount of money that Pablo had collected for IFS from one of his clients.  Shortly after hiring counsel, we handed the devices and money over to counsel to be transferred back as soon as possible to IFS as directed by its attorneys. The devices and money were returned to IFS by on or about April 7, 2022.

27. When IFS terminated me, I did not copy or transfer any files from my IFS computer, IFS cell phone, or any other IFS device. To my knowledge, nobody made any such copies. While working for IFS, I did not copy or transfer (or have someone else copy or transfer) any IFS files from any IFS device (*e.g.*, a laptop or cell phone) with the intention to use them for Legacy.

28. Prior to IFS ambushing me about Legacy, in February of 2022, I sent a copy of a contact list of my IFS clients prepared by a former assistant by email to my wife so that she could print it for me. I was unable to print the file on my IFS computer. I wanted the hard copy because I was having performance problems with my newly hired assistant (turnover was high especially since COVID-19) and I wanted a full list that I could refer to when talking to the newly hired assistant and making sure that the accounts were being serviced appropriately. This list of contacts was comprised of the business name, IFS client ID number, contact information typically a name (sometimes first and last, sometimes first only) plus phone numbers that could be for the office, cell, fax, or other contact point. Two of my larger IFS clients, Bufadora and Castanedas, also had separate sheets identifying the IFS client ID number for the respective individual locations. The list does not, and did not, contain any information about the clients' purchase history or preferences, pricing information, or information on IFS' profits or margins for these clients. I have not used this list I emailed my wife for business-related purposes

since IFS fired me.

29. I have access to the system and information at Legacy to determine whether Legacy sold products to a given business. On April 28, 2022, I checked the relevant systems and information and determined that Legacy never sold products to MDD Supplies and that Legacy never received any payments related to the "Carlos Catering" business.

30. I did happen to meet with Hugo Mesa during a weekend at a food truck. The meeting was not planned, and Hugo approached me to complain about policies and product issues of IFS that he believed were preventing him from making additional sales. I told Hugo about Legacy and that it was seeking to grow its client base as a business separate and apart from IFS. He asked to try and increase his income by also selling for Legacy in the Arizona market, outside of his area in Southern California where he made sales for IFS. I told him he could try and make sales on the weekends and on his own time, but I told him he was not to do anything that might take any customer away from IFS.

31. Legacy generally could not beat IFS's prices.

32. Hugo Mesa did tell me about a potential customer that he called Carlos Catering. Hugo was responsible for any dealings with Carlos Catering. Hugo pursued any business with them. I did not know about Carlos Catering doing business with IFS or that it was a potential IFS customer. Legacy does not do business with Carlos Catering and plans not do so in the future

33. Previously, because of Hugo, Legacy had items delivered to an address in Bakersfield that Hugo Mesa provided us for "Carlos Catering" to fulfil a supposed order. Legacy was never paid for these items, resulting in thousands of dollars of losses at least.

34. On April 29, 2022, I personally traveled to and visited that address in Bakersfield that Hugo provided for Carlos Catering and that Legacy had items delivered to, 3929 Chester Avenue, Bakersfield CA 93307. Attached as **Exhibit D** is

a true and correct photo of the storefront located at the address as I viewed it on April 29, 2022. There is no "Carlos Catering" there, and there appears never to have been one. The address was in a strip mall. Currently at the address is La Mexicana Productos Naturales. I spoke to a woman named Maria who worked there. The shop sells items such as vitamins, teas, botanic remedies, diet pills, etc. It is not a catering business. Maria had only been working there for a short time. I visited another business located in the same strip mall. I spoke to Jesus, the owner of Chutas Feed and Pet Supply, which has been in that strip mall for multiple years. Jesus said that he could not recall there ever being a Carlos Catering in the shopping center or any type of catering business.

35. Jesus Trujillo is my nephew (by marriage). As with Hugo, we instructed Jesus to be very careful not to take any opportunities or clients from IFS, and to only seek new clients outside their coverage area for IFS.

36. Hugo and Jesus Trujillo both no longer work with Legacy. Both of them did not work for Legacy following their meetings with IFS on March 30, 2022.

37. It is my experience from working with IFS that IFS did not require its customers or suppliers to keep their dealings with IFS confidential or secret. For example, customers were free to tell anyone what prices IFS charged them.

38. It is my understanding that after I turned my IFS work cellphone and IFS computer that IFS lost the devices. These devices would contain evidence that would help prove that Defendants did not misappropriate IFS' trade secrets that we no longer obtain because of the loss of the devices by IFS. For example, the text messages and files on these devices would illustrate what information we had access to from IFS, how we used that information, as well as communications with IFS management regarding pricing and supply issues. Due to the loss of these devices, our abilities to mount a defense has been harmed.

I declare under penalty of perjury of the laws of California and United States that the foregoing is true and correct. Executed this 3rd Day of October 2022.

Savino Morales

*IFS v. Morales, et al.*
USDC, Case No. 2:22-cv-02120 ODW(JEMx)

14

**Savino Morales Decl. ISO Defendants' Motion for Summary Judgment**