1  CDF LABOR LAW LLP
       Dan M. Forman, State Bar No. 155811
2      dforman@cdflaborlaw.com
       Amy S. Williams, State Bar No. 228853
3      awilliams@cdflaborlaw.com
   707 Wilshire Boulevard, Suite 5150
4  Los Angeles, CA 90017
   Telephone: (213) 612-6300
5
   Attorneys for Plaintiff/Counter-Defendant
6  PERRIN BERNARD SUPOWITZ, LLC, a
   California LLC dba INDIVIDUAL
7  FOODSERVICE

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11 PERRIN BERNARD SUPOWITZ, LLC,          ) Case No. 2:22-cv-02120-ODW-JEM
   a California LLC dba INDIVIDUAL         )
12 FOODSERVICE,                           ) Judge: Otis D. Wright, II
                                          )
13              Plaintiff,                ) **PLAINTIFF'S OPPOSITION TO**
14         v.                             ) **DEFENDANTS' MOTION FOR**
                                          ) **PARTIAL SUMMARY**
15 PABLO MORALES, an individual;          ) **JUDGMENT**
   LEGACY WHOLESALE GROUP, LLC,           )
16 an Arizona Limited Liability Corporation; ) Date:  November 7, 2022
   SAVINO MORALES, an individual; and     ) Time:  1:30 p.m.
17 SERGIO ESCAMILLA, an individual;       ) Ctrm:  5D
   and DOES 1 through 20, inclusive,      )
18                                        )
                Defendants.               )
19 ─────────────────────────────         )
                                          )
20 LEGACY WHOLESALE GROUP, LLC,           )
                                          )
21              Counter-Complainant,      )
                                          )
22         v.                             )
                                          )
23 PERRIN BERNARD SUPOWITZ, LLC,          )
   a California LLC dba INDIVIDUAL         )
24 FOODSERVICE,                           )
                                          )
25              Counter-Defendant.        )
   ─────────────────────────────         )
26

27

28

                                            PLAINTIFF'S OPPOSITION TO
CDF LABOR LAW LLP              DEFENDANTS' MOTION FOR PARTIAL
                                            SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF OPPOSITION ............................................................... 2

II.    DEFENDANTS FAILED TO MEET THEIR BURDEN .............................. 8

III.   NUMEROUS DISPUTED MATERIAL FACTS PRECLUDE
SUMMARY JUDGMENT ON IFS' TRADE SECRET CLAIMS ................ 8

    A.    Defendants Misappropriated IFS' Trade Secrets And
Diverted At Least $1,389,362.12 From At Least 17 IFS
Customers In A Mere 6 Months .................................................. 8

    B.    Standard For Trade Secret Misappropriation ....................................... 10

    C.    IFS Adequately Defined Its Trade Secrets ........................................ 11

    D.    IFS Took Necessary Precautions To Maintain The Secrecy
Of Its Trade Secrets ................................................................ 16

         1.    Earning Statements ................................................. 18

         2.    Dart Competitive Price Agreement ........................... 19

         3.    IFS' Website ........................................... 19

         4.    Confidentiality Agreement With Customers And
Vendors ................................................................ 20

    E.    IFS Derives Significant Economic Value From Keeping
It's Trade Secrets Confidential ................................................... 21

    F.    Defendants Used IFS Trade Secrets To Divert IFS' Sales ................. 23

    G.    Partial Summary Judgment On Injunctive Relief Is
Improper ............................................................................... 24

         1.    Defendants Concealed At Least 3 IFS Customers
From Whom Legacy Diverted Business — Perjury
And A Fraud On The Court ........................................ 25

         2.    Defendants Continue To Solicit IFS' Customers For
Legacy ................................................................. 27

IV.   NUMEROUS DISPUTED MATERIAL FACTS PRECLUDE
SUMMARY JUDGMENT ON IFS' UNFAIR COMPETITION
AND CONVERSAION CLAIMS .................................................. 27

    A.    The Unfair Competition Claim Is Not Preempted ............................. 27

    B.    Injunctive Relief And Restitution Under The UCL Is
Proper ................................................................................. 29

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

2064324.1

1

### <u>TABLE OF CONTENTS (cont.)</u>

2                                                                       <u>**Page**</u>

3       C.    The Conversion Claim Is *Not* Based On Trade Secret

4             Misappropriation ................................................................................29

   V.    CONCLUSION ............................................................................30
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

2064324.1

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>State Cases</u>

4
5

*Agric. Lab. Rels. Bd. v. Richard A. Glass Co.*
175 Cal.App.3d 703 (1985)..................................................................... 15

6

*Courtesy Temp. Serv., Inc. v. Camacho*
222 Cal.App.3d 1278 (1990)............................................................ 13, 21, 22

7
8

*Greenly v. Cooper*
77 Cal.App.3d 382 (1978)........................................................................ 22

9

*Morlife, Inc. v. Perry*
56 Cal.App.4th 1514 (1997)..................................................................... 22

10
11

*Whyte v. Schlage Lock Co.*
101 Cal.App.4th 1443 (2002)................................................................... 22

<u>Federal Cases</u>

12
13

*Ambat v. City & County of San Francisco*
757 F3d 1017 (9th Cir. 2014)..................................................................... 7

14
15

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) .................................................................................. 7

16
17

*Autodesk, Inc. v. ZWCAD Software Co.*
Case No. 5:14–cv–01409–EJD, 2015 WL 2265479 (N.D. Cal.
May 13, 2015) ........................................................................................ 11

18
19

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*
No. 819CV00642JLSJDE, 2019 WL 2177262 (C.D. Cal. May 20,
2019)......................................................................................................... 11

20

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*
2013 WL 12081182 (C.D. Cal. Nov. 22, 2013)...................................... 12, 21

21
22

*Fitspot Ventures, LLC v. Bier*
2015 WL 5145513 (C.D. Cal. September 1, 2015)...................................... 22

23

*Fortinet Inc. v. FireEye Inc.*
2014 WL 4955087 (N.D. Cal., Sept. 30, 2014)......................................... 10

24
25

*Hollingsworth Solderless Terminal Co. v. Turley*
622 F.2d 1324 (9th Cir. 1980)..................................................... 12, 20, 21, 22

26

*Imax Corp. v. Cinema Techs., Inc.*
152 F.3d 1161 (9th Cir. 1998).................................................................. 14

27
28

*In IDX Sys. Corp. v. Epic Sys. Corp.*
285 F.3d 581 (7th Cir. 2002)................................................................... 14

4

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Kewanee Oil Co. v. Bicron Corp.*
    416 U.S. 470 (1974) ............................................................ 18

*MAI Sys. Corp. v. Peak Computer, Inc.*
    991 F.2d 511 (9th Cir. 1993) ............................................... 12

*Mattel, Inc. v. MGA Entm't, Inc.*
    782 F. Supp. 2d 911 (C.D. Cal. 2011) ................................. 22

