CDF LABOR LAW LLP
Dan M. Forman, State Bar No. 155811
dforman@cdflaborlaw.com
Amy S. Williams, State Bar No. 228853
awilliams@cdflaborlaw.com
707 Wilshire Boulevard, Suite 5150
Los Angeles, CA 90017
Telephone: (213) 612-6300

Attorneys for Plaintiff/Counter-Defendant PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE,

Plaintiff,

v.

PABLO MORALES, an individual; LEGACY WHOLESALE GROUP, LLC, an Arizona Limited Liability Corporation; SAVINO MORALES, an individual; and SERGIO ESCAMILLA, an individual; and DOES 1 through 20, inclusive,

Defendants.

---

LEGACY WHOLESALE GROUP, LLC,

Counter-Complainant,

v.

PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE,

Counter-Defendant.

---

Case No. 2:22-cv-02120-ODW-JEM

Judge: Otis D. Wright, II
Ctrm: 5D

**PLAINTIFF PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE'S RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Filed concurrently with:
(1) Notice of Motion;
(2) Declaration of Amy S. Williams;
(3) [Proposed] Order

Date: November 28, 2022
Time: 1:30 p.m.
Dept: 5D

## TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 1

II. SUMMARY OF FACTS .......... 6

A. IFS Is Engaged In The Highly Competitive Food Distribution Business .......... 6

B. IFS Developed Valuable Confidential And Trade Secret Information .......... 7

C. IFS Took Reasonable Measures To Keep Information Secret .......... 7

D. IFS Derives Significant Economic Value Keeping Trade Secrets Confidential .......... 8

E. Defendants Misappropriate IFS' Trade Secret And Confidential Information And Documents And Cause Irreparable Harm To IFS .......... 10

1. Defendants Concealed Their Identity To Form And Conduct Legacy Business .......... 10

2. Defendants Used Confidential Customer Information To Funnel Products To Legacy .......... 10

3. Defendants Fraudulently Induced IFS To Extend Credit And Sell Product To Legacy .......... 11

4. Defendants Use IFS' Trade Secret Inventory. Allocation And Pricing Information To Induce IFS To Sell Product To Legacy At Minimum Pricing And Resell That Product To IFS Customers At A Substantial Profit .......... 11

5. Savino Misappropriates IFS' Top Customer Report And Other Documents Containing Confidential And Trade Secret Information .......... 12

6. Legacy Uses IFS' Confidential and Trade Secret Credit Information to Provide Its Customers with Credit .......... 13

7. Pablo And Savino Solicit Top IFS' Salesmen And Sergio Instructs Them To Use Fake Names To Conduct Legacy Business .......... 13

8. IFS Customers And Former Legacy Employee Confirm That Defendants Stole IFS' Customers Using IFS' Devices, Customer Meetings And Confidential And Trade Secret Information .......... 14

## TABLE OF CONTENTS (cont.)

**Page**

F. Defendants Divert Sales Of At Least $1,389,362.12 From At Least 17 IFS Customers In A Period Of 6 Months ........................ 15
1. Defendants Concealed At Least 5 IFS Customers From Whom Legacy Diverted Business — Perjury And A Fraud On The Court ........................ 16
2. Amapola Markets And Rong Cheng Trading ........................ 16
3. Espinoza Brothers, Puebla Produce, Kennias and Luna Supply ........................ 17
4. Defendants Continue To Solicit IFS' Customers For Legacy ........................ 17
III. IFS MEETS STANDARD FOR PRELIMINARY INJUNCTION ........................ 17
IV. PRELIMINARY INJUNCTION SHOULD ISSUE ........................ 18
A. IFS Will Likely Succeed On The Merits Of Its Misappropriation Claims Under The DTSA And CUTSA ........................ 18
1. IFS' Protectable Trade Secrets Include Customer Information, Customer Credit, Pricing And Personnel Information ........................ 19
2. IFS Took Reasonable Precautions To Protect Trade Secrets ........................ 21
3. Defendants' Actions Constitute Misappropriation ........................ 22
B. Irreparable Harm ........................ 23
C. Balance of Equities ........................ 24
D. Public Interest ........................ 24
E. Bond ........................ 25
V. CONCLUSION ........................ 25

# TABLE OF AUTHORITIES

Page(s)

**State Cases**

*Courtesy Temp. Serv., Inc. v. Camacho*
222 Cal.App.3d 1278 (1990) .......... 19, 20

*Morlife, Inc. v. Perry*
56 Cal.App.4th 1514 (1997) .......... 20, 21, 24

*Whyte v. Schlage Lock Co.*
101 Cal.App.4th 1443 (2002) .......... 20

**Federal Cases**

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2010) .......... 18

*Arizona Dream Act Coalition v. Brewer*
757 F.3d 1053 (9th Cir. 2014) .......... 23

*Chartwell Staffing Servs. Inc. v. v. Atl. Sols. Grp. Inc.*
2019 WL 2177262 (C.D. Cal. May 20, 2019) .......... 21

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*
2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) .......... 19, 20, 21, 23, 24, 25

*Fitspot Ventures, LLC v. Bier*
2015 WL 5145513 (C.D. Cal. September 1, 2015) .......... 20, 21

*Fortinet Inc. v. FireEye Inc.*
2014 WL 4955087 (N.D. Cal., Sept. 30, 2014) .......... 19

*Hollingsworth Solderless Terminal Co. v. Turley*
622 F.2d 1324 (9th Cir. 1980) .......... 20

*Johnson v. Couturier*
572 F.3d 1067 (9th Cir. 2009) .......... 25

*Kewanee Oil Co. v. Bicron Corp.*
416 U.S. 470 (1974) .......... 24

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*
634 F.2d 1197 (9th Cir. 1980) .......... 24

*MAI Sys. Corp. v. Peak Computer, Inc.*
991 F.2d 511 (9th Cir. 1993) .......... 19, 22

*Mattel, Inc. v. MGA Entm't, Inc.*
782 F. Supp. 2d 911 (C.D. Cal. 2011) .......... 20

*Pac. Aerospace & Elec., Inc. v. Taylor*
295 F.Supp.2d 1188 (E.D. Wash. 2003) .......... 23

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*
944 F.2d 597 (9th Cir. 1991) ........ 23

*Salazar v. Buono*
559 U.S. 700 (2010) ........ 18

*Semper/exeter Paper Co. LLC v. Henderson Specialty Paper LLC*
2009 WL 10670619 (C.D. Cal. Sept. 21, 2009) ........ 20

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009) ........ 24

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
240 F.3d 832 (9th Cir. 2001) ........ 23

*Sun Distrib. Co., LLC v. Corbett*
2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) ........ 21, 22, 23

*Super-Krete Int'l, Inc. v. Sadleir*
712 F.Supp.2d 1023 (C.D. Cal. 2010) ........ 23

*The Lands Council v. McNair*
537 F.3d 981 (9th Cir. 2008) ........ 18

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*
609 F.3d 975 (9th Cir. 2010) ........ 18

*U.S. Philips Corp. v. KBC Bank N.V.*
590 F.3d 1091 (9th Cir. 2010) ........ 17

*Univ. of Tex. v. Camenisch*
451 U.S. 390 (1981) ........ 18

*WeRide Corp. v. Kun Huang*
No. 18-CV-07233-EJD, 379 F. Supp. 3d 834 (N.D. Cal. 2019) ........ 23

