**LESOWITZ GEBELIN LLP**
Scott M. Lesowitz (SBN 261759)
        scott@lawbylg.com
Steven T. Gebelin (SBN 261507)
        steven@lawbylg.com
8383 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90211
Telephone: (310) 341-3072; Facsimile:  (310) 341-3070

**JOHNSON & RAWI PC**
Jeffery W. Johnson (SBN 133467)
        jjohnson@johnsonrawi.com
99 South Lake Avenue, Suite 208, Pasadena, California 91101
Telephone: (626) 585-5663; Facsimile:  (626) 239-3630

*Attorneys for Defendants* Pablo Morales,
Savino Morales, Sergio Escamilla, and
Legacy Wholesale Group, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERRIN BERNARD SUPOWITZ, LLC, dba INDIVIDUAL FOODSERVICE, <br><br> Plaintiff, <br><br> V. <br><br> PABLO MORALES, LEGACY WHOLESALE GROUP, LLC, SAVINO MORALES, SERGIO ESCAMILLA, and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. 2:22-cv-02120 ODW(JEMx) [Assigned to the *Honorable Otis D. Wright, II*] <br><br> **DEFENDANTS' <u>REPLY</u> IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hearing Date: November 21, 2022 <br> Hearing Time: 1:30 p.m. <br> Hearing Courtroom: 5D |

1

## **<u>Table of Contents</u>**

2

3    I.    INTRODUCTION ................................................................................3

4    II.   THE EARNINGS STATEMENTS WERE NOT CONFIDENTIAL ......................3

5    III.  IFS' CONCESSIONS AND ADMISSIONS.............................................5

6
          **A.        IFS Conceded Its Actual Costs Are Not Trade
7         Secrets     5**

8         **B.        IFS Conceded Its Products and Vendors are
9         Not Trade Secrets  5**

10        **C.        IFS Concedes the Identity of Its Customers
          are Not Secret  5**
11
     IV.  There is No Admissible Evidence of Trade Secret Misappropriation.....................6
12
          **A.        Material Facts 50 through 61 (ECF No. 147-2
13        pp. 19-21)  6**

14        **B.        Material Fact 62 (ECF No. 147-2 pp. 21-23)**.................11
15
          **C.        Additional Citations from Material Facts 1
16        through 49  12**

17   V.   NO INFORMATION REMAINS USEFUL ...........................................14

18   VI.  THE CONVERSION AND UCL CLAIMS.........................................14
19
     VII. CONCLUSION ................................................................................14
20

21

22

23

24

25

26

27

28

## Table of Authorities

**Cases**

*360 Mortgage Group, LLC v. Home Point Financial Corporation*, 740 Fed.Appx. 263, 268 (4th Cir. 2018) ........................................................................ 11

*Ajaxo Inc. v. E*Trade Group Inc.*, 135 Cal.App.4th 21, 64, n. 44 (2005) ...................... 14

*American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal.App.3d 1318, 1325 (1986)................................................................................................ 10

*ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714-15 (6th Cir. 2005)................................................................ 6

*Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal.App.3d 1278, 1288 (1990) ................... 6

*Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.*, 616 F.Supp.2d 805, 820 (N.D. Ill. 2009)................................................................ 8

*Digital Development Corp. v. International Memory Systems*, 185 U.S.P.Q. 136 (S.D. Cal. 1973) .............................................................................................. 14

*Firetrace USA, LLC v. Jesclard*, 800 F.Supp.2d 1042, 1054 (D. Ariz. 2010) ................... 8

*Nat'l Lab. Rels. Bd. v. Long Island Ass'n for Aids Care, Inc.*, 870 F.3d 82, 86 (2d Cir. 2017) .............................................................................................. 4

*Science of Skincare, LLC v. Phytoceuticals, Inc.*, 2009 WL 2050042 (C.D. Cal. July 7, 2009)........................................................................................ 8

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D. Cal. 1989) ...................................................................................... 8

**Statutes**

Cal. Labor Code § 226(a) ...................................................................................... 4

Cal. Labor Code § 232(b) ...................................................................................... 4

## I.  INTRODUCTION

IFS has provided woefully inadequate evidence that Defendants misappropriated IFS's trade secrets. IFS attempts to confuse the issues by providing irrelevant evidence that Defendants breached their duties of loyalty and committed fraud. IFS also puts forward clearly inadmissible statements from its agents. Worse, IFS resorts to misrepresenting evidence and making false accusations of perjury.[1]

After roughly six months of discovery, IFS cannot point to a single trade secret Defendants used to obtain business for Legacy.

