1 | **LESOWITZ GEBELIN LLP**
2 | Scott M. Lesowitz (SBN 261759)
  |    scott@lawbylg.com
3 | Steven T. Gebelin (SBN 261507)
4 |    steven@lawbylg.com
  | 8383 Wilshire Boulevard, Suite 800, Beverly Hills, CA 90211
5 | Telephone: (310) 341-3072; Facsimile:  (310) 341-3070
6 |
7 | **JOHNSON & RAWI PC**
  | Jeffery W. Johnson (SBN 133467)
8 |    jjohnson@johnsonrawi.com
  | 99 South Lake Avenue, Suite 208, Pasadena, California 91101
9 | Telephone: (626) 585-5663; Facsimile:  (626) 239-3630
10 |
11 | *Attorneys for Defendants* Pablo Morales,
   | Savino Morales, Sergio Escamilla, and
12 | Legacy Wholesale Group, LLC
13 |
14 | **UNITED STATES DISTRICT COURT**
   | **CENTRAL DISTRICT OF CALIFORNIA**
15 |

| | |
|---|---|
| PERRIN BERNARD SUPOWITZ, LLC, dba INDIVIDUAL FOODSERVICE, | Case No. 2:22-cv-02120 ODW(JEMx) [Assign. to *Hon. Otis D. Wright, II*] |
| Plaintiff, | |
| V. | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| PABLO MORALES, LEGACY WHOLESALE GROUP, LLC, SAVINO MORALES, SERGIO ESCAMILLA, and DOES 1 through 20, inclusive, | [Nov. 11, 2022, Declaration of Steven Arroyo Filed Concurrently; this Opposition refers to and incorporates the following documents Defendants previously filed: ECF Nos. 40, 65, 106, 107, 109, 111, 178-1, 178-2, 179] |
| Defendants. | Hearing Date: December 5, 2022 Hearing Time: 1:30 p.m. Hearing Courtroom: 5D |

# **Table of Contents**

I.   INTRODUCTION ...................................................................................5

II.  STATEMENT OF FACTS.......................................................................7

    **A.**                  **IFS' Employment of Savino and Pablo** ..............................7

    **B.**                  **Pablo and Savino Received Only Limited Information**  7

    **C.**                  **IFS' Customers, Vendors, and Suppliers Did not Have Confidentiality Agreements, and Frequently Share Information**  7

    **D.**                  **Savino, Pablo, and Sergio Escamilla Start Legacy**  8

    **E.**                  **IFS Terminates Pablo and Savino, and Continues to Share Customer and Pricing Information with Them** ................8

    **F.**                  **Savino and Pablo Acted Diligently to Return their IFS Devices**  9

III. ARGUMENT 1: ANY INFORMATION DEFENDANTS HAVE IS OLD AND OUTDATED........................................................................10

IV.  ARGUMENT 2: DEFENDANTS HAVE NOT MISAPPROPRIATED TRADE SECRETS...........................................12

    **A.**                  **IFS Relies on the Rejected Doctrine of Inevitable Disclosure** .........................................................12

    **B.**                  **IFS Has Insufficiently Articulated the Alleged Trade Secrets**  13

    **C.**                  **IFS Has not Established It Took Necessary Measures to Maintain the Secrecy of the Alleged Trade Secrets** ...................14

        1.             IFS Has Publicized the Alleged Trade Secrets ...................14

        2.             IFS Did Not Require Confidentiality of Customers and Suppliers ........................................................16

    **D.**                  **IFS's Customer List and Pricing Information Lack Value**  17

        1.             IFS's Customer List ...............................................17

        2.             Pricing and Vendor Information .................................19

        3.             Dart Competitive Pricing Agreement..............................20

**E.**            **Defendants' Evidence of Misappropriation Is**
**Unpersuasive**      21

    1.        Ability to Do Business in Arizona ........................................21

    2.        The Number of Joint IFS-Legacy Customers .......................21

    3.        Use of IFS Devices and Meetings..........................................22

    4.        LEGACY 01413, Lopez Decl., and Trujillo Decl. ..............22

    5.        The "Top Account" Spreadsheet............................................23

    6.        The "Account Contact" Spreadsheet.....................................25

    7.        The Amapola Markets Report ................................................25

    8.        Use of Credit Information .....................................................26

    9.        Use of Pseudonyms ...............................................................26

    10.       Steps to Obtain Credit from IFS............................................26

    11.       Hiring of Hugo Mesa and Jesus Trujillo ..............................27

    12.       LEGACY 02200.....................................................................27

    13.       LEGACY02176.....................................................................28

    14.    Additional Documents Savino Sent to His Wife
to Print      28

    15.       La Surtidora..........................................................................29

V.      CONCLUSION ...........................................................................29

1

## **Table of Authorities**

2    *Abba Rubber Co. v. Seaquist*, 235 Cal.App.3d 1, 19 (1991).................................... 17

3    *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal.App.3d
4        1318, 1326 (1986)...................................................................................... 18

5    *Amgen Inc. v. Health Care Services*, 47 Cal.App.5th 716, 735 (2020)............................ 16

6    *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir.. 2014)................................... 12

7
   *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts,*
8       *Inc.*, 402 F.3d 700, 714-15 (6th Cir. 2005)............................................. 18

9    *Cisneros v. U.D. Registry, Inc*., 39 Cal.App.4th 548, 574 (1995).................................... 12

10   *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc*., 616
11      F.Supp.2d 805, 820 (N.D. Ill. 2009)................................................ 16, 26

12   *Dowell v. Biosense Webster, Inc*., 179 Cal.App.4th 564, 575 (2009) ............................... 13

13   *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945 (2008) ........................................ 13

14   *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc*., 654 F.3d 989, 997-98
15      (9th Cir. 2011) ...................................................................... 12

16   *Fortna v. Martin*, 158 Cal.App.2d 634, 640 (1958) ........................................................ 19

17   *In re Providian Credit Card Cases*, 96 Cal.App.4th 292, 305 (2002) .............................. 16

18   *International Paper Co. v. Suwyn*, 966 F.Supp. 246, 258 (S.D.N.Y.) (1997)................... 12

19
   *Language Line Services, Inc. v. Language Services Associates, Inc*., 2013
20      WL 12173920 (N.D. Cal. June 25, 2013).................................................. 12

21   *Nat'l Lab. Rels. Bd. v. Long Island Ass'n for Aids Care, Inc*., 870 F.3d 82, 86
22      (2d Cir. 2017) ....................................................................... 15

23   *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d
      1150, 1162 (9th Cir. 2011) ........................................................... 11
24

25   *Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976 (9th Cir. 2011)......................................... 11

26   *Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Services, Inc*., 90 F. Supp. 3d
      1058, 1073 (C.D. Cal. 2015) ....................................................... 29

27   *Science of Skincare, LLC v. Phytoceuticals, Inc*., 2009 WL 2050042 (C.D.
28      Cal. July 7, 2009).................................................................. 25

