**CDF LABOR LAW LLP**
  Dan M. Forman, State Bar No. 155811
    dforman@cdflaborlaw.com
  Amy S. Williams, State Bar No. 228853
    awilliams@cdflaborlaw.com
707 Wilshire Boulevard, Suite 5150
Los Angeles, CA 90017
Telephone: (213) 612-6300

Attorneys for Plaintiff/Counter-Defendant
PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE,<br><br>　　　　Plaintiff,<br>　　v.<br><br>PABLO MORALES, an individual; LEGACY WHOLESALE GROUP, LLC, an Arizona Limited Liability Corporation; SAVINO MORALES, an individual; and SERGIO ESCAMILLA, an individual; and DOES 1 through 20, inclusive,<br><br>　　　　Defendants.<br><br>LEGACY WHOLESALE GROUP, LLC,<br><br>　　　　Counter-Complainant,<br>　　v.<br><br>PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE,<br><br>　　　　Counter-Defendant. | Case No. 2:22-cv-02120-ODW-JEM<br><br>Judge: Otis D. Wright, II<br><br>**PLAINTIFF PERRIN BERNARD SUPOWITZ, LLC, a California LLC dba INDIVIDUAL FOODSERVICE'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　November 28, 2022<br>Time:　1:30 p.m.<br>Dept:　5D |

PLAINTIFF'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY INJUNCTION

CDF Labor Law LLP

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................... 1

II. THE COURT SHOULD NOT CREDIT DEFENDANTS' DECLARATIONS ..................................................................................... 2

III. IFS WILL LIKELY SUCCEED ON THE MERITS ........................................ 4

    A. IFS Does Not Rely On The Inevitable Disclosure Doctrine ................. 4

    B. IFS Adequately Defined Its Trade Secrets ............................................ 4

    C. IFS Made Reasonable Efforts To Maintain The Secrecy Of Its Trade Secrets ................................................................................... 6

        1. IFS Did Not Make Earning Statements Public .......................... 6

        2. Dart Competitive Price Agreement ........................................... 7

        3. IFS' Website ................................................................................ 8

        4. Confidentiality Agreement With Customers And Vendors ...................................................................................... 8

    D. IFS Derives Significant Economic Value From Keeping Trade Secrets — Including Customer Lists — Confidential ................. 8

    E. The Few Months Since IFS Terminated Pablo And Savino's Employment Does Not Diminish The Value Or Potential Misuse Of IFS' Trade Secrets .................................................. 9

    F. Evidence Of Defendants' Misappropriation Of IFS Trade Secrets ................................................................................................ 10

        1. The Savino Account Contact Spreadsheet ............................... 10

        2. The Savino Top Account LM Report ...................................... 10

        3. The IFS Customer Report For Amapola Markets ................... 11

        4. Credit Information And Terms Of Credit For IFS Customers ................................................................................. 11

        5. Hiring IFS' Employees ............................................................. 12

IV. IFS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION ......................................................................................... 12

i            PLAINTIFF'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY INJUNCTION

2085776.1

# **TABLE OF AUTHORITIES**

**Page(s)**

**State Cases**

*Whyte v. Schlage Lock Co.*
   101 Cal.App.4th 1443 (2002) ............................................................................ 4

**Federal Cases**

*Autodesk, Inc. v. ZWCAD Software Co.*
   2015 WL 2265479 (N.D. Cal. May 13, 2015) ................................................... 5

*Bracco v. Lackner*
   462 F.Supp. 436 (N.D. Cal. 1978) ..................................................................... 2

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*
   2019 WL 2177262 (C.D. Cal. May 20, 2019) ................................................... 5

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*
   2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) .............................................. 12

*Hollingsworth Solderless Terminal Co. v. Turley*
   622 F.2d 1324 (9th Cir. 1986) ........................................................................... 8

*Int'l Paper Co. v. Suwyn*
   966 F. Supp. 246 (S.D.N.Y. 1997) .................................................................... 9

*Kewanee Oil Co. v. Bicron Corp.*
   416 U.S. 470 (1974) .......................................................................................... 7

*Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*
   2013 WL 12173920 (N.D. Cal. June 25, 2013) ................................................ 9

*N. Elec. Co. v. Torma*
   819 N.E.2d 417 (Ind. Ct. App. 2004) ................................................................ 7

*Pac. Aerospace & Elec., Inc. v. Taylor*
   295 F.Supp.2d 1188 (E.D. Wash. 2003) ......................................................... 12

