# EXHIBIT F

Page 1

1   UNITED STATES DISTRICT COURT
2   CENTRAL DISTRICT OF CALIFORNIA
3
4   PERRIN BERNARD SUPOWITZ, LLC, a   )
    California LLC dba INDIVIDUAL     )
5   FOODSERVICE,                      )
                                      )
6         Plaintiffs,                 )
                                      )
7   vs.                               ) Case No. 2:22-cv-
                                      ) 02120-ODW-JEM
8   PABLO MORALES, an individual;     )
    LEGACY WHOLESALE GROUP, LLC, an   )
9   Arizona Limited Liability         )
    Corporation; SAVINO MORALES, an   )
10  individual; and SERGIO ESCAMILLA, )
    an invidivual; and DOES 1 through )
11  20, inclusive,                    )
                                      )
12        Defendants.                 )
    _____    )
13
14
15   VIDEOTAPED DEPOSITION PURSUANT TO RULE 30(B)(6) OF
16        SERGIO ESCAMILLA AND SAVINO MORALES
17           TUESDAY, DECEMBER 13, 2022
18              LOS ANGELES, CALIFORNIA
19
20   CONTAINS TESTIMONY DESIGNATED AS CONFIDENTIAL AND
21      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
22
23
24   Reported by: Nanci L. Grube
                  CSR No. 3446
25   LitiCourt Job No. 205240

Page 2

1   UNITED STATES DISTRICT COURT
2   CENTRAL DISTRICT OF CALIFORNIA
3
4   PERRIN BERNARD SUPOWITZ, LLC, a   )
    California LLC dba INDIVIDUAL     )
5   FOODSERVICE,                      )
                                      )
6         Plaintiffs,                 )
                                      )
7   vs.                               ) Case No. 2:22-cv-
                                      ) 02120-ODW-JEM
8   PABLO MORALES, an individual;     )
    LEGACY WHOLESALE GROUP, LLC, an   )
9   Arizona Limited Liability         )
    Corporation; SAVINO MORALES, an   )
10  individual; and SERGIO ESCAMILLA, )
    an invidivual; and DOES 1 through )
11  20, inclusive,                    )
                                      )
12        Defendants.                 )
    _____    )
13
14
15   VIDEOTAPED DEPOSITION PURSUANT TO RULE 30(B)(6)
16   OF SERGIO ESCAMILLA AND SAVINO MORALES, taken
17   on behalf of the Plaintiff/Counter-Defendant at
18   707 Wilshire Boulevard, Suite 5150, Los Angeles,
19   California, commencing at 10:23 a.m. to 7:09 p.m.,
20   Tuesday, December 13, 2022 before NANCI L. GRUBE,
21   CSR No. 3446, pursuant to Amended Notice.
22
23   CONTAINS TESTIMONY DESIGNATED AS CONFIDENTIAL AND
24      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
25

Page 3

1   APPEARANCES:
2
3   FOR THE PLAINTIFFS:
4      CDF LABOR LAW, LLP
       BY: DAN M. FORMAN, ESQ.
5        - AND -
         JAYVON C. BROWN, ESQ.
6      707 Wilshire Boulevard
       Suite 5150
7      Los Angeles, California 90017
       (213) 612-6300
8      dforman@cdflaborlaw.com
       jbrown@cdflaborlaw.com
9
10  FOR THE DEFENDANTS:
11     LESOWITZ GEBELIN, LLP
       BY: SCOTT LESOWITZ, ESQ.
12     8383 Wilshire Boulevard
       Suite 800
13     Beverly Hills, California 90211
       (310) 341-3072
14     scott@lawbylg.com
15  ALSO PRESENT IN-PERSON:
16     CRAIG SCHUMACHER, Videographer
17
18  ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:
19     PABLO MORALES
20
21
22
23
24
25

