**O**

# United States District Court
# Central District of California

| | |
|---|---|
| PERRIN BERNARD SUPOWITZ, LLC, | Case № 2:22-cv-02120-ODW (JEMx) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [104] AND DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [173]** |
| v. | |
| PABLO MORALES et al., | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Perrin Bernard Supowitz, LLC, doing business as Individual FoodService ("IFS"), brings suit against Pablo Morales; Savino Morales; Sergio Escamilla; and Legacy Wholesale Group, LLC for diverting IFS's clients and sales to Legacy and misappropriating IFS's trade secrets for Legacy's benefit. Defendants move for partial summary judgment on all trade secret-based claims and forms of relief, and IFS moves for a preliminary injunction to, among other things, stop the alleged trade secret misappropriation. (Mot. Partial Summ. J. ("Mot. PSJ"), ECF No. 104; Mot. Prelim. Inj., ECF No. 173 (collectively, "Motions").) The Court carefully considered the papers filed in connection with the Motions and deemed the matters appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal.

L.R. 7-15.  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Partial Summary Judgment, and **DENIES** IFS's Motion for Preliminary Injunction.

## II.   FACTUAL BACKGROUND

IFS sells food service products to restaurants and other establishments.  (Defs.' Statement of Uncontroverted Facts ("SUF") 1, ECF No. 105.)  It offers a wide variety of products, including food packaging, tableware, utensils, cookware, janitorial equipment, and more.  (*Id.*)  Pablo and Savino[1] worked for IFS as salespeople from 1995 and 1997, respectively, (SUF 4), until March 2022, (FAC ¶ 43, ECF No. 99).

### A.   Pablo's and Savino's Employment with IFS

Pablo's and Savino's jobs at IFS involved fostering relationships with restaurants, food vendors, and other customers and selling them products from IFS's catalog.  (*See* SUF 1, 4, 6.)  Pablo and Savino earned commissions on the products they sold to IFS's customers, (Mot. PSJ 7), and by IFS's own account, they became the most trusted and highest paid salespeople in the company during their more than twenty years there, (Opp'n PSJ 9, ECF No. 168; Pl.'s Statement of Genuine Disputes ("SGD") 26, ECF Nos. 169 (sealed), 170 (unsealed).)

Virtually any company in the food service industry in California and Arizona is a potential customer of IFS, (SUF 7), and the food distribution industry of which IFS is a part is highly competitive, (SUF 15).  To identify potential customers, Pablo and Savino would use publicly available sources to identify and obtain the contact information for restaurants and other potential customers.  (SUF 6.)  They would then contact the potential customer to ask for the prices it paid for items with its current vendors, and if possible, they would offer IFS products at better prices or on better terms.  (*Id.*)

---

[1] For clarity and efficiency, the Court refers to Pablo and Savino by their first names.  No disrespect is intended.

IFS's customers regularly purchase food service items from multiple sources, (SUF 8), and IFS does not require its customers to enter confidentiality or non-disclosure agreements as a condition of doing business with IFS, (SUF 16, 18). Importantly, in the event that IFS terminated their employment, Pablo and Savino were permitted under IFS policy to compete with IFS for the business of IFS's customers, including the customers who Pablo and Savino serviced for IFS. (SUF 22; Decl. Scott Lesowitz ISO Mot. PSJ ("Lesowitz Decl.") Ex. K ("Shapiro Dep.") 47:7–10, ECF No. 109-1 ("If someone knows, has a relationship or like knows a [customer] they used to work with while employed with IFS, we do not prohibit them from going and seeing that person.").)

Although Pablo and Savino may have asked about the price IFS paid for particular products on isolated occasions, they generally did not have access to the exact prices IFS paid to purchase the products for its inventory. (SUF 9; SGD 9.) IFS provided its salespeople, including Pablo and Savino, with minimum prices salespeople could charge customers without additional permission, but these prices did not necessarily represent the actual cost of the products or IFS's break-even point. (SUF 10.)

At least for some items, Pablo and Savino could ask for IFS's "office costs" or "lowest net costs." (Shapiro Dep. 73:7–18.)   This value refers to the lowest price at which IFS could sell a product without losing money; it is the "true cost" paid by IFS for the product and includes components beyond the price IFS paid to purchase the product from a vendor. (*Id.* at 73:11–12, 74:13–15.) During the relevant time period, IFS did not have a consistent method for determining its office cost for a given item. (*Id.* at 75:3–6.) Moreover, Jeremy Shapiro, who was Pablo's and Savino's supervisor in the months leading up to their termination, never informed Pablo or Savino about what was included in the office cost of a product or how he or IFS determined the office cost for a given product. (*Id.* at 75:7–10; SUF 13, 25.)

Neither Pablo nor Savino had a written employment contract during their time at IFS. (SUF 5.) They did, however, sign a series of confidentiality and non-disclosure agreements at various points over the years. (SGD 5.) Collectively, these agreements obligated Pablo and Savino to protect the trade secrets and other confidential information of IFS, to use IFS's confidential information only for IFS's benefit, to avoid conflicts of interest, and to return all confidential information upon termination of employment. (*Id.*; FAC ¶¶ 22, 29.)

**B.   Pablo and Savino Form Legacy with Escamilla**

In March 2021, while still working for IFS, Pablo and Savino, along with their business associate Escamillo, formed Legacy. (FAC ¶ 30.) Pablo and Savino used fake names (Sam Ruiz and Paolo Ruiz) in connection with their roles at Legacy. (SGD 62; *See* Decl. Dan Forman ISO Opp'n PSJ ("Forman Decl.") Ex. A ("Escamilla Dep.") 69:15–24, ECF No. 161-3 (sealed).) This facilitated Legacy doing business with IFS without IFS discovering that Pablo and Savino were running Legacy. (*Id.*)

Without revealing his association with Legacy, Pablo induced IFS to provide credit to Legacy and authorize the sale of goods to Legacy. (*Id.*) According to IFS, Pablo made several misrepresentations in doing so. In one email to IFS, Pablo warned IFS that it might lose Legacy as a customer. (Decl. Dan Forman ISO Opp'n PSJ ("Forman Decl.") Ex. F ("Pablo Dep.") 244:16–246:19, ECF Nos. 169-3 (sealed) 170-3 (unsealed).) Pablo also stated that he succeeded at bringing Legacy's business to IFS from a different supplier. (*See id.* at 376:15–378:17 (discussing misrepresentation that a particular supplier was selling Legacy $20,000 worth of products per week at 21-day credit terms).) In making these statements, which tended to suggest that Pablo and Legacy were unrelated, Pablo did not reveal that he owned Legacy. Pablo made additional, similar representations to IFS that tended to conceal from IFS the fact that Legacy was under Pablo and Savino's control. (Decl. Jeremy Shapiro ISO Opp'n PSJ ("Shapiro Decl.") ¶ 20, ECF No. 143 (describing and providing a text message in

which Pablo stated, "I had to promise a 3% rebate to Legacy or else I'm losing the account.  Not sure if [it'll] still stay.").

Prior to the termination of their employment at IFS, Pablo and Savino caused Legacy to sell its products to between seventeen and twenty of IFS's customers. (SGD 50a, 55.)

## C.   Termination of Pablo's and Savino's Employment with IFS

IFS eventually discovered Pablo and Savino's ownership of Legacy, and on March 31, 2022, IFS terminated their employment.  (FAC ¶ 43; SUF 34.)  Legacy continued to do business with IFS's customers, diverting (in IFS's view) significant sales from IFS.  (*See* Opp'n PSJ 9–10 (providing exact amount of allegedly diverted sales in sealed, unredacted version of document); *see also* Mem. ISO Mot. Prelim. Inj. ("Mem. Prelim. Inj.") 1, ECF No. 174 (providing exact amount of allegedly diverted sales on unsealed filing).)