*N. Elec. Co. v. Torma*
    819 N.E.2d 417 (Ind. Ct. App. 2004) .................................. 17

*Pellerin v. Honeywell Int'l, Inc.*
    877 F. Supp. 2d 983 (S.D. Cal. 2012) ................................. 11

*Phillips v. Frey*
    20 F.3d 623 (5th Cir. 1994) ................................................. 18

*Scott v. Harris*
    550 U.S. 372 (2007) .............................................................. 7

*Semper/exeter Paper Co. LLC v. Henderson Specialty Paper LLC*
    2009 WL 10670619 (C.D. Cal. Sept. 21, 2009) ............. 13, 21

*Sun Distrib. Co., LLC v. Corbett*
    No. 18-CV-2231-BAS-BGS, 2018 WL 4951966 (S.D. Cal. Oct.
    12, 2018) ............................................................................. 12

*Way.com, Inc. v. Singh*
    No. 3:18-CV-04819-WHO, 2018 WL 6704464 (N.D. Cal. Dec.
    20, 2018) ........................................................................ 19, 22

**State Statutes and Regulations**

Cal. Civ. Code § 3426 ............................................... 9, 10, 28

**Federal Statues and Regulations**

18 U.S.C. § 1836 ........................................................................ 9

18 U.S.C. § 1839(3) ................................................................. 10

*H.R. Rep.* 114-529
    Defend Trade Secrets Act of 2016 (Apr. 26, 2016) ............. 9

**Federal Rules**

Fed. R. Civ. P. 56(a) .................................................................. 7

2064324.1

# I. SUMMARY OF OPPOSITION

Defendants PABLO MORALES ("Pablo") and SAVINO MORALES ("Savino") used fake names to Defendant Legacy Wholesale Group, LLC ("Legacy"), and together with Defendant SERGIO ESCAMILLA ("Sergio") lied to Plaintiff PERRIN BERNARD SUPOWITZ, LLC dba INDIVIUDAL FOODSERVICE ("IFS") to purchase goods from it for nearly a year while they misappropriated IFS' trade secrets to divert sales of at least $1,389,362.12 from at least 17 IFS customers in a mere 6 months.

Now, Defendants continue to lie, but they do so the Court.  They have perjured themselves in discovery responses, sworn deposition testimony, and numerous declarations proffered by Defendants including the declarations upon which they rely in support of their motion for partial summary judgment.  The Court should not credit any of Defendants representations in support of this motion creating genuine disputes as to material facts in issues.  Below are a few undisputable examples:

| LIE/DISPUTED MATERIAL FACT | TRUTH/EVIDENCE |
|---|---|
| • Defendants formed Legacy to conduct business in Arizona because IFS would not allow them to do business in Arizona.<br>Pablo Decl. ¶ 12, Savino Decl. ¶ 13; MSJ at 12:19-26<br>• IFS only had minimal operations in Arizona through a sister company, Brady.<br>Savino Decl. ¶ 14 | • Pablo and Savino serviced IFS customers in Arizona for more than 20 years.  One of those customers was one of the largest customers Savino serviced for IFS, Rong Cheng Trading.  For years, IFS paid Pablo and Savino to travel to Arizona twice a month to service IFS' customers and prospect for new IFS' customers.<br>IFS Response to Fact ("RTF") No. 6; IFS Material Disputed Fact ("MDF") No. 50a. |
| • "At no point have I used any confidential IFS information to benefit Legacy and take away an | • After forming Legacy, Savino secured a report of the top 5 IFS accounts he serviced.  The report |

CDF LABOR LAW LLP

2064324.1

| | |
|---|---|
| opportunity from IFS.  Nor have I provided any confidential IFS information to Legacy to help it compete against IFS." <br><br> Savino Decl. ¶ 19 | identified each and every item purchased, the item number, description, vendor name, date of last sale, quantity, dollar amount of sales, last sales price, new sell price, difference in sell price, margin, and price on delivery.  Within the next 6 months Legacy had diverted sales from at least 3 of these top customers, 2 of which they disclosed, and 1 they concealed and continue to conceal from the Court. <br><br> RTF No. 27; MDF No. 50b. |
| • "IFS showed me various documents that I emailed my wife, Cynthia Morales, while I was employed at IFS, such as documents with certain sales and pricing information…I did not use such documents I emailed to Cynthia to further Legacy business or in a manner that would have harmed IFS." <br><br> Savino Decl. ¶ 19. | • Savino sent IFS' customer purchase and pricing spreadsheets and a customer contact spreadsheet for the IFS customers that Savino serviced to his wife's email address. Savino used this information to solicit business from an IFS customer for Legacy admitting to Pablo and Sergio, "**good thing about this one is that I have all their pricing since I'm the one that sells them.**" <br><br> RTF No. 27; MDF No. 50b. |
| • Legacy has done business with only 17 IFS customers. <br> Savino Decl. ¶ 18; Pablo Decl. ¶ 19. | • Legacy has done business with at least 20 IFS customers and Legacy is actively soliciting IFS customers for business. <br><br> MDF No. 50a. |

Any one of these or the numerous other disputed material facts defeats

1  Defendants' motion for partial summary judgment.[1]  The motion must be denied.

2  ## II.  DEFENDANTS FAILED TO MEET THEIR BURDEN

3  A court "shall grant summary judgment if the movant shows that there is no

4  genuine dispute as to any material fact and the movant is entitled to judgment as a

5  matter of law." Fed. R. Civ. P. 56(a). Courts must view the facts and draw reasonable

6  inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550

7  U.S. 372, 378 (2007). A disputed fact is "material" where the resolution of that fact

8  might affect the outcome of the suit under the governing law, and the dispute is

9  "genuine" where "the evidence is such that a reasonable jury could return a verdict

10  for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11  (1986). The party moving for summary judgment has both an initial burden of

12  production and the ultimate burden of persuading the court that there is "no genuine

13  dispute as to any material fact and the movant is entitled to judgment as a matter of

14  law."  FRCP 56(a).  Because summary judgment is a "drastic device," cutting off a

15  party's right to present its case to a jury, the moving party bears a "heavy burden" of

16  demonstrating the absence of any triable issue of material fact.  *Ambat v. City &*

17  *County of San Francisco*, 757 F3d 1017, 1031 (9th Cir. 2014).  Defendants have

18  failed to meet that burden.

19  ## III.  NUMEROUS DISPUTED MATERIAL FACTS PRECLUDE SUMMARY
20  ## JUDGMENT ON IFS' TRADE SECRET CLAIMS

21  **A.   Defendants Misappropriated IFS' Trade Secrets And Diverted At Least**
22  **$1,389,362.12 From At Least 17 IFS Customers In A Mere 6 Months**

23  IFS is engaged in the highly competitive food distribution business.  IFS, over

24  the course of many years and at great expense, developed valuable confidential and

25  trade secret information, took reasonable measures to keep such information secret

26  _____

27  [1] Defendants failed to provide any evidence in support of 2 of their own
"uncontroverted facts", Nos. 37 & 38.