*Winter v. Natural Res. Def. Council, Inc.*
55 U.S. 7 (2008) ........ 18, 23, 24

**State Statutes and Regulations**

Cal. Civ. Code § 3426.1(d) ........ 19

**Federal Statutes and Regulations**

18 U.S.C. § 1839(3) ........ 19

18 U.S.C. § 1839(5)(A) ........ 22

18 U.S.C. § 1839(6)(A) ........ 22

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

**Federal Rules**

F.R.C.P. 65 .......... 17

F.R.C.P. 65(c) .......... 25

## I. INTRODUCTION

Plaintiff Individual FoodService ("IFS") asks this Court to enjoin the Defendants from further profiting from fraud, deception, cover up and misappropriation of IFS' confidential and trade secret information and property.[1] Defendants Pablo Morales ("Pablo"), Savino Morales ("Savino") and Sergio Escamilla ("Sergio"), through their company Defendant Legacy Wholesale Group, LLC ("Legacy"), used IFS' confidential and trade secret information to divert at least $1,389,362.12 in sales from IFS in a mere six months. (Savino Depo. 159:22-162:14; Ex. 85.)[2] IFS has completely lost at least 3 customers (Kershaw Decl. ¶ 8)[3] and stands to lose more customers, further damage to its goodwill and business by Defendants who testified that they are actively soliciting IFS customers and "doing damage" to IFS. (Pablo Depo. 342:13-343:20; Forman Decl. ¶ 12, Ex. K.)

IFS has yet to uncover the full extent of Defendants' fraud, deception, coverup and misappropriation as Defendants refuse to provide details regarding Legacy's sales and refuse to provide any information whatsoever about Legacy's sales after March 31, 2022, when IFS discovered Defendants' conduct. (Forman Decl. ¶ 14.) Despite Defendants' extensive coverup, IFS painstakingly uncovered proof that Pablo and Savino, among IFS' highest paid and most trusted salesmen, repeatedly used IFS' valuable trade secret customer information for Legacy's purposes, and Defendants have repeatedly lied to this Court regarding the extent to which their

---

[1] IFS brings this motion following the Court's granting IFS' Motion for Leave to Amend its Complaint to add a fraud cause of action against Pablo Morales at which time the Court concluded that IFS' then pending Motion for Preliminary Injunction ("MPI") was moot. (ECF 98.)

[2] The deposition testimony and exhibits referred to herein are located as follows: Sergio depo. ECF 170-1 and exhibits ECF 165; Cynthia Morales depo. ECF 169-2/170-2 and exhibits 165-1; Pablo depo. ECF 169-3/170-3 and exhibits 165-2; Savino depo. ECF 169-4/170-4 and exhibits 165-3.

[3] The Declarations referred to herein are located as follows: DeBilio Decl. ECF 33, Forman Decl. ECF 139, Kershaw Decl. ECF 141, Lesowitz Decl. ECF 109, Lopez Decl. ECF 144, Mesa Decl. ECF 32, Rice Decl. ECF 140, Shapiro Decl. ECF 143, Trujillo Decl. ECF 142.

conduct harmed and continues to harm IFS, including:

a. Defendants have repeatedly sworn that they formed Legacy because IFS prevented them from conducting IFS business in Arizona.[4] For years, Pablo and Savino traveled to Arizona twice a month ***to service IFS' customers*** and prospective customers, at IFS' expense. (Pablo Depo. 149:19-151:16, 226:15-227:19, 207:18-25; Ex. 65; Savino Depo. 188:2-190:11; Ex. 109.) Pablo serviced IFS customer, Acme Meats, in Arizona for 25 years. (Pablo Depo. 414:9-417:8.) Arizona customer, Rong Cheng Trading, was one of the largest customers that Savino serviced for IFS. (Savino Depo. 334:7-335:17, Ex. 146.)

b. Defendants have repeatedly sworn that Legacy conducted business with 17 IFS customers.[5] However, IFS discovered that number is at least 22. In addition to the 17 IFS customers from whom Defendants admittedly diverted business, Pablo and Savino admitted at deposition that they won over three more IFS customers for Legacy - Puebla Produce, Espinoza Brothers, and Rong Cheng Trading, one of the largest clients that Savino serviced for IFS. (Savino Depo. 176:8-9 & 14-16, Ex. 146, Pablo Depo. 452:3-457:3, Exs. 87, 88, Pablo Depo. Pablo 447:16-449:13; 451:23-452:2, Ex. 86.) Mr. Trujillo secreted Kennias for Legacy. (Trujillo Decl. ¶¶ 11, 13.) And, Counsel to Defendants revealed that Luna Supply, a former IFS customer, is a Legacy customer. (Defendants' Opp to MTC (ECF 156).)

c. Defendants admit they used meetings with IFS' customers, while working for IFS, scheduled using IFS' devices, and under the guise of IFS business, to sell Legacy's products. (Pablo Depo. 337:11-349:5; Savino Depo. 348:14-349:9.)

d. Defendants have repeatedly sworn that Legacy only sold products to IFS customers for which IFS was out of stock or where IFS would not match the customer's price request.[6] However, when asked to produce invoices to confirm this, Defendants refused, forcing IFS to file a motion to compel which is presently pending. In any event, Defendants sworn statements are belied by

---

[4] Savino Dec. ¶12,13 (ECF 20-1), Pablo Dec. ¶12,13 (ECF 20-4); Savino Dec. ¶13, 14 (ECF 40), Pablo Dec. ¶12,13 (ECF 41); Savino Dec. ¶13,14 (ECF 62), Pablo Decl.¶12,13 (ECF 63); Savino Dec.¶13,14 (ECF 106), Pablo Dec.¶ 12,13 (ECF 107).

[5] Savino Decl. ¶ 16 (ECF 20-1), Pablo Decl. ¶ 17 (ECF 20-4); Savino Decl. ¶ 17 (ECF 40), Pablo Decl. ¶ 19 (ECF 41); Savino Decl. ¶ 18 (ECF 62), Pablo Decl. ¶ 19 (ECF 63); Savino Decl. ¶ 18 (ECF 106), Pablo Decl. ¶ 19 (ECF 107); Sergio Depo. 113:4-114:6, Ex. 35, Savino Depo. 159:24-166:16; Pablo Depo. 426:12-428:5, Savino Depo., 159:22-162:14; Ex. 85.)