## II. THE EARNINGS STATEMENTS WERE NOT CONFIDENTIAL

Defendants argued IFS' trade secrets claims fail, among other reasons, because twice after IFS terminated Savino and Pablo, IFS sent them detailed earnings statements containing the customer, vendor, and pricing information at issue in this case; IFS did not indicate they were confidential. MSJ pp. 18-19.

IFS' unpersuasive response is that the earnings statements fell within the confidentiality agreement in the IFS Employee Handbook and filing them was wrongful (though the Court refused to seal them). Opp., 18:7-19:11.

---

[1] IFS states, "Legacy's owners have sworn that they sold…product to 17 IFS customers from the time they commenced operations in August 2021 until the termination of their employment with IFS on March 31, 2022. (RTF No. 43; MDF No. 50a.) This is perjury and fraud on the Court." Opposition 25:14-19. IFS states Legacy also did business with Rong Cheng Trading, Espinoza Brothers, and Puebla Produce prior to March 31, 2022. Initially, it is irrelevant how many joint IFS-Legacy customers there were; all that matters is whether Legacy misappropriated trade secrets with any of these customers, and IFS has provided no evidence of this. That said, IFS' accusation is wrong. Legacy never sold items to Puebla Produce. Pablo Reply Decl. ¶ 2. And Legacy did not sell items to Rong Cheng Trading or Espinoza Brothers until after March 31, 2022. Pablo Reply Decl. ¶ 2; Savino Reply Decl. ¶ 2, IFS also says Defendants lied by claiming that IFS would not allow them to do any business in Arizona. Opposition p. 6:16-26. However, Defendants only said that IFS did not want them to expand their business in Arizona further. Savino 10-3-22 Decl. ¶ 14. Furthermore, IFS does not rebut the testimony of Steven Arroyo, Pablo and Savino's former supervisor, that Savino and Pablo told him they wanted to expand their business in Arizona, but he told them no. Arroyo Decl. ¶ 12. Regardless, this is a duty of loyalty issue.

1    The confidentiality agreement that IFS alludes to is IFS' form "Employee

2    Handbook." The "Employee Handbook" required employees to agree that "I am

3    aware that **during the course of my employment**, confidential information may be

4    made available to me regarding Individual FoodService. I agree not to disclose this

5    information during my employment or thereafter to a competitor, the media, or to

6    any other person or corporation." Zoyla Rice Decl. Exh. F. Therefore, the Employee

7    Handbook plainly does not apply to information provided post-termination.

8    Moreover, IFS' Handbook carved out of the "confidentiality agreement"

9    wage and employment information by stating that "nothing in this handbook is

10   intended to unlawfully restrict an employee's right to engage in any of the rights

11   guaranteed them by Section 7 of the National Labor Relations Act." Zoyla Rice

12   Decl. Exh. F. As the information in the commission sales reports directly showed

13   how IFS calculated Pablo and Savino's wages, it was information that they could

14   not and were not restricted from discussing. *See, e.g., Nat'l Lab. Rels. Bd. v. Long*

15   *Island Ass'n for Aids Care, Inc*., 870 F.3d 82, 86 (2d Cir. 2017); Cal. Labor Code §

16   232(b) ("No employer may.. Require an employee to sign a … document that

17   purports to deny the employee the right to disclose the amount of his or her

18   wages."); *see also* Cal. Labor Code § 226(a) (requiring employer to provide

19   itemized statement of wages). Ms. Rice confirmed they are sent for salespeople to

20   "verify that the commission calculations are accurate." ECF No. 52, ¶ 2.

21   Ms. Rice's initial cover letters further indicated the statements were not

22   confidential by demanding that Savino and Pablo return IFS' "confidential

23   information" and documents; if IFS intended the earnings statements to be

24   "confidential information," IFS would not have provided them at the same time it

25   demanded the return of all "confidential information."