*Sega Enterprises Ltd. V. Accolade, Inc.*, 977 F. 2d 1510, 1530 fn. 10 (9th
        Cir. 1992) ........................................................................................... 29

*Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F.Supp. 1170,
        1177 (C.D. Cal. 1989) ....................................................................... 24

*UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F.Supp.2d 854, 872 (N.D.
        Ill. 2009) ............................................................................................ 12

*Way.com, Inc. v.* Singh, 2018 WL 6704464, at *10 (N.D. Cal. Dec. 20, 2018) .............. 16

*Whyte v. Schlage Lock Co.*, 101 Cal.App.4th 1443, 1458-59 (2002) ................................. 13

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21 (2008) .................... 11

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279 (11th Cir.
        2018) .................................................................................................. 19

## OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

On April 13, 2022, the Court denied Plaintiff Perrin Bernard Supowitz, LLC, dba, Individual Services's ("IFS") application for a temporary restraining order. The Court found that IFS's evidence "consists of conclusory, boilerplate averments regarding the existence of trade secrets and Defendants' use of them. For all these conclusory allegations, however, IFS submits no evidence regarding what Defendants are actually doing with the devices, electronically stored information, or trade secrets that is causing IFS financial or other harm." Doc. no. 22, pp. 2-3 (internal citations omitted).

All of the alleged trade secrets at issue will be at least eight months old at the time of the hearing. This is because Savino and Pablo Morales would have obtained any alleged trade secrets prior to their termination by IFS on March 31, 2022.

Savino and Pablo's former IFS supervisor, Steven Arroyo, states in a new declaration, "Any pricing information, sales information, credit information, customer order information, and the like, of IFS that is over six months old would have no value to a competitor of IFS (even assuming it had any value in the first place) as the information would almost assuredly be outdated. Pricing changes frequently in the food service industry, especially in the recent period of high inflation. Product availability changes. Customer needs change. Etc." Arroyo 11-11-22 Decl. ¶ 3. Thus, even if any information at issue were a valuable trade secret in the past and even if it were misused (we dispute both vigorously), there would be no justification to issue a preliminary injunction to protect this old, stale information.

Furthermore, IFS still has insufficient evidence that trade secret misappropriation ever occurred, let alone after Defendants left their employment. Indeed, most of the alleged misappropriation IFS discusses could only possibly have been accomplished while Savino and Pablo Morales worked for IFS and irrelevant to the question of injunctive relief addressing future conduct.

1    IFS points to various documents that Savino Morales emailed his wife to print
2   for him, because he primarily worked from home. Defendants all state that they
3   have not used these documents for any business-related purpose since March 31,
4   2022. Savino MSJ Decl. (ECF No. 106), ¶ 19; Pablo MSJ Decl. (ECF No. 107), ¶
5   20; Escamilla MSJ Decl. (ECF No. 111), ¶¶ 8 & 10.

6    IFS cites previously filed declarations, mostly those in opposition to its
7   Defendants' motion for summary judgment. Defendants incorporate by reference
8   and reassert their evidentiary objections to this evidence. (ECF No. 179.)

9    IFS absurdly claims 100% of Legacy's $1,389,362.12 in total sales (including
10  to customers who never did business with IFS) were the result of misappropriation
11  of IFS' trade secrets. This is an example of how silly IFS' motion is.

12   IFS simply wants to prevent Defendants from exercising their right to
13  compete against IFS. This can be seen, among other places, in the overly broad
14  relief IFS seeks. IFS requests that Defendants be barred from doing any business
15  with any IFS customer that Savino or Pablo serviced for IFS. California law strongly
16  protects Savino and Pablo's right to compete against their former employer.
17  Relatedly, the requests for preliminary injunction's descriptions of the information
18  Defendants would be barred from using are so vague and poorly defined that it
19  would be wholly implausible for the Defendants to know what they are barred from
20  doing. For this reason alone, the Court should deny the motion.

21   IFS is a large company that has provided no concrete evidence as to why it
22  would be permanently and irreparably damaged if a preliminary injunction is not
23  issued and why monetary damages would be inadequate. In contrast, if the Court
24  grants a preliminary injunction, the Court would be preventing three small
25  businessmen from making a living and engaging in their trade. The balance of
26  potential harms greatly favors denying the Motion. (It is also galling that IFS claims
27  a bond is not even necessary.) The Court should deny the motion.

28

## II. <u>STATEMENT OF FACTS</u>

### A.    <u>IFS' Employment of Savino and Pablo</u>

While at IFS, Pablo and Savino worked on commissions and developed their own customers. Id; Lesowitz MSJ Decl. (ECF No. 109), Exh. K (Shapiro transcript) at pg. 35:3-25. Neither worked under a written employment agreement. Savino MSJ Decl. (ECF No. 106), ¶ 12; Pablo MSJ Decl. (ECF No. 107), ¶ 11.

### B.    <u>Pablo and Savino Received Only Limited Information</u>

Pablo and Savino only had access to information from IFS about their own clients. Savino MSJ Decl. (ECF No. 106), ¶ 2; Pablo MSJ Decl. (ECF No. 107), ¶ 2. Even for Pablo and Savino's own clients, IFS did not provide them with the prices IFS paid to obtain the products that IFS resold, instead using an opaque profit formula that considered supposed office and other internal costs. Arroyo 5-2-21 Decl. (ECF No. 65), ¶ 7; Savino MSJ Decl. (ECF No. 106), ¶ 8; Pablo MSJ Decl. (ECF No. 107), ¶ 8; Lesowitz MSJ Decl. (ECF No. 109) Exh. K (Shapiro transcript) at pp. 55:18-24, 73:6-75:10, 104:7-105:1, 107:12-14.

IFS had no set formula or practice for setting internal cost numbers provided to salespeople. Lesowitz MSJ Decl. (ECF No. 109), Exh. K (Shapiro tran.) at pp. 73:6-75:10, 104:7-105:1, 107:12-14. As IFS executive Jeremy Shapiro testified, about how IFS set its "office cost" for a given product, "There is no structure to it. There is no formula." Id. at pp. 104:7-105:1.

Jeremy Shapiro testified that even when he would orally provide Savino or Pablo IFS' "lowest net cost" for a product, the "lowest net cost" figure that he would provide was not the amount that IFS paid to obtain the product. Lesowitz MSJ Decl. (ECF No. 109), Exh. K (Shapiro transcript) at pp. 73:6-75:10.

### C.    <u>IFS' Customers, Vendors, and Suppliers Did not Have Confidentiality Agreements, and Frequently Share Information</u>

As Steven Arroyo, Savino and Pablo's long-time supervisor at IFS, wrote in his original declaration in this case, "Throughout my tenure in the industry, the food

service distribution industry has been very competitive, with customers generally able to select among many different distributors to supply their needs. Those customers readily share information with salespeople looking to earn their business, frequently showing invoices with their purchases and prices from competitors. IFS has 10 or more competitors that its customers can move their business to and buy the same products." Arroyo 5-2-22 Decl. (ECF No. 65) ¶ 3.