*Pellerin v. Honeywell Int'l, Inc.*
   877 F. Supp. 2d 983 (S.D. Cal. 2012) ............................................................... 5

*Phillips v. Frey*
   20 F.3d 623 (5th Cir. 1994) ............................................................................... 7

*Porretti v. Dzurenda*
   11 F.4th 1037 (9th Cir. 2021) ............................................................................ 2

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
   240 F.3d 832 (9th Cir. 2001) ........................................................................... 12

*Sun Distrib. Co., LLC v. Corbett*
   2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) ............................................ 5, 12

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*Super-Krete Int'l, Inc. v. Sadleir*
  712 F.Supp.2d 1023 (C.D. Cal. 2010) .......................................................... 12

*UTStarcom, Inc. v. Starent Networks, Corp.*
  675 F. Supp. 2d 854 (N.D. Ill. 2009) ............................................................ 9

*Way.com, Inc. v. Singh*
  2018 WL 6704464 (N.D. Cal. Dec. 20, 2018) .............................................. 8

*Waymo LLC v. Uber Techs., Inc.*
  2017 WL 2123560 (N.D. Cal. May 15, 2017) ............................................ 10

*WeRide Corp. v. Kun Huang*
  379 F. Supp. 3d 834 (N.D. Cal. 2019) ........................................................ 12

# I. INTRODUCTION

On January 4, 2022, while employed by IFS, Savino Morales wrote to the owners of Legacy bragging that he had just had a "very good meeting" with one of the top IFS accounts that he serviced stating "***good thing about this one is that I have all their pricing since I'm the one that sells them***". The day before the meeting he sent to his personal email account an IFS quote listing Amapola's production selection and prices, and the day after the meeting he sent to his personal email voluminous confidential trade secret reports that detailed the customer relationship, including pricing, between IFS and that customer. (Savino Depo. 310:1-314:20, Exs. 134, 135, 139.)[1] This smoking gun evidence proves IFS' claims for breach of contract, breach of duty of loyalty and misappropriation of trade secrets by Defendants, all the while under cover of fraud and other deceptive practices that enabled Defendants to divert more than $1,389,362.12 in revenue to Legacy in a mere six months. Contrary to Defendants' distractions, there is nothing "silly" about Defendants' misappropriation of IFS' trade secrets and other tortious activity that should be enjoined pending trial.

IFS will prevail on the trade secret theft claims. The evidence demonstrates that Defendants misappropriated IFS' trade secret Customer Lists (sales data reports detailing confidential customer data including customer name, customer contact or contacts, decisionmaker, decisionmaker's contact information, customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories and sales volume), and used those trade secrets to negotiate special pricing for Legacy, set up meetings with IFS' customers for the purpose of soliciting sales for Legacy, extend credit to customers on the same terms as IFS, and identify

---

[1] The deposition testimony and exhibits referred to herein are on file: Sergio depo. ECF 170-1 and exhibits ECF 165; Cynthia Morales depo. ECF 169-2/170-2 and exhibits 165-1; Pablo depo. ECF 169-3/170-3 and exhibits 165-2; Savino depo. ECF 169-4/170-4 and exhibits 165-3.

comparable product and pricing in preparing sales quotes and diverting sales from IFS to Legacy. Defendants malfeasance was profound, deliberate and structured as evidenced by the fact that they created false identifies to hide their relationship with Legacy, an admission that their actions were deceptive and fraudulent, and intended to damage IFS. (Sergio Depo., Ex. 42 ("I don't want your names on it for the reasons we discussed")).

As a result of Defendants' misappropriation of IFS' trade secrets, IFS lost revenue, at least three customers, and the goodwill of its business, and IFS' trade secrets continue to provide Defendants valuable, non-public information regarding IFS' most profitable customers. Defendants attempt to downplay the value of IFS' trade secrets while they refuse to disclose Legacy's own customer, pricing and relationship information is not relevant as they continue to threaten misuse of IFS' trade secret information.

IFS seeks only to enjoin Defendants from soliciting and doing business with those IFS customers they, or their employees, serviced while employed by IFS, and from hiring more IFS employees. As Defendants concede, such relief will not impact Defendants' ability to solicit any of the thousands of other potential customers or employees in California, Arizona or otherwise.

IFS requests that the Court issue the preliminary injunction.