Page 4

1              INDEX
2   WITNESS
3   SERGIO ESCAMILLA
4   EXAMINATION                          PAGE
5     BY MR. FORMAN    14, 86, 102, 130, 173, 203, 206,
6                      219, 236, 228, 230, 254, 260,
7                      271, 275, 283
8   SAVINO MORALES
9   EXAMINATION                          PAGE
10    BY MR. FORMAN    77, 95, 128, 165, 201, 205, 219,
11                     224, 227, 230, 248, 255, 261,
12                     272, 281, 306
13         TESTIMONY DESIGNATED AS
                 CONFIDENTIAL
14
         FROM              TO
15    Page 138, Line 15   Page 147, Line 11
16    Page 163, Line 7    Page 178, Line 12
17    Page 292, Line 10   Page 305, Line 25
18         TESTIMONY DESIGNATED AS
      HIGHLY CONFIDENTIAL - ATTORNEYS EYES' ONLY
19
         FROM              TO
20    Page 41, Line 1     Page 45, Line 20
21    Page 88, Line 20    Page 91, Line 9
22    Page 105, Line 10   Page 124, Line 20
23    Page 180, Line 18   Page 185, Line 10
24    Page 255, Line 6    Page 290, Line 14
25    Page 304, Line 10   Page 310, Line 14

Page 9

1  VIDEOGRAPHER: Good morning. We are on the record
2  at 10:16 a.m. December 13, 2022 for the videotaped
3  deposition of 30(B)(6) witness Legacy Wholesale. We are
4  taking this deposition at 707 Wilshire Boulevard in Los
5  Angeles, California in the action entitled Perrin Bernard
6  Supawitz versus Pablo Morales, et al., case No.
7  2:22-cv-02120-Odw-jem.
8       My name is Craig Schumacher. I'm the video
9  production specialist from Liticourt Corporation located
10 in El Segundo, California. This is DVD No. 1 of volume
11 one. Would Counsel and all present, please identify
12 yourselves for the record.
13      MR. FORMAN: Dan Forman on behalf of plaintiff and
14 counter-defendant IFS. Here with my colleague Javon
15 Brown. Anything else I need to say? CDF Labor Law LLP.
16      MR. LESOWITZ: Scott Lesowitz from Lesowitz Gebelin
17 LLP representing the defendants today. Present are
18 Sergio Escamilla and Savino Morales.
19      MR. FORMAN: Can we swear Savino Morales, his
20 client, as well?
21
22           SERGIO ESCAMILLA,
23 having been first duly administered an oath in accordance
24 with CCP 2094, was examined and testified as follows:
25 ///

Page 10

1           SAVINO MORALES,
2  having been first duly administered an oath in accordance
3  with CCP 2094, was examined and testified as follows:
4
5       MR. FORMAN: Good morning. I'm Dan Forman. I'm
6  counsel, as you know, to the plaintiff and
7  counter-defendant IFS in this case, and you guys have
8  already talked, sitting in the chair right now -- Sergio
9  Escamilla who is sitting in the chair right now. We're
10 here today for the deposition of Legacy Wholesale
11 pursuant to 30(B)(6). We had some conversations off the
12 record which I would like to confirm.
13      Mr. Escamilla, you have been designated by
14 Legacy to testify in categories 1 through 10 and 32
15 through 39 plus additional testimony can't be answered by
16 Mr. Morales, you are here to try to provide additional or
17 potential PMK or 30(B)(6) testimony.
18      MR. ESCAMILLA: If I can, absolutely.
19      MR. FORMAN: And if I didn't say it, Mr. Savino
20 Morales is designated for most of or all of categories 11
21 through 31 in the Notice of Deposition or Amended Notice
22 of Deposition, correct?
23      MR. MORALES: Correct.
24      MR. FORMAN: I have asked the court reporter to mark
25 Exhibit 150, which is a copy of the Amended Deposition

Page 11

1  Notice, I will give counsel a copy. If you can give the
2  witness the exhibit, a copy, Madam Reporter. Thank you.
3       MR. LESOWITZ: Exhibit what number?
4       MR. FORMAN: 150.
5          (Whereupon Exhibit 150 was marked
6       for identification.)
7       MR. FORMAN: And, Counsel, we had asked for a number
8  of documents. You have provided us with written
9  objections and indicated that none will be produced at
10 this time.
11      MR. LESOWITZ: We objected to some and the other
12 documents as I said have been produced.
13      MR. FORMAN: But none are being produced here today?
14      MR. LESOWITZ: Correct, but I know that we did
15 produce many documents in the last few days.
16      MR. FORMAN: So today I'm going to be using some
17 abbreviations or definitions, and I just want to put
18 those on the record, and if we can hopefully get
19 agreement on them. I will be using the term IFS to
20 describe my client, Perrin Bernard Supawitz dba
21 Individual Foodservice today is that a definition that we
22 can use?
23      MR. LESOWITZ: Agreed.
24      MR. FORMAN: I will be using the term Legacy to
25 describe the defendant, Legacy Wholesale Supply, in this