After their termination, Pablo and Savino did not copy or transfer files from any of IFS's computers, phones, or other devices.  (SUF 34.)  They returned their IFS cellphones and computers to IFS by April 7, 2022, about one week after their termination.  (SUF 35.)  IFS sent these devices to its forensic consultant, and that consultant then shipped the devices to another consultant using UPS.  (Decl. Dan Forman ISO Ex Parte Appl. ¶¶ 2–4, ECF No. 24.)  UPS lost the devices in transit, and the devices remain lost to this day.  (Mot. PSJ 29.)

## III.   PROCEDURAL BACKGROUND

On March 31, 2022, IFS brought suit, asserting claims against Defendants for (1) violation of the Defend Trade Secrets Act ("DTSA"); (2) violation of the California Uniform Trade Secrets Act ("CUTSA"); (3) breach of contract; (4) tortious inducement to breach contract; (5) breach of duty of loyalty; (6) conversion; (7) tortious inducement to breach duty of loyalty; (8) tortious interference with business relations/contract; and (9) unfair competition.  (Compl., ECF No. 1.)

On June 7, 2022, Legacy answered and counterclaimed against IFS for (1) violation of Unfair Practices Act—loss leader anticompetitive conduct and (2) unfair business practices. (Answer & Countercl., ECF No. 78.) Shortly thereafter, IFS moved for leave to amend the Complaint, and on August 25, 2022, the Court granted the Motion. (Order Granting Mot. Leave, ECF No. 98.) IFS filed its First Amended Complaint, adding a tenth cause of action for fraud. (FAC ¶¶ 122–129.)

On October 3, 2022, Defendants filed the Motion for Partial Summary Judgment now under consideration. Then, on October 31, 2022, IFS filed the Motion for Preliminary Injunction now under consideration. Both Motions are fully briefed.

## IV.   DISCUSSION—SUMMARY JUDGMENT

The Court considers first the Motion for Partial Summary Judgment, the resolution of which moots or otherwise addresses all issues raised by the Motion for Preliminary Injunction.

Defendants move for summary judgment on Counts 1 and 2 of the First Amended Complaint, arguing that it is beyond genuine factual dispute that IFS cannot prove a trade secret claim, either because (1) IFS has not adequately defined the trade secrets at issue; (2) the information at issue does not constitute a trade secret; or (3) to the extent any information is a trade secret, either Defendants are not in possession of that information or have not used, disclosed, or otherwise misappropriated it. (Mot. PSJ 14–25.) The Court addresses these issues first, examining in detail the various categories of putative trade secret on which IFS bases its claims.

Defendants further move for partial summary judgment as to IFS's requests for injunctive relief based on trade secret misappropriation. (*Id.* at 26.) While Defendants primarily argue that injunctive relief is inappropriate because IFS has no trade secret claim at all, they alternatively argue that, if the Court does find that trade secrets are at issue, it should nevertheless grant summary judgment on the request for a trade secret injunction because there is no evidence of possible future misappropriation. (*Id.* at 26–27.) The Court addresses this issue second.

Defendants argue IFS's claim for unfair competition (Count 9) is fully derivative of its claims for violations of DTSA and CUTSA (Counts 1 and 2) and should likewise be dismissed via summary judgment. (*Id.* at 27–28.) Finally, Defendants argue that they returned all property belonging to Plaintiff and that, as a result, there is no genuine issue of material fact regarding conversion (Count 6). (*Id.* at 28–30.) The Court addresses these two claims last, and in that order.

## A.     Evidentiary Objections

As a preliminary matter, Defendants object to evidence IFS submits in opposition to Defendants' summary judgment motion. (Objs., ECF No. 179.) Many of Defendants' objections are boilerplate and conclusory; these objections are properly disregarded. Several objections are to purportedly improper legal conclusions, but "objections to evidence on the ground that . . . it constitutes an improper legal conclusion are . . . duplicative of the summary judgment standard itself." *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Thus, the Court overrules these objections as objections, while at the same time acknowledging that it remains the task of the Court, not of parties and witnesses, to draw legal conclusions. Furthermore, Defendants' objections regarding lack of foundation, lack of personal knowledge, and speculation may go to the weight of a given piece of evidence, but none of these objections provide a basis for altogether disregarding the proffered evidence at the summary judgment stage. *See id.* (noting objections based on the speculative nature of a statement are likewise duplicative of the summary judgment standard and that "[i]nstead of *objecting*, parties should simply *argue*").

As for Objection No. 36, Defendants take issue with a perceived lack of clarity in the statement of Lopez, the principal of longtime IFS customer Red Hot, but this lack of clarity, without more, does not compel the Court to disregard this evidence at summary judgment. Objection No. 36 is expressly overruled.

None of Defendants' remaining objections move the needle in any meaningful way. To the extent any other objection has merit, the Court does not rely on that piece

1   of evidence in analyzing the Motion for Partial Summary Judgment.   *See Burch*,

2   433 F. Supp. 2d 1122 (E.D. Cal. 2006) (proceeding with only necessary rulings on

3   evidentiary objections).

4   **B.   Legal Standard**

5   A court "shall grant summary judgment if the movant shows that there is no

6   genuine dispute as to any material fact and the movant is entitled to judgment as a

7   matter of law."   Fed. R. Civ. P. 56(a).   A disputed fact is "material" where the

8   resolution of that fact "might affect the outcome of the suit under the governing law,"

9   and the dispute is "genuine" where "the evidence is such that a reasonable jury could

10   return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

11   242, 248 (1986).   The burden of establishing the absence of a genuine issue of

12   material fact lies with the moving party, and the moving party may meet this burden

13   with arguments or evidence or both.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

14   (1986).

15   Once the moving party satisfies its burden, the nonmoving party cannot simply

16   rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a

17   material issue of fact precludes summary judgment.   *Matsushita Elec. Indus. Co. v.*

18   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v.*

19   *Franciscan Ceramics*, *Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).   The non-moving

20   party must show that there are "genuine factual issues that . . . may reasonably be

21   resolved in favor of either party."   *Franciscan Ceramics*, 818 F.2d at 1468 (quoting

22   *Anderson*,  477 U.S. at 250) (emphasis omitted).   Provided the moving party has

23   satisfied its burden, the court should grant summary judgment against a party who

24   fails to present evidence establishing an essential element of its claim or defense when

25   that party will ultimately bear the burden of proof on that claim or defense at trial.   *See*

26   *Celotex*, 477 U.S. at 322.

27   In ruling on summary judgment motions, courts draw all reasonable inferences

28   in the light most favorable to the nonmoving party, refraining from making credibility

determinations or weighing conflicting evidence.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1183 (C.D. Cal. 2004).

## C.    Trade Secrets (Counts 1 and 2)

IFS's first and second causes of action are for violations of federal trade secret law (DTSA) and state trade secret law (CUTSA).  Courts typically analyze federal and California trade secret misappropriation claims together because the elements are "substantially similar."  *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020); *ChromaDex, Inc. v. Elysium Health, Inc.*, 301 F. Supp. 3d 963, 970–71 (C.D. Cal. 2017).  "To state a claim for trade secret misappropriation under [either federal or state law], a plaintiff must allege that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff."  *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1046 (N.D. Cal. 2020) (quoting *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018)).

The DTSA defines "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).  The CUTSA's definition of trade secret is shorter, but it reflects the same essential elements.  Under CUTSA,

'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d); *see also Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 53 (2014) ("[A] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.").

Defendants move for summary judgment on three grounds: (1) that IFS has not adequately defined its trade secrets for purposes of this lawsuit, (Mot. PSJ 15–18); (2) that Pablo and Savino had access to a limited amount of information as salespeople for IFS, and they could not have misappropriated trade secrets they did not have, (SUF 10, 13, 36); and (3) that, of the information to which Pablo and Savino did have access, either that information is not a trade secret, or Defendants never used it in a way that harmed IFS, or both, (Mot. PSJ 18–25). As discussed below, at least one of these three bases applies to much of the confidential information at issue. As a result, the Court dismisses several components of the trade secret claims, leaving intact certain portions of the trade secret claims based on particular trade secrets.