28

CDF Labor Law LLP

2064324.1

1    and derived significant value from doing so.

2           Defendants Pablo and Savino worked for IFS as outside salesmen for more

3    than 20 years servicing IFS' customers throughout California, Nevada *and Arizona*.[2]

4    They had been the most trusted and highest paid salesman in the company, together

5    earning nearly a million dollars annually.  (RTF No. 26.)

6           In March 2021, Pablo and Savino along with their friend Sergio, created fake

7    names and formed a competing business, Legacy.  (MDF No. 62.)  In August 2021,

8    when supply chain issues posed an impediment to Legacy's ability to secure product,

9    Pablo fraudulently induced IFS to provide credit to Legacy and authorize the sale of

10   goods to Legacy without disclosing his or Savino's conflict of interest by ownership

11   of Legacy.  (*Id*.)  He used his knowledge and ability to set IFS' confidential pricing

12   to cause IFS to sell goods to Legacy at prices substantially lower than prices that

13   Legacy would otherwise have been charged in an arms-length transaction and with

14   knowledge that Legacy intended to sell the goods to IFS' customers, and potential

15   customers, at a profit to Legacy.  (*Id*.)

16          Defendants used IFS' trade secret and confidential customer information to

17   target IFS' top customers, give credit to those customers based on IFS' confidential

18   credit decisionmaking, determine orders for Legacy based on IFS' customer purchase

19   history information, inventory, allocation and pricing -- all while Pablo and Savino

20   still worked for IFS.  (DMF Nos. 50-62.)  Further, Defendants encouraged other of

21   IFS' top salespersons to breach their agreements with IFS, secretly work for Legacy

22   under pseudonyms, and use IFS' devices, confidential information and trade secrets

23   to sell products for Legacy to IFS' customers.  (*Id*.)

24          Within approximately six months, Defendants diverted sales from at least 17

25

26   [2] For years, Pablo and Savino traveled to Arizona twice a month to service IFS'
     customers and prospective customers.  Pablo serviced IFS customer, Acme Meats, in
27   Arizona for 25 years.  Arizona customer, Rong Cheng Trading, was one of the
     largest IFS customers that Savino serviced for IFS.  (RTF No. 6; MDF No. 50a.)

28

CDF Labor Law LLP

2064324.1

1 | IFS customers in excess of $1,389,362.12. (RTF No. 43; MDF No. 50a.)

2 |      Savino and Pablo testified that each IFS customer that they converted to a

3 | Legacy customer arose from a meeting or phone call that had been scheduled in their

4 | role as an IFS salesperson with the use of IFS's devices to discuss the customer

5 | purchasing from IFS. (MDF No. 59.) Pablo and Savino then leveraged those IFS

6 | meetings to sell Legacy's goods to IFS' clientele. (*Id*.) IFS ultimately discovered

7 | Defendants' scheme and terminated Pablo and Savino's employment on March 31,

8 | 2022.

9 |      Defendants continue to use IFS' trade secrets to usurp and harm business

10 | opportunities from both current and former IFS customers, as well as customers

11 | whose business should have been offered to IFS during Pablo and Savino's

12 | employment with IFS. (RTF Nos. 14, 27, 32, 33, 41, 42, 43, 44, 45, 46, 47, 48; MDF

13 | No. 56.) IFS suffered and continues to suffer irreparable harm from Defendants

14 | misuse of its trade secrets and such conduct must be enjoined.

15 | **B.**   **Standard For Trade Secret Misappropriation**

16 |      IFS alleges violation of the Defend Trade Secrets Act (18 U.S.C. § 1836, et

17 | seq.) ("DTSA") and the California Uniform Trade Secrets Act (California Civil Code

18 | § 3426, et seq.) ("CUTSA"). Congress enacted the DTSA to provide a "single,

19 | national standard for trade secret misappropriation with clear rules and predictability

20 | for everyone involved." *See H.R. Rep.* 114-529, Defend Trade Secrets Act of 2016

21 | (Apr. 26, 2016). The DTSA defines "trade secret" broadly to include:

22 |     *all forms and types of financial, business,* scientific, technical,
23 |     economic, or engineering *information, including* patterns, plans,
    *compilations,* program devices, formulas ... whether tangible or
24 |     intangible, and whether or how stored, compiled, or memorialized
    physically, electronically, graphically, photographically, or in writing
25 |     if (A) the owner thereof has taken reasonable measures to keep such
26 |     information secret; and (B) the information derives independent
    economic value, actual or potential, from not being generally known
27 |     to, and not being readily ascertainable through proper means by,
28 |     another person who can obtain economic value from the disclosure or

CDF Labor Law LLP

2064324.1

use of the information....

18 U.S.C. § 1839(3) (emphasis added). The DTSA covers "all forms and types of financial, business ... information" if (1) the owner has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to the public.

The DTSA analysis is equally applicable under CUTSA, "[t]rade secret means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* Cal. Civ. Code § 3426.1(d); *see also Fortinet Inc. v. FireEye Inc.*, 2014 WL 4955087, at *7 (N.D. Cal., Sept. 30, 2014) (finding non-public proprietary competitive knowledge and intelligence could be trade secrets).  IFS' trade secrets satisfy these requirements.

C.   **IFS Adequately Defined Its Trade Secrets**

IFS provided evidence that its trade secrets are:

- internal communication of pricing and sales strategies;

- sales data reports detailing confidential customer data including customer name, customer contact or contacts, decisionmaker, decisionmaker's contact information, direct dial, cell phone, customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories, sales volume, product assortment, manufacturer's names for each item, and trends that could be used to promote greater sales ("Customer Lists");

- prospective client contact information;

- presentation materials;

- confidential manufacturer communications specific to IFS, including inventory allocations, contracts between IFS and manufacturers and vendors, and special purchases unique to IFS;

- vendor contacts, vendor reliability, vendor quantities, product qualities, allocations, and other information ("Vendor Lists");

11

- IFS' employee performance information;

- Private label brand manufacturers, products and training;

- IFS' financial information and data, and IFS' product catalogue, pricing schedules, and selling resources; and

- warehouse organization (collectively "Trade Secrets"). (RTF Nos. 43, 44, 45, 46, 47.)

It is well settled that "[a] plaintiff need not 'spell out the details of the trade secret.'" *Autodesk, Inc. v. ZWCAD Software Co.*, Case No. 5:14–cv–01409–EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015). Nevertheless, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012). IFS has done so.