[6] Savino Decl. ¶ 14 (ECF 20-1), Pablo Decl. ¶ 15 (ECF 20-4); Savino Decl. ¶ 14 (ECF 40), Pablo Decl. ¶ 16 (ECF 41); Savino Decl. ¶ 15 (ECF 62), Pablo Decl. ¶ 16 (ECF 63); Savino Decl. ¶ 15 (ECF 106), Pablo Decl. ¶ 16 (ECF 107).

their own written communications (Williams Decl. ¶3, Ex. A); testimony from third parties (Lopez Decl. ¶¶ 5-11); and Legacy's own former employee. (Trujillo Decl. ¶¶ 10, 13.)

e. IFS provided Savino a detailed "Top Account" spreadsheet for the top five accounts he serviced for IFS including every item purchased, the item number, description, vendor name, date of last sale, quantity, dollar amount of sales, last sales price, new sell price, difference in sell price, margin, and price on delivery. Savino used that list to divert sales from at least three of those top accounts to Legacy. (Savino Depo. 159:24-162:14, 176:8-9, 14-16, 234:13-246:24, Exs. 85, 117, 146, Pablo Depo. 447:16-449:13, 451:23-457:3, Exs. 86, 87, 88.)

f. Savino emailed an "Account Contact Spreadsheet" to his wife's personal email for Legacy's use. The spreadsheet was created by IFS employees over the course of many years and included customer name, customer contact, work phone number, cell phone number, email address, names and contact information for the customer's warehouses and notes regarding customer preferences. Savino testified that this spreadsheet had "value to him as a salesperson", that "value was to provide him with information about contacts and various customers that he had called and cultivated over the years" with IFS, and the collection of information was not something he could Google. (Savino Depo. 300:2-305:2, Ex. 136.)

g. Savino sent a highly confidential Customer Report for IFS customer Amapola Markets to his wife's personal email. This report contained information regarding each item purchased by Amapola by item number, unit, description, vendor name, last sale, quantity, $ sales, current office cost, last unit sell price, margin and IFS buyer. The very next day, he bragged to Pablo and Sergio that he had met with Amapola for Legacy and "***good thing about this one is that I have all their pricing since I'm the one that sells them.***" (Savino Depo. 310:1-314:20, Ex. 139.)

h. Email communications reveal Defendants caucused on using IFS' credit information about IFS' customers for Legacy's credit decisions to save the cost of running credit checks. (Savino 275:12-285:4, Ex. 102; Sergio Depo. 227:2-228:19, Ex. 56; Cynthia Depo. 97:21-101:16, Ex. 3, 4.) While Defendants deny implementing that practice, one of IFS' customers confirmed this practice (Lopez Decl. ¶5) as do text messages among the Defendants and their employees. (Savino 79:17-19, 82:1-82:5, Ex. 102 at 2871; Forman Decl. ¶10, Ex. I.)

i. Defendants condoned the use of IFS' devices and cell phone numbers by its employees for Legacy's benefit and even caused those employees to send IFS'

confidential information to them for Legacy. (Trujillo Decl. ¶ 4, Mesa Decl. ¶¶ 6, 9, Ex. 1.)

Indeed, the entire relationship between IFS and Legacy was built on Defendants' fraud and deception.

j. At the outset, Pablo, Savino and their friend Sergio, a California lawyer, intentionally kept Pablo and Savino's names out of the ownership of the business. (Sergio Depo. 16:4-11, 65:6-14; 84:1-85:2, 98:8-100:22, 185:6-186:21, Exs. 28, 42 ("I don't want your names on it for the reasons we discussed.)

k. They created fake names for use with Legacy. (Sergio Depo. 69:15-24; Pablo 145:18-148:3, Ex. 36.)

l. In August 2021, when supply chain issues posed an impediment to Legacy's ability to secure product, Pablo fraudulently induced IFS to provide credit to Legacy and authorize the sale of goods to Legacy without disclosing his or Savino's conflict of interest by ownership of Legacy. (DeBilio Decl. ¶ 9, 10; Pablo Depo. 363:14-383:23, Exs. 77, 78, Sergio Depo. 174:2-177:24, Ex. 40; Shapiro Decl. ¶ 12.)

m. Legacy had no factual basis for the planned $20,000/month purchase volume that Legacy told IFS it was going to do. (Sergio Depo. 174:16-177:24.)

n. On August 25, 2021 Pablo mislead IFS in a written email communication "Don't put [Legacy] on hold on 2nd order. You might as well lose that customer for me!!!" at a time when he was an owner of Legacy and had control over its decision-making. (Pablo Depo. 244:16-249:3, Ex. 74.)

o. Further, on August 25, 2021 when Pablo knew that IFS' competitors, PNR and R3, were not vendors to Legacy, yet Pablo misrepresented, in writing, to IFS that he "took [Legacy] from PNR and R3" so that IFS believed that it faced competition from PNR and R3 to induce IFS to expedite its decision-making about accepting an order for goods from Legacy. (*Id*.; Sergio Depo. 246:1-19)

p. Pablo also fraudulently induced IFS to extend favorable credit terms to Legacy. Originally, IFS provided Legacy with net 7-day terms and a $3,000 credit limit. On August 26, 2021 Pablo told IFS in a written communication that "[Legacy will be] ordering 10-12K a week. ***Our competition*** gives him $20K a week 21 days credit" at a time when Pablo knew Legacy had no terms from any competitor of IFS. (Pablo Depo. 363:14-383:23, Exs. 77, 78 (emphasis added).) Pablo conceded at deposition that there was no factual basis to that statement. (*Id*.) On September 3, 2021, Pablo again misrepresented Legacy's creditworthiness to IFS asserting that "PNR our

competition gives him 21 days at 20K a week" and "just tell me what we should tell [Legacy] after I told [Legacy] we would match PNR's credit" when Pablo knew that PNR was not a vendor of Legacy. (Pablo Depo. 363:14-383:23; Sergio Depo. 246:1-19.) As a result, IFS approved net 21-day terms and a $30K credit limit, which enabled Legacy to place large orders with IFS at low prices and resell the product to IFS' customers at a profit to Legacy. (Shapiro Decl. ¶ 13, 14, 19.)

q. Even after Legacy was approved, Pablo attempted to gain additional favorable terms for Legacy based on false pretenses demanding that IFS give Legacy a 3% rebate telling IFS, "I had to promise a 3% rebate to Legacy or else I'm losing the account. Not sure if he'll still stay." (Shapiro Decl. ¶ 20, Ex. 2.)

r. On October 29, 2021, Pablo misrepresented to IFS "Can you help my AZ customer get better pricing. Three chain customer is buying at this price and I believe we have a ridiculous cost" referring to IFS' authorized pricing for Legacy. (Shapiro Decl. ¶ 21, Ex. 3.)

s. On November 2, 2021, Pablo sought reduced pricing on products for Legacy by fraudulently representing that Legacy was purchasing at a certain price from Western Paper, another distributor from whom Legacy did not purchase any products. (Pablo Depo. 395:8-397:19, Ex. 80; Sergio Depo. 246:1-19.)

t. Legacy hired two of IFS' top sales performers, Hugo Mesa and Jesus Trujillo, and directed them not to use their real names. (Trujillo Decl. ¶¶ 3-5; Pablo Depo. 488:24-493:19, Ex. 98*;* Savino Depo. 54:7-98:3, Ex. 102.)

u. On November 17, 2021 Pablo texted a Legacy employee that he had used IFS' system to check inventory on a product, that he was "trying to get old pricing" from IFS and that he was "working [Jeremy Shapiro, EVP and Chief Merchandising Officer for IFS]". (Forman Decl. ¶11, Ex. J.) Pablo used his knowledge and ability to set IFS' confidential pricing to cause IFS to sell to Legacy at prices substantially lower than prices than it would otherwise have been charged in an arms-length transaction and with knowledge that Legacy intended to sell the goods to IFS' customers and potential customers at a profit to Legacy. (Shapiro Decl. ¶14; Trujillo Decl. ¶13.)

v. Savino even characterized his Legacy sales as "doing damage" to IFS. (Forman Decl. ¶ 12, Ex. K.)