26

27

28

## III.   IFS' CONCESSIONS AND ADMISSIONS

### A.   IFS Conceded Its Actual Costs Are Not Trade Secrets

Defendants argued in the moving papers that Defendants cannot plausibly claim that the pricing information Savino and Pablo possess are trade secrets in part because IFS filed an IFS-Dart pricing agreement publicly in this case. MSJ p. 19.

IFS's response in its Opposition is remarkable. IFS states that "IFS does *not* contend that the Dart Competitive Price Agreement, which reflects the cost of certain items to IFS, is an IFS trade secret….. The Dart Competitive Price Agreement, which had expired on February 28, 2022, reflected IFS' cost on 77 items and demonstrated that IFS did provide Pablo and Savino IFS' actual cost of certain items." Opposition p. 19:13-14 (emphasis in original).  IFS has conceded that it does not contend that IFS' <u>actual</u> costs of items in February 2022 is not a trade secret. (The competitive price agreements actually do not indicate IFS' actual costs since there is a separate rebate agreement; however, IFS is stuck with its assertions that the agreement reflects IFS' true costs and they are not trade secrets.)

### B.   IFS Conceded Its Products and Vendors are Not Trade Secrets

In discussing the large amount of vendor and product information on its website, IFS states, "IFS does *not* contend that the mere list of product or names of vendors is trade secret to IFS…" Opposition p. 19:27-28 (emphasis in original). Therefore, IFS has now conceded that the identity of its vendors, the merchandise IFS sells, and the prices IFS pays to its vendors are not trade secrets. What is left?

### C.   IFS Concedes the Identity of Its Customers are Not Secret

As discussed in the opening papers, courts will only find customer lists to be trade secrets when potential customers are difficult to identify, such as with a niche product. IFS does not claim it is difficult to identify its potential customers.

In Opposition, IFS concedes that the identity of its customers is not a trade secret. IFS writes, "Here, it is not the mere identity of IFS' customers that constitutes the trade secret, it is the customer contact or contacts, decisionmaker,

decisionmaker's contact information, direct dial, cell phone, customer credit ratings, payment history, IFS' pricing, profitability…order histories, sales volume, product assortment, manufacturer's names for each item, and trends…" Opposition pp. 20-21. So, IFS has conceded the identity of its customers is not a trade secret. IFS instead claims "customer list" includes a plethora of information beyond a list of customers and contact information. IFS includes information that Savino and Pablo never had access to such as IFS' markups and profit margins. (They also did not have access to "credit ratings," but simply knew some customers paid their bills.) IFS also misleadingly quotes *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal.App.3d 1278, 1288 (1990), to incorrectly make it appear that it stated billing rates, mark up rates, and other information are always trade secrets, rather than trade secrets under the facts of that particular case.

That Savino and Pablo knew cellphone numbers from customers they developed and serviced at IFS (they did not have information for other customers) does not make the list a trade secret (and there is no evidence Savino and Pablo could not locate or contact the customers without IFS information). *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc*., 402 F.3d 700, 714-15 (6th Cir. 2005) (affirming summary judgment of a misappropriation of trade secrets claim, stating, "Even the name of the person at each transmission shop responsible for buying parts, to which ATC ascribes great importance, can be ascertained simply by calling each shop and asking.") (citing California law).

## IV.   There is No Admissible Evidence of Trade Secret Misappropriation

In this section, we address each piece of evidence that IFS cites in its Separate Statement, ECF No. 147-2. We start with IFS' "additional material disputed facts," which are Entries 50 through 62. ECF No. 147-2 pp.19-23.

### A.    Material Facts 50 through 61 (ECF No. 147-2 pp. 19-21)

Entry 50a. IFS asserts that, prior to March 31, 2022, Legacy did business with twenty customers of IFS, not 17. IFS is wrong. Savino Reply Decl. ¶ 2; Pablo Reply

1  Decl. ¶ 2. That said, it is irrelevant how many IFS customers Legacy did business

2  with. All that is relevant is whether Legacy misappropriated trade secrets in

3  conducting business with the joint customers. IFS has provided no evidence of this.