IFS customers are free to purchase products from competitors of IFS. Lesowitz MSJ Decl. (ECF No. 109), Exh. K (Shapiro transcript) at pg. 29:3-5.

### D.   Savino, Pablo, and Sergio Escamilla Start Legacy

In late 2020, Pablo and Savino went to IFS management and told IFS management that they wished to expand their business into Arizona; IFS was not interested. Id.; Arroyo 5-2-22 Decl. (ECF No. 65) ¶ 12.

Defendants were careful not to take any clients or business opportunities from IFS, with Legacy servicing newly developed customers in Arizona, and only selling items to IFS customers if IFS could not fill the order. Savino MSJ Decl. (ECF No. 106), ¶ 15; Pablo MSJ Decl. (ECF No. 107), ¶¶ 14-16.

The revenues that IFS received from Savino and Pablo's sales improved after Legacy was up and running. Savino MSJ Decl. (ECF No. 106), ¶ 17; Pablo MSJ Decl. (ECF No. 107), ¶ 18.

### E.   IFS Terminates Pablo and Savino, and Continues to Share Customer and Pricing Information with Them

On March 31, 2022, IFS terminated Pablo and Savino, who worked remotely. After their termination, Savino and Pablo did not copy or transfer files from any of their IFS computers, phones, or other devices. Savino MSJ Decl. (ECF No. 106), ¶ 23; Pablo MSJ Decl. (ECF No. 107), ¶ 22.

IFS emailed Savino and Pablo a letter on the morning of March 31, 2022, that stated that their "employment with Individual Foodservice Company is terminated, effective immediately" and demanded the immediate return of all of IFS's

"confidential information." Savino MSJ Decl. (ECF No. 106) ¶ 23 & Exh. B; Pablo MSJ Decl. (ECF No. 107), ¶ 21 & Exh. E.

Those email attachments IFS sent to Savino and Pablo post-termination contained Savino and Pablo's most recent earnings statements. They list IFS sales to the customers that they serviced during the most recent pay period, including what items were sold and what the customer paid. Savino MSJ Decl. (ECF No. 106) ¶ 23 & Exh. B; Pablo MSJ Decl. (ECF No. 107), ¶ 21 & Exh. E. IFS did not indicate that the earnings statements were confidential or constituted trade secrets. Id.

On April 29, 2022, IFS again sent Savino and Pablo new sets of earnings statements that contained the same types of customer, pricing, and vendor information. Savino MSJ Decl. (ECF No. 106), ¶ 25 & Exh. C; Pablo MSJ Decl. (ECF No. 107), ¶ 23 & Exh. F. Once again, the documents were not marked confidential and were not redacted. Id.

Defendants filed the March 31 and April 29 earnings publicly. Only later, IFS belatedly claimed that the earnings statements were confidential.

On May 11, 2022, IFS filed an application to seal the earnings statements. ECF No. 48. On May 17, the Court denied IFS' application to seal. The Court held, "Plaintiff simply describes the contents of the purportedly confidential material without explaining how or why the secrecy of any particular piece of information gives Plaintiff a competitive advantage or would otherwise harm Plaintiff if available to the public.  In short, Plaintiff fails to persuade the Court that any of the purportedly confidential information qualifies as a trade secret." ECF No. 57 at p. 2.

### F.    <u>Savino and Pablo Acted Diligently to Return their IFS Devices</u>

After their termination, Savino and Pablo did not copy or transfer files from any of IFS' computers, phones, or other devices. Savino MSJ Decl. (ECF No. 106) ¶ 27; Pablo Decl. (ECF No. 107), ¶ 25. Pablo and Savino returned their IFS devices by April 7, 2022. Savino MSJ Decl. (ECF No. 106), ¶ 26; Johnson Decl.

## III.   <u>ARGUMENT 1: ANY INFORMATION DEFENDANTS HAVE IS OLD AND OUTDATED</u>

Defendants vigorously dispute that they have misappropriated any trade secrets of Defendants. However, even if there were sufficient evidence that Defendants had committed acts of misappropriation in the past, it would still clearly be inappropriate for the Court to grant a preliminary injunction.

This is because all the alleged trade secret information that Defendants possess predates IFS' termination of Savino and Pablo Morales on March 31, 2022. By the time of the hearing on IFS' Motion for a Preliminary Injunction, all the alleged trade secret information at issue in this case will be over eight months old. In other words, even if information Defendants possess previously constituted valuable trade secrets (something we strongly dispute), that information is now too old and outdated to constitute valuable, useful trade secrets going forward.

IFS states that in its moving papers that its Motion for a Preliminary Injunction focusses on customer information, sales histories, order histories, product needs, contact information, credit information, pricing information, and personnel information. ECF No. 174, p. 7:23-27. IFS did not even attempt to put forward evidence showing that any of this alleged trade secret information that Defendants may still possess is still useful and valuable despite being over half of a year old.

Steven Arroyo was Savino and Pablo Morales' supervisor at IFS for many years until Mr. Arroyo left for another food services company in March 2021. Arroyo 11-11-22 Decl. ¶ 1. Mr. Arroyo states in his newly executed declaration, "Any pricing information, sales information, credit information, customer order information, and the like, of IFS that is over six months old would have no value to a competitor of IFS (even assuming it had any value in the first place) as the information would almost assuredly be outdated. Pricing changes frequently in the food service industry, especially in the recent period of high inflation. Product availability changes. Customer needs change. Etc." Arroyo 11-11-22 Decl. ¶ 3. Mr.

Arroyo opines that, "whatever pricing, personnel, sales history, order history, customer needs information, and credit information of IFS that Savino and Pablo Morales may still have from their employment at IFS would not be useful to them or Legacy Wholesale and would not better enable them to compete against IFS." Arroyo 11-11-22 Decl. ¶ 4.

IFS' papers incorrectly assume that IFS would be automatically entitled to a preliminary injunction if it can prove past acts of misappropriation. Even if IFS has provided sufficient evidence that prior acts of misappropriation occurred (we strongly contend otherwise), IFS would still have to show there is a sufficiently great threat that Defendants will misappropriate trade secrets in the future and thereby cause future harm that may only be remedied by a preliminary injunction.

In, *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 21 (2008) the Supreme Court rejected "that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." The Supreme Court held that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction…. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22 (emphasis in original).