## II. THE COURT SHOULD NOT CREDIT DEFENDANTS' DECLARATIONS

The Court "may" and in this case "must" "render credibility determinations before deciding a motion for a preliminary injunction." *See Porretti v. Dzurenda*, 11 F.4th 1037, 1051 (9th Cir. 2021); *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (When considering a motion for preliminary injunction or TRO, "[t]he weight to be given each of these statements is in the discretion of the trial court."); *see also Bracco v. Lackner*, 462 F.Supp. 436, 442 (N.D. Cal. 1978) (when considering affidavits submitted in support of a TRO or preliminary injunction

"[t]he weight to be given such evidence is a matter for the Court's discretion, upon consideration of the competence, personal knowledge and credibility of the affiant"). Defendants have deliberately and repeatedly submitted to the Court patently false sworn statements. Defendants' Declarations are not credible.

Defendants lied about the IFS employees Defendants' solicited for Legacy. For example, Sergio swore that he did not instruct Jesus Trujillo to use a fake name for Legacy business and that Trujillo told him that he was not subject to any agreements with IFS that would restrict his work for Legacy. (ECF 20-6, Sergio Decl. ¶¶ 12-3.) Trujillo's testimony demonstrates that Sergio mislead the Court. (ECF 142, Trujillo Decl. ¶¶ 4, 5.)[2]

Defendants lied about the number of IFS customers from whom they solicited business for Legacy. In each and every Declaration, including most recently in support of Defendants' Motion for Partial Summary Judgment, Defendants swore that Legacy conducted business with 17 IFS customers. (*See* ECF 104, Mtn at p. 2-3.) Despite Defendants' extensive coverup, IFS uncovered that Legacy had done business with at least three additional IFS customers, Rong Cheng Trading, Espinoza Brothers and Luna Supply that they failed to disclose. (*Id*.) And, had pitched other IFS customers, like Amapola using IFS' trade secrets. (*Id*.) Defendants' manufactured claim that Legacy did not sell items to IFS' customers until after the termination of their employment does not hold water and does not absolve them from their fraud on the Court.[3]

Defendants lied about IFS preventing them from conducting business in Arizona. In Opposition, Defendants claim that IFS only said it did not want Pablo

---

[2] While Sergio may have dropped his misleading statement from subsequent declarations, he has not admitted to the deceit or explained it. Compare ECF 20-6 to ECF 64 and 111.

[3] Indeed, Defendants use of IFS' Trade Secrets to solicit additional IFS customers after termination of IFS' employment demonstrates that they continued to misappropriate IFS' Trade Secrets and underscores the need for injunctive relief.

and Savino to "expand" their business in Arizona. (ECF 181, Opp. at p. 21.) This is belied by the fact that IFS allowed and encouraged sales to Legacy (albeit under fraudulent circumstances), and Mr. Trujillo's testimony that he serviced IFS customers in Arizona, too.

Defendants lied about only selling to IFS customers when IFS could not supply the product or price the customer desired. Despite the fact that Legacy refuses to provide details about sales to IFS' customers, the declarations of two non-party witnesses, IFS customer Red Hot Chilis and former Legacy employee, Jesus Trujillo, prove that Defendants could have sold such product through IFS but chose to sell through Legacy.

While the foregoing evidence defines the breach of duty of loyalty, breach of contract, and inducing other IFS employees to do the same, this evidence goes to fundamental credibility determinations necessary to decide this Motion and the underlying deceit that the Court must consider when balancing equities. Defendants are not credible and the Court should not consider their declarations.

## III. IFS WILL LIKELY SUCCEED ON THE MERITS

### A. IFS Does Not Rely On The Inevitable Disclosure Doctrine

The inevitable disclosure doctrine once allowed an "employee [to] be enjoined by demonstrating the employee's new job duties will inevitably cause the employee to rely upon knowledge of the former employer's trade secrets." *Whyte v. Schlage Lock Co.,* 101 Cal.App.4th 1443, 1446 (2002). IFS demonstrated that Defendants actually used and threaten to continue to use IFS' trade secrets.

### B. IFS Adequately Defined Its Trade Secrets

This argument is frivolous as Court ordered verified Defendants' Supplemental Responses assert that they have produced "non-privileged DOCUMENTS that mention IFS *in connection with its specifically identified trade secret or confidential information*." (Forman Decl. ¶ 2, Ex. 1-2.) IFS adequately defined its Trade Secrets. (ECF 104, Mtn. at p. 7.) IFS focused in on: (a) Customer

Lists defined as IFS sales data reports detailing confidential customer data including customer name, customer contact or contacts, decisionmaker, decisionmaker's contact information, customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories and sales volume and (b) IFS' employee performance information.