Page 12

1  case. Is that a definition we can use?
2       MR. LESOWITZ: It's Legacy Wholesale Group, but,
3  yes, agreed, you can use Legacy.
4       MR. FORMAN: Legacy Wholesale Group. Thank you for
5  the clarification.
6       We have a lot of people with the last name
7  Morales in this case, so no disrespect, but I am going to
8  call Pablo Morales Pablo. Is that okay?
9       MR. LESOWITZ: Okay. Good.
10      MR. FORMAN: And Savino Morales, I will call him
11 Savino?
12      MR. LESOWITZ: Good.
13      MR. FORMAN: And Susie Morales I will call Susie.
14      MR. LESOWITZ: Good.
15      MR. FORMAN: And Cynthia Morales I will refer to as
16 Cindy?
17      MR. LESOWITZ: Agreed.
18      MR. FORMAN: And if refer to Sergio, I am referring
19 to you, sir, Mr. Escamilla, but I will try to typically
20 call you Mr. Escamilla.
21      THE WITNESS: Okay.
22      MR. FORMAN: I would like you to define the term --
23 and again this is my definition -- but the defined term
24 IFS' customers, and by that I'm referring to customers
25 that I understand had been at one point in time customers

Page 177

1 reviewed for production and discovery, right?
2   A.  I can't think of any -- I don't remember, to be
3 honest.
4   Q.  Well, does it seem like these three
5 applications are the universe of credit applications that
6 you provided in discovery that were from IFS' customers?
7   MR. LESOWITZ:  All I'm looking at now we produced --
8 go ahead, your best recollection.
9   THE WITNESS:  I just don't remember.  I'm not trying
10 to be facetious on the topic.  I just don't remember if
11 it was limited to three that we got and that was it.
12 BY MR. FORMAN:
13   Q.  Let me show you another document.  It might
14 help refresh your recollection.  165.
15       (Whereupon Exhibit 165 was marked
16    for identification.)
17 BY MR. FORMAN:
18   Q.  Can you tell me what 165 is, sir?
19   A.  IT seems to be a credit reference from King
20 Taco.
21   Q.  Was that part of King Taco's effort to obtain
22 credit from Legacy?
23   A.  I'm assuming it was.  It's not our credit
24 application.
25   Q.  Are you aware of any other documents from the

Page 178

1 relationship prospective that related to an application
2 for credit by King Taco to Legacy?
3   A.  Not aware, no.
4   Q.  You are not aware of King Taco having completed
5 a credit application?
6   A.  For Legacy, I don't remember.
7   Q.  Do you know when King Taco provided this credit
8 reference to Legacy?
9   A.  Actually I don't.  I don't remember.
10   Q.  Did Legacy provide King Taco with credit?
11   A.  I believe we did.  I just don't know the terms.
12 I believe they were 15-day terms.
13   Q.  And, Mr. Escamilla, of Legacy's customers who
14 are not IFS customers, what you guys call IFS share
15 customers, what is the number of credit applications,
16 completed credit applications that Legacy maintains?
17   A.  I don't remember.  I think we provided that in
18 discovery.  It could have been one.  It could have been
19 20.  I don't remember.
20   Q.  Your best estimate around 20?
21   A.  I can't know because I don't remember.  I
22 apologize.
23   Q.  And are the records of non-IFS customer credit
24 applications with Legacy maintained in the credit
25 application files at Legacy?

Page 179

1   A.  Like I said, I'm not sure if it's none or 20 or
2 I would have to check.
3   MR. FORMAN:  Okay.  I will move to strike that as
4 nonresponsive.  Please read my question back.
5       (Record read.)
6   THE WITNESS:  If they provided one, yeah, we would
7 maintain that.
8 BY MR. FORMAN:
9   Q.  Does Legacy maintain physical files with credit
10 applications?
11   A.  No, it's got to be electronic.
12   Q.  Now, does Legacy maintain goodwill?
13   MR. LESOWITZ:  Objection; vague and ambiguous.
14   THE WITNESS:  Yeah, I'm not clear what you mean.
15 BY MR. FORMAN:
16   Q.  Do you understand the term goodwill associated
17 with business, sir?
18   A.  Yeah, yeah.  Yeah.
19   Q.  It's an asset of the business, right?
20   A.  Of course, yes.
21   Q.  And do the owners receive any reports of
22 Legacy's -- the value of Legacy's goodwill?
23   A.  No.
24   Q.  Have you ever seen any reports showing a
25 decline in the goodwill enjoyed by Legacy?