The Court first considers whether IFS articulates its putative trade secrets with sufficient specificity before proceeding to discuss each category of trade secret.

### 1. Specificity of Trade Secrets

IFS defines its trade secrets as:

- internal communication of pricing and sales strategies;
- sales data reports detailing confidential customer data including customer name, customer contact or contacts, decisionmaker, decisionmaker's contact information, direct dial, cell phone, customer credit ratings, payment history,

IFS' pricing, profitability including mark up, order histories, sales volume, product assortment, manufacturer's names for each item, and trends that could be used to promote greater sales ("Customer Lists");

- prospective client contact information;
- presentation materials;
- confidential manufacturer communications specific to IFS, including inventory allocations, contracts between IFS and manufacturers and vendors, and special purchases unique to IFS;
- vendor contacts, vendor reliability, vendor quantities, product qualities, allocations, and other information ("Vendor Lists");
- IFS'[s] employee performance information;
- Private label brand manufacturers, products and training;
- IFS' financial information and data, and IFS' product catalogue, pricing schedules, and selling resources;
- and warehouse organization (collectively "Trade Secrets").

(Shapiro Decl. ¶ 3; *see also* Lesowitz Decl. Ex. L ("Suppl. Interrog. Resp.") 1–2, ECF No. 109-2 (same).)

A "plaintiff seeking relief for misappropriation of trade secrets . . . should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (emphasis omitted). Under this standard, courts have granted or affirmed summary judgment when the plaintiff failed to identify the trade secrets at issue with "reasonable specificity." *Id.* at 1167; *see IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) ("[Plaintiff] has been both too vague and too inclusive, effectively asserting that all information in or about its software is a trade secret. That's not plausible—and, more to the point, such a broad assertion does not match up to the statutory definition.").

IFS does not meet this standard in identifying some of its trade secrets. In defining its trade secrets, IFS identifies a very broad swath of information relating to Pablo's and Savino's experience at IFS. As in *IDX*, "[t]hat's not plausible;" the mere fact that someone learned information in confidence at a company does not mean that that information "match[es] up to the statutory definition," 285 F.3d at 583, nor does it mean that the information derives independent economic value from its secrecy. 18 U.S.C. § 1839(3)(B); Cal. Civ. Code § 3426.1(d)(1). Moreover, if all of the identified information is indeed a trade secret, then Pablo's and Savino's obligations under trade secret law would effectively eviscerate their right to compete by soliciting IFS's current and former customers. This is a right guaranteed to them by both company policy, (SUF 22), and California law, *see Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1337 (9th Cir. 1980) ("[S]olicitation by an employee of his former employer's customers will not be enjoined unless some type of unfair trade practice is shown."); *cf. Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575 (2009) (finding noncompete and nonsolicitation clauses void and unenforceable even where competing would cause disclosure of trade secrets). For these reasons, the Court does not blindly accept that each and every item in IFS's long list is, legally and factually, a trade secret.

The cases IFS cites are not contrary to this conclusion. In *Chartwell Staffing Services Inc. v. Atlantic Solutions Group Inc.*, No. 8:19-cv-00642-JLS (JDEx), 2019 WL 2177262, at *6 (C.D. Cal. May 20, 2019), the district court found the trade secrets to be adequately defined, but the trade secrets in that case centered on two topics only: (1) customer lists and databases; and (2) employee information. Here, the list of purported trade secrets goes significantly beyond these two categories. And in *Sun Distributing Co. v. Corbett*, No. 18-cv-2231-BAS-BGS, 2018 WL 4951966, at *2–3 (S.D. Cal. Oct. 12, 2018), the court did not blindly agree that the long list of items the plaintiff designated as trade secrets were all in fact trade secrets. Instead, it focused its analysis on the smaller number of items that the parties actually addressed

1 and that might actually constitute trade secrets. *Id.* This Court follows that same

2 approach.

   2.   *Analysis of Putative Trade Secrets by Category*

4       IFS adequately defines and engages with several categories of putative trade

5 secrets. This includes the names of Pablo's and Savino's IFS customers; the contact

6 information for each customer and its decisionmaker; each customer's "credit

7 information;" and each customer's order history, including the price and quantity of

8 goods IFS previously sold the customer. IFS also argues that the names of its

9 vendors, the price at which it purchased goods from those vendors, and its office

10 costs/lowest net costs are trade secrets Defendants misappropriated.

11      The Court discusses each of these categories of information in turn, inquiring as

12 to each category as appropriate: (1) whether the information at issue is indeed a trade

13 secret, (2) whether Defendants had access to the information, and (3) whether

14 Defendants used the information in a way that harmed IFS.

   a.   *Identity of Pablo's and Savino's IFS Customers*

16      First, the Court considers whether the IFS customer lists Defendants used

17 constitute trade secrets. In this section, the Court uses the term "customer list" to refer

18 to the bare identity of IFS's customers, as opposed to the broader swath of information

19 IFS defines as "Customer Lists" in the Shapiro Declaration and elsewhere. (*See*

20 Opp'n PSJ 11–12; Shapiro Decl. ¶ 3.) A customer list may constitute a trade secret

21 "'because it allows a competitor . . . to direct its sales efforts to those potential

22 customers that are already' doing business with the plaintiff." *Extreme Reach, Inc. v.*

23 *Spotgenie Partners, LLC*, No. 2:13-cv-07563-DMG (JCGx), 2013 WL 12081182,

24 at *3 (C.D Cal. Nov. 22, 2013) (quoting *MAI Sys. Corp. v. Peak Comput., Inc.*,

25 991 F.2d 511, 521 (9th Cir. 1993)). Determining whether a customer list, or the

26 information on it, is a trade secret, involves returning to the definitional trade secret

27 questions: (1) does the customer list derive independent value from being kept secret,

28 and (2) has the plaintiff made reasonable efforts to keep the customer list secret? *Am.*

*Paper & Packaging Prods., Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1324 (1986).  "As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret."  *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997).  Under this approach, "[p]erhaps the most important consideration is whether the information is readily accessible to a reasonably diligent competitor."  *Hollingsworth*, 622 F.2d at 1332.

Here, IFS does not accuse Pablo and Savino of taking IFS customer lists belonging to other IFS salespeople or IFS more broadly.  Instead, IFS asserts that the subset of customers Pablo and Savino each serviced while working for IFS is itself the customer list.  (*See* SGD 59 ("[E]ach IFS customer [Pablo and Savino] converted to a Legacy customer arose from a meeting or phone call that had been scheduled in their role as an IFS salesperson."); *cf.* Opp'n PSJ 21 (citing, and not disputing, Pablo's and Savino's sworn assertions that "while employed at IFS they could not access information about IFS'[s] customers serviced by other sales representatives")).)  This distinction is key because, under IFS policy, Pablo and Savino are both permitted to solicit sales for Legacy from customers who were their own customers at IFS. (SUF 22; Shapiro Dep. 47:7–10.)  Based on this IFS policy, and on the California law it reflects,  *Hollingsworth*, 622 F.2d at 1337, the Court cannot conclude that the mere identity of Pablo's and Savino's customers constitutes IFS's trade secret.  Pablo and Savino acquired the information by proper means, while working for IFS.  That Pablo and Savino cannot use their knowledge of the identity of their IFS customers is logically inconsistent with their right to solicit business from those customers.  In other words, if the mere identity of Pablo's and Savino's IFS customers is a trade secret, then Pablo and Savino cannot do any business at all with those customers without misappropriating IFS's trade secrets.  The Court will not conclude that either DTSA or CUTSA was enacted with an intent to broadly ban competition by salespeople leaving their employers, or more generally that trade secret law curtails

open competition so severely.  Instead, Pablo and Savino must be permitted to use the identities of their IFS customers in soliciting their business for Legacy.  *Id.* ("To prohibit a company from soliciting the customers of a competitor, even a competitor's long-standing customers, where such solicitation does not otherwise constitute an unfair trade practice, would be inconsistent with the balance between stability of contractual business relationships and encouragement of competition . . . .").