For example, in *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, No. 819CV00642JLSJDE, 2019 WL 2177262, at *6 (C.D. Cal. May 20, 2019), Chartwell defined its trade secrets:

> customer lists, including information relating to customers' business affairs, special staffing needs, preferred methods of doing business, methods of operation, key contact personnel, mark up rates, pay rates, and other negotiated terms specific to each customer, job order specifications and the particular characteristics and requirements of persons generally hired by the customer, specific job listings, mailing lists, computer runoffs, financial and other information; employee information, including the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment.

Like here, defendants argued that Chartwell had failed to define its trade secrets. In rejecting that argument, the Court concluded that "[a]lthough Chartwell's definition of its trade secrets is comprehensive, the trade secrets are essentially

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

Chartwell's customer list and the information that accompanies the list, such as the key contacts, mark up rates, and pay rates of each customer, as well as information regarding Chartwell's employees."

Similarly, in *Sun Distrib. Co., LLC v. Corbett*, No. 18-CV-2231-BAS-BGS, 2018 WL 4951966, at *3 (S.D. Cal. Oct. 12, 2018) plaintiff identified its trade secrets as:

> confidential know-how and proprietary business methods and procedures (including the development of delivery schedules, routes, "Do Not Deliver" lists), customer lists and contact information, the identity of key contact personnel and decision makers, price lists and structures, customer requirements (including delivery needs, schedules, routes, and "Do Not Deliver" lists), service providers and drivers and pricing structure, employee information and compensation structure, and other proprietary business, operating, and financial information.

The Court determined that "although publication names and contact information might be public knowledge, it is clear Plaintiff has put in time and effort to develop other specific information, inter alia, its customer list, preferences, pricing structures, and "do not deliver" list."  Accordingly, Plaintiff has established it has protectable trade secrets."

Contrary to prevailing law in this circuit, Defendants would have this Court conclude that a business cannot protect its customer lists and other customer information in confidence. "The Ninth Circuit has held that a customer list qualifies as a trade secret 'because it allows a competitor ... to direct its sales efforts to those potential customers that are already' doing business with the plaintiff." *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *3 (C.D. Cal. Nov. 22, 2013) (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1330 (9th Cir. 1980).  "[B]illing rates, key contacts, specialized requirements and mark up rates, [are] sophisticated information and irrefutably of commercial value and not

readily ascertainable to other competitors." *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal.App.3d 1278, 1288 (1990).  Information concerning "customers' specialized needs, pricing, contact persons, and compatible suppliers and container manufacturing companies" merits trade secret protection.  *Semper/exeter Paper Co. LLC v. Henderson Specialty Paper LLC*, 2009 WL 10670619, at *5 (C.D. Cal. Sept. 21, 2009).

Similar to *Sun Distrib. Co., ,* IFS defines its Customer Lists as "sales data reports detailing **confidential customer data** including customer name, **customer contact or contacts**, decisionmaker, **decisionmaker's contact information**, direct dial, cell phone, **customer credit ratings**, **payment history**, **IFS' pricing**, profitability including mark up, **order histories**, **sales volume, product assortment**, manufacturer's names for each item, and trends that could be used to promote greater sales."  Hard copy examples include:

**Savino Top Account LMR Report**:  The Report, a spreadsheet, identified the top five accounts that Savino serviced for IFS and for each account it identified every item purchased, the item number, description, vendor name, date of last sale, quantity, dollar amount of sales, last sales price, new sell price, difference in sell price, margin, and price on delivery.  Defendants diverted sales from at least 3 customers identified in this Report.  (RTF No. 27; MDF No. 50b.)

**Savino Account Contact Spreadsheet**:  This spreadsheet was created by IFS employees over the course of many years and included customer name, customer contact, work phone number, cell phone number, email address, names and contact information for the customer's warehouses and notes regarding customer preferences.  Savino testified that this spreadsheet had "value to him as a salesperson", that "value was to provide him with information about contacts and various customers that he had called and cultivated over the years" with IFS, and the collection of information was not something he could Google.  (RTF No. 27; MDF No. 50b).  Savino emailed this spreadsheet to his wife's personal email for Legacy's

1    use.  (*Id.*)

2        ***Customer Report for Amapola Markets***:  This report contained information

3    regarding each item purchased by Amapola by item number, unit, description,

4    vendor name, last sale, quantity, $ sales, current office cost, last unit sell price,

5    margin and IFS buyer.  Savino sent this list to his wife's personal email and used it in

6    an attempt to solicit business from Amapola Markets.  As Savino told Pablo and

7    Sergio, "**good thing about this one is that I have all their pricing since I'm the**

8    **one that sells them.**" (RTF No. 27; MDF No. 50b.)

9        Defendants' reliance on trade secret cases involving complex technical

10   systems and software is misplaced and would eliminate trade secret claims arising

11   from the theft of customer lists and other valuable and protected customer

12   information.  In *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161 (9th Cir. 1998),

13   the Court considered whether Imax, the manufacturer of the patented "rolling loop"

14   motion picture projectors, had adequately identified its trade secrets as "the design of

15   the cam unit, *including every dimension and tolerance that defines or reflects that*

16   *design*" and "the design of the film arms, *including every dimension and tolerance*

17   *that defines or reflects that design*".  The Court rejected Imax's contention that use of

18   the catchall phrase "*including every dimension and tolerance that defines or reflects*

19   *that design*" achieved the level of specificity necessary to identify the numerical

20   dimensions and tolerances as trade secrets.  The Court noted that "because Imax's

21   trade secrets claim involves a sophisticated and highly complex projector system, it

22   is unlikely that the district court or any trier of fact would have expertise in

23   discerning exactly which of the projector system's many "dimensions and tolerances"

24   were trade secrets" and the competitor could "not be expected to prepare its rebuttal

25   to Imax's trade secrets claim without some concrete identification of exactly which

26   "dimensions and tolerances" Imax alleged were incorporated into the competitor's

27   own projector system."

28        In *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 582–83 (7th Cir. 2002),

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

1  the Court considered whether IDX's 43-page description of the methods and
2  processes underlying and the inter-relationships among various features making up
3  IDX's software package for use in managing the financial side of a medical practice
4  was specific enough.  The Court determined it was not.  "[A] plaintiff must do more
5  than just identify a kind of technology and then invite the court to hunt through the
6  details in search of items meeting the statutory definition."

7       Lastly, in *Agric. Lab. Rels. Bd. v. Richard A. Glass Co.*, 175 Cal.App.3d 703,
8  707–08 (1985), Defendant Glass was engaged in the growing, harvesting and
9  packing of citrus crops in Riverside County.  In the context of a discovery dispute,
10  Glass refused to produce information regarding the costs of Glass' processes and the
11  price Glass charged for its services.  The Court concluded that Glass, in a far cry
12  from the instant matter, failed to provide the Court with any information that would
13  support a claim of trade secret and that there was no evidence indicating that a
14  protective order would be insufficient.