Legacy's coverup and efforts to stonewall discovery cannot camouflage that Defendants continue to use IFS' trade secrets and confidential information to irreparably harm IFS. IFS is likely to prevail on the merits. Accordingly, IFS asks the Court to enjoin Legacy and its owners, their agents, employees, representatives, and

those acting in concert from:

1. Any further use or disclosure of IFS' confidential or trade secret information: (a) that may be used to contact, sell to, take orders from, make credit decisions with respect to IFS' customers or former customers that Pablo and Savino served while employed at IFS; (b) that may be used to contact or buy from IFS' vendors; or (c) that may be used to hire IFS' employees;

2. Continuing to do business with any of IFS' customers that Savino Morales, Pablo Morales, or any IFS employee hired by Legacy serviced for IFS, including but not limited to the 17 customers from whom Defendants admittedly diverted business and the other IFS clients that were concealed from Plaintiff and the Court, including but not limited to Kennias, Luna Supply, Rong Cheng, Espinoza Brothers, Puebla Produce and Amapola Markets (Legacy attempted to divert Amapola's business);

3. Soliciting any of IFS' other customers that Savino Morales, Pablo Morales, or any IFS employee hired by Legacy serviced for IFS, and

4. Hiring any IFS employee that was employed by IFS in the 24 months prior to April 1, 2022.

IFS (1) is likely to succeed on the merits; (2) is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in favor of injunctive relief; and (4) an injunction is in the public interest.

## II. <u>SUMMARY OF FACTS</u>

### A. <u>IFS Is Engaged In The Highly Competitive Food Distribution Business</u>

IFS is one of the largest food distribution businesses in the Western United States and has been in the business for decades. (DeBilio Decl. ¶ 15(a).) A food distribution business, like IFS, purchases goods from manufacturers and large suppliers and sells those goods to restaurants, convenience stores, grocery stores, schools, hospitals and other businesses that use and resell food, beverages, storage containers, disposable utensils, food preparation equipment, cleaning and janitorial supplies. (*Id.*¶ 6.) The food distribution business is a highly competitive business.

(*Id.*) Each food distribution enterprise maintains proprietary information that has significant value when maintained in confidence. (*Id.* at ¶ 7.) Such information also has great value to a food distribution company's competitors. (*Id.*)

**B. <u>IFS Developed Valuable Confidential And Trade Secret Information</u>**

IFS, over the course of many years and at great expense, developed valuable confidential and trade secret information including:

- internal communication of pricing and sales strategies;
- sales data reports detailing confidential customer data including customer name, customer contact or contacts, decisionmaker, decisionmaker's contact information, direct dial, cell phone, customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories, sales volume, product assortment, manufacturer's names for each item, and trends that could be used to promote greater sales ("Customer Lists");
- prospective client contact information;
- presentation materials;
- confidential manufacturer communications specific to IFS, including inventory allocations, contracts between IFS and manufacturers and vendors, and special purchases unique to IFS;
- vendor contacts, vendor reliability, vendor quantities, product qualities, allocations, and other information ("Vendor Lists");
- IFS' employee performance information;
- Private label brand manufacturers, products and training;
- IFS' financial information and data, and IFS' product catalogue, pricing schedules, and selling resources;
- and warehouse organization (collectively "Trade Secrets"). (Shapiro Decl. ¶3.)

For the purposes of this Motion, IFS focuses on: (a) IFS' customer information, including sales history, order history, product needs, and contacts, and credit information, (b) IFS' confidential pricing to surreptitiously provide Legacy with advantageous pricing, (c) IFS' confidential personnel information that Legacy used to hire IFS' top employees.

**C. <u>IFS Took Reasonable Measures To Keep Information Secret</u>**

IFS took reasonable efforts to protect the confidential nature of its Trade Secrets as that information provides significant value to IFS by maintaining it in confidence. (DeBilio Decl. ¶ 15(e); Lesowitz Decl. ¶ 2-5, Ex. K; Shapiro Decl. ¶¶ 3-6, 9-11; Kershaw Decl.¶¶ 4-6; and Rice Decl. ¶¶ 2-8, Exs. A-G.) IFS' efforts include, among other things, maintaining trade secret information in a password protected computer system, including a multi-factor authentication for VPN and scheduled password resets. (Savino Depo. 90:17-92:4, 190:12-192:4, Ex. 110.) In addition, IFS secures its premises, allowing only IFS employees to enter IFS' premises and warehouse and requiring an escort for any non-IFS employee. (Pablo Depo. 63:25-64:2, 65:7-18.) Further, IFS requires, as a condition of employment that its employees enter into confidentiality agreements and agree to protect IFS' confidences and disclose any potential or actual conflict of interest. (*Id*.; Pablo Depo. 65:19-66:12; 119:17-120:10.)

Pablo and Savino joined IFS in 1995 and 1997 and agreed to the terms of IFS' 2019 Employee Handbook including its Code of Ethics, Reporting Irregularities, Conflict of Interest, reporting Potential Conflicts of Interest, Confidentiality Agreement, Employee Proprietary Information and Non-Disclosure Addendum, and Removal of Items and Property as well as stand-alone Confidentiality and Non-Disclosure Agreements (collectively "Employment Agreements"). (Rice Decl. ¶¶ 3-4, Ex. A, B, C, D & E; *see also* IFS Opp to MPSJ at ECF 168:17.) Because Pablo and Savino agreed to keep IFS' confidences, by agreement and through access to IFS' password protected computer systems, IFS provided them with its Trade Secrets. (Shapiro Decl. ¶ 4.)

### D. <u>IFS Derives Significant Economic Value Keeping Trade Secrets Confidential</u>

IFS' Trade Secrets are not publicly available on the internet or in any trade journals or magazines and IFS derives significant economic value from keeping its confidential customer, vendor and employee information confidential to IFS.

(Shapiro Decl. ¶ 6; Kershaw ¶ 10.) As a distributor, which does not manufacture goods, these are the IFS' most important assets. (*Id*.) IFS' competitors would, and Legacy and its owners did and continue to, obtain an unfair and damaging economic competitive advantage from IFS's confidential information. (*Id*.)

For example, Sergio testified that "of course" customer information, including contact information, decisionmaker, order history, margins, profitability and pricing is confidential, that he would not share that information with people not affiliated with Legacy and certainly would not share that information with a competitor, and that Legacy's customer list is valuable to Legacy's busines and would be valuable to a competitor. (Sergio Depo. 75:10-14; 77:13-22; 78:13-79:19 ("I don't want my customer list provided to any competitor.") Sergio also testified that Legacy considers vendor information to be confidential and does not share its costs from vendors or distributors with competitors. (Sergio Depo. 79:23-82:4; 83:12-15.) Indeed, in discovery, even with a protective order in place, Legacy refuses to provide details about the sales to IFS' customers, sales to Legacy's other customers, credit information and other material information that Legacy claims is confidential. (Forman Decl. ¶ 14.)

Pablo testified that he gathered customer contact information with the help of his IFS secretary and he considered the information to be IFS' information. (Pablo Depo. 128:20-133:25.)