4      Entry 50b (first part). In 50(b), IFS first cites Exhibits 85 and 117 to Savino

5  Morales' deposition as well as testimony regarding these two exhibits. Exhibit 85 is

6  a list of Legacy's customers. Referring to Exhibit 117, MDF No. 50(b) states, "After

7  forming Legacy, Savino secured a report of the top 5 IFS accounts he serviced. The

8  report identified each and every item purchased, the item number, description,

9  vendor name, date of last sale, quantity, dollar amount of sales, last sales price, new

10  sell price, difference in sell price, margin, and price on delivery. Within the next 6

11  months Legacy had diverted sales from at least 3 of these …"

12      IFS's characterization of Exhibit 117 is inaccurate.

13      First, the spreadsheet is not a list of every item sold for any customer. Exhibit

14  117 only lists sales that IFS deemed to have been made at too low of a price. This

15  can be seen by (a) Savino's deposition testimony and (b) by looking at the

16  document, as each spreadsheet entry lists a negative margin in red (with a negative

17  margin simply indicating that the item was sold below "office cost," not actual cost).

18      Second, the earliest email on the first page of Exhibit 117 demonstrates that

19  Savino did not request that the spreadsheet be sent to him. Jeremy Shapiro's

20  assistant Sylvia Medina wrote to Savino in the earliest email, "Here are the lists that

21  we spoke about with Jeremy that he is increasing pricing on….Please see the

22  attached report and call me if you have any questions." Per Savino's testimony, IFS

23  sent him the list because it wanted Savino to raise prices on the items.

24      Third, the "margin" entries in Exhibit 117 are not the actual profit margin that

25  IFS netted. Negative "margin" in Exhibit 117 is the difference between "office cost"

26  and cost charged the customer. Savino Tran. pp. 240:20-241:15, 245:2-246:8;

27  Lesowitz Dec. Exh. K (Shapiro tran.) at pp. 73:6-75:10, 104:7-105:1, 107:12-14.

28      Fourth, we note Savino did not forward Exhibit 117.

1       Finally, IFS does not even attempt to connect any information in Exhibit 117
2   to any business Legacy did. *Universal Analytics, Inc. v. MacNeal-Schwendler Corp*.,
3   707 F.Supp. 1170, 1177 (C.D. Cal. 1989) ("Apparently, UAI's trade secrets claim is
4   based purely on the speculation that since the former UAI employees are working in
5   similar areas at MSC and that after the employees began working for MSC, MSC
6   announced improvements in its Nastran products, therefore MSC must be
7   misappropriating UAI trade secrets. There is no logic to UAI's theory."); *Science of*
8   *Skincare, LLC v. Phytoceuticals, Inc*., 2009 WL 2050042 (C.D. Cal. July 7, 2009)
9   (Honorable Otis D. Wright II presiding) (granting summary judgment where
10  "Plaintiff has not sufficiently shown a causal link between a potential
11  misappropriation of a trade secret and the alleged damages."); *Firetrace USA, LLC*
12  *v. Jesclard*, 800 F.Supp.2d 1042, 1054 (D. Ariz. 2010) ("Plaintiffs have not met
13  their burden to overcome summary judgment by showing evidence they were
14  proximately damaged by Mr. Jesclard's use of confidential information.")

15      Entry 50b (second part). IFS asserts Savino used IFS' pricing information to
16  solicit business from Amapola Markets to Legacy. However, Legacy has never done
17  any business with Amapola Markets. Savino 10-3-22 Decl. ¶ 19. In response,
18  Legacy merely asserts that "Savino attempted to sell Legacy's products to Amapola
19  Markets in January 2022." Plaintiff's Response to Material Fact No. 41.

20      Furthermore, when Savino met with people from certain markets in the
21  Amapola Markets chain in January 2022, those particular markets had stopped doing
22  business with IFS. In January 2022, Savino was pitching these markets to again do
23  business with IFS, which was the main purpose of Savino's meeting. Savino Tran.
24  298:9-299:12, 310:23-311:10. Furthermore, as IFS concedes in response to Material
25  Facts 16 and 17, IFS did not require its vendors or customers to keep any pricing
26  information confidential. And Savino and Pablo did not have access to any of IFS'
27  actual costs or margins. *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands*
28  *Intern. Inc*., 616 F.Supp.2d 805, 820 (N.D. Ill. 2009) ("There is no indication Del

Monte's customers were prohibited from divulging the prices they paid for bananas. There is no indication Kinnavy misappropriated a pricing formula. As such, the Court finds that price information alone cannot constitute a trade secret.")