As the Ninth Circuit stated following *Winter*, "Under our case-specific approach, we do not presume irreparable harm simply because a defendant violates a statute that authorizes injunctive relief." *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1162 (9th Cir. 2011) (internal citations and quotations omitted). *See also Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976 (9th Cir. 2011) (holding that due to intervening Supreme Court precedent, under the Copyright Act, traditional rules of equity applied, and a court may not presume that a party moving for a preliminary injunction will suffer irreparable harm due to the

moving party showing a likelihood of prevailing on the merits); *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc*., 654 F.3d 989, 997-98 (9th Cir. 2011) (holding the same and discussing limitations of Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873 (9th Cir. 2009)); *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir.. 2014) ("Although past wrongs may help establish the threat of a future injury, they are insufficient alone."); *Cisneros v. U.D. Registry, Inc*., 39 Cal.App.4th 548, 574 (1995) ("A change in circumstances, rendering injunctive relief moot or unnecessary, justifies the denial of an injunction. An injunction should not be granted as punishment for past acts. The injunctive remedy should not be exercised in the absence of any evidence that the acts are likely to be repeated in the future.") (internal citations and quotations).

Any information Defendants possess is stale and outdated and cannot justify injunctive relief. *Language Line Services, Inc. v. Language Services Associates, Inc*., 2013 WL 12173920 (N.D. Cal. June 25, 2013) (vacating preliminary injunction on the grounds that "the information is now stale and thus of less import than at the time the injunction was first imposed."); *UTStarcom, Inc. v. Starent Networks, Corp*., 675 F.Supp.2d 854, 872 (N.D. Ill. 2009) ("Significantly, UTSI does not present the Court with evidence suggesting these documents still retain value. Thus, for 'staleness' reasons alone, the Court would deny UTSI's request to designate these documents trade secrets."); *International Paper Co. v. Suwyn*, 966 F.Supp. 246, 258 (S.D.N.Y.) (1997) ("Moreover, the passage of more than fifteen months since Suwyn's departure makes this type of information sufficiently old and stale that [a permanent] injunction is unnecessary to protect it.").

## IV.   ARGUMENT 2: DEFENDANTS HAVE NOT MISAPPROPRIATED TRADE SECRETS

### A.   IFS Relies on the Rejected Doctrine of Inevitable Disclosure

California law rejects the "doctrine of inevitable disclosure" under which "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that

defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Whyte v. Schlage Lock Co*., 101 Cal.App.4th 1443, 1458-59 (2002). "[T]he doctrine of inevitable disclosure creates a de facto covenant not to compete and runs counter to the strong public policy in California favoring employee mobility." *Id*. at 1462 (internal citations omitted). California has a "settled public policy in favor of open competition." *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945 (2008).

IFS's evidence of misappropriation is scant and insufficient. IFS simply assumes that Defendants have used, and will use, IFS' alleged trade secrets because Legacy has been doing business with IFS' customers.

The Court must be especially careful about issuing a preliminary injunction in this case, as it would limit Defendants' rights to compete against IFS. In, *Dowell v. Biosense Webster, Inc*., 179 Cal.App.4th 564, 575 (2009), the Court of Appeal cautioned against the use of trade secret law to prohibit people from competing against their former employers. *Dowell* even doubted whether post-*Edwards* trade secret law could ever justify barring an employee from competing against his or her former employer (a position it noted is not universal). *Id.* at 577. In *Dowell*, the court held that, even if trade secret law could theoretically be used to prohibit competition against a former employer, the agreement at issue was invalid when it prohibited the former employee from using "the names of customers, customer preferences, needs, requirements, purchasing histories or other customer-specific information" learned during employment was invalid. *Id*. at 578 The court noted that, "Given such an inclusive and broad list of confidential information, it seems nearly impossible that employees like Dowell and Chapman, who worked directly with customers, would not have possession of such information." Id.

**B.   IFS Has Insufficiently Articulated the Alleged Trade Secrets**

IFS has insufficiently identified or articulated the trade secrets that Defendants allegedly misappropriated. As the Court stated when denying IFS' application for a TRO, "IFS's showing otherwise consists of conclusory, boilerplate

averments regarding the existence of trade secrets and Defendants' use of them." Doc. no. 22 at p. 3. IFS has done nothing to provide more specifics of what information is at issue other than to point to some additional documents that Savino emailed to his wife to print. (IFS has not demonstrated Defendants used any of these documents to complete sales to any customer; IFS just assumes it.)

## C. **IFS Has not Established It Took Necessary Measures to Maintain the Secrecy of the Alleged Trade Secrets**

### 1. IFS Has Publicized the Alleged Trade Secrets

#### a. Earnings Statements

Ironically, most of the IFS information that Defendants possess is contained in their earnings statements. After IFS terminated Savino and Pablo, IFS twice sent them earnings statements without indicating that the documents were confidential, including on April 29, 2022, after Defendants had publicly filed the first set of earnings statements. Savino MSJ Decl. (ECF No. 106), ¶¶ 22-24 & Exhs. B & C; Pablo MSJ Decl. (ECF No. 107), ¶¶ 21-23 & Exhs. E & F.

IFS has previously incorrectly claimed that the earnings statements fell within the confidentiality agreement in the IFS Employee Handbook and filing them was wrongful (though the Court refused to seal them). The "Employee Handbook" required employees to agree that "I am aware that **during the course of my employment**, confidential information may be made available to me regarding Individual FoodService. I agree not to disclose this information during my employment or thereafter to a competitor, the media, or to any other person or corporation." Zoyla Rice Decl. (ECF No. 140), Exh. F (emphasis added).

Moreover, IFS' Handbook carved out of the "confidentiality agreement" wage and employment information by stating that "nothing in this handbook is intended to unlawfully restrict an employee's right to engage in any of the rights guaranteed them by Section 7 of the National Labor Relations Act." Zoyla Rice Decl. (ECF No. 140) Exh. F. As the information in the commission sales reports

directly showed how IFS calculated Pablo and Savino's wages, it was information that they could not and were not restricted from discussing. *See, e.g., Nat'l Lab. Rels. Bd. v. Long Island Ass'n for Aids Care, Inc*., 870 F.3d 82, 86 (2d Cir. 2017); Cal. Labor Code § 232(b) ("No employer may.. Require an employee to sign a … document that purports to deny the employee the right to disclose the amount of his or her wages."); *see also* Cal. Labor Code § 226(a) (requiring employer to provide itemized statement of wages). Ms. Rice confirmed they are sent for salespeople to "verify that the commission calculations are accurate." ECF No. 52, ¶ 2.

Ms. Rice's initial cover letters further indicated the statements were not confidential by demanding that Savino and Pablo return IFS' "confidential information" at the same time she provided them the earnings statements.

### b. Dart Competitive Pricing Agreement

On April 25, 2022, IFS publicly filed in this case a copy of an IFS competitive pricing agreement with Dart that was in effect through February 28, 2022. ECF No. 30-5.

### c. IFS' Website and Other Sharing

IFS has listed thousands of specific items it sells on its website as well as hundreds of its vendors and brands. Savino MSJ Decl. (ECF No. 106) ¶ 10; Escamilla Decl. (ECF No. 111), ¶ 19 & Exh. J.