"A plaintiff need not 'spell out the details of the trade secret.'" *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015). Nevertheless, the plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012). For example, in *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2019 WL 2177262, at *6 (C.D. Cal. May 20, 2019), Chartwell defined its trade secrets:

> customer lists, including information relating to customers' business affairs, special staffing needs, preferred methods of doing business, methods of operation, key contact personnel, mark up rates, pay rates, and other negotiated terms specific to each customer, job order specifications and the particular characteristics and requirements of persons generally hired by the customer, specific job listings, mailing lists, computer runoffs, financial and other information; employee information, including the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporary or permanent employment.

Like here, defendants argued that Chartwell had failed to define its trade secrets. In rejecting that argument, the Court concluded that "[a]lthough Chartwell's definition of its trade secrets is comprehensive, the trade secrets are essentially Chartwell's customer list and the information that accompanies the list, such as the key contacts, mark up rates, and pay rates of each customer, as well as information regarding Chartwell's employees." *Id.; see also Sun Distrib. Co., LLC v. Corbett,*

2018 WL 4951966, at *3 (S.D. Cal. Oct. 12, 2018) ("although publication names and contact information might be public knowledge, it is clear Plaintiff has put in time and effort to develop other specific information, inter alia, its customer list, preferences, pricing structures… Accordingly, Plaintiff has established it has protectable trade secrets.")

IFS adequately defined its trade secrets and identified concrete examples including the Savino Account Contact Spreadsheet, Savino Top Account LM Report, and Customer Report for Amapola Markets that Savino bragged about using when pitching Amapola for Legacy, all of which are discussed in section III(F) below.

## C. IFS Made Reasonable Efforts To Maintain The Secrecy Of Its Trade Secrets

IFS has undertaken reasonable efforts to protect the confidential nature of its Trade Secrets. (ECF 104 Mtn. at p. 8.) Defendants do not dispute these efforts by IFS. Instead, Defendants raise red herring arguments that IFS "publicized" its trade secrets with regard to two earning statements and back-up documentation provided to Pablo and Savino, a Dart Competitive Price Agreement filed with the Court, a list of product and vendors on IFS' website, and the fact that customers and vendors are not bound by confidentiality agreements.

### 1. IFS Did Not Make Earning Statements Public

IFS provided Pablo and Savino with earning statements and confidential back-up information in their employment with IFS with regard to paid commissions on sales ("earning statements"). (ECF 52, Rice Decl. ¶¶ 2-4.) IFS provided Pablo and Savino with their final earning statements in the same manner that IFS had throughout their employment, in confidence, pursuant to their agreements to maintain their confidentiality, and with the expectation that the earning statements would only be used for the intended purpose of confirming that IFS accurately calculated and paid earned commissions. Pablo and Savino confirmed that they understood IFS' intended purpose. (*Id.*; ECF 106 Savino Decl. ¶ 24; ECF 107 Pablo

Decl. ¶22.) IFS' cover letter enclosing the earning statements advised Pablo and Savino to return all of IFS' property, including hard copies or property that was stored on a non-IFS device. (*Id.*)

Notwithstanding, without asking for IFS' consent, Defendants filed the earnings statements in this action and opposed IFS' efforts to limit the damage from the disclosure. (ECF 139, Forman Decl. ¶13.) Defendants' intentional decision to disclose this information in the public record, after IFS's direction to maintain the confidentiality of its trade secrets, without any attempt to maintain confidentiality, demonstrates their complete and total disregard for their legal obligations. Defendants cannot defeat IFS' claim of secrecy by breaching their own duties of confidentiality. *See N. Elec. Co. v. Torma*, 819 N.E.2d 417, 428 (Ind. Ct. App. 2004) ("misplaced trust in a third party who breaches a duty of confidentiality does not necessarily negate efforts to maintain secrecy."); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) ("necessary element of secrecy is not lost [ ] if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.'"); *see also Phillips v. Frey*, 20 F.3d 623, 630–31 (5th Cir. 1994) ("while it is true that outside any confidential relationship, one who voluntarily discloses secret information or who fails to take reasonable precautions to secure its secrecy cannot properly claim that information constitutes a trade secret, creating such a duty upon the disclosee is a reasonable precaution, and a voluntary disclosure made within the periphery of a confidential relationship eliminates the need to take further precautions to secure the trade secret.")