Page 180

1   A.  I think that goodwill is a vague term, and it's
2 hard to calculate, so, no, I haven't seen any reports
3 that I know of.
4   Q.  Have you ever put a value on Legacy's goodwill
5 as known?
6   A.  That would be challenging to do, and, yeah, I
7 don't think I have a figure for you.
8   Q.  Have you ever put a value as an owner of
9 Legacy's goodwill?
10   A.  Not that I remember.
11   Q.  And are you aware of any of the owners of
12 Legacy ever putting a value on Legacy's goodwill?
13   A.  Not a physical number.  I'm not -- I'm not
14 remembering anything like that.
15   Q.  How about a range?  Have you or any of the
16 owners put a range on the value of Legacy's goodwill?
17   A.  Not that I know of.  Not.
18   MR. FORMAN:  Mark 166.
19       (Whereupon Exhibit 166 was marked
20    for identification.)
21   MR. FORMAN:  This might be a relationship question,
22 so I will ask Mr. Escamilla.  My goal is to ask an
23 operational question.
24   Q.  There is an e-mail here from Daisy to Sam Ruiz
25 February 11, 2022, correct?

Page 181

1  A.  Yes.
2  Q.  And there is four customers that are identified
3  in her e-mail, right?
4  A.  Let me see, yes.
5  Q.  And at least three of them at the present time
6  were customers of IFS, right?
7  A.  Well, actually I think there is one, two, three
8  customers and one vendor.
9  Q.  And focusing on the customers and operations,
10 is Miss Tablado performing some function of Legacy's
11 operations to determine its customers' needs?
12     MR. LESOWITZ:  At this time or --
13     MR. FORMAN:  Yes.
14     THE WITNESS:  I think Daisy's role was more customer
15 service, and she was working at the direction of Pablo
16 and Savino, and maybe it appears that I'm sure the
17 salesman asked them to make contact with the customer to
18 see what their needs were.
19 BY MR. FORMAN:
20 Q.  And so you don't think this is her utilizing
21 the usage report type documents we looked at earlier in
22 evaluating what Legacy's customers needed to purchase
23 based on that report?
24 A.  It might be communications with salespeople.  I
25 don't know.  Or it might be based on conversations with

Page 182

1  the customer.
2  Q.  But it reflects that that -- one of your
3  vendors, Reyma, didn't have certain things available for
4  purchase by Legacy, right?
5  A.  Right.
6  Q.  And so the response and part of the operations
7  here from San Ruiz to Daisy says, "Let's get what we can
8  from IFS," right?
9  A.  Sam is here.  He can speak for himself.
10 Q.  Okay.  If Legacy is designating Sam to answer
11 that question, we are fine with that.
12     MR. LESOWITZ:  Yes.
13     THE WITNESS:  What does it say there?  What does it
14 say --
15 BY MR. FORMAN:
16 Q.  Sir, the reporter can't -- you are reading out
17 loud.  You need to make her hear it or read to yourself.
18 A.  Okay.  I don't see where it said let's find out
19 if we can get it through IFS.
20 Q.  On the first line it says, "Thank you, Daisy.
21 Let's get what we can from IFS except for product that
22 goes through Coco."  Do you see that?
23 A.  Yes.
24 Q.  Are those your words?
25 A.  Looks like they are, yes.

Page 183

1  Q.  And so was it your plan, again, Legacy's plan
2  to purchase the items that are listed below that Legacy
3  could not get from IFS?
4  A.  We were -- we were buying products from IFS at
5  the time, yes.
6  Q.  And at the time of this e-mail you are
7  directing Daisy -- she is telling you Reyma doesn't have
8  certain things, right?
9  A.  Yes.
10 Q.  And you're directing her to get those things
11 from IFS, right?
12 A.  No, not necessarily because it doesn't say this
13 product is from Reyma.  She is saying let's get what we
14 can from IFS.  It doesn't directly say it's Reyma.
15 Q.  Sir, Miss Tablado's e-mail to you -- look under
16 El Progresso.  Reyma doesn't have eight by eight black.
17 A.  Yes.
18 Q.  Do you see that?
19 A.  Yes.
20 Q.  Is she communicating to you that Reyma didn't
21 have eight by eight black for Legacy to purchase?
22 A.  Yes.
23 Q.  And are you directing her let's get what we can
24 from IFS, eight by eight black?
25 A.  No, that's still her saying that.