Moreover, if Pablo and Savino are permitted under both company policy and California law to do business with their prior IFS customers, then IFS has not taken steps to keep that particular subset of its customers secret.  In addition, because Pablo and Savino have such permission, a list of the mere names of their prior IFS customers has no independent economic value to IFS.

IFS appears to concede that the "mere identity of IFS'[s] customers" is not a trade secret.  (Opp'n PSJ 20–21.)  Nevertheless, IFS argues that its trade secrets go beyond mere customer names and include the customers' contact information; each customer's decisionmaker's contact information; and the customer's order, payment, and credit history are all customer-related trade secrets that Defendants misappropriated.  (*Id.*)  IFS also argues that Defendants misappropriated information from the vendor side, including the names of IFS's vendors, the cost to IFS of purchasing products from those vendors, and IFS's break-even point, or "office costs." (Opp'n PSJ 15.)  In determining whether any of this additional information constitutes a trade secret, the Court remains mindful that, under California law and company policy, Pablo and Savino were permitted to solicit business from their former IFS customers.  In order for this permission not to be illusory, Pablo and Savino must have a certain amount of latitude to use information they naturally absorbed while working for IFS; otherwise, as discussed, trade secret law would broadly prohibit salespeople leaving their employers from competing.  *See Hollingsworth*, 622 F.2d at 1330 ("[A salesperson] necessarily acquires some information about the employer's business and how to sell the employer's products to customers more effectively.  [The salesperson]

is not automatically barred from using this information in subsequent employment with a competitor.").

### b.    Customer and Decisionmaker Contact Information

With all this in mind, the Court cannot conclude that the contact information IFS had for a given customer or its decisionmaker constitutes a trade secret.  For any given customer (say, a restaurant), any supplier (IFS, Legacy, or one of its competitors) could simply call or email the restaurant and ask for the name and contact information of the person responsible for ordering supplies for the restaurant. *See ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714–15 (6th Cir. 2005) ("Even the name of the person at each transmission shop responsible for buying parts, to which ATC ascribes great importance, can be ascertained simply by calling each shop and asking.").  This information is therefore not a secret.  Moreover, IFS submits nothing of substance suggesting that compiling a list of readily available decisionmakers requires significant time or expense.  It also submits nothing suggesting that it derived any independent or special economic value from its relationship with a particular decisionmaker on Pablo's and Savino's customer lists.  Absent any of these indicators, the Court sees no basis for concluding that the contact information for IFS's customers has independent economic value to IFS that derives from the information being known only to IFS.

That Pablo and Savino have a right to compete confirms this conclusion; if this right is not illusory, then Pablo and Savino must have certain latitude in competing, and this includes the latitude to contact the customers they previously serviced at IFS by way of the contact person they used while working for IFS.  Without this latitude, an absurdity would result: laws protecting open competition would allow Pablo and Savino to solicit business from a former customer, but laws protecting trade secrets would require Pablo and Savino to pretend they did not know who that customer's decisionmaker was. *Hollingsworth*, 622 F.2d at 1330.

In the absence of any indicia that IFS's relationship with a particular decisionmaker provided a special economic benefit or advantage not readily available to other reasonably diligent suppliers, the Court cannot conclude that the contact information for a customer or its decisionmaker constitutes a trade secret in this case.

### c.   Pricing and Order Information

The Court next considers whether there are triable trade secret claims based on the pricing and order information for Pablo's and Savino's customers. By "pricing and order information," the Court means data reflecting: (1) what items IFS sold to a customer, (2) when IFS sold the items, (3) the quantity of each item sold, and (4) the price at which IFS sold each item.

At the very least, whether this information constitutes a trade secret in this case is in genuine dispute. There is no doubt that, under California law, a supplier's database of customer pricing and order information has independent economic value to the supplier that arises because that information is not known to other suppliers. *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (observing certain customer information, including "billing rates," "specialized requirements," and "markup rates" are "sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors"). By definition, the supplier's time and effort is required to compile a database of historical pricing and order information. A competitor could use this information to undercut the supplier and divert the customer's business to the competitor, all without the time and expense required to observe and compile the customer's order preferences and habits.

Moreover, the record broadly supports the conclusion that, generally speaking, Pablo and Savino had access to this information. They were, after all, the salespeople responsible for these customers' accounts, and no one disputes that (1) IFS kept records of the prices at which it sold items to customers, and (2) Pablo and Savino had access to this information as part of their job selling items to IFS customers. (*See,*

*e.g.*, SUF 32, 33 (discussing Pablo's and Savino's earnings statements which contained, among other things, the cost of goods sold to IFS customers).)

Furthermore, the record contains evidence from which a jury could reasonably infer that Defendants used IFS customer pricing and order information to help divert those customers' sales from IFS to Legacy.  The Declaration of Ishmael Lopez is key in this regard.  (Decl. Ishmael Lopez ISO Opp'n PSJ ("Lopez Decl."), ECF No. 144.) Lopez is the manager of an entity called Red Hot Chilis Inc., a customer of IFS for over ten years.  (*Id.* ¶¶ 2–3.)  Pablo serviced Red Hot's account at IFS.  (*Id.* ¶ 3.)  By Lopez's account:

> In late 2021 or early 2022, Pablo Morales called me to discuss Red Hot purchasing a number of products from IFS.  During that call, Pablo Morales told me that he could sell Reyma brand foam products to Red Hot from a new company in Arizona called Legacy at a better price than the price at which IFS would sell Reyma products to Red Hot . . . .

(*Id.* ¶ 5.)  Lopez did not show Pablo another vendor's quote, nor did Lopez ask Pablo to match the pricing from another vendor.  (*Id.* ¶ 6.)  Approximately four to six weeks later, on January 25, 2022, Legacy sent Red Hot a quote for the purchase of five different varieties of Reyma foam cups, all at a lower price than what IFS offered. (*Id.* ¶¶ 9, 10, 11, Ex. A ("Red Hot Quote"), ECF No. 144-1.)  Based on Pablo offering to beat IFS's prices, the timeframe, and the fact that Legacy beat IFS's prices on all five items, a jury could reasonably and properly infer that Defendants used IFS's pricing information for Red Hot in diverting Red Hot's purchases from IFS to Legacy. IFS's showing sufficiently connects the trade secret (the pricing and order information) to the harm (IFS's lost sales), and defeats summary judgment.

Supporting this conclusion, on January 3, 2022, Savino sent an email from his IFS account to his wife's personal email account with an attachment entitled "Individual FoodService Quote for [ACME][2]."  (Forman Decl. Ex. H ("Savino Dep.

---

[2] At the request of the parties, the name of this nonparty has been changed for the purpose of this Order.