15       IFS adequately defined its trade secrets and demonstrated triable issues of
16  material fact.

17  **D.    IFS Took Necessary Precautions To Maintain The Secrecy Of Its Trade**
18  **Secrets**

19       IFS has undertaken reasonable efforts to protect the confidential nature of its
20  Trade Secrets as that information provides significant value to IFS by maintaining it
21  in confidence.  (RTF No. 27, 48; MDF No. 51.)  IFS' efforts include, among other
22  things, maintaining such trade secret information in a password protected computer
23  system, including a multi-factor authentication for VPN and scheduled password
24  resets.  (*Id.*)  In addition, IFS secures its premises, allowing only IFS employees to
25  enter IFS' premises and warehouse and requiring an escort for any non-IFS
26  employee.  (RTF No. 48.)  Further, IFS requires, as a condition of employment that
27  its employees enter into confidentiality agreements and agree to protect IFS'
28  confidences and disclose any potential or actual conflict of interest that the

16

employees might encounter.  (*Id.*; RTF No. 45.)

By virtue of these agreements, Pablo and Savino agreed to:

a.      Only use IFS' confidential and proprietary information and trade secrets for legitimate business purposes of IFS;

b.      Safeguard IFS' confidential information, including "… ***pricing, costs, contracts, business plans, sales data, accounting information, strategic developments***, ideas, know-how, research, products, ***services***, ***customer lists***, finances, … ***business and product development plans***, the salaries and ***terms of compensation of other employees***, customers, and other ***information concerning Individual FoodService's actual or anticipated business***" (emphases added);

c.      Protect "***All business-related information***, including without limitation, documents, notes, files, records, oral information, computer files or similar materials (except in the ordinary course of performing duties on behalf of Individual FoodService) ***may not be removed from Individual FoodService's premises without permission from Individual FoodService***. Additionally, the contents of Individual FoodService's records or information otherwise obtained in regard to business may not be disclosed to anyone, except where required for a business purpose. Employees must not disclose any confidential information, purposefully or inadvertently through casual conversation, to any unauthorized person inside or outside the company. Employees who are unsure about the confidential nature of specific information must ask their supervisor for clarification" (emphases added).

d.      Comply with IFS' policies with regard to computer system data created and stored for IFS and its customers; and

e.      Return all of IFS' confidential information in their possession when their employment with the IFS ceased; and

f.      Disclose and obtain approval for engaging in business activities during the term of their employment that competed with IFS business.

1   Defendants do not dispute these efforts by IFS.  Instead, Defendants argue that

2   IFS "publicized" its trade secrets with regard to two earning statements and back-up

3   documentation provided to Pablo and Savino, a Dart Competitive Price Agreement

4   filed with the Court, a list of product and vendors on IFS' website, and the fact that

5   customers and vendors are not bound by confidentiality agreements. These

6   arguments are red herrings.

7       **1.    Earning Statements**

8       IFS provided Pablo and Savino with earning statements and confidential back-

9   up information in their employment with IFS with regard to paid commissions on

10  sales (hereinafter "earning statements"). (RTF Nos. 32, 33.)  IFS provided Pablo and

11  Savino with their final earning statements in the same manner that IFS had

12  throughout their employment, in confidence, pursuant to their agreements to

13  maintain their confidentiality, and with the expectation that the earning statements

14  would only be used for the intended purpose of confirming that IFS accurately

15  calculated and paid earned commissions.  Pablo and Savino confirm that this was

16  IFS' intended purpose.  Defendants' Uncontroverted Fact, Nos. 32 & 33. IFS' cover

17  letter enclosing the earning statements advised Pablo and Savino to return all of IFS'

18  property, including hard copies or property that was stored on a non-IFS device.

19  (*Id*.)

20      Notwithstanding, Pablo and Savino filed the earnings statements with the

21  Court and IFS' additional efforts, commencing on May 5, 2022, to limit the damage

22  from the disclosure have not been successful.  (Forman Decl. ¶13.)  Defendants'

23  intentional decision to disclose this information in the public record, after IFS's

24  direction to maintain the confidentiality of its trade secrets, without any attempt to

25  maintain confidentiality, demonstrates their complete and total disregard for their

26  legal obligations.  Defendants cannot defeat IFS' claim of secrecy by breaching their

27  own duties of confidentiality.  *See N. Elec. Co. v. Torma*, 819 N.E.2d 417, 428 (Ind.

28  Ct. App. 2004) ("misplaced trust in a third party who breaches a duty of

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

confidentiality does not necessarily negate efforts to maintain secrecy."); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) ("necessary element of secrecy is not lost [ ] if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.'"); *see also Phillips v. Frey*, 20 F.3d 623, 630–31 (5th Cir. 1994) ("while it is true that outside any confidential relationship, one who voluntarily discloses secret information or who fails to take reasonable precautions to secure its secrecy cannot properly claim that information constitutes a trade secret, creating such a duty upon the disclosee is a reasonable precaution, and a voluntary disclosure made within the periphery of a confidential relationship eliminates the need to take further precautions to secure the trade secret.")

## 2. **Dart Competitive Price Agreement**

IFS does *not* contend that the Dart Competitive Price Agreement, which reflects the cost of certain items to IFS, is an IFS trade secret. IFS proffered the Dart Competitive Price Agreement in support of its TRO because Defendants have repeatedly argued that IFS did not provide them with the "actual cost" of certain items to IFS. The Dart Competitive Price Agreement, which had expired on February 28, 2022, reflected IFS' cost on 77 items and demonstrated that IFS did provide Pablo and Savino IFS' actual cost of certain items. (RTF No. 27.)

Defendants' argument that the disclosure of the Agreement somehow defeats IFS' trade secret claim is a distraction. Defendants were admittedly privy to the lowest price at which IFS was willing to sell a product and the price customers paid for a certain product. Defendants used that information to secure product for Legacy at prices that substantially were lower than what Legacy would otherwise have been charged and resold the goods to IFS' customers at a profit to Legacy.

## 3. **IFS' Website**

IFS does *not* contend that the mere list of product or names of vendors is trade secret to IFS and IFS' website does not disclose any trade secret information. The

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   website lists product under the categories: disposables, food, jansan, safety and

2   smallwears.  It does not disclose any trade secret information regarding product.

3   Defendants also refer to a "Vendors & Catalog" page of the IFS website.  In yet

4   another attempt to distract this Court, Defendants states in its motion that "IFS lists

5   its vendors…on the website."  In making this assertion, however, Defendants rely on

6   an inactive "internet archive" that can only be accessed by typing

7   http://web.archive.org/web/20210613173223/https://individualfoodservice.com/vend

8   ors-catalogs/ and which purportedly reflects a June 13, 2021 version of the website.

9   (*See* Sergio Decl. ¶ 19, Ex. J.)  In any event, that list does not disclose any trade

10  secret information regarding IFS' vendors.