Savino testified that the IFS' customer list that he misappropriated had "value to him as a salesperson", that "value was to provide him with information about contacts and various customers that he had called and cultivated over the years" with IFS, and the collection of information was not something he could Google. (Savino Depo. 300:2-305:2, Ex. 136.) Savino didn't want other IFS sales representatives to learn about the accounts he serviced for IFS, including who he sold to and pricing, insisting that they "be treated with confidentiality." (Shapiro Decl. ¶ 5, Ex. 1.)

Savino's wife, Cynthia, who performs work for Legacy, testified that Legacy

protects its pricing information and limits access to that information to certain employees. (Cynthia Depo. 58:2-25.)

**E. Defendants Misappropriate IFS' Trade Secret And Confidential Information And Documents And Cause Irreparable Harm To IFS**

**1. Defendants Concealed Their Identity To Form And Conduct Legacy Business**

Pablo and Savino worked for IFS as outside salesmen for more than 20 years. They were some of the most trusted and highest paid salesman in the company, together earning nearly a million dollars annually. (Shapiro Decl.¶ 22.) In March 2021, Pablo, Savino, and their friend Sergio, an attorney, formed a competing business, Legacy. They went to extraordinary lengths to conceal their ownership of Legacy so they could continue their employment with IFS while directly competing. (Sergio Depo. 73:8-12.) First, they created fake names, Paolo Ruiz and Sam Ruiz. (Sergio Depo. 69:15-24; Pablo 145:18-148:3, Ex. 36.) Next, they selected a name, Legacy Wholesale Group, LLC, that did not contain any reference to Pablo or Savino Morales. (Sergio Depo. 65:6-14; 185:6-186:21, Ex. 42.)

On March 17, 2021 Sergio filed Articles of Organization which identified him as the only principal of Legacy and designated the statutory agent Solares Enterprise Group, LLC, a company he had formed for real estate ventures. (Sergio Depo. 16:4-11, 84:1-85:2, Ex. 28.) Further, although Sergio was named in the Operating Agreement, Pablo and Savino formed a trust to hold their membership so that their names would not be disclosed in the corporate records. (Sergio Depo. 98:8-100:22.)

In fact, when Pablo and Savino poached employees from IFS for Legacy, they hid their ownership of Legacy and directed the employees to use false names. (Trujillo Decl. ¶¶ 3, 5.) Once the ruse was exposed and IFS terminated Pablo and Savino's employment, Sergio told them to change their Legacy signature blocks to reflect their true names. (Pablo Depo. 354:16-357:2, Ex. 76.)

**2. Defendants Used Confidential Customer Information To Funnel**

**Products To Legacy**

Before Legacy became a customer of IFS, Pablo and Savino funneled products to Legacy by placing an order under IFS' customer account, La Nueva Fuente, and intercepting the delivery. (Sergio Depo 220:2-226:2, Ex. 54, 55; Pablo Depo. 171:10-178:12, Exs. 54, 57.) To avoid discovery by IFS, Defendants paid cash, and when Pablo's wife mistakenly emailed Pablo at his IFS email, Sergio instructed Pablo to wipe the email from the IFS server to cover their tracks. (*Id*.)

**3. Defendants Fraudulently Induced IFS To Extend Credit And Sell Product To Legacy**

Defendants fraudulently induced IFS to extend credit and sell product to Legacy at extremely favorable terms and at substantially reduced pricing. (*See supra* Intro, u.) After IFS questioned the profitability of sales to Legacy and the future of IFS' relationship with Legacy, Pablo and Sergio worked in concert to maintain the deception. On February 18, 2022, Pablo told IFS that he has "a million-plus account in Phoenix" referring to Legacy. (Pablo 401:5-405:14; 410:20-417:8, Ex. 82.) And, then Pablo warned Sergio that IFS may reach out to him and instructed him to mislead IFS that Legacy's "primary targets are Shamrock, Sysco, and Tapia accounts", which Sergio agreed to do. (Pablo 417:22-420:17, Ex. 83.)

**4. Defendants Use IFS' Trade Secret Inventory. Allocation And Pricing Information To Induce IFS To Sell Product To Legacy At Minimum Pricing And Resell That Product To IFS Customers At A Substantial Profit**

Defendants knew IFS' inventory, whether product was on allocation, and the minimum price that they were authorized to charge a customer for such product ("office cost"). (Shapiro Decl. ¶¶ 6-8, 13-15, 18; Kershaw Decl. ¶ 5.) Defendants used this confidential and trade secret inventory, allocation and pricing information and fraudulently induced IFS to sell product to Legacy at minimum pricing and then caused Legacy to resell that product to IFS' customers at a substantial markup,

depriving IFS of the inventory and the opportunity to sell limited products to those or other customers at higher prices. (*Id*., Kershaw Decl. ¶¶ 6-8.) For example, on September 22, 2021 Pablo attempted to place an order for cups for Legacy which, at the time, were the "hardest products to get" and at a price that would have been a loss to IFS. Pablo persuaded IFS to authorize the sale by increasing the price by a mere $2 per case, a price lower than his authorization by misrepresenting to IFS that "I'm trying to kick PNR ass and this account will and is buying more and more" when Pablo knew that Legacy had no relationship with PNR. (Pablo Depo. 389:16-393:11, Ex. 79; *see also supra* Intro, o, p.)

Despite IFS' warnings of December 6, 2021 and February 24, 2022, that Pablo was selling to Legacy at margins that were too low, Pablo continued to sell to Legacy at the lowest permissible margins, even fraudulently requesting a 3% rebate (Shapiro Decl. ¶ 20, Ex. 2) as significantly, IFS' margin before paying commissions and certain other costs, on Pablo's sales to Legacy was 6%. (Kershaw Decl. ¶ 6.) In comparison, Legacy reported that its profit margins on sales to IFS customers in 2022, through March 31, 2022, was 19.93%. (*Id*. at ¶ 4.) Had Pablo and Savino sold IFS' goods directly to customers of IFS, they could have sold those goods, on average, at prices 20% higher than what Pablo charged to Legacy for the same goods. (*Id*. at ¶ 6.)

**5. <u>Savino Misappropriates IFS' Top Customer Report And Other Documents Containing Confidential And Trade Secret Information</u>**

On August 4, 2021, within weeks of Legacy commencing operations, Savino secured a report of the top 5 IFS accounts he serviced. (Savino Depo. 234:13-246:24, Ex. 117.) The report identifies each and every item purchased, the item number, description, vendor name, date of last sale, quantity, dollar amount of sales, last sales price, new sell price, difference in sell price, margin, and price on delivery. (*Id*.) The evidence demonstrates that within the next 6 months Legacy had diverted sales from at least 3 of these top customers, 2 of which they disclosed — Haros Food Service

and Pacific Coast Produce in an amount of $178,858.89 — and a third, Rong Cheng Trading, which Defendants concealed and continue to conceal from the Court.