Entry 50(c): IFS asserts that "Sergio condoned the use of IFS' devices and cell phone numbers and Mr. Trujillo did not explain that he did not have any contract commitments to IFS." Whether Sergio, Pablo, and Jesus Trujillo used their work devices or personal devices in doing their business for Legacy is irrelevant.

Entry 50(d): IFS cites Paragraphs 5 through 11 of the Lopez Declaration. Mr. Lopez claims that Pablo Morales called him and told Mr. Lopez that Legacy could sell his business Reyma foam cups at a lower price than IFS could. (It is unstated what numbers or specificity, if any, was used or discussed.) IFS does not claim in any of the evidence derived from IFS (such as in the Shapiro or Kershaw Declarations) that IFS could have supplied the items to Mr. Lopez and Red Hot Chilis that are referenced in Mr. Lopez's declaration. If IFS could have fulfilled the orders, IFS would have said so in its declarations. As Pablo Morales states in his declaration on Reply, Pablo could not fulfill the orders through IFS. Pablo Reply Decl. ¶ 3. Furthermore, IFS' supply of foam products generally to Pablo's customers was poor, and IFS insisted that Pablo sell Dart products, which are more expensive, and Mr. Lopez had told Pablo he did not want to pay more for Dart products. Pablo Reply Decl. ¶ 3. Furthermore, there is a gap in Mr. Lopez's timeline: he states that he received the estimate four to six weeks after the conversation with Pablo (Lopez Par. 10), it is unclear what prices, conversation, or document he is referring to in Paragraph 11. Furthermore, whether Legacy fulfilled orders that IFS could have fulfilled is a question for the duty of loyalty claim.

Entry 51:IFS cites Ex. F of the Rice Declaration, purportedly a page of a 2020 employee handbook. The page says the employee will not disclose "confidential information," without defining "confidential information." (The older agreements lack foundation and are not even with IFS.) Furthermore, "An agreement between

employer and employee defining a trade secret may not be decisive in determining whether the court will so regard it." *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal.App.3d 1318, 1325 (1986).

Entry 52: IFS cites evidence that there were times Legacy did not bother to run a credit check on a customer of IFS and that Legacy used language from IFS' credit check template. None of this could involve trade secrets. Defendants were free to assume that IFS (or any other company) would not do business with a company that did not pay its bills. And Savino and Pablo cannot be expected to forget that a customer of theirs at IFS paid its bills. Also, how was IFS damaged from Legacy not having a customer fill out a credit application? If anything, Legacy runs the risk of not getting paid. As to the credit application itself, it is a standard form that asks for standard information about the business. Furthermore, IFS requires customers to complete the form, making it generally known. (Entry 42 and IFS' citations to Depo. Exhibits 61, 62, 126, and 127 are on the same point.)

Entries 53 through 55: IFS cites the declaration of Jesus Trujillo. Initially, the Court should not consider the Trujillo Declaration because IFS pressured Mr. Trujillo, an IFS employee, to sign it. Trujillo Decl. ¶ 1 ("I would prefer not to be called as a witness as both Pablo and Savino Morales are my uncles.") Regardless, Mr. Trujillo's declaration says nothing about Legacy using IFS pricing or any alleged IFS trade secrets. IFS cites Paragraphs 6 and 10 for the proposition that Legacy sold products to IFS customers when IFS did not have a request product without offering an alternative through IFS. That would only be relevant to (if anything) the duty of loyalty claims. IFS also cites Paragraph 13 in which Mr. Trujillo states that for the customers he originated for Legacy in Arizona, these customers "could have purchased their products from IFS…" This is inadmissible speculation. Furthermore, it is only relevant to the duty of loyalty claim.