In addressing the information displayed on its website in its Opposition to Defendants' Motion for Summary Judgment, IFS conceded that "IFS does *not* contend that the mere list of product or names of vendors is trade secret to IFS…" ECF No. 138, p. 19:27-28 (emphasis in original).

Furthermore, IFS shared pricing and other supposedly confidential information without using non-disclosure agreements with its competitor, All American, as part of a joint bid process. Lesowitz MSJ Decl. (ECF No. 109), Exh. K (Shapiro transcript) pp. 78:3-10, 156:20-157:7, 176:3-8.

2.   <u>IFS Did Not Require Confidentiality of Customers and Suppliers</u>

IFS did not require its customers or suppliers to enter into confidentiality agreements. Savino MSJ Decl. (ECF No. 106), ¶ 37; Lesowitz Decl. (ECF No. 107), Exh. K (Shapiro tran.) at pp. 50:23-51:5. Defendants are free to simply ask potential customers what prices they paid for IFS products or what prices they charged IFS for products. *See Amgen Inc. v. Health Care Services*, 47 Cal.App.5th 716, 735 (2020) (In finding that price increase notice was not a trade secret stated, "Amgen provided no evidence that the recipients of the price increase information, whether registered purchasers or purchasers contracting with pharmacy benefit managers, were under any contractual obligation to maintain its confidentiality, nor does Senate Bill No. 17 impose any confidentiality obligations."); *In re Providian Credit Card Cases*, 96 Cal.App.4th 292, 305 (2002) (telemarketer scripts cannot be trade secrets because by using the scripts on potential customers the content of the scripts are disclosed to the public); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc*., 616 F.Supp.2d 805, 820 (N.D. Ill. 2009) ("There is no indication Del Monte's customers were prohibited from divulging the prices they paid for bananas. There is no indication Kinnavy misappropriated a pricing formula. As such, the Court finds that price information alone cannot constitute a trade secret.").

In *Way.com, Inc. v.* Singh, 2018 WL 6704464, at *10 (N.D. Cal. Dec. 20, 2018), the court denied a preliminary injunction after it evaluated the evidence on the existence of a trade secret. The court concluded the customer list was " 'readily ascertainable through public sources,' namely Way's own website" listing customers ("partners"); that "contact information of partners' key decision makers is not likely difficult enough to obtain," and "Way's competitors would likely gain little by learning the businesses with whom Way partners because it is evident that all businesses with parking lots might choose to sell those spots through an online marketplace like Way." Furthermore, that "parking partners do not have to sign nondisclosure agreements" and were "free to share with others the fact of their

1  partnership with Way along with the precise details of the agreement—from

2  structure to price to number of spots" indicated that the plaintiff did not adequately

3  protect the information as secret. *Id.* at *11.

### D.  **IFS's Customer List and Pricing Information Lack Value**

#### 1.  IFS's Customer List

6  IFS cannot plausibly claim that its customer list is a trade secret since

7  virtually any food services company could be a customer of IFS or Legacy, and they

8  do not serve a niche market. In fact, in IFS' Opposition to Defendants' Motion for

9  Summary Judgment, IFS conceded that the identity of its customers is not a trade

10 secret. IFS wrote, "Here, it is not the mere identity of IFS' customers that constitutes

11 the trade secret…" ECF No. 138, pp. 20-21. Also, IFS executive Jeremy Shapiro

12 acknowledged at his deposition that no IFS policy prohibits salespeople post-

13 employment from contacting the clients they serviced while at IFS. Lesowitz Decl.

14 (ECF No. 109), Exh. K (Shapiro transcript) at pp. 39:19-40:1, 46:17-47:12.

15 IFS resold a large variety of items that any foodservices company would

16 need. Savino MSJ Decl. (ECF No. 106), ¶ 5. Virtually any company in the food

17 services industry is a potential customer of either IFS or Legacy and many

18 customers purchased from multiple sources. Lesowitz Decl. (ECF No. 109), Exh. K

19 (Shapiro transcript) at pg. 27:3-22; Savino MSJ Decl. (ECF No. 106), ¶ 7; Pablo

20 MSJ Decl. (ECF No. 107), ¶ 7; Arroyo 5-2-22 Decl. (ECF No. 65) ¶¶ 3-7.

21 California law only potentially protects customer lists in the narrow

22 circumstance where the plaintiff services a niche market within an industry and it is

23 difficult and expensive to determine who the potential customers are within the

24 larger industry; also, California law is unlikely to find that a customer list is a trade

25 secret where customers use multiple vendors. *Abba Rubber Co. v. Seaquist*, 235

26 Cal.App.3d 1, 19 (1991) ("By itself, knowledge of the identities of the businesses

27 which buy from a particular provider of goods or services is of no particular value to

28 that provider's competitors. However, that information is valuable to those

competitors if it indicates to them a fact which they previously did not know: that those businesses use the goods or services which the competitors sell."); *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal.App.3d 1318, 1326 (1986) ("While the information sought to be protected here, that is lists of customers who operate manufacturing concerns and who need shipping supplies to ship their products to market, may not be generally known to the public, they certainly would be known or readily ascertainable to other persons in the shipping business. The compilation process in this case is neither sophisticated nor difficult nor particularly time consuming. The evidence presented shows that the shipping business is very competitive and that manufacturers will often deal with more than one company at a time. There is no evidence that all of appellant's competition comes from respondents' new employer.").

That Savino and Pablo Morales may have had direct contact information for people at certain businesses does not convert IFS' customer list into a trade secret. *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc*., 402 F.3d 700, 714-15 (6th Cir. 2005) (affirming the granting of summary judgment against a trade secrets claim, stating, "As the district court found, ATC can point to no evidence that the identities of transmission parts customers contained on its customer list was obtained through great effort or expense, or that the names on the list were not discoverable from a telephone book or similar legitimate source. Even the name of the person at each transmission shop responsible for buying parts, to which ATC ascribes great importance, can be ascertained simply by calling each shop and asking.") (citing approvingly, and basing its holding in part on, *Morlife v. Perry,* 66 Cal.Rptr.2d at 735). Furthermore, any customer contact information Defendants may have had comes from Savino and Pablo having personally developed and serviced the business for IFS.

2.     Pricing and Vendor Information

The prices of the products IFS offer for sale change rapidly. Pricing
information quickly becomes stale. Arroyo 11-11-22 Decl. ¶¶ 3-4; Pablo MSJ Decl.
(ECF No. 107), ¶ 9; Savino MSJ Decl. (ECF No. 106), ¶ 9. IFS publicly filed in this
case a competitive price agreement from Dart Container Corporation that had
expired less than two months earlier. ECF No. 30-5.

There is nothing indicating that IFS uses any special or unique methods to
determine its pricing (in fact, Jeremy Shapiro's testimony indicates that pricing was
set in an arbitrary and inconsistent manner), and Savino and Pablo were never privy
to any methods. *Fortna v. Martin*, 158 Cal.App.2d 634, 640 (1958) ("Fortna also
claimed that his methods of pricing and bidding were secret. The evidence does not
show that Fortna devised any secret or improved method of making estimates or
computing costs. At most, the evidence discloses that Fortna utilized a system which
considered his costs, but any successful business man must do the same.")