### 2. Dart Competitive Price Agreement

IFS proffered the Dart Competitive Price Agreement to demonstrate that Pablo and Savino lied when they said that IFS did not provide them with "actual cost" of items to IFS. Defendants were admittedly privy to the lowest price at which IFS was willing to sell a product as well as the price customers paid for a certain product. Defendants used that information to secure product for Legacy at prices that

substantially were lower than what Legacy would otherwise have been charged and sold that product to IFS customers at a discount.

### 3. IFS' Website

Defendants strawman argument that "IFS lists its vendors…on the website" is irrelevant. IFS does *not* contend that the mere list of product or names of vendors is trade secret to IFS and IFS' website does not disclose any trade secret information. Indeed, IFS protects its confidential and trade secret vendor information, especially as it relates to IFS' private label products.

### 4. Confidentiality Agreement With Customers And Vendors

While absent a contractual agreement, customers and vendors are usually free to share price information, however, this does not negate a trade secrets claim. *Way.com, Inc. v. Singh*, 2018 WL 6704464, at *10–11 (N.D. Cal. Dec. 20, 2018) is distinguishable. Way considered customer names published on Way's internal website available to every employee to be trade secret. Here, it is not the mere identity of IFS' customers that constitutes the trade secret, it is the customer contact or contacts, decisionmaker, decisionmaker's contact information, direct dial, cell phone, customer credit ratings, payment history, IFS' pricing, profitability including mark up, order histories, sales volume, product assortment, manufacturer's names for each item, and trends that could be used to promote greater sales. This information is much wider than what might be available on an outdated invoice retrieved from a customer and is not "readily accessible to a reasonable diligent competitor." *Hollingsworth Solderless Terminal Co.*, 622 F.2d at 1332. Indeed, Pablo and Savino testified that while employed at IFS they could not even access information about IFS' customers serviced by other sales representatives. (ECF 106 Savino Decl., ¶ 2, ECF 107 Pablo Decl., ¶ 2.)

### D. IFS Derives Significant Economic Value From Keeping Trade Secrets — Including Customer Lists — Confidential

Defendants false flag that "IFS cannot plausibly claim that its customer list is a

trade secret since virtually any food services company could be a customer of IFS or Legacy," is based on their own artificially narrow definition of customer list as the "mere identity of IFS' customers" and is not persuasive. (ECF 181 Opp. at p. 17.) Indeed, the trade secret value of customer list information is underscored by Defendants' own deposition testimony cited in IFS' moving papers, none of which Defendants address in opposition. (ECF 104 Mtn. at p. 9.)

### E. The Few Months Since IFS Terminated Pablo And Savino's Employment Does Not Diminish The Value Or Potential Misuse Of IFS' Trade Secrets

Relying solely on the foundationless and inadmissible opinion of non-party Steve Arroyo, Defendants contend that even if they misappropriated IFS' Trade Secrets, "that information is now too old and outdated to constitute valuable, useful trade secrets going forward." (ECF 181 Opp. at p. 10:10-13.) Arroyo is not an expert, has no personal knowledge of the information Defendants' misappropriated, how they have used that information, or how they intend to use that information. Accordingly, Arroyo's blanket assertion should be stricken.

Likewise, the cases upon which Defendants rely are inapposite as they all involve periods of time in excess of at least one year, whereas Pablo and Savino lost their IFS employment on March 30, 2022, seven months ago. *See Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 2013 WL 12173920, at *3 (N.D. Cal. June 25, 2013) (after **three** years no evidence of misappropriation was found); *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 864 (N.D. Ill. 2009) (design technology more than **10 years** old, a competitive analysis more than **8 years old**, and pricing, marketing data and revenue projections at least **6 years old** were stale and outdated); *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 257 (S.D.N.Y. 1997) ("In the approximate **15 month** period since his departure from International Paper, there is no indication that Suwyn has exploited any information that he may have gleaned from those plans, or intends to do so.")

Further, the fact that after the termination of Pablo and Savino's employment,

Defendants continue to use IFS Trade Secrets and solicited and diverted business to Legacy from at least three IFS customers, demonstrates the continuing value of those Trade Secrets. (ECF 178-2 Pablo Reply Decl. ¶ 2, ECF 178-1 Savino Reply Decl. ¶ 2.) Where, as here, former employees are in possession of the employer's trade secrets, "[m]issue of that treasure trove remains an ever-present danger...." *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017).