Page 184

1  Q.  So you are telling me that where it says "Thank
2  you, Daisy.  Let's get what we can from IFS," that's her
3  words not your words?
4  A.  Well, is this going upwards or is it going
5  downwards?
6  Q.  It's your e-mail, sir.
7      MR. LESOWITZ:  It looks like -- so the issue.  No,
8  the bottom one is 10:09 a.m.  The top one is 10:19 a.m.,
9  so the top one says from Sam Ruiz.
10     THE WITNESS:  So it's going up.
11 BY MR. FORMAN:
12 Q.  Can you testify you sent that e-mail, sir?
13 A.  Yes.
14     MR. LESOWITZ:  He was just confused by your words.
15     THE WITNESS:  Yes.
16 BY MR. FORMAN:
17 Q.  And your words were "Let's get what we can from
18 IFS except for product that goes through Coco," correct?
19 A.  Yes.
20 Q.  And the product that you are referring to
21 getting from IFS is what she is telling you down below
22 Reyma doesn't have in stock, right?
23 A.  Correct.
24 Q.  And then the plan was for Legacy to purchase
25 those goods from IFS and sell them to Pacific Coast, El

Page 185

1  Progresso and Haros Food Service?
2      MR. LESOWITZ:  Do you want a moment to look at the
3  document?
4      MR. MORALES:  No, I understand what you are saying,
5  yes, I understand what you are saying.
6  BY MR. FORMAN:
7      Q.  And the answer is yes?
8      A.  Yes.
9      Q.  That was the plan, correct?
10     A.  Correct.
11     MR. FORMAN:  Okay.  Let's look at another document
12 that we got recently.  Mark 167.
13         (Whereupon Exhibit 167 was marked
14 for identification.)
15     THE REPORTER:  Can we take a moment?
16 BY MR. FORMAN:
17     Q.  While I'm shutting the shade, maybe you can put
18 on the record how many pages it is?
19     A.  It appears to be three pages and the top
20 portion of a fourth page.
21     Q.  And that's in -- its original form is as an
22 Excel spreadsheet?
23     A.  That's what it appears, yes.
24     Q.  And it's entitled cash log, right?
25     A.  Yes.

Page 186

1      Q.  And this is a document that you utilized for
2  Legacy in part for Legacy's financial health evaluations?
3      A.  Not financial health evaluations, but just
4  tracking cash payments.
5      Q.  You use in document as part of your
6  responsibilities for Legacy, right?
7      A.  Yes.
8      Q.  And can you explain to me why it started on
9  January 3rd, 2022?
10     A.  Because we identified a need for something to
11 track cash payments.
12     Q.  And specifically cash payments from L.A.,
13 right?
14     A.  I think so, yes.
15     Q.  And how did Legacy track cash payments prior to
16 January 2022?
17     A.  We didn't have a formal way.  We just had an
18 account for it, and the salesman would bring the cash to
19 Arizona.
20     Q.  And is that kind of reflected on the first of
21 January 15, 2022?  It says UMB deposit Pablo Arizona
22 trip, 25,000?
23     A.  That seems out of place, and it could be in
24 error.  I'm not sure where that came from.
25     Q.  What is your understanding as to what the

Page 187

1  25,000 referencing the Pablo Arizona trip relates to?
2      A.  That's the first time I see this, and I'm sure
3  there is an answer, but I would have to explore it more.
4      Q.  Okay.  And can you explain, I mean, is it true
5  that after June 8th, 2022 Legacy stopped tracking cash
6  payments?  That's the last date, right, on this log?
7      A.  I think so because that might line up with the
8  time that we opened the Chase account, so we could deal
9  with this issue.
10     Q.  And when you look at this document, do you see
11 on the first page it says February 1, 2022, can you find
12 that date for me?
13     A.  Yes.
14     Q.  You said Daniel Betancourt payment, correct?
15     A.  Yes.
16     Q.  And it has an invoice number, right?
17     A.  It does.
18     Q.  And then in the deposit column it has $5,000,
19 right?
20     A.  I see that.
21     Q.  And then underneath that there is another
22 almost identical entry with the No. 10,000, right?
23     A.  Yes.
24     Q.  Except that was on February 2nd, correct, yeah
25 -- am I reading that correctly?