Exs.") 157–60 ("Acme Email 1"), ECF Nos. 161-10 (sealed, unredacted), 160-11 (unsealed, redacted).)  The attachment contains a chart with sixty-three entries, and each entry includes the product name, IFS's item number, and a price for the product underneath a column entitled "Our Price." (*Id.*)  The next day, on  January 4, 2022, Savino had a meeting with a representative from Acme Market, one of his IFS customers, to discuss Legacy selling certain products to Acme.  (Forman Decl. Ex. G ("Savino  Dep.")  310:23–311:10,  ECF  Nos. 161-9  (sealed,  unredacted),  160-10 (unsealed, redacted).)  In a January 4, 2022 email to his co-owners at Legacy, Savino wrote, in reference to his discussion with Acme, "[g]ood thing about this one is that I have all their pricing since I'm the one that sells them." (*Id.* at 310:4–311:17.)  The day after that, on January 5, 2022, Savino emailed his wife another attachment whose filename read, in pertinent part, "[Acme]. . . Office \$, Sell \$ and Margin Rpt." (Savino Dep. Exs. 160–66 ("Acme Email 2").)  This list appears to comprise IFS's sales to Acme for the period beginning September 1, 2021 and ending December 31, 2021. The list's 115 entries each indicate the product name, the name of the vendor from whom IFS purchased the product; the date, quantity, and sale price for each sale; the office cost of the product; and the profit margin. (*Id.*)

In his deposition, Savino pointed out that he could have meant many things by his statement about having all of Acme's pricing, (Savino Dep. 311:18–313:4), but that admission only underscores that summary judgment is not appropriate.  A jury would be entitled to interpret "I have all their pricing because I'm the one that sells them" as "I have access to the prices Acme paid IFS because I'm Acme's contact person at IFS."  Based on this interpretation, along with the two emails Savino sent his wife the day before and after his meeting with Acme, a jury could reasonably infer that Legacy actually used Acme's prior pricing and order information with IFS in selling products to Acme.  Other evidence in the record provides a similar basis to infer that Pablo and Savino used IFS pricing data to divert other IFS customers to Legacy.  (*See* Decl. Hugo Mesa ISO Opp'n PSJ ("Mesa Decl.") ¶ 6, ECF No. 145

("Pablo . . . told me that he told the IFS customers that Legacy could order the same products as IFS at a price that was lower than what IFS'[s] customers paid for the same products.").)

Against this backdrop, IFS submits evidence showing that it lost significant business from customers whom Pablo and Savino serviced at IFS and who later chose to do business with Legacy.  (Decl. Nigel Kershaw ISO Opp'n PSJ ("Kershaw Decl.") ¶ 7, ECF No. 141 ("Three [former IFS] customers no longer do business with IFS."); *id.* ¶ 8 ("IFS'[s] reports reflect that revenues from customers listed on Legacy00112 are $605,000 less than revenue from those same customers for the same period of 2021 . . . .").)  A trier of fact could reasonably infer that at least some of this loss of business happened as a result of Defendants' use of IFS customer pricing and order information.

In summary, IFS's pricing and order information for each of Pablo's and Savino's customers constitutes a trade secret, and whether Pablo and Savino used this information in diverting IFS's sales to Legacy remains in genuine dispute.  Accordingly, the trade secret claims, to the extent they are based on the misappropriation of pricing and order information, withstand summary judgment.

### d.    Credit Information

The Court next considers whether the "credit information" for each of Pablo's and Savino's customers was a trade secret Defendants misappropriated.  (Opp'n PSJ 22 (citing Forman Decl. ¶ 14).)  As a preliminary matter, the parties use the term "credit information" to refer to at least four different categories of information, and it is necessary to consider each of these four categories separately.

First, to the extent "credit information" refers to detailed compilations or professionally prepared reports on the topic of creditworthiness that IFS may have prepared or obtained for each of its customers, Defendants are entitled to summary judgment.  This is because IFS submits no evidence suggesting Pablo and Savino had access to this level of information at IFS, or that such reports existed at all.

Instead, testimony from Escamilla's deposition suggests that the only creditworthiness-related information Defendants may have used in operating Legacy is the general fact that IFS had an active account with a given customer and that customer paid its bills; this is the second meaning of "credit information" as used by the parties.  (*See* Forman Decl. Ex. A ("Escamilla Dep.") 228:2–7, ECF No. 161-3 (referencing email from Savino stating, "let's only pull the [credit] reports on accounts that are not IFS.  For the most part IFS already did their homework on these accounts and there's no need to run them again and pay for those accounts"); *id.* at 228:15–19 ("[T]he customers that we had in common were basically Savino's or Pablo's, and they already had a relationship with them, so I was comfortable with them kind of approving or disapproving any terms for any of those customers.").)  Where a salesperson previously serviced customers for a former employer and seeks to do business with those customers directly, the salesperson's right to compete by doing business with that customer is illusory unless the salesperson has some natural latitude to use their general knowledge regarding whether that customer paid its bills on time. *Hollingsworth*, 622 F.2d at 1330.  If the Court ruled otherwise, salespeople could find themselves in the awkward position of being legally required run a pro forma credit check to uncover information they already know and do not need.  The Court declines to rule in this illogical and unprecedented way.

Third, to the extent "credit information" refers to the written credit applications and contracts IFS entered into with its customers, these contracts are not trade secrets.  There is no evidence that these contracts were confidential or that IFS took any steps to keep the terms of its credit applications secret after sending the applications to its customers.

Fourth and finally, to the extent "credit information" refers to the credit terms that IFS offered its customers, this information would constitute a trade secret for the same reason that pricing information would constitute a trade secret.  The credit terms to which a customer is willing to agree is confidential information compiled at IFS's

time and expense, and a competitor could use this information to offer a customer better terms and divert sales from IFS.  *Courtesy*, 222 Cal. App. 3d at 1288. Moreover, IFS presents sufficient evidence suggesting that Defendants used their knowledge of a customer's credit terms with IFS in determining what credit terms to offer that customer through Legacy.  For instance, in offering Legacy's business to Red Hot, Pablo told Lopez that "Legacy would give [Red Hot] the same credit terms as IFS had given to Red Hot."  (Lopez Decl. ¶ 5.)  As with the pricing information, and absent any countervailing evidence presented by Defendants, a trier of fact could reasonably infer from this information that Pablo and Savino used their knowledge of the specific credit terms IFS offered a given customer—knowledge that belonged to IFS—in establishing Legacy's relationship with that customer and diverting sales from IFS.  Thus, IFS's trade secret claims survive summary judgment to the extent they are based on misappropriation of the terms of credit IFS offered the customers Pablo and Savino serviced.

Thus far, the Court has distinguished two categories of information that qualify as a trade secret for purposes of summary judgment: (1) pricing and order information for IFS's customers, and (2) the credit terms IFS offered its customers. Herein, the Court uses the term "order history" to refer to these two categories collectively.

### e.    Identity of Vendors

The categories of putative trade secret discussed thus far relate to IFS's information about its customers, whereas the remaining categories relate to IFS's information about its vendors.  The first of these categories is the names of IFS's vendors and any lists of such vendors.

First, the mere names of IFS's vendors do not constitute a trade secret.  For example, it is no secret that Dart and Reyma sell food service products to distributors like IFS and Legacy.  If the mere identity of IFS's vendors is a trade secret, then trade secret law would effectively prevent Pablo and Savino from competing altogether because it would prevent them from buying products from any vendors who sold

products to IFS.   This cannot be the result.   *Hollingsworth*, 622 F.2d at 1330.

Moreover, as of June 2021, IFS listed approximately 213 of its vendors on its website

under the heading, "Individual FoodService is proud to partner with the following

vendors."  (Decl. Sergio Escamilla ISO Mot. PSJ ("Escamilla Decl.") ¶ 19 Ex. J, ECF

No. 108-4.[3])   That, prior to this lawsuit, IFS publicly displayed the names of many of

its vendors further suggests that the mere names of IFS's vendors is not an IFS trade

secret.

Thus, the only way IFS has a trade secret claim based on vendor lists is if IFS

can (1) point to a vendor list that has value beyond the mere identity of the vendors

and (2) show that Defendants used the valuable part of the vendor list (3) in a way that

harmed IFS.   IFS's evidence fails to raise a genuine dispute as to each of these

requirements.   Other than the statements of legal conclusions found in IFS's

declarations, IFS submits no meaningful evidence suggesting that Defendants had

access to a vendor list that had some value beyond the mere identity of the vendors.

And, to the extent Defendants may have used any such information, IFS fails to

submit evidence that would allow a trier of fact, reasonably and without speculation,

to find a causal connection between the use of the information and harm to IFS.

Moreover, IFS admits in its Opposition that a list of IFS's vendors "does not

disclose any trade secret information regarding IFS's vendors."   (Opp'n PSJ 20.)

Thus, IFS appears to concede that the mere identity of its vendors is not a trade secret.