11          Under this argument, Defendants would conclude that the recipe for Coca-

12  Cola is not a protected trade secret because Coca-Cola widely advertises its soft

13  drinks.  IFS' publication of some information about its vendors and products does

14  not prove or demonstrate that its other trade secret information about its vendors and

15  products, especially information about IFS' private label products and their

16  manufacture are not held as trade secret.

17          **4.      Confidentiality Agreement With Customers And Vendors**

18          In virtually all businesses, customers are free to share the price they pay for

19  product.  Likewise, vendors, whose goal it is to sell product, are free to give pricing

20  to prospective buyers.  This, however, does not negate a claim of trade secrets.

21          *Way.com, Inc. v. Singh*, No. 3:18-CV-04819-WHO, 2018 WL 6704464, at

22  *10–11 (N.D. Cal. Dec. 20, 2018) is distinguishable.  There, the information Way

23  considered to be a trade secret, customer names, were published on Way's website

24  the list was available to every employee.  Here, it is not the mere identity of IFS'

25  customers that constitutes the trade secret, it is the customer contact or contacts,

26  decisionmaker, decisionmaker's contact information, direct dial, cell phone,

27  customer credit ratings, payment history, IFS' pricing, profitability including mark

28  up, order histories, sales volume, product assortment, manufacturer's names for each

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

CDF Labor Law LLP

2064324.1

1  item, and trends that could be used to promote greater sales.  This information is not

2  "readily accessible to a reasonable diligent competitor."  *Hollingsworth Solderless*

3  *Terminal Co.*, 622 F.2d at 1332.  Indeed, Pablo and Savino testified that while

4  employed at IFS they could not access information about IFS' customers serviced by

5  other sales representatives.  (Savino Decl., ¶ 2, Pablo Decl., ¶ 2.)

6  **E.**  **IFS Derives Significant Economic Value From Keeping It's Trade Secrets**

7  **Confidential**

8      IFS' Trade Secrets are not publicly available on the internet or in any trade

9  journals or magazines and IFS derives significant economic value from keeping its

10  confidential customer and employee information confidential to IFS.[3]  (RTF No. 47.)

11  As a distributor, which does not manufacture goods, these are the IFS' most

12  important assets.  (*Id*.)  IFS' competitors would, and Legacy and its owners did and

13  continue to, obtain an unfair and damaging economic competitive advantage from

14  IFS's confidential information.  (RTF No. 43; MDF Nos. 56, 62)

15      IFS' derives significant economic value from keeping its Customer Lists

16  secret.  Sergio testified that "of course" customer information, including contact

17  information, decisionmaker, order history, margins, profitability and pricing is

18  confidential, that he would not share that information with people not affiliated with

19  Legacy and certainly would not share that information with a competitor, and that

20  Legacy's customer list is valuable to Legacy's busines and would be valuable to a

21  competitor.  (RTF No. 46.)  Sergio also testified that Legacy considers vendor

22  information to be confidential and does not share its costs from vendors or

23  distributors with competitors.  (*Id*.)  Indeed, in discovery, even with a protective

24  order in place, Legacy refuses to provide details about the sales to IFS' customers,

25

26  [3] As explained above, Defendants' arguments regarding the names of vendors and

27  the Dart Pricing Agreement is irrelevant as IFS does not assert those are IFS trade secrets.

28

CDF Labor Law LLP

2064324.1

1  sales to Legacy's other customers, credit information and other material information
2  that Legacy claims is confidential.  (Forman Decl. ¶ 14.)

3       Pablo testified that he gathered customer contact information with the help of
4  his IFS secretary who printed them out for Pablo and he considered the information
5  to be IFS' information.  (RTF No. 46.)  Savino testified that IFS customer list he
6  misappropriated had "value to him as a salesperson", that "value was to provide him
7  with information about contacts and various customers that he had called and
8  cultivated over the years" with IFS, and the collection of information was not
9  something he could Google.  (*Id.*)  Savino didn't want any other IFS sales
10 representative to know anything about the accounts he serviced for IFS, including
11 who he sold to and at what price, insisting that they "be treated with confidentiality."
12 (*Id.*)  Savino's wife, Cynthia, who performs work for Legacy, testified that Legacy
13 protects its pricing information and limits access to that information to certain
14 employees.  (*Id.*)

15      Customer lists and related information are subject to trade secret protection.
16 *Extreme Reach, Inc.*, 2013 WL 12081182, at *3;  *Hollingsworth Solderless Terminal*
17 *Co. v. Turley*, 622 F.2d at 1330; *Courtesy Temp. Serv., Inc.*, 222 Cal.App.3d at 1288;
18 *Semper/exeter Paper Co. LLC*, 2009 WL 10670619, at *5.

19      In a customer information trade secret case, the "most important consideration
20 is whether the information is readily accessible to a reasonably diligent competitor."
21 *Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332.  Here, IFS reasonably
22 protected its trade secret customer information from its competitor but was helpless
23 to protect Pablo and Savino's use of IFS' trade secrets for use by Defendant Legacy.

24      "In the context of customer lists, the answer to the question of whether the
25 information is readily accessible 'is often inferred from evidence concerning whether
26 the information is available in public directories,' but even if the names are in public
27 directories 'those names may appear among the names of many other businesses
28 which may be neither actual nor even potential customers of the plaintiff.  Hence, it

may be costly to parse from such a directory potentially profitable customers from entries not worth pursuing." *Extreme Reach*, 2013 WL 12081182, at *3 (quoting *Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332). "Thus, a customer list may be a trade secret even if the 'general class' of customers is 'readily accessible' to others." *Id.* quoting *Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332–33; *see also, Fitspot Ventures, LLC v. Bier*, 2015 WL 5145513 at *3 (C.D. Cal. September 1, 2015) citing *Courtesy Temp. Serv., Inc.,* 22 Cal.App.3d at 1288 and *Greenly v. Cooper,* 77 Cal.App.3d 382, 392 (1978).  Further, courts have recognized that information related to cost and pricing can be a trade secret. *Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1455 (2002).

       "As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1522 (1997); *see Way.com, Inc. v. Singh*, 2018 WL 6704464, at *10 (N.D. Cal. Dec. 20, 2018) (same) (quoting *Morlife*, 56 Cal.App.4th at 1522). Information has independent economic value due to its nondisclosure when its secrecy "provides a business with a 'substantial business advantage." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011) (quoting *Morlife*, 56 Cal.App.4th at 1522).

       Even Savino testified that IFS prevented their access to customer information related to IFS' customers that they did not service.  (Savino Decl., ¶ 2, Pablo Dec., ¶ 2.)  Here, the evidence demonstrates that IFS spent decades gathering its trade secret information, protecting it from dissemination and this information provides IFS a substantial competitive advantage.  Defendants used IFS' trade secrets to divert sales of at least $1,389,362.12 from at least 17 IFS customers in a mere 6 months. (RTF No. 32; MDF No. 50a.)  The trade secrets have significant value.