Additionally, Savino sent numerous documents containing IFS' confidential and trade secret information from the password protected IFS server to his wife's personal email for Legacy's use, including competitive price agreements (Savino Depo. 233:7-234:12, Exs. 25, 116; Cynthia 117:8-20, Ex. 14); IFS customer purchase and pricing spreadsheets (Savino Depo. 307:2-309:11, Exs. 137, 138); and a customer contact spreadsheet for those IFS customers that Savino serviced for IFS (Savino Depo.300:2-305:2, Ex. 136), in addition to documents identified in section F2 below. And, Savino and Pablo induced Hugo Mesa, one of the IFS employees, hired to undertake sales for Legacy, to send them the list of JanSan suppliers that he had cultivated for IFS. (Mesa Decl. ¶ 9, Ex. 1.) Sergio admitted that Legacy's customer lists, pricing information and vendor information is confidential yet has argued that IFS' is not. (*See* Sergio Depo. 75:10-14; 77:13-22; 78:13-79:19.)

**6. <u>Legacy Uses IFS' Confidential and Trade Secret Credit Information to Provide Its Customers with Credit</u>**

*See supra* Intro, h.

**7. <u>Pablo And Savino Solicit Top IFS' Salesmen And Sergio Instructs Them To Use Fake Names To Conduct Legacy Business</u>**

Pablo and Savino used their knowledge of IFS salesmen performance to solicit two of IFS' top salesmen for Legacy, Jesus Trujillo and Hugo Mesa. (Pablo Depo. 210:12-211:2.)

In September 2021, Pablo and Savino told Mr. Trujillo about Legacy and that he could make extra money selling Legacy's goods but hid their ownership stake. (Trujillo Decl. ¶ 3.) Sergio then met with Mr. Trujillo and instructed him to use the code name Guillermo and to keep the fact that he worked for Legacy hidden from IFS. (*Id*. at ¶¶ 3-5, 7,8, Exs. 1, 2; Sergio Depo. 217:10-19, Ex. 53 ("I got Jesus looking for business for us now. Hopefully he'll have good luck brother. He's go by

the name of Guillermo.")) While Mr. Trujillo did not wish to bring IFS' customers to Legacy, he relented to the pressures and incentives that Legacy provided to him. (*Id*. at ¶ 10, Ex. 4.) From September 2021 until March 29, 2022, Mr. Trujillo obtained 20 new customers for Legacy, one of which was a customer that Mr. Trujillo serviced for IFS, and each of which could have purchased their products from IFS at similar or better prices than the pricing offered by Legacy. (*Id*. at ¶¶ 10-13.)

A few months later, Legacy hired Hugo Mesa. (Mesa Decl. ¶ 3.) Defendants told Mr. Mesa that since they did not yet have business cards, he should give prospective customers his IFS cell phone number and tell them that he was a Legacy Sales Consultant, but that he should not use his real name and so Mr. Mesa went by Armando. (*Id*. at ¶ 6; Pablo Depo. 488:24-493:19, Ex. 98*;* Savino Depo. 54:7-98:3, Ex. 102.) Savino admitted to Mr. Mesa that he told IFS customers that Legacy could offer the same products as IFS but at lower prices and that Legacy could ship to any IFS customers, especially other distributors, at lower prices than IFS charged. (*Id*.) Mr. Mesa made several trips to Arizona to try to set up new accounts for Legacy, each of which were during the middle of the week on days where Mr. Mesa was being paid by IFS. (*Id*. at ¶ 7.) Significantly, Savino and Pablo instructed Mr. Mesa to send them his most recent manufacturer contact list, which he did. (Mesa Decl. ¶ 8 & 9, Ex. 1.) That list, the IFS Janitorial Supplier Contact List, was prepared by IFS over the course of many years, is not publicly available and has significant value to IFS and would have significant value to IFS' competitors, like Legacy. (*Id*.; Pablo 281:20-283:25; Savino 324:18-326:20; Exs. 72, 143.)

**8. <u>IFS Customers And Former Legacy Employee Confirm That Defendants Stole IFS' Customers Using IFS' Devices, Customer Meetings And Confidential And Trade Secret Information</u>**

Defendants stole IFS' customers using IFS' devices, IFS' customer meetings and IFS' confidential and trade secret information. (*See supra* Intro, c & i.) IFS customers, Red Hot and La Surtidora, and former Legacy employee, Jesus Trujillo,

confirm this.

Non-Party Red Hot demonstrated that in late 2021 or early 2022, Pablo called Mr. Lopez to discuss Red Hot purchasing products from IFS, however, during that call, Pablo told him that he could sell Reyma brand products to Red Hot from a new company in Arizona called Legacy at a better price than the price at which IFS would sell Reyma products to Red Hot and that Legacy would give Red Hot the same credit terms as IFS had given to Red Hot. Pablo did not tell Mr. Lopez that IFS was unable to supply the product, and Mr. Lopez did not show Pablo another vendor's quote, ask him to match the pricing from another vendor, or ask for any discount pricing from IFS. Rather, Pablo asked Mr. Lopez to keep the fact that he was selling products from Legacy a secret. A few weeks later Mr. Lopez received a quote from Legacy offering prices that were lower than the prices IFS had previously proposed and so Red Hot purchased the products from Legacy. (Lopez Decl. ¶ 2-12.)

Jesus Trujillo confirms that Pablo and Savino encouraged him to set up meetings with IFS customers and to offer those customers Legacy's products when IFS could not fulfill the sale due to a specific brand shortage as opposed to offering alternative IFS products. (Trujillo Decl. ¶ 10.)

Jeremy Shapiro met with the General Manager of La Surtidora, an 11-year IFS customer. The GM told Mr. Shapiro that in the few months before April 2022 he called Savino to order items from IFS, Savino told him that IFS did not have those items but that Savino was also a sales rep for a company called Legacy and that he knew Legacy could supply those products at a lower cost than IFS. The GM toured Mr. Shapiro through his inventory and the products he bought from Legacy, all of which IFS could have supplied. (Shapiro Decl. ¶¶ 26, 27.)

**F. <u>Defendants Divert Sales Of At Least $1,389,362.12 From At Least 17 IFS Customers In A Period Of 6 Months</u>**

Information provided by Defendants demonstrate that between August 2021 and March 31, 2022, Defendants diverted sales of at least $1,389,362.12 from at least

17 IFS customers. (Savino Depo. 159:22-162:14; Ex. 85.)

**1. Defendants Concealed At Least 5 IFS Customers From Whom Legacy Diverted Business — Perjury And A Fraud On The Court**

On multiple occasions in discovery and by declaration to this Court, including most recently in their Motion for Partial Summary Judgment filed on October 3, 2022, Defendants have sworn that they sold $1,389,362.12 in product to 17 IFS customers from the time they commenced operations in August 2021 until the termination of their employment with IFS on March 31, 2022. (*See supra* Intro, b.) This is perjury and fraud on the Court.

Defendants knowingly concealed Legacy sales to IFS customers Rong Cheng Trading, Espinoza Brothers, Puebla Produce, Kennias and Luna Supply, and their attempts to solicit Amapola Markets. The evidence demonstrates that Defendants used IFS' trade secrets to identify, target and divert sales from at least 22 of IFS' top customers, 3 of which IFS has lost entirely. (*Id*.)