Entries 56 through 58: IFS cites portions of the Kershaw Declaration. Mr. Kershaw admits in Paragraph 6 that IFS earned a 6% profit margin over "office

1   cost" on IFS' sales to Legacy. Mr. Kershaw also claims IFS sold fewer products to

2   joint IFS and Legacy customers post-Savino and Pablo. This is not evidence that

3   Savino and Pablo used IFS trade secrets. There is no evidence alleged trade secret

4   misappropriation caused any declines as opposed to any other factor. *360 Mortgage*

5   *Group, LLC v. Home Point Financial Corporation*, 740 Fed.Appx. 263, 268 (4th

6   Cir. 2018) (affirming summary judgment as to trade secret misappropriation claim

7   as plaintiff's "report simply set forth a correlation between the timing of Glenn's

8   resignation and a continued decline in Mortgage Group's North Carolina sales,

9   without any evidence showing that the misappropriation caused that decline.")

10      Entries 59 through 61: IFS provides evidence that Defendants used IFS devices

11   for Legacy business and used meetings with customers for IFS to sell products

12   through Legacy. Even if true, this would relate solely to the duty of loyalty claims.

13      **B.      Material Fact 62 (ECF No. 147-2 pp. 21-23)**

14      Citing MDF No. 62, IFS argues Pablo Morales "used his knowledge and

15   ability to set IFS' confidential pricing to cause IFS to sell goods to Legacy at prices

16   substantially lower than prices that Legacy would otherwise have been charged in an

17   arms-length transaction and with knowledge that Legacy intended to sell the goods

18   to IFS' customers, and potential customers, at a profit to Legacy." Opp. p. 9:11-15.

19      None of the evidence cited in Entry 62 supports IFS' assertion that

20   Defendants used IFS trade secrets to obtain better prices for Legacy from IFS.

21      IFS starts by referencing evidence that Defendants used fake names in

22   conducting business for Legacy. That says nothing about use of trade secrets.

23      Entry 62 cites Deposition Exhibits 40, 74, 77, 78, and 80 and related

24   deposition testimony, which IFS says show that Defendants falsely claimed to IFS

25   that Legacy had done business with IFS competitors, that Legacy had received

26   certain prices and credit terms from the competitors, that IFS could lose Legacy as a

27   customer, and that Legacy was a substantial business. Even if Defendants made all

28

1   these alleged misrepresentations, none would involve the use of IFS trade secret

2   information. Legacy's business and Legacy's dealings are not IFS' trade secrets.

3        Entry 62 at page 22 lines 21 through 24 claims that "Pablo misrepresented to

4   IFS via a text message to Jeremy Shapiro, 'Can you help my AZ customer get better

5   pricing. Three chain customer is buying at this price and I believe we have a

6   ridiculous cost' referring to IFS' authorized pricing for Legacy. (Shapiro Decl. ¶ 21,

7   Ex. 3.)." Reading the text messages contained in Exhibit 3 to the Shapiro

8   Declaration, it is wholly unclear what price this text message is referring to, what

9   this text message was asking for, why the request was being made, what other

10  documents or conversations may have also occurred among the participants of the

11  text messages, or what Jeremy Shapiro did with this request. The only context

12  provided is a conclusory and unsupported statement by Jeremy Shapiro in Paragraph

13  21 of his declaration that Pablo's text message was "referring to IFS confidential

14  special pricing on that specific item." This is unhelpful and insufficient. We do not

15  know what allegedly confidential pricing is being referenced, whether Legacy in

16  fact obtained better pricing, or what the basis is for Mr. Shapiro's statement.

17       Entry 62 also references text message bates stamped Legacy02200. The

18  words of Legacy02200 do not support reading the message as saying anything about

19  Legacy using trade secrets to obtain better prices from IFS. In fact, there is nothing

20  in the words indicating that what is being discussed is Legacy obtaining products

21  from IFS or the pricing at which Legacy obtains products. IFS has provided no

22  evidence (such as deposition testimony) providing any context to Legacy02200.

23       Entry No. 62 also cites Paragraph 14 of Jeremy Shapiro's declaration which is

24  simply high-level, inadmissible, unsupported, speculation and conjecture.