Again, Savino and Pablo Morales did not have access to what prices IFS
actually paid to vendors for products. Lesowitz MSJ Decl. (ECF No. 109) Exh. K
(Shapiro transcript) at pp. 55:18-24, 73:6-75:10, 104:7-105:1, 107:12-14.

Furthermore, the identity of IFS' vendors and the suppliers of its products are
not valuable trade secrets. IFS conceded in its Opposition to Defendants' Motion for
Summary Judgment, "IFS does *not* contend that the mere list of product or names of
vendors is trade secret to IFS…" ECF No. 38, p. 19:27-28 (emphasis in original).

In *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279 (11th Cir.
2018), the Eleventh Circuit affirmed the granting of summary judgment against the
plaintiff's misappropriation of trade secrets claims. The court affirmed the findings
that (a) the identity of the plaintiff's suppliers of materials and components for its
boats were not trade secrets and (b) that "the prices Yellowfin negotiated with its
suppliers were also not trade secrets." *Id.* at 1297-99. As to the identity of the
suppliers, "the identities of Yellowfin's suppliers are typically well known," and the

1  defendant conceded that they are not secret in deposition. *Id.* at 1298. As for why
2  pricing information was not a trade secret, three reasons were provided, (1) "the
3  negotiated prices were based on the volume of [the plaintiff's] boat production," (2)
4  "discounts were based in part on the relationships it cultivated with its vendors," and
5  (3) one of the defendants "learned [the plaintiff's] production costs in the ordinary
6  course of working at [the plaintiff]." *Id.*

7              3.   <u>Dart Competitive Pricing Agreement</u>

8       IFS filed a copy one of its competitive pricing agreements with Dart
9  Container Corporation publicly in this case. ECF No. 30-5. In attempting to handle
10 this public disclosure in its Opposition to Defendants' Motion for Summary
11 Judgment, IFS conceded that, "IFS does *not* contend that the Dart Competitive Price
12 Agreement, which reflects the cost of certain items to IFS, is an IFS trade secret.....
13 The Dart Competitive Price Agreement, which had expired on February 28, 2022,
14 reflected IFS' cost on 77 items and demonstrated that IFS did provide Pablo and
15 Savino IFS' actual cost of certain items." ECF No. 138 p. 19:13-14 (emphasis in
16 original). Thus, IFS has conceded that it does not contend that IFS' <u>actual</u> costs of
17 items in February 2022 is a trade secret.

18      IFS is stuck with its concession regarding actual costs. However, the Dart
19 competitive pricing agreement did not in fact disclose IFS' actual costs to obtain
20 items from Dart. IFS has a separate rebate agreement with Dart in which IFS
21 receives certain rebates for the items sold; Savino and Pablo have never had copies
22 of these rebate agreements. Lesowitz MSJ Decl. (ECF No. 109), Exh. K(Shapiro
23 transcript), pp. 84:7-85:10, 86:11-13, 88:2-89:11.

24      Regardless, Legacy has never purchased items from Dart. Savino MSJ Decl.
25 (ECF No. 106), ¶ 19; Pablo MSJ Decl. (ECF No. 107), ¶ 20; Escamilla MSJ Decl.
26 (ECF No. 111), ¶ 8.

**E.**     **Defendants' Evidence of Misappropriation Is Unpersuasive**

The evidence that IFS cites in its papers does not prove that Defendants misappropriated IFS' trade secrets. The evidence certainly is insufficient to justify the extraordinary remedy of a preliminary injunction.

We address the evidence IFS cites in its papers.

1.     Ability to Do Business in Arizona

IFS argues that "Defendants have repeatedly sworn that they formed Legacy because IFS prevented them from conducting IFS business in Arizona," when in reality, Defendants served two customers for IFS in Arizona. Renewed Motion for PI pg. 2:2-7 (item "a"). Defendants never claimed that IFS would not allow them to do any business in Arizona; Defendants only said that IFS did not want them to expand their business in Arizona further. Savino MSJ Decl. (ECF No. 106), ¶ 14. Furthermore, Steven Arroyo, Defendants' prior supervisor at IFS stated in his original declaration that, "Pablo and Savino told IFS management (including me) that they wanted to develop clients in Arizona, we told Pablo and Savino that IFS would not support them developing business in those locations." Arroyo 5-2-22 Decl. (ECF No. 65) ¶ 12.

That said, whether Defendants could have serviced additional Arizona customers through IFS has nothing to do with the question of whether Defendants misappropriated trade secrets. IFS is attempting to confuse the question of whether Defendants violated their duties of loyalty to IFS and the question of whether Defendants have misappropriated trade secrets.

2.     The Number of Joint IFS-Legacy Customers

IFS claims that Defendants lied about the number of IFS customers that Legacy has done business with. Renewed Motion for PI, pp. 2:7-14 (item "b") & 16:2-14. IFS wrote, "On multiple occasions… Defendants have sworn that they sold $1,389,362.12 in product to 17 IFS customers from the time they commenced operations in August 2021 until the termination of their employment with IFS on March 31, 2022," while

1    the evidence indicates that Defendants sold items to 22 IFS customers. Renewed
2    Motion for PI, pp. 16:2-14.

3        IFS is wrong. Defendants indeed only did business with 17 IFS customers
4    prior to March 31, 2022. Regarding the five "extra" customers: (a) for Kennias,
5    Defendants included Kennias in its original discovery responses and included it in
6    its list of 17 customers it did business with, (b) for Rong Cheng Trading, Espinoza
7    Brothers, and Lunas Supply, Legacy did not sell items to any of them until after
8    March 31, 2022, and (c) for Puebla Produce, Legacy never sold items to that
9    business. Savino MSJ Reply Dec. (ECF No. 178-1); Pablo MSJ Reply Dec. (ECF
10   No. 178-2).

11       That said, this is a red herring. It does not matter how many IFS customers
12   Legacy has done business with. Legacy is free to do business with IFS customers.

13                    3.    Use of IFS Devices and Meetings

14       IFS claims that Defendants used their IFS devices in conducting business for
15   Legacy and did Legacy-related business with customers during meetings for IFS.
16   Renewed Motion for PI, pp. 2:15-17 (item "c") & 3:27-4:4 (item "i"). Even if this
17   were true, it is irrelevant to the question of trade secret misappropriation. IFS is
18   attempting to confuse the issues.

19                    4.    LEGACY 01413, Lopez Decl., and Trujillo Decl.

20       IFS cites three pieces of evidence in arguing that it is incorrect that "Legacy
21   only sold products to IFS customers for which IFS was out of stock or where IFS
22   would not match the customer's price request." Renewed Motion for PI, pp. 2:17-3:2
23   (item "d"). Initially, whether Defendants could have sold items through IFS or not is
24   a question for the duty of loyalty claim, not the trade secret claim.