### F. Evidence Of Defendants' Misappropriation Of IFS Trade Secrets

#### 1. The Savino Account Contact Spreadsheet

Defendants misappropriated a Savino Account Contact Spreadsheet. Defendants contend that this spreadsheet contains "nothing but the names of customers along with contact information." To the contrary, the spreadsheet was carefully curated by IFS' employees over the course of many years and includes the customer contact information for 142 IFS customers, including customer name, customer contact, work phone number, cell phone number, email address, names and contact information for the customer's warehouses and notes regarding customer preferences. The evidence demonstrates that Savino emailed this spreadsheet to his wife's personal email in violation of IFS' policies.

#### 2. The Savino Top Account LM Report

Defendants misappropriated the Savino Top Account LM Report. Defendants argue that this nearly 80-page Report does not warrant trade secret protection because: (a) it lists information only for sales IFS deemed made at too low of a price, (b) that Savino did not request the spreadsheet be sent to him, and (c) there is no connection between the Report and Legacy's sales.

As the email transmitting the Report demonstrates, the Report reflects updated pricing on all items purchased by the five top accounts that Savino serviced and the Report itself contradicts Defendants' assertion that it reflects only negative margins. In any event, even if it were limited, that would not diminish the value of the trade secret information contained therein. Both DTSA and CUTSA define

"misappropriation" as using "improper means," which includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Whether or not Savino requested the Report, he used the Report in breach of his various duties to IFS. Lastly, it is no coincidence that in the first six months of Legacy's operations, Legacy targeted and diverted sales from at least three of the five IFS customers on the Report.

### 3. The IFS Customer Report For Amapola Markets

Defendants also misappropriated IFS' Customer Report for Amapola Markets. Defendants contend that the Amapola Report does not support a claim for misappropriation because: (a) Savino intended to meet with Amapola on behalf of IFS; (b) Savino could have asked Amapola for its invoices from IFS; and (c) Legacy has not yet done business with Amapola. These arguments are contrary to both law and fact. Email and text messages Savino sent to Pablo and Sergio revealed that on the day after he sent related reports to his personal email, on January 4, 2022 he met with Amapola for Legacy, not IFS. Savino told Pablo and Sergio he had two very good meetings that day, one with IFS client Rong Cheng and the other with IFS client Amapola Markets. With regard to Amapola Markets, he candidly bragged "***good thing about this one is that I have all their pricing since I'm the one that sells them.***" And, in fact, he emailed IFS' pricing and other trade secret information to his personal email the next day. Of import, Defendants did not ask Amapola for its invoices from IFS at the meeting with Amapola and Defendants' assertion that they have not done business with Amapola is suspect given the fact that they have concealed at least 3 other IFS customers from whom they have solicited business. In any event, absent injunctive relief, there is nothing to prevent Defendants from using IFS' trade secret information to solicit business from Amapola in the future.

### 4. Credit Information And Terms Of Credit For IFS Customers

Defendants did not just assume that IFS would not have done business with a customer if it did not pay its bills. (ECF 181 Opp. at p. 26:10-13.) Rather,

Defendants knew the results of IFS' credit analysis and used IFS customer credit information to extend credit to Legacy customers on the same non-public, unique terms that IFS extended. Doing so allowed Legacy to divert sales from those customers to Legacy.

### 5. Hiring IFS' Employees

Pablo and Savino acquired confidential employee performance information by virtue of their employment with IFS and used that information to solicit two of IFS' top salesmen for Legacy, Jesus Trujillo and Hugo Mesa.

## IV. IFS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

"It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." *WeRide Corp. v. Kun Huang*, No. 18-CV-07233-EJD, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019). "Evidence of threatened loss of prospective customers supports a finding of irreparable harm." *Extreme Reach*, 2013 WL 12081182, at *7 (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Super-Krete Int'l, Inc. v. Sadleir*, 712 F.Supp.2d 1023, 1037 (C.D. Cal. 2010)). Indeed, "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Sun Distributing*, 2018 WL 4951966, at *7 (quoting *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F.Supp.2d 1188, 1198 (E.D. Wash. 2003)). Pablo and Savino were among IFS' most highly trusted and highly compensated salesmen together earning nearly a million dollars annually. In a mere six months, Defendants used IFS' Trade Secrets to divert sales from IFS in excess of $1,389,362.12. This Court should balance the equities and prevent future harm to IFS by enjoining unlawful behavior.

CDF LABOR LAW LLP

Dated: November 21, 2022

By: _____
Dan M. Forman
Attorneys for Plaintiff/Counter-Defendant