Page 188

1      A.  Yes.
2      Q.  So there were two separate cash payments a day
3  apart that were recorded on this cash log from the Daniel
4  Betancourt company?
5      A.  They both come back to the same invoice number
6  on this document which is 295, and I think -- I think
7  that something did not go right with that account.
8  Either they bounced a check or we had an issue with their
9  cash.  I don't remember exactly, but it does track
10 invoice No. 295.
11     Q.  And that invoice, at least as far as these
12 records show, was paid in part on February 1st, and then
13 there would be credit for whatever was paid on February
14 2nd, right, more credit?
15     A.  That's what it appears.
16     Q.  And Daniel Betancourt is known -- do you know
17 another name that they go under?
18     A.  If I'm not mistaken, Kennia's -- I don't know
19 how to spell it.  Maybe Savino can help us.
20     Q.  It's okay.
21     A.  Kennia's Party Supply.
22     MR. MORALES:  K-e-n-n-i-a-s, I think.  I'm not sure.
23 BY MR. FORMAN:
24     Q.  If you go to the next page, March 22, about a
25 third of the way down.

Page 317

1  whether Pablo could pick up the check on April 19th,
2  right?
3      A. Yes.
4      Q. And you had extended credit to Rong Cheng so
5  they could pay you at some point after the delivery,
6  correct?
7      A. Yes.
8      Q. And what was the importance of picking up a
9  check from Rong Cheng at that point?
10     A. The was no importance. It was just he wanted
11 to know if I could pick up a check at the time.
12     Q. Who is he?
13     A. I think it was Kyle.
14     Q. So you wrote an e-mail to him asking if Pablo
15 could pick up a check, and you are saying that Kyle asked
16 you to pick up a check?
17     A. I think there was a conversation on the phone
18 between me and Kyle, and he asked if he could pick it up
19 on a certain date, and I said my brother can pick it up
20 on that date.
21     Q. And then he wrote back and said it got mailed
22 out, right?
23     A. I think so, yes.
24     Q. On April 15th, correct?
25     A. On what date did you write that?

Page 318

1      MR. FORMAN: Next in order, please.
2          (Whereupon Exhibit 182 was marked
3      for identification.)
4  BY MR. FORMAN:
5      Q. You're not Rong Cheng, but he wrote you and
6  told you it had been mailed out on April 15th, correct?
7      A. Yes, correct.
8      Q. And you believed him, right?
9      A. Yes.
10     Q. This is a two-page exhibit, 182. This is
11 another e-mail chain between you and Kyle at Rong Cheng?
12     A. It appears, yes.
13     Q. And you initiated the e-mail chain saying you
14 wanted him to know you are no longer with IFS, right?
15     A. On April 25th, right. Yes.
16     Q. And did you meet with him that day or the next
17 day?
18     A. I don't remember if it was that day or when he
19 scheduled it. We scheduled to meet.
20     Q. He said, yes, we are here, what time will you
21 come?
22     A. Yes.
23     Q. Did you meet with him, there was a topic you
24 wanted to talk to him about in your April 15 e-mail to
25 him?

Page 319

1      A. Yes.
2      Q. What did you say to him on April 15th?
3      A. I don't recall exactly. I just told him that I
4  was no longer with IFS.
5          MR. LESOWITZ: I'm sorry. It's 7:08 pm. How long
6  have we been on the record for?
7          VIDEOGRAPHER: Seven hours and 20 something minutes.
8          MR. LESOWITZ: 20 something minutes, we are done.
9          MR. FORMAN: Over my objection, counsel for the
10 defendants has terminated the deposition.
11         MR. LESOWITZ: Because the Federal Rules of Civil
12 Procedure only allow for seven hours per deposition
13 without leave of court.
14         MR. FORMAN: Federal Rules of Civil Procedure also
15 require timely production of documents and other things
16 that are subject to dispute.
17         VIDEOGRAPHER: This concludes today's proceedings.
18 Total number of DVDs used is four. We are going off the
19 record. The time is 7:09.
20         (Whereupon the deposition concluded at
21     7:09 p.m.)