For these reasons, Defendants are entitled to summary judgment on the trade

secret claims to the extent they are based on misappropriation of the identity of IFS's

vendors.

### f.    Cost to IFS of Purchasing Products

The Court next considers whether the cost to IFS of purchasing products for its

inventory—that is, the prices vendors charged IFS—is a trade secret and whether

---

[3] IFS makes a nod at disputing the authenticity of the archived webpage Escamilla submits in
support of this contention, but IFS does not submit any evidence suggesting that the archived
webpage is not a fair and accurate representation of IFS's website as of June 2021.  (Opp'n PSJ 20.)

Defendants may have misappropriated this information.  Defendants are entitled to summary judgment on this issue because there is no dispute that Pablo and Savino did not have access to this information on a broad and general level, and, to the extent they did have access to this information in isolated cases, IFS offers no evidence suggesting that Defendants used this information in a way that harmed IFS.

Defendants' declarations clearly set forth the assertion that IFS did not provide Pablo or Savino with the exact prices that IFS paid for items that it resold.  (Decl. Savino Morales ISO Mot. PSJ ("Savino Decl.") ¶ 8, ECF No. 106; Decl. Pablo Morales ISO Mot. PSJ ("Pablo Decl.") ¶ 8, ECF No. 107.)  The evidence IFS proffers to dispute this assertion shows only that Savino may have received the true cost of a small subset of items at a particular time.  In particular, at one point, Savino asked Shapiro and others to send him the "true deviated costs" for products sold to a customer for which IFS was losing money.  (Savino Dep. 259:22–260:4.)  Savino does not remember if he ever received this information from Shapiro or anyone else. (*Id.* at 260:14–261:5.)  Regardless, IFS offers no evidence suggesting that Legacy ever used this particular pricing information regarding a limited set of items in competing with IFS.

IFS otherwise proffers no evidence suggesting Pablo and Savino had general, ongoing access to the exact prices IFS paid its vendors.  If IFS did have a practice of providing such information to its salespeople, it would be able to provide evidence indicating as much.  But IFS offers no such evidence.  (*See generally* Opp'n, SGD.)  Thus, it is beyond genuine dispute that Pablo and Savino did not have general, ongoing access to the prices IFS paid its vendors, and therefore, it is beyond genuine dispute that they could not have possibly misappropriated this information.  *See Gonzalez v. US Human Rts. Network*, --- F. Supp. 3d ---, 2022 WL 3017385, at *1 (D. Ariz. 2022) ("There is no issue for trial unless enough evidence favors the non-moving party." (citing *Anderson*, 477 U.S. at 249)).

For these reasons, Defendants are entitled to summary judgment on IFS's trade secret claims to the extent they are based on misappropriation of IFS's cost to purchase products.

        *g.*     *Office Costs/Lowest Net Costs*

The final category of potential trade secret is IFS's "office costs" or "lowest net costs," which refers to the overall cost to IFS of providing a product, taking into account both the cost of the product and the administrative expense of running IFS as a business. (*See* SUF 12 and evidence cited therein.) Preliminarily, it is beyond dispute that IFS did not have a special process for determining the office cost of a given product. (Shapiro Dep. 75:3–6 (Q. "[D]oes IFS have a consistent method it uses to determine the lowest net cost?" A. "No.").) Moreover, there is no evidence to suggest that anyone at IFS ever shared with Pablo and Savino the particular considerations that went into determining the office cost of a given item. (*See id.* at 75:7–10 (Q. "[W]hen Savino or Pablo would speak to you about lowest net costs, would you ever inform them of exactly what you are including in lowest net cost?" A. "No.").) Therefore, it is beyond dispute that no particular process for determining office costs is at issue. What remains is whether IFS has a trade secret claim based on Defendants' misappropriation or use of a particular office cost of which they had knowledge.

The answer to this question is 'no,' because of the lack of a causal connection between the use of any office cost and harm to IFS. Office costs are unique to the entity that generates them in that they reflect business expenses unique to that entity. Here, for example, IFS's office costs for a given item would be different from Legacy's because the two entities pay different amounts to rent or mortgage their buildings, to compensate their employees, and so on. Moreover, the purposes of having an office cost for a product are primarily internal, and include (1) helping the seller determine a viable price at which to sell the product and (2) helping the seller track their profit margin over office cost. (*See* Shapiro Dep. 74:4–9 ("[T]he lowest net

1    cost of a product was where IFS could sell potentially without losing money. . . .

2    [A]ny sales rep . . . could use [lowest net cost] as a cost basis to then mark up to make

3    a profit.").)  Therefore, on a broad categorical level, it is unclear how entity A could

4    use entity B's office costs in a way that causes harm to entity B; so too here, where

5    IFS submits nothing of substance explaining or suggesting exactly how Defendants

6    could or did use one of IFS's office costs and how the use of that office cost caused a

7    customer to move its business from IFS to Legacy or otherwise harmed IFS.  For

8    these reasons, Defendants are entitled to summary judgment to the extent IFS's trade

9    secret claims are based on its office costs.

10       To summarize thus far: IFS's trade secret claims withstand summary judgment,

11   but only to the extent the claims are based on misappropriation of order history,

12   defined as IFS's historical data reflecting customer pricing and order information and

13   customer credit terms.

14       *3.    Injunctive Relief to Stop Trade Secret Misappropriation*

15       Defendants argue that, even if the Court does not altogether dismiss the trade

16   secret claims, the Court should nevertheless grant summary judgment against IFS's

17   request for injunctive relief to stop trade secret misappropriation.  (Mot. PSJ 26–27.)

18   Defendants' main contention is that any of IFS's confidential information Pablo and

19   Savino might still have is "old and stale," and as such, "[t]here is no chance of future

20   acts of misappropriation."  (*Id.* at 26.)

21       This argument is well taken.  Injunctive relief under DTSA and CUTSA is

22   subject to the same requirements for an injunction in the general civil context.  *See*

23   *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1086–87 (E.D. Cal. 2012).

24   In particular:

25       A plaintiff seeking a permanent injunction must satisfy a four-[element]
         test before a court may grant such relief, and is required to show: (1) that
26       it has suffered an irreparable injury; (2) that remedies available at law,
         such as monetary damages, are inadequate to compensate for that injury;
27       (3) that, considering the balance of hardships between the plaintiff and

28

defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*In re W. Asbestos Co.*, 416 B.R. 670, 691 n.11 (N.D. Cal. 2009) (citing *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)).   The "irreparable injury" requirement "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."   *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 968 (N.D. Cal. 2009) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

By isolating and clarifying exactly what IFS seeks to restrain Defendants from doing, the problem with IFS's request for a trade secret injunction becomes clear. IFS's request for injunctive relief in the First Amended Complaint is boilerplate and self-referential, (*see* FAC at 24), but what IFS actually seeks is most clear in the Proposed Order it submits in connection with its Motion for Preliminary Injunction. (Proposed Order, ECF No. 173-1.)   IFS asks this Court to prohibit Defendants from (1) further using IFS's trade secrets in doing business with customers Pablo and Savino serviced while at IFS; (2) doing business altogether with any customer Pablo and Savino serviced while at IFS; and (3) hiring anyone recently employed by IFS. (*Id.* at 2–3.)   As a matter of law, however, IFS cannot obtain relief in any of these three senses.

### a.   Use of Trade Secrets in Doing Business with IFS Customers

The first issue is whether IFS can obtain an injunction to stop Defendants from using IFS trade secrets in conducting Legacy's business.   As discussed, the only trade secret upon which IFS may continue to maintain suit is its customer order history data; therefore, any injunction IFS might obtain would be correspondingly narrowed to prohibit Defendants from using IFS order history data.