**F.**    **Defendants Used IFS Trade Secrets To Divert IFS' Sales**

       Savino and Pablo testified that each IFS customer that they converted to a

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  Legacy customer arose from a meeting or phone call that had been scheduled in their

2  role as an IFS salesperson with the use of IFS' devices to discuss the customer

3  purchasing from IFS.  (RTF No. 27; MDF No. 59.)  Ishmael Lopez, manager of

4  operations for Red Hot Chilis Inc., a non-party verifies Defendants' tortious actions.

5      Among other things Red Hot frequently purchased from IFS were Reyma-

6  brand foam products. In late 2021 or early 2022, Pablo called Mr. Lopez to discuss

7  Red Hot purchasing a number of products from IFS.  During that call, Pablo told him

8  that he could sell Reyma brand foam products to Red Hot from a new company in

9  Arizona called Legacy at a better price than the price at which IFS would sell Reyma

10  products to Red Hot and that Legacy would give Red Hot the same credit terms as

11  IFS had given to Red Hot.  Mr. Lopez did not show Pablo another vendor's quote or

12  ask him to match the pricing from another vendor.  In fact, Mr. Lopez had not asked

13  him for any discount pricing from IFS.  Pablo did not tell Mr. Lopez that IFS was not

14  able to supply Red Hot with Reyma brand's 8 ounce Foam Squats, 10 ounce Foam

15  cups, 12 ounce Foam cups, 16 ounce Foam cups and 20 ounce Foam cups.  He did

16  not tell Mr. Lopez any information that lead Mr. Lopez to believe that IFS was not

17  able to fulfill Red Hot's need for Reyma brand foam products.  (RTF No. 27.)

18      Pablo asked Mr. Lopez to keep the fact that he was selling products from

19  Legacy a secret from other employees of IFS.  On January 25, 2022, Mr. Lopez

20  received an email from Legacy with Legacy's quote for Reyma brand's 8 ounce

21  Foam Squats, 10 ounce Foam cups, 12 ounce Foam cups, 16 ounce Foam cups and

22  20 ounce Foam cups. The prices that Legacy offered were lower than the prices that

23  IFS, through Pablo, proposed to Red Hot prior to that date and so Red Hot purchased

24  the foam products from Legacy. (RTF No. 27.)

25      Within approximately six months of commencing sales, Defendants diverted

26  sales from at least 17 IFS customers in excess of $1,389,362.12.  (RTF No. 43; MDF

27  No. 50a.)

28  **G.**   **Partial Summary Judgment On Injunctive Relief Is Improper**

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

CDF Labor Law LLP

2064324.1

1   Defendants contend that even if the Court finds there are triable issues as to

2   IFS' trade secret claims, the Court should enter partial summary judgment on IFS'

3   request for injunctive relief because "the only information they have is old and

4   stale." However, Defendants continue to misrepresent to the Court the number of

5   IFS customers from which they successfully solicited business for Legacy using IFS

6   trade secret and confidential information, they refuse to produce material sales,

7   revenues and product information regarding Legacy business occurring after the

8   commencement of this lawsuit, and have testified that they are actively soliciting IFS

9   customers for Legacy business. Injunctive relief is the only relief that will prevent

10  the irreparable harm IFS continues to suffer as a result of Defendants'

11  misappropriation.

12      **1.    Defendants Concealed At Least 3 IFS Customers From Whom**

13          **Legacy Diverted Business — Perjury And A Fraud On The Court**

14  On multiple occasions in discovery and by declaration to this Court, including

15  most recently in their Motion for Partial Summary Judgment filed on October 3,

16  2022, Legacy's owners have sworn that they sold $1,389,362.12 in product to 17 IFS

17  customers from the time they commenced operations in August 2021 until the

18  termination of their employment with IFS on March 31, 2022.  (RTF No. 43; MDF

19  No. 50a.)  This is perjury and fraud on the Court.  The evidence demonstrates that

20  Defendants used IFS' trade secret and confidential information to identify, target and

21  divert sales from at least 20 of IFS' top customers, 4 of which IFS has lost entirely.

22  (MDF No. 57.)

23      **a.    Amapola Markets And Rong Cheng Trading**

24  Savino serviced IFS customers Amapola Markets and Rong Cheng Trading for

25  IFS.  (RTF Nos. 26, 41; MDF No. 50a.)  In fact, Rong Cheng was identified as one

26  of the top 5 accounts that Savino serviced.  (RTF Nos. 42, 43; MDF No. 50b.)

27  (telling Legacy personnel that Rong Cheng "is one of my biggest customers at IFS".)

28  On January 3, 2022, from IFS' server, Savino sent a quote for Amapola

CDF Labor Law LLP

2064324.1

1  Markets, an IFS customer he serviced, using IFS' pricing information to his personal

2  email.  (RTF No. 41.)  He also, at about the same time, sent, to his personal email, an

3  IFS report reflecting Amapola purchase and pricing history for the last three months

4  including each and every item purchased, the item number, description, vendor

5  name, date of last sale, quantity, dollar amount of sales, last sales price, new sell

6  price, difference in sell price, margin, and price on delivery.  (*Id*.)  While Savino

7  claimed that he did so to support a meeting with Amapola for IFS' purposes in about

8  two weeks' time,  (*Id*.) , his Legacy texts revealed that on January 4, 2022 he had met

9  with Amapola for Legacy, not IFS, and that Amapola was very interested in

10  switching over from Dart[4] to Reyma and bragged to the Defendants "**good thing**

11  **about this one is that I have all their pricing since I'm the one that sells them.**"

12  (RTF No. 27; MDF No. 50b.)[5]

13      The same day, he also met with Arizona-based Rong Cheng Trading.  Savino

14  told Pablo and Sergio that "[t]hey are very interested in switching over from Dart to

15  Reyma but they want to see samples and pricing."  (RTF Nos. 27, 42, 43, 47; MDF

16  No. 50b.)  On January 19, 2022, from IFS' server Savino sent to his personal email

17  two spreadsheets, one reflecting IFS' pricing information on certain Dart products,

18  and the other reflecting IFS' pricing information on certain Reyma products.  (RTF

19  No. 27.)  On February 24, 2022, from IFS' server, Savino emailed IFS' Competitive

20  Price Agreement with Dart for Socal Asian EPS, which contained pricing for many

21  of the Dart products IFS sold to Rong Cheng to his personal email.  (*Id*.)

22      Shortly thereafter and prior to March 31, 2022, Rong Cheng became a

23  customer of Legacy.  (MDF No. 50a.) Defendants' declarations that Amapola is not

---

25  [4] Savino admits that Legacy could not purchase Dart products because they weren't taking on new customers which he learned from IFS.  (Savino Depo. 314:5-20.)