**2. Amapola Markets And Rong Cheng Trading**

Savino serviced IFS customers Amapola Markets and Rong Cheng Trading for IFS.[7] On January 3, 2022, from IFS' secure server, Savino sent a quote for Amapola Markets using IFS' pricing information to his personal email as well as an IFS report reflecting Amapola's purchase and pricing history for the last three months. (Savino Depo. Exs. 134, 135.) While Savino claimed that he did so to support a meeting with Amapola for IFS' purposes, his Legacy texts revealed that on January 4, 2022 he met with Amapola for Legacy, not for IFS, and that Amapola was very interested in switching over from Dart[8] to Reyma via Legacy and bragged to the Defendants "***good thing about this one is that I have all their pricing since I'm the one that***

---

[7] *See supra* Intro, b and g; *see also* Pablo Depo. 149:19-151:16, 226:15-227:19, 207:18-25, 414:9-417:8; Ex. 65; Savino Depo. 188:2-190:11; 310:1-314:20, 334:7-335:17, Exs. 109, 139, 146.)

[8] Savino admits that Legacy could not purchase Dart products because they weren't taking on new customers which he learned from IFS. (Savino Depo. 314:5-20.)

***sells them.***" (*Id*. at Ex. 139)[9]

The same day, he also met with Arizona-based Rong Cheng Trading. Rong Cheng was identified as one of the top 5 accounts that Savino serviced. (*See supra* Intro, b (telling Legacy personnel that Rong Cheng "is one of my biggest customers at IFS".) Savino told Pablo and Sergio that "[t]hey are very interested in switching over from Dart to Reyma but they want to see samples and pricing." (*Id*. at Ex. 139.) On January 19, 2022, from IFS' server, Savino sent to his personal email two spreadsheets, one reflecting IFS' pricing information on certain Dart products, and the other reflecting IFS' pricing information on certain Reyma products. (*Id*. at Exs. 137, 138.) On February 24, 2022, from IFS' server, Savino emailed IFS' Competitive Price Agreement with Dart for Socal Asian EPS, which contained pricing for many of the Dart products IFS sold to Rong Cheng to his personal email. (*Id*. at Ex. 116.) Shortly thereafter and prior to March 31, 2022, Rong Cheng became a customer of Legacy. (*Id*. at Ex. 146.)

**3. <u>Espinoza Brothers, Puebla Produce, Kennias and Luna Supply</u>**

*See supra*, Intro, b.

**4. <u>Defendants Continue To Solicit IFS' Customers For Legacy</u>**

Legacy is actively soliciting IFS customers for Legacy, without limitation. (Pablo Depo. 342:13-343:20.) Defendants will continue to use IFS' confidential and trade secret information to solicit IFS customers for Legacy business causing irreparable harm to IFS unless enjoined from doing so.

## III. <u>IFS MEETS STANDARD FOR PRELIMINARY INJUNCTION</u>

Federal Rule of Civil Procedure 65 provides injunctive relief is to preserve the rights and relative positions of the parties, *i.e.*, the status quo, until a final judgment issues. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir.

---

[9] While, as of March 31, 2022, there is no evidence that Legacy had sold goods to Amapola, Legacy refuses to provide written discovery of its sales to IFS' customers after March 31, 2022.

2010) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). An injunction is an exercise of a court's equitable authority, which should not be invoked as a matter of course, but rather "only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700 (2010).

A plaintiff seeking injunctive relief must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008)). An injunction may also be appropriate when a plaintiff raises "serious questions going to the merits" and demonstrates that "the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2010) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). Legacy's continued use of IFS' trade secrets continues to cause IFS irreparable harm.

## IV. PRELIMINARY INJUNCTION SHOULD ISSUE

### A. IFS Will Likely Succeed On The Merits Of Its Misappropriation Claims Under The DTSA And CUTSA

Congress enacted the DTSA to provide a "single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved." *See H.R. Rep.* 114-529, Defend Trade Secrets Act of 2016 (Apr. 26, 2016). The DTSA defines "trade secret" broadly to include:

> *all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas* ... whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through

> proper means by, another person who can obtain economic value from the disclosure or use of the information....

18 U.S.C. § 1839(3) (emphasis added). The DTSA covers "all forms and types of financial, business ... information" if (1) the owner has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to the public.

The DTSA analysis is equally applicable under CUTSA, "Trade secret means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* Cal. Civ. Code § 3426.1(d); *see also Fortinet Inc. v. FireEye Inc.*, 2014 WL 4955087, at *7 (N.D. Cal., Sept. 30, 2014) (finding non-public proprietary competitive knowledge and intelligence could be trade secrets). IFS' trade secrets satisfy these requirements.[10]

**1. <u>IFS' Protectable Trade Secrets Include Customer Information, Customer Credit, Pricing And Personnel Information</u>**

"The Ninth Circuit has held that a customer list qualifies as a trade secret 'because it allows a competitor ... to direct its sales efforts to those potential customers that are already' doing business with the plaintiff." *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *3 (C.D. Cal. Nov. 22, 2013) (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993). "[B]illing rates, key contacts, specialized requirements and mark up rates, [are] sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors." *Courtesy Temp. Serv., Inc. v. Camacho*, 222

---

[10] Given the deception that Defendants have perpetrated on the Court, the Court cannot credit declarations or any representations that they may introduce.

Cal.App.3d 1278, 1288 (1990); see also *Semper/exeter Paper Co. LLC v. Henderson Specialty Paper LLC*, 2009 WL 10670619, at *5 (C.D. Cal. Sept. 21, 2009) (Information concerning "customers' specialized needs, pricing, contact persons, and compatible suppliers and container manufacturing companies" merits trade secret protection.) "The most important consideration is whether the information is readily accessible to a reasonably diligent competitor." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1332 (9th Cir. 1980).

> "In the context of customer lists, the answer to the question of whether the information is readily accessible 'is often inferred from evidence concerning whether the information is available in public directories,' [but trade secret not lost even if in public directory as] it may be costly to parse from such a directory potentially profitable customers from entries not worth pursuing."

*Extreme Reach*, 2013 WL 12081182, at *3 (quoting *Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332). "Thus, a customer list may be a trade secret even if the 'general class' of customers is 'readily accessible' to others." *Id*. quoting *Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332–33; *see also, Fitspot Ventures, LLC v. Bier*, 2015 WL 5145513 at *3 (C.D. Cal. September 1, 2015) citing *Courtesy Temp. Serv., Inc. v. Camacho*, 22 Cal.App.3d 1278, 1288 (1990). Further, courts have recognized that information related to cost and pricing can be a trade secret. *Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1455 (2002).

"As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1522 (1997). Information has independent economic value due to its nondisclosure when its secrecy "provides a business with a 'substantial business advantage." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011) (quoting *Morlife*, 56 Cal.App.4th at 1522).

Here, the evidence demonstrates that IFS spent decades gathering its trade secret information, protecting it from dissemination and it provides IFS a substantial

competitive advantage. Even Savino wanted customer information to which he was privy protected from other IFS salespersons. That Defendants developed relationships with IFS' customers while working for IFS does not make those customers' information ineligible for trade secret protection. *Chartwell Staffing Servs. Inc. v. v. Atl. Sols. Grp. Inc.*, 2019 WL 2177262, at *4 (C.D. Cal. May 20, 2019) as "[t]here is no legitimate reason for characterizing differently the conduct of a former employee who uses customer information personally developed for the employer during the period of employment from the use of the very same information developed by a coworker who had no customer contact." *Morlife*, 56 Cal.App.4th at 1526; *see also Fitspot Ventures*, 2015 WL 5145513 at *3. This is because "information developed by an employee concerning the employer's customers represents an investment of time and money *on the part of the employer*, justifying a grant of trade secret protection against exploitation by the former employee." *Id.* (emphasis in original).