25       Par. 13 of the Trujillo Decl. does not reference sales to Legacy or pricing.

26  **C.**    **Additional Citations from Material Facts 1 through 49**

27       <u>Entry No. 9</u> Defendants state in Material Fact No. 9 that "IFS did not provide

28  Savino Morales or Pablo Morales with the exact prices that IFS paid for items that it

resold." IFS disputes this citing solely to Deposition Exhibits 121 and 122. Exhibits 121 and 122 show, at most, that IFS provided more specific pricing information for two items no later than early 2021 that were sold to the El Super market. As Jeremy Shapiro testified, Savino Morales was given more leeway to request (but was not simply given) some information not normally provided to salespeople regarding El Super in assisting IFS to bid for additional business from El Super. Lesowitz Decl. Exh. K (Shapiro transcript) at pp. 140:22-142:11. However, El Super was the only customer for which Savino could request such additional information. Id. Mr. Shapiro further testified that Savino's access to any special information for El Super ended well before Savino was terminated from IFS. Id. IFS does not even attempt to tie Savino's possible knowledge regarding these two items to the trade secret misappropriation claims. Thus, other than for these two single items from early 2021, it is undisputed that Savino and Pablo never received IFS' true cost of items.

Entry 43: IFS' response to Entry 43 contains a blatantly implausible interpretation of Legacy 02176. IFS says, "Savino told Legacy's co-owners that his sales were doing damage to IFS." In Legacy 02176, the writer says that he will not be able to travel to Arizona for a meeting, saying, "Unfortunately I won't be able to go. I'm doing my damage from L.A." There is indicating "doing my damage" meant damage to IFS's sales. IFS provides no extrinsic evidence for its interpretation.

Entry 46: IFS cites Exhibit 1 of the Shapiro Declaration along with other supposed evidence that Defendants themselves consider certain categories of information to be trade secrets. Exhibit 1 to the Shapiro Declaration contains a text message from Savino Morales to Jeremy Shapiro saying that he did not want IFS to share information about his sales to other IFS salespeople. That Savino generally did not want other salespeople to have information about his sales is a far cry from an admission that any particular alleged trade secret in this case constitutes a legally protected trade secret. Similarly, in Entry 46, IFS also cites pages 75 through 83 of Sergio Escamilla's transcript where Mr. Escamilla testified that he considered

1 certain information of Legacy (not IFS) to be confidential, especially margin and
2 profit information. Defendants do not have margin or profit information of IFS.

3 **V. <u>NO INFORMATION REMAINS USEFUL</u>**

4       All IFS information Defendants possess is at least six months old. Defendants
5 moved for partial summary judgment as to IFS' request for a permanent injunction
6 on the alternative ground that even if IFS has evidence of past misappropriation, the
7 information Defendants possess "is old and stale." MSJ pp. 26-27.

8       IFS made no attempt to present evidence that information Defendants possess
9 could still be useful to them going forward. Instead, in the Kershaw Declaration, IFS
10 emphasizes how high inflation is impacting the market. And IFS even filed its Dart
11 price list publicly since it was out-of-date having expired roughly six weeks earlier.

12      Past misappropriation does not automatically lead to a permanent injunction.
13 *Ajaxo Inc. v. E\*Trade Group Inc*., 135 Cal.App.4th 21, 64, n.44 (2005) ("In the area
14 of trade secrets, the principles applicable to injunctions in general govern. A court
15 may grant an injunction only when monetary compensation is inadequate.")
16 (citations omitted); *Digital Development Corp. v. International Memory Sys.*, 185
17 U.S.P.Q. 136 (S.D. Cal. 1973) (finding liability for trade secret misappropriation but
18 refusing a permanent injunction as Defendant "failed to establish that the continued
19 use of the controller design by plaintiff will do irreparable harm...."); Appendix A1,
20 1979 UTSA (rejecting "punitive perpetual injunctions").

21 **VI.    <u>THE CONVERSION AND UCL CLAIMS</u>**

22      IFS claims its conversion and UCL claims do not involve trade secrets. What
23 else there would be? Savino and Pablo swear they returned all tangible property; IFS
24 has no rebuttal. Savino Decl. ¶ 26; Pablo 10-Decl. ¶ 24; Johnson Decl.

25 **VII.   <u>CONCLUSION</u>**

26      The Court should grant summary judgment as requested.

27 Dated: November 7, 2022                    /s/ *Scott Lesowitz*
28                                    For Lesowitz Gebelin LLP, Counsel for Defendants