25       That said, none of the evidence is persuasive. IFS cites LEGACY 01413 (Exh.
26   A to the Williams Declaration). In this email, Savino says that certain items will need
27   to be ordered from Legacy. That is it. This is not persuasive evidence of anything.

28

IFS also cites to the Declaration of Ishmael Lopez. See also Motion, pg. 15:2-13. Mr. Lopez claims that Pablo Morales called him and told Mr. Lopez that Legacy could sell his business Reyma foam cups at a lower price than IFS could. (He does not specify specifics such as what dollar amounts, if any, were mentioned.) IFS does not claim in any declarations by its employees (such as Jeremy Shapiro or Nigel Kershaw) that IFS could have supplied the items to Mr. Lopez and Red Hot Chilis that are referenced in Mr. Lopez's declaration. As Pablo Morales states in his declaration responding to Mr. Lopez's declaration, Pablo could not fulfill the orders through IFS. Pablo MSJ Reply Decl. (ECF No. 178-2), ¶ 3. Furthermore, IFS' supply of foam products generally to Pablo's customers was poor, and IFS insisted that Pablo sell Dart products, which are more expensive, and Mr. Lopez had told Pablo that he did not want to pay more for Dart products. Pablo MSJ Reply Decl. (ECF No. 178-2), ¶ 3. Furthermore, there is a gap in Mr. Lopez's timeline: he states that he received the estimate four to six weeks after the conversation with Pablo (Lopez Par. 10). It is unclear what prices, conversation, or documents he is referring to in Paragraph 11.

IFS also cites to Paragraphs 10 and 13 of the Declaration of Jesus Trujillo. In Paragraph 10, Mr. Trujillo claims that Savino and Pablo "encouraged" him to offer IFS customers Legacy products when IFS could not fill an order instead of offering them an alternative from IFS. Even if this were true, this would only be relevant to the duty of loyalty claim and would not implicate use of trade secrets. In Paragraph 13, Mr. Trujillo states that for the customers he originated for Legacy in Arizona, these customers "could have purchased their products from IFS…" This is inadmissible speculation. Furthermore, it is only relevant to the duty of loyalty claim.

### 5.   The "Top Account" Spreadsheet

IFS cites Deposition Exhibit 117 and related testimony, and claims that IFS provided Savino a "detailed 'Top Account' spreadsheet."  Renewed Motion for PI,

pg. 3:3-8 (item "e") (where IFS mistakenly cites Exhibits 86, 87, 88, in what appears to be a typo) & 12:20-13:2. IFS claims that this "report identifies each and every item purchased, the item number, description, vendor name, date of last sale, quantity, dollar amount of sales, last sales price, new sell price, difference in sell price, margin, and price on delivery." Renewed Motion for PI, pg. 12:24-28.

IFS' account of the "Top Account" spreadsheet is inaccurate. First, the spreadsheet is not a list of every item sold for any customer. Exhibit 117 only lists sales that IFS deemed to have been made at too low of a price. This can be seen by (a) Savino's deposition testimony and (b) by looking at the document, as each spreadsheet entry lists a negative margin in red (with a negative margin simply indicating that the item was sold below "office cost," not actual cost).

Second, the earliest email on the first page of Exhibit 117 demonstrates that Savino did not request that the spreadsheet be sent to him. Jeremy Shapiro's assistant Sylvia Medina wrote to Savino in the earliest email, "Here are the lists that we spoke about with Jeremy that he is increasing pricing on….Please see the attached report and call me if you have any questions." Per Savino's testimony, IFS sent him the list because it wanted Savino to raise prices on the items.

Third, the "margin" entries in Exhibit 117 are not the actual profit margin that IFS netted. Negative "margin" in Exhibit 117 is the difference between "office cost" and cost charged the customer. Savino Tran. pp. 240:20-241:15, 245:2-246:8; Lesowitz MSJ Dec. (ECF No. 109), Exh. K (Shapiro tran.) at pp. 73:6-75:10, 104:7-105:1, 107:12-14.

Fourth, we note Savino did not forward Exhibit 117.

Finally, IFS does not even attempt to connect any information in Exhibit 117 to any sales Legacy made. *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F.Supp. 1170, 1177 (C.D. Cal. 1989) ("Apparently, UAI's trade secrets claim is based purely on the speculation that since the former UAI employees are working in similar areas at MSC and that after the employees began working for MSC, MSC

announced improvements in its Nastran products, therefore MSC must be misappropriating UAI trade secrets. There is no logic to UAI's theory."); *Science of Skincare, LLC v. Phytoceuticals, Inc*., 2009 WL 2050042 (C.D. Cal. July 7, 2009) (Honorable Otis D. Wright II presiding) (granting summary judgment where "Plaintiff has not sufficiently shown a causal link between a potential misappropriation of a trade secret and the alleged damages."); *Firetrace USA, LLC v. Jesclard*, 800 F.Supp.2d 1042, 1054 (D. Ariz. 2010) ("Plaintiffs have not met their burden to overcome summary judgment by showing evidence they were proximately damaged by Mr. Jesclard's use of confidential information.").

### 6.  The "Account Contact" Spreadsheet

IFS cites to Deposition Exhibit 136, which was an "Account Contact Spreadsheet" that Savino emailed to his wife so that she could print it for him. Renewed Motion for PI, pg. 3:9-15 (item "f"). However, Exhibit 136 contains nothing but the names of customers along with contact information for the customers. It does not contain any pricing information, any sales information, etc. There is also no evidence Defendants have used Exhibit 136 to compete against IFS.

### 7.  The Amapola Markets Report

IFS cites to a "Customer Report" for Amapola Markets that Savino emailed to his wife so that she could print it for him and a text message regarding Amapola. Renewed Motion for PI, pp. 3:16-20 (item "g") & 16:16-17:1.

However, Legacy has never done any business with Amapola Markets. Savino MSJ Decl. (ECF No. 106), ¶ 19.

Furthermore, when Savino met with people from certain markets in the Amapola Markets chain in January 2022, those particular markets had stopped doing business with IFS. In January 2022, Savino was pitching these markets to again do business with IFS, which was the main purpose of Savino's meeting. Savino Tran. 298:9-299:12, 310:23-311:10.

Furthermore, it is undisputed that IFS did not require its vendors or customers to keep any pricing information confidential. Savino was free to ask any customers for its invoices from IFS. And Savino and Pablo did not have access to any of IFS' actual costs or margins. *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc*., 616 F.Supp.2d 805, 820 (N.D. Ill. 2009) ("There is no indication Del Monte's customers were prohibited from divulging the prices they paid for bananas. There is no indication Kinnavy misappropriated a pricing formula. As such, the Court finds that price information alone cannot constitute a trade secret.")

### 8.   Use of Credit Information

IFS cites to evidence that shows that at times Defendants may have decided not to run a credit check on a Legacy customer because they assumed that IFS would not have done business with the customer if it did not pay its bills. Renewed Motion for PI, pg. 3:21-26 (item "h"). This does not implicate trade secrets. Defendants were free to assume that a large company like IFS would not do business with a bad customer that does not pay its invoices. Furthermore, Savino and Pablo cannot be expected to forget that certain of their IFS customers were generally good customers. IFS is attempting to ban any competition.

### 9.   Use of Pseudonyms

IFS claims that Defendants initially hid Savino and Pablo's ownership interest in Legacy and used fake names when conducting Legacy business. Renewed Motion for PI, pg. 4:4-9 (items "j" & "k"). Even if Defendants used pseudonyms when working for Legacy and IFS concurrently, this would not involve the use of trade secrets. IFS is trying to blur the distinction between its duty of loyalty claims and its trade secret claims.

### 10.   Steps to Obtain Credit from IFS

IFS cites to Deposition Exhibits 40, 74, 77, and 78, and testimony regarding the exhibits, to argue that, in order to induce IFS to provide better credit terms to Legacy, Defendants made false representations to IFS regarding Legacy's business

dealings, stature, creditworthiness, and Legacy's business plans. Renewed Motion for PI, pp. 4:10-13-5:14 (items "l" through "s").

This is another example of IFS attempting to confuse the issues by raising issues only relevant to their duty of loyalty and fraud claims. None of this evidence involves the use of trade secrets. IFS does not have a trade secret interest in Legacy's business dealings (let alone false information about Legacy's business dealings).

### 11.   Hiring of Hugo Mesa and Jesus Trujillo

IFS points to Legacy hiring two IFS employees, Hugo Mesa and Jesus Trujillo. Renewed Motion for PI, pg. 5:15-16 (item "t"). However, the mere hiring of two individuals from IFS does not constitute trade secret misappropriation. Furthermore, neither Mr. Mesa nor Mr. Trujillo in their declarations show use of IFS trade secrets.

### 12.   LEGACY 02200

Relying on the document bates stamped LEGACY 02200, IFS argues that Defendants used IFS information to obtain better prices for Legacy from IFS. Renewed Motion for PI, pg. 5:17-22 (item "u"). (We initially note that even if this were true, which we strenuously deny, Defendants could not repeat such behavior in the future, as Defendants no longer work for IFS and IFS now knows their connections to Legacy.) However, IFS' characterizations of LEGACY 02200 are inaccurate.

The words of Legacy02200 do not support reading the message as saying anything about Legacy using trade secrets to obtain better prices from IFS. In fact, there is nothing in the words indicating that what is being discussed is Legacy obtaining products from IFS or the pricing at which Legacy obtains products. IFS has provided no deposition testimony providing any context to Legacy 02200.

13.   <u>LEGACY02176</u>

Legacy mischaracterizes the contents of the documents bates stamped as LEGACY 02176. IFS asserts that Savino "characterized his Legacy sales as 'doing damage' to IFS." Renewed Motion for PI, pg. 5:23-24 (item "v"). This chaterization is false. In Legacy 02176, the writer says that he will not be able to travel to Arizona for a meeting, saying, "Unfortunately I won't be able to go. I'm doing my damage from L.A." There is no indication the writer is doing any kind of damage to IFS.

14.   <u>Additional Documents Savino Sent to His Wife to Print</u>

Legacy later in its papers cites to additional documents that Savino Morales apparently emailed his wife to print for him, namely Deposition Exhibits 14, 25, 116, 137, and 138, and Mesa Decl. Exh. 1. Renewed Motion for PI, pg. 13:3-14.

Exhibits 14 and 116 contain Dart Competitive Price Agreements. However, IFS has conceded that the Dart Competitive Price Agreements are not trade secrets. ECF No. 138 p. 19:13-14. Furthermore, these competitive prices agreements do not contain the actual cost of IFS to obtain the items, as there is a separate rebate agreement that Savino and Pablo Morales never had access to. Lesowitz MSJ Decl. (ECF No. 109), Exh. K(Shapiro transcript), pp. 84:7-85:10, 86:11-13, 88:2-89:11. Also, Legacy has never purchased items from Dart. Savino MSJDecl. (ECF No. 106), ¶ 19.

Exhibits 25 and 137 contain sales information from less than 50 sales of Dart products (Ex. 25) and 14 sales of Reyma products (Ex. 137) from no later than January 2022. The information on these exhibits appears to be the same type of information that would be in Savino and Pablo's pay reports, nothing more. Any conjecture tying the documents to Legacy sales to any customer is spurious and disingenuous.

Exhibit 138 appears to be a one-page spreadsheet of 30 sales of Dart products that IFS had flagged that Savino sold at a price that should have been higher. It is not evidence of trade secret misappropriation.

1   IFS also points to a list of janitorial suppliers. However, in its Opposition to

2   Defendants' Motion for Summary Judgment, IFS properly conceded that "IFS does

3   not contend that the mere list of product or names of vendors is trade secret to

4   IFS…" ECF No. 138, p. 19:27-28 (emphasis in original).

5            15.   La Surtidora

6            Jeremy Shapiro claims to have spoken to GM of La Surtidora and purports the

7   GM told Mr. Shapiro that Savino told the GM that Legacy could supply certain

8   products at a lower price than IFS. Renewed Motion for PI, pg. 15:18-24.  Savino

9   Morales disputes this. Savino Decl. to Original PI Motion (ECF No. 40), ¶ 37.

10           This evidence of what the GM of La Surtidora told Jeremy Shapiro is

11  inadmissible hearsay; Defendants object to its consideration. IFS has not provided a

12  sworn declaration or deposition testimony from the GM of La Surtidora. (IFS has

13  not deposed him.) There are times where courts may consider hearsay on a motion

14  for preliminary injunction when there has not been sufficient time for the moving

15  party to secure testimony of a witness through a deposition. However, IFS has had

16  over six months to depose the GM of La Surtidora and has not done so. Since IFS

17  has failed to depose the GM of La Surtidora, since the purported statements are

18  contested, and since they are not directly corroborated by writings, it would be

19  inappropriate for the Court to consider the out-of-court statements. *Rubin ex rel.*

20  *N.L.R.B. v. Vista Del Sol Health Services, Inc*., 90 F. Supp. 3d 1058, 1073 (C.D.

21  Cal. 2015); *Sega Enterprises Ltd. V. Accolade, Inc*., 977 F. 2d 1510, 1530 fn. 10

22  (9th Cir. 1992).

23  **V. CONCLUSION**

24           The Court should deny all of Plaintiff's requested relief.

25           Respectfully submitted.

26  Dated: November 14, 2022      /s/ *Scott Lesowitz*

27                               Attorney and Partner
                                 For Lesowitz Gebelin LLP, Counsel for Defendants

28