Page 320

1  STATE OF CALIFORNIA    )
                          ) ss:
2  COUNTY OF LOS ANGELES  )
3
4      I, NANCI GRUBE, do hereby certify:
5      That I am a duly qualified Certified Shorthand
6  Reporter, in and for the State of California, holder of
7  certificate number 3446, which is in full force and
8  effect and that I am authorized to administer oaths and
9  affirmations;
10     That the foregoing deposition testimony of
11 SERGIO ESCAMILLA and SAVINO MORALES was taken before me
12 at the time and place herein set forth;
13     That prior to being examined, the witnesses
14 named in the foregoing deposition, were duly sworn or
15 affirmed by me, to testify the truth, the whole truth,
16 and nothing but the truth;
17     That the testimony of the witnesses and all
18 objections made at the time of the examination were
19 recorded stenographically by me, and were thereafter
20 transcribed under my direction and supervision;
21     That the foregoing pages contain a full, true
22 and accurate record of the proceedings and testimony to
23 the best of my skill and ability;
24     That prior to the completion of the foregoing
25 deposition, review of the transcript was requested.

Page 321

```
1    I further certify that I am not a relative or
2  employee or attorney or counsel of any of the parties,
3  nor am I a relative or employee of such attorney or
4  counsel, nor am I financially interested in the outcome
5  of this action.
6
7        IN WITNESS WHEREOF, I have subscribed my name
8  this ____ day of _____, ____.
9
10
11        _____
12        NANCI GRUBE, CSR No. 3446
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 322

```
1        PENALTY OF PERJURY CERTIFICATE
2        I, SERGIO ESCAMILLA, hereby declare I am a
3  witness in the above captioned matter; that I have read
4  the foregoing transcript or that it has been read to me,
5  and I know the contents thereof; that the transcript of
6  MY TESTIMONY is true to my knowledge, except as to those
7  matters which are herein stated upon my information or
8  belief, and as to those matters, I believe them to be
9  true; that I find the transcript of MY TESTIMONY to be a
10 true and accurate transcription of my testimony, with
11 the following corrections, if any:
12
13 PAGE  LINE  CHANGE
14 ____  ____  _____
15 Reason _____
16 ____  ____  _____
17 Reason _____
18 ____  ____  _____
19 Reason _____
20 ____  ____  _____
21 Reason _____
22 ____  ____  _____
23 Reason _____
24 ____  ____  _____
25 Reason _____
```

Page 323

```
1  PAGE  LINE  CHANGE
2  ____  ____  _____
3  Reason _____
4  ____  ____  _____
5  Reason _____
6  ____  ____  _____
7  Reason _____
8  ____  ____  _____
9  Reason _____
10 ____  ____  _____
11 Reason _____
12 ____  ____  _____
13 Reason _____
14 ____  ____  _____
15 Reason _____
16 ____  ____  _____
17 Reason _____
18        I declare under penalty of perjury under the
19 laws of the State of California that the foregoing is
20 true and correct.
21        Executed on the ____ day of _____ 20___,
22 at _____, _____.
            (City)          (State)
23
24        _____
25        SERGIO ESCAMILLA
```

Page 324

```
1        PENALTY OF PERJURY CERTIFICATE
2        I, SAVINO MORALES, hereby declare I am a
3  witness in the above captioned matter; that I have read
4  the foregoing transcript or that it has been read to me,
5  and I know the contents thereof; that the transcript of
6  MY TESTIMONY is true to my knowledge, except as to those
7  matters which are herein stated upon my information or
8  belief, and as to those matters, I believe them to be
9  true; that I find the transcript of MY TESTIMONY to be a
10 true and accurate transcription of my testimony, with
11 the following corrections, if any:
12
13 PAGE  LINE  CHANGE
14 ____  ____  _____
15 Reason _____
16 ____  ____  _____
17 Reason _____
18 ____  ____  _____
19 Reason _____
20 ____  ____  _____
21 Reason _____
22 ____  ____  _____
23 Reason _____
24 ____  ____  _____
25 Reason _____
```