To satisfy their burden on summary judgment, Pablo and Savino each declare that, based on their experience at IFS, prices change rapidly, such they are not currently using customer order history data. (*See* Pablo Decl. ¶ 9 ("In the industry . . .

pricing for items sold by IFS have [sic] been changing rapidly.  Even if I knew some information about IFS's pricing of a certain item previously, that information is likely already outdated."); Savino Decl. ¶ 9 (same).)   Accordingly, in order to prevail at summary judgment on its request for an injunction to stop use of trade secrets, IFS must submit evidence that would allow a trier of fact to reasonably infer that Defendants are actively and currently using customer order history data, or are threatening to, in a way that would harm IFS.  But IFS submits no such evidence. IFS does not rebut Defendants' evidence that prices do not change rapidly; instead, it asserts that, regardless, IFS's order history data "can be used by Pablo and Savino to IFS'[s] detriment," (SGD 14), and cites to a paragraph of the Shapiro Declaration that merely repeats this speculative argument—that Defendants' knowledge of IFS's year-old price history could be used by Legacy "to compete with IFS for [IFS's] clients," (Shapiro Decl. ¶ 7).  Even if Defendants may have used customer order history to divert business from IFS to Legacy, Defendants submit no evidence that Defendants are presently using IFS's year-old customer order history, and that such use is the legal and proximate cause of any continued lost sales.

Absent such evidence, too much speculation is required to conclude that there is any "real or immediate threat" of continued trade secret misappropriation.  *Hynix Semiconductor*, 609 F. Supp. 2d at 968.  It is beyond dispute that Pablo and Savino have not had any business relationship whatsoever with IFS for almost a year now, and there is no evidence in the record that Pablo and Savino obtained any new information from IFS after their termination.  (Mot. PSJ 26–27; *see generally* Opp'n PSJ.)  Moreover, the evidence, which includes the passage of time, indicates that the prices and credit terms Legacy is currently offering to its customers are a product of market forces and the ongoing relationship between Legacy and the customer rather than the result of a single moment in the past where Defendants used IFS order history to prepare a quote for a Legacy customer.  An injunction to stop Defendants from using IFS's year-old customer order history is not appropriate because there is no

evidence that Defendants' current or future use of IFS customer order history is the legal and proximate cause of any present or future diverted sales. IFS, for its part, presents nothing that would allow a reasonable trier of fact to arrive at a different conclusion. Any misappropriation of IFS order history data happened in the past, and the mere fact that its effects continue into the future does not entitle IFS to a trade secret injunction regarding prior misappropriation. *See Hynix Semiconductor*, 609 F. Supp. 2d at 969.

> b. *Doing Business with IFS Customers*

In addition to asking for an injunction to stop the use of trade secrets, IFS asks more broadly for a preliminary, and eventually a permanent, injunction stopping Legacy from doing business with any of Pablo's and Savino's former IFS customers. For three reasons, the Court declines to impose this prohibition. First, under both California law and IFS's own policies, Pablo and Savino are generally permitted to do business with IFS's customers. *Hollingsworth*, 622 F.2d at 1337; (SUF 22). Second, DTSA and CUTSA prohibit using trade secrets, but a broad injunction prohibiting Legacy from doing business with any of IFS's customers would prohibit far more conduct than the mere use of IFS's trade secrets. The Court is not convinced that either the state or federal legislatures, in enacting DTSA and CUTSA, intended that a trade secret injunction be used to enjoin such a broad class of otherwise lawful conduct. *See* D. Kirk Jamieson, *Just Deserts: A Model to Harmonize Trade Secret Injunctions*, 72 Neb. L. Rev. 515, 536 (1993) (noting Commissioners' Comments on UTSA injunction statute "expressly decry punitive perpetual injunctions and propose setting injunctions by the time necessary for good faith competitors to replicate the trade secret legitimately"); *cf. Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302, 1327 (2016) ("Injunctive relief is not a remedy designed to right completed wrongs." (citing *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 464–65 (2005) (cleaned up))). Third, as a matter of public policy, were the Court to impose a perpetual punitive injunction on Defendants for having solicited business improperly at one

point in the past, this would have a chilling effect on competition in general.  Those wishing to compete with their former employers would be unnecessarily deterred from doing so out of concern for the risk of running afoul of the law and forever losing the right to do business with certain customers, all on the basis of past instances of actual or alleged misappropriation.

### c.   Hiring IFS's Employees

Finally, Defendants are entitled to summary judgment on IFS's request for an injunction preventing them from hiring anyone recently employed by IFS.  Although IFS submits evidence suggesting Defendants hired away, or tried to hire away, some of IFS's employees, (see SGD 53), IFS submits no evidence suggesting that Defendants ever used, or will use, any of IFS's trade secrets in hiring away any of IFS's employees.  Absent a clear delineation of the trade secret at issue and a causal connection between use of those trade secrets and the activity sought to be enjoined, injunctive relief under DTSA and CUTSA is not appropriate.

For these reasons, Defendants show they are entitled to judgment as a matter of law on IFS's request for an injunction under DTSA or CUTSA to stop the use of trade secrets.  Summary judgment is **GRANTED** in favor of Defendants to this extent.

### D.   Unfair Competition (Count 9)

Defendants seek dismissal of IFS's Count 9 for unfair competition under California law.  California's unfair competition law ("UCL") prohibits "any unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Here, IFS asserts its UCL claim under the "unlawful" and "unfair" prongs.  (FAC ¶ 120.) The "unlawful" prong prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law."  *Herskowitz v. Apple Inc.*, 940 F. Supp. 2d 1131, 1145 (N.D. Cal. 2013) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).  The "unfair" prong "creates a cause of action for a business practice that is unfair even if not proscribed by some

other law." *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014.)

Of the several arguments Defendants raise in opposition to the UCL claim, one of their arguments in particular carries the day: namely, that the remedies the UCL provides are not applicable to this case. (Mot. PSJ 28.) The remedies available under the UCL are limited to restitution and injunctive relief. *Zhang v. Superior Ct.*, 57 Cal. 4th 364, 371 (2013). Here, IFS can obtain neither.

First, IFS cannot obtain restitution because it seeks to recover money in which it had no initial ownership interest. "An order of restitution has been defined as 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through the person.'" *Schertzer v. Bank of Am., N.A.*, 489 F. Supp. 3d 1061, 1071 (S.D. Cal. 2020) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003)). Here, the relief IFS seeks is compensation for the sales and business opportunities it lost to Legacy, including "restitution of all profits received by Defendants . . . as a result of having engaged in . . . wrongful conduct." (FAC ¶ 121.) But "compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." *Lee v. Luxottica Retail N. Am., Inc.*, 65 Cal. App. 5th 793, 802–03 (2021). IFS cannot obtain the compensation it seeks by way of restitution because Defendants never took money in which IFS first had an ownership interest. *See Schertzer*, 489 F. Supp. 3d at 1071.

Nor can IFS obtain a UCL injunction. For the purpose of analysis of this point, the Court assumes without deciding that the UCL claim is based on both Defendants' tortious conduct and their trade secret misappropriation. A UCL injunction based on Defendants' tortious conduct is not appropriate because the torts have already been committed and the business has already been diverted. *Hynix Semiconductor*, 609 F. Supp. 2d at 968 (refusing to impose injunction "where there is no showing of any real

or immediate threat that the plaintiff will be wronged again").  Here, while Defendants may have committed tortious interference or tortious inducement early on in establishing Legacy, the contracts and relationships have already been disturbed, in the past.  IFS provides no evidence suggesting the possibility that Defendants will commit tortious interference or tortious inducement as to additional contracts or customers in the future, and accordingly, an injunction to stop future tortious interference or inducement is inappropriate.  *Davis*, 245 Cal. App. 4th at 1326–27 ("In order to grant injunctive relief under the UCL, 'there must be a threat that the wrongful conduct will continue.'").

Finally, a UCL injunction based on trade secret misappropriation is not appropriate, for reasons discussed above.  *See supra* Part IV.C.3.

As the UCL offers no remedies appropriate for the wrongs IFS alleges, summary judgment as to the UCL claim is **GRANTED** in Defendants' favor.

**E.    Conversion (Count 6)**

IFS's conversion claim is of a decidedly different character from its trade secret claims.  "IFS's conversion claim is based on the conversion of documents, electronic files, cash and funds collected from IFS'[s] customers that was not turned over to IFS, including compensation from IFS for time when Pablo and Savino provided services to [Legacy]."  (Opp'n PSJ 29; *accord* FAC ¶ 97.)

First, as a matter of law, the "cash," "funds," and "compensation" to which IFS refers cannot form the basis of a conversion claim in this case.  This is because, to state a claim for conversion, a plaintiff "must allege . . . entitle[ment] to immediate possession at the time of conversion."  *See United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 177 F. Supp. 3d 1183, 1194 (N.D. Cal. 2016); *see also Sullivan v. Transamerica Life Ins. Co.*, No. 2:21-cv-00645-CAS (GJSx), 2021 WL 2000301, at *7 (C.D. Cal. May 17, 2021) (finding plaintiffs failed to state a claim for conversion because "plaintiffs never had a possessory interest in the initial face amounts [of the insurance policies]—rather, they had a contractual right to that amount at the death of

the insureds"). Here, the "cash and funds collected from IFS'[s] customers" that IFS alleges was converted, (FAC ¶ 97), refer to the money IFS did not make as a result of Legacy diverting IFS customers and sales to its own business. IFS cannot be referring to anything else; it neither alleges nor suggests that Defendants stole or directly misappropriated cash from IFS's coffers. But money IFS alleges it should have made but did not make cannot be the subject of a conversion claim because IFS never had an immediate possessory interest in such money in the first place. *See United Energy Trading*, 177 F. Supp. 3d at 1194.

The same is true of "compensation from IFS for time when Pablo and Savino provided services to Legacy." (FAC ¶ 99.) Pablo and Savino were entitled to compensation from IFS for working for IFS. If they used some of that time to provide services for Legacy, IFS might have a claim against them for reimbursement for that lost time, but that does not mean that IFS ever had an immediate possessory interest in the compensation paid for that lost time. IFS's right to reimbursement for Pablo's and Savino's having built Legacy on IFS's time and dime is a matter of Pablo's and Savino's contractual obligations and their duty of loyalty to their employer; these obligations do not give rise to a claim for conversion. *See Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1058 (N.D. Cal. 2021) (finding no claim for conversion "for breach of duties that merely restate . . . contractual obligations," where student sought partial refund from college for not providing in-person education during COVID-19 pandemic).

This leaves the question whether IFS has a valid conversion claim based on Pablo and Savino having converted IFS's electronic files and physical items such as documents and electronic devices. (FAC ¶ 97.) As for electronic files, while Defendants may have *used* IFS's electronic files for Legacy's benefit, this does not mean they converted those files. A conversion takes place when the defendant interferes not merely with the property but with the plaintiff's *dominion* over the property. *Snyder & Assoc. Acquisitions LLC v. United States*, 859 F.3d 1152, 1161

1   (9th Cir. 2017); *Welco Elecs., Inc. v. Mora*, 223 Cal App. 4th 202, 208 (2014).  Here,

2   there is no suggestion that Defendants' use of IFS's electronic files also deprived IFS

3   of its ability to use those files or otherwise interfered with IFS's dominion over the

4   files.  Thus, there can be no conversion of the referenced electronic files.

5       As for IFS's physical documents and devices, Defendants submit evidence

6   indicating that they returned IFS's documents and devices shortly after their

7   employment was terminated and that they are not currently in possession of any of

8   IFS's physical property.  (SUF 35.)  A declaration from Defendants' former counsel

9   confirms the details of how Pablo and Savino returned their "laptop, phone, aircard,

10  and any other of IFS'[s] equipment" as instructed in writing.  (Decl. Jeffery W.

11  Johnson ("Johnson Decl.")[4] ¶¶ 3–6, 8–11, ECF No. 66.)  IFS, for its part, submits no

12  evidence suggesting Pablo and Savino still have any of IFS's physical property.

13  (Opp'n PSJ 29; *see generally* SGD.)  Accordingly, it is beyond genuine dispute that

14  IFS has no claim for conversion of its physical property.

15      For these reasons, no part of the conversion claim is legally viable.  Thus,

16  summary judgment as to the conversion claim is **GRANTED** in Defendants' favor.

17  **F.    Summary**

18      To summarize, the Court **GRANTS IN PART AND DENIES IN PART**

19  Defendants' Motion for Partial Summary Judgment.  As for Plaintiffs' trade secret

20  claims (Counts 1 and 2), the Motion is denied with respect to customer order history

---

21  [4] Defendants cite the Johnson Declaration in support of one of their assertions of fact in their

22  Statement of Uncontroverted Facts.  (SUF 37.)  IFS counters that "Defendants do not provide any evidence in support of this purported uncontroverted fact."  (SGD 37.)  However, Defendants

23  submitted the Johnson Declaration with their prior, now-moot Motion for Summary Judgment, and it

24  is found on the docket at ECF No. 66.  IFS presents no authority suggesting the Court is required to ignore evidence previously submitted in connection with a different motion, and in this instance the

25  Court will not close its eyes to the existence of the Johnson Declaration when it is on file and readily

26  accessible.  *See Miller v. Corr. Corp. of Am.*, No. 3:03-cv-00266-JWS, 2008 WL 11338666, at *5 (D. Alaska Sept. 18, 2008) (taking no issue with plaintiff, in opposing summary judgment motion,

27  referring to evidence submitted in connection with other motions); *Ore. Freeze Dry, Inc. v. Americold Logistics, LLC*, No. CV 05-1119-ST, 2006 WL 2707967, at *1 n.1 (D. Ore. Sept. 18,

28  2006) (allowing parties in briefing a motion to incorporate by reference evidence submitted with earlier motion).

and is granted in Defendants' favor with respect to all other putative trade secrets. Furthermore, the Motion is granted with respect to Plaintiffs' prayer for a trade secret injunction, the conversion claim (Count 6), and the UCL claim (Count 9).

## V.   DISCUSSION—PRELIMINARY INJUNCTION

IFS moves for a preliminary injunction to stop both the misappropriation of its trade secrets and the effects of the misappropriation.  (Mot. Prelim. Inj. 1.)   As discussed above, this includes orders prohibiting Defendants from (1) further using IFS's trade secrets in doing business with customers Pablo and Savino serviced while at IFS; (2) doing business altogether with any customer Pablo and Savino serviced while at IFS; and (3) hiring anyone recently employed by IFS.   (Proposed Order 2–3.)

The disposition of Defendants' Motion for Partial Summary Judgment essentially moots IFS's request for a preliminary injunction.  To obtain a preliminary injunction, the moving party must demonstrate, among other things, a likelihood of success on the merits.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But, for the reasons discussed above, the injunctions IFS seeks are not appropriate for this case, and Defendants are entitled to judgment as a matter of law on IFS's request for a trade secret injunction.  *See supra* Part IV.C.3.  That being the case, IFS has no chance of succeeding on the merits of its injunction request.  Accordingly, the Court **DENIES** IFS's Motion for Preliminary Injunction.

## VI.   CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Partial Summary Judgment.   (ECF No. 104.)  The Court **DISMISSES WITH PREJUDICE** (1) Counts 1 and 2 for trade secret misappropriation, to the extent based on trade secrets other than order history; (2) IFS's prayer for injunctive relief for trade secret misappropriation; (3) Count 8 for conversion; and (4) Count 9 for UCL violations.  The Court otherwise denies the Motion for Partial Summary Judgment; IFS may proceed on the order history-based,

non-injunctive component of its trade secret claims, along with the claims Defendants have not challenged.

The Court **DENIES** IFS's Motion for Preliminary Injunction.  (ECF No. 173.)

**IT IS SO ORDERED.**

January 31, 2023

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**