26  [5] While, as of March 31, 2022, there is no evidence that Legacy had sold goods to

27  Amapola, Legacy refuses to provide written discovery of its sales to IFS' customers after March 31, 2022.

CDF Labor Law LLP

2064324.1

1  likely to become a customer of Legacy have no credence or foundation.

2          **b.**     **Espinoza Brothers and Puebla Produce**

3      In September 2021 Pablo secured Legacy's first order from IFS' customer

4  Puebla Produce.  (MDF No. 50a.)

5      Espinoza Brothers was an IFS customer in Fresno that Pablo serviced for IFS.

6  Pablo testified that he successfully solicited Espinoza Brothers in becoming a Legacy

7  customer.  "I've sold him through IFS for 24 years".  (*Id.*)

8      **2.**     **Defendants Continue To Solicit IFS' Customers For Legacy**

9      Pablo testified that Legacy is actively soliciting IFS customers for Legacy,

10  without limitation.  (RTF No. 43.)  Defendants will continue to use IFS' confidential

11  and trade secret information to solicit IFS customers for Legacy business causing

12  irreparable harm to IFS unless enjoined from doing so.  Defendants lied to IFS for

13  months while they operated a competing business, all the while still employed by,

14  and being paid hundreds of thousands of dollars by IFS.  Savino even characterized

15  his Legacy sales as "doing damage" to IFS.  (RTF No. 43.)  Defendants covered up

16  their wrongdoing.  Defendants' lies, and misappropriation of IFS' confidential

17  information and trade secrets caused IFS to lose revenue, irreparably damaged

18  relationships with customers and the goodwill of its business.

19  **IV.  NUMEROUS DISPUTED MATERIAL FACTS PRECLUDE SUMMARY**

20      **JUDGMENT ON IFS' UNFAIR COMPETITION AND CONVERSAION**

21      **CLAIMS**

22  **A.**     **The Unfair Competition Claim Is Not Preempted**

23      Defendants argue that IFS' unfair competition ("UCL") claim "seems to be

24  predicated solely on Defendants' alleged misappropriation of trade secrets."

25  However, a simple reading of the First Amended Complaint reflects that the unfair

26  competition claim is also based on Defendants' conversion, tortious inducement to

27  breach contract, tortious inducement to breach duty of loyalty, and tortious

28  interference with business relations/contract.  See FAC ¶ 119 ("IFS re-alleges and

1  incorporates the allegations of paragraphs 1-15, 28, 29, 31-42, 75-83, 96-103, 105-

2  111, and 113-118 of this Complaint as if fully set forth herein.")  Those allegations

3  rely on a different "nucleus of facts."

4      For example, the conversion claim alleges that Pablo and Savino improperly

5  took maintained, and converted IFS' property for their own use and benefit,

6  including but not limited to, documents, electronic files, ***cash and funds collected***

7  ***from IFS' customers that was not turned over to IFS, including compensation***

8  ***from IFS for time when Pablo and Savino provided services to LEGACY***.  (FAC

9  ¶¶ 95-103.)

10     The tortious inducement to breach duty of loyalty and tortious inducement to

11 breach contract claims are based on allegations that Defendants knowingly and

12 intentionally induced other IFS employees to breach their duty of loyalty and

13 contractual obligations to IFS.  (FAC ¶¶ 104-111.)

14     The tortious interference with business relations/contract claim alleges that

15 Defendants engaged in negligent or intentional conduct designed to disrupt the

16 business relationships between IFS and its customers, vendors, suppliers and

17 business venture partners by diverting existing or probable customers, suppliers and

18 business venture partners to LEGACY.  (FAC ¶ 112-118.)

19     Thus, the unfair competition claim is not preempted.  *See Robert Half Int'l,*

20 *Inc. v. Ainsworth*, 68 F. Supp. 3d 1178, 1189–90 (S.D. Cal. 2014) (claim for breach

21 of fiduciary duty by: (1) soliciting the RHI employees she was supervising to leave

22 the employ of RHI and go to work for a competitor; (2) spending large amounts of

23 time away from the office, failing to develop RHI's business, and encouraging the

24 employees she was taking with her to do the same; (3) organizing and participating

25 in a coordinated scheme to resign; (4) informing every RHI client with whom she

26 was working that she was leaving her employment with RHI; and (5) misleading an

27 RHI client into believing that RHI did not want that client's business was not

28 preempted by the CUTSA.)

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

1  **B.**     **Injunctive Relief And Restitution Under The UCL Is Proper**

2          Defendants argue that the UCL's remedies are improper because there is no

3  threat that the wrongful conduct will continue and no restitution to be had.  To the

4  contrary, the evidence clearly demonstrates the threat of continuing wrongful

5  conduct.  (RTF No. 43) To this very day, Defendants continue to lie to Defendants

6  and the Court regarding their unlawful conduct.  (MDF No. 50.)

7          Additionally, IFS is entitled to restitution of cash and funds that Defendants'

8  wrongfully converted.  The CUTSA "does not affect (1) contractual remedies,

9  whether or not based upon misappropriation of a trade secret, (2) other civil remedies

10  that are not based upon a misappropriation of a trade secret, or (3) criminal

11  remedies." Cal. Civ. Code § 3426.7 (b).  The UCL restitution civil remedy is not

12  based on the misappropriation of a trade secret.

13  **C.**     **The Conversion Claim Is *Not* Based On Trade Secret Misappropriation**

14          As set forth above, IFS' conversion claim is based on the conversion of

15  documents, electronic files, cash and funds collected from IFS' customers that was

16  not turned over to IFS, including compensation from IFS for time when Pablo and

17  Savino provided services to LEGACY.  (FAC ¶¶ 95-103.)  Defendants claim that "it

18  is undisputed that by April 7, 2022, Savino and Pablo had returned their IFS devices

19  and all cash that belonged to IFS."  However, neither of those purported

20  uncontroverted facts are supported by any evidence whatsoever.  (See SS UMF Nos.

21  37 & 38.)  Thus, Defendants failed to meet their burden and their motion must be

22  denied on that basis alone.

23          The evidence amply demonstrates that Pablo and Savino asserted that certain

24  goods had not been delivered to customers so that internal records reflected a

25  reduced sales price and charged customers the full price while Defendants converted

26  the differential of which Defendants wrongfully obtained possession and control.

27  Defendants failed to return IFS' property.  Summary judgment on IFS' conversion

28  claim must be denied.

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

CDF LABOR LAW LLP

2064324.1

# V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests the Court to deny the Motion in its entirety

Dated:  October 17, 2022        CDF LABOR LAW LLP
                                Amy S. Williams


                                By:   <u>/s/ Dan M. Forman</u>
                                        Dan M. Forman
                                Attorneys for Plaintiff/Counter-Defendant
                                PERRIN BERNARD SUPOWITZ, LLC, a
                                California LLC dba INDIVIDUAL FOODSERVICE

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

CDF Labor Law LLP

2064324.1