At a minimum, IFS' Customer information, credit information, sales pricing and information about its employees qualify as trade secrets that should be protected.

**2. <u>IFS Took Reasonable Precautions To Protect Trade Secrets</u>**

The evidence demonstrates that IFS took reasonable measures to keep the information secret. *See Extreme Reach*, 2013 WL 12081182, at *4 ("Extreme Reach has established that it took reasonable steps to maintain the secrecy of its Customer List by password protecting it, making it available to only certain employees, and protecting it with a firewall."); *Sun Distrib. Co., LLC v. Corbett*, 2018 WL 4951966, at *4 (S.D. Cal. Oct. 12, 2018) ("Plaintiff attests it has its 'employees sign employment agreements with provisions to maintain the confidentiality of Trade Secrets [and] has a security system designed to protect its proprietary, confidential, and trade secret information."); *Morlife, Inc.*, 56 Cal.App.4th at 1523 (1997) (finding reasonable measures where customer list was stored on a computer with restricted access and company instructed employees to maintain confidentiality);

*MAI Sys.*, 991 F.2d at 521 ("MAI took reasonable steps to insure the secrecy to this information as required by the UTSA. MAI required its employees to sign confidentiality agreements respecting its trade secrets, including the Customer Database.").

**3. Defendants' Actions Constitute Misappropriation**

Defendants misappropriated IFS' trade secrets through improper means. The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). The term "improper" includes "theft, bribery, ***misrepresentation***, ***breach or inducement of a breach of a duty*** to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A) (emphasis added). Even one email is sufficient to demonstrate misappropriation of a trade secret. *Sun Distributing Co.*, 2018 WL 4951966 (S.D. Cal. Oct. 12, 2018).

Savino sent to his personal email IFS reports reflecting detailed IFS customer purchase and pricing history as well as IFS pricing on product from two different vendors, and used that information to solicit and sell product to IFS' top customers on behalf of Legacy. While he denies using such information in recent declarations, in candid communications with the other owners of Legacy, Savino bragged to the other defendants, "***good thing about this one is that I have all their pricing since I'm the one that sells them.***" (Savino Ex. 139.) This single action indisputably demonstrates misappropriation and supports injunctive relief.

Pablo and Savino surreptitiously started and built Legacy in competition to IFS and Pablo fraudulently induced IFS to provide credit to Legacy and authorize the sale of goods to Legacy without disclosing his or Savino's conflict of interest by ownership of Legacy. *See supra*, Intro, j-t. Defendants used IFS' trade secret and confidential customer information to target IFS' top customers, give credit to those customers based on IFS' confidential credit information, determine orders for Legacy based on IFS' customer purchase information, inventory, allocation and pricing -- all

while Pablo and Savino still worked for IFS. Savino and Pablo testified that each IFS customer that they converted to a Legacy customer arose from a meeting or phone call that had been scheduled in their role as an IFS salesperson, and Pablo and Savino leveraged those IFS meetings to sell Legacy goods to IFS' clientele. Within six months, Defendants diverted sales from at least 17 IFS customers in excess of $1,389,362.12. They also used their knowledge of IFS' top salespersons to hire two such employees for Legacy.

IFS had protectable trade secrets that it reasonably protected and that were misappropriated. IFS is likely to prevail on the merits.

**B. <u>Irreparable Harm</u>**

A party seeking a preliminary injunction must establish that he is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). "It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." *WeRide Corp. v. Kun Huang*, No. 18-CV-07233-EJD, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019). "Evidence of threatened loss of prospective customers supports a finding of irreparable harm." *Extreme Reach*, 2013 WL 12081182, at *7 (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Super-Krete Int'l, Inc. v. Sadleir*, 712 F.Supp.2d 1023, 1037 (C.D. Cal. 2010)). Indeed, "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Sun Distributing*, 2018 WL 4951966, at *7 (quoting *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F.Supp.2d 1188, 1198 (E.D. Wash. 2003)).

The loss of a customer relationship is an irreparable injury that may have an economic component but is intangible and qualifies as irreparable harm. Defendants

diverted sales from at least 17 IFS customers in excess of $1,389,362.12 in a mere 6 months, all while Pablo and Savino still worked for IFS. Defendants continue to misrepresent to the Court the number of IFS customers from which they successfully solicited business for Legacy using IFS trade secret and confidential information and refuse to produce material sales, revenues and product information regarding Legacy business occurring after the commencement of this lawsuit and yet, Pablo testified that Legacy continues to actively solicit IFS customers for Legacy business.

Defendants have caused IFS to lose revenue, customers and the goodwill of its business. IFS has suffered and continues to suffer irreparable harm.

**C. <u>Balance of Equities</u>**

A party seeking a preliminary injunction must establish that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. In assessing this prong, a court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)). "While California courts have shown a reluctance to impose an unconditional prohibition on doing business with customers of the former employer, they have prohibited the unlawful use of trade secrets to solicit those customers." *Morlife*, 56 Cal.App.4th at 1524. In such cases, an injunction will have "no impact on any future legitimate sales efforts *not* based on misappropriation of protected trade secrets." *Morlife*, 56 Cal.App.4th at 1528 (noting that defendant was "free to solicit customers whose identities are not the trade secrets of Morlife"). Accordingly, this prong weighs in favor of the issuance of a preliminary injunction.

**D. <u>Public Interest</u>**

A party seeking a preliminary injunction must establish that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Protection of trade secrets benefits the public interest." *Extreme Reach*, 2013 WL 12081182, at *9 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 483 (1974) ("[I]t is hard to see how the public

would be benefited by disclosure of customer lists.... in fact, keeping such items secret encourages businesses to initiate new and individualized plans of operation, and constructive competition results.”)). Accordingly, this prong weighs in favor of a preliminary injunction that preserves IFS’ trade secrets.

**E. <u>Bond</u>**

FRCP 65(c) provides preliminary injunctive relief “only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.” Fed. R. Civ. P. 65(c). “Despite the seemingly mandatory language, Rule 65(c) invests the district court ‘with discretion as to the amount of security required, *if any*.’” *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). “The burden of establishing the amount of bond necessary to secure against the wrongful issuance of an injunction rests with the defendant.” *Extreme Reach*, 2013 WL 12081182, at *9–10. Here, there are no costs or damages that Defendants might sustain as a result of an injunction as Defendants have no right to use IFS’ trade secrets to operate Legacy, recruit and hire IFS’ employees and do business with IFS’ customers. Any claim that an injunction will cause them to go out of business, would be “speculative at best.” *See Extreme Reach*, 2013 WL 12081182, at *10 (no bond required to enjoin soliciting plaintiff’s employees and clients). Accordingly, the Court need not order bond in connection with the injunction. However, IFS will post any bond required by the Court and as supported by the evidence.

## V. CONCLUSION

For the foregoing reasons, IFS requests entry of Preliminary Injunction to stop further irreparable harm to IFS.

Dated: October 31, 2022

CDF LABOR LAW LLP

By: ______________________
Dan M. Forman
Attorneys for Plaintiff/Counter-Defendant PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE