```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                         WESTERN DIVISION

 4          THE HON. OTIS D. WRIGHT II,, JUDGE PRESIDING

 5

 6    PERRIN BERNARD SUPOWITZ, LLC,     )
                                        )
 7                       Plaintiff,     )
                                        )
 8              vs.                     ) No. CV-22-02120-ODW
                                        )
 9    PABLO MORALES, an individual;     )
      LEGACY WHOLESALE GROUP, LLC, an   )
10    Arizona Limited Liability         )
      Corporation;; SAVINO MORALES, an  )
11    individual; and SERGIO ESCAMILLA, )
      an individual;  and DOES 1        )
12    through 20, inclusive, ,          )
                                        )
13                       Defendants.    )
      _____)
14

15

16

17            REPORTER'S TRANSCRIPT OF JURY TRIAL

18                  Los Angeles, California

19                 Wednesday, July 12, 2023

20                  Volume 2, PM Session

21

22

23              Wil S. Wilcox, CSR 9178
          Official U.S. District Court Reporter
24                350 West 1st Street
            Los Angeles, California 90012
25            Email: wil.wilcox@gmail.com
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF/COUNTER-DEFENDANT PERRIN BERNARD SUPOWITZ, LLC,
     A CALIFORNIA LLC DBA INDIVIDUAL FOODSERVICE:
 3
                         CDF LABOR LAW LLP
 4                       Dan M. Forman, State Bar No. 155811
                         dforman@cdflaborlaw.com
 5                       Amy S. Williams, State Bar No. 228853
                         awilliams@cdflaborlaw.com
 6                       707 Wilshire Boulevard, Suite 5150
                         Los Angeles, CA 90017
 7                       Telephone: (213) 612-6300

 8

 9   FOR THE DEFENDANTS/CROSS-COMPLAINANT PABLO MORALES, LEGACY
     WHOLESALE GROUP, LLC; SAVINO MORALES, and SERGIO ESCAMILLA
10
                         LESOWITZ GEBELIN LLP
11                       Scott M. Lesowitz, State Bar No. 261759
                         scott@lawbylg.com
12                       Steven T. Gebelin, State Bar No. 261507
                         steven@lawbylg.com
13                       8383 Wilshire Boulevard, Suite 800
                         Beverly Hills, CA 90211
14                       Telephone: (310) 341-3072

15

16

17

18

19

20

21

22

23

24

25
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
 1                        I N D E X

 2            JULY 12, 2023; VOLUME 2, PM SESSION

 3            CHRONOLOGICAL INDEX OF WITNESSES

 4   PLAINTIFF'S                                    VOIR
     WITNESS            DIRECT CROSS REDIRECT RECROSS DIRE VOL
 5
     Sergio Escamilla      6                               2
 6

 7            ALPHABETICAL INDEX OF WITNESSES

 8                                                  VOIR
 9   WITNESS            DIRECT CROSS REDIRECT RECROSS DIRE VOL

10
     Escamilla, Sergio     6                               2
11

12                        EXHIBITS

13
     PLAINTIFF'S                      FOR          IN
14   EXHIBIT    DESCRIPTION    IDENTIFICATION   EVIDENCE  VOL

15   36         Document                           56      2

16   53         Document                           57      2

17   55-2       Document                           60      2

18   57-B       Document                           41      2

19   76         Document                           61      2

20   85         Document                           73      2

21   163        Document                           70      2

22   164        Document                           73      2

23   169        Document                           31      2

24   175        Document                           39      2

25   1068-8     Document                           25      2
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1                              EXHIBITS

2                             (Continued)

3
     PLAINTIFF'S                       FOR           IN
4    EXHIBIT      DESCRIPTION     IDENTIFICATION   EVIDENCE   VOL

5    1078-11      Document                            25        2

6    1083-2       Document                            25        2

7    1105         Document                            52        2

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

            Day 2 of Jury Trial; July 12, 2023; P.M. Session

| 1 | LOS ANGELES, CA.; WEDNESDAY, JULY 12, 2023; 11:05 A.M. |

1    LOS ANGELES, CA.; WEDNESDAY, JULY 12, 2023; 11:05 A.M.

2                              -oOo-

3    *(The following was in open court in the jury's presence.)*

4            THE COURT:  Call your next witness.

5            MR. FORMAN:  Shall we call the next witness or

6    is this a good time?

7            THE COURT:  Oh, thank you.

8            MR. FORMAN:  Whatever pleases the Court.

9            THE COURT:  No.  Let's get some work done.

10           Yes.  Call your next witness.

11           MR. FORMAN:  Okay.  We'll call Mr. Sergio

12   Excamilla, Your Honor.

13           THE COURT:  Okay.  Excellent.  He didn't have to

14   travel too far.

15           THE CLERK:  Do you solemnly swear that the

16   testimony you are about to give in the matter now pending

17   before this Court will be the truth, the whole truth and

18   nothing but the truth, so help you God?

19           THE WITNESS:  Yes.

20           THE CLERK:  Please be seated.

21           Please state your first and last name.  Spell it

22   for the record.  Speak slowly and speak into the

23   microphone, please.

24           THE WITNESS:  Sure.  It's Sergio, S-E-R-G-I-O.

25   Last name is Escamilla, E-S-C-A-M-I-L-L-A.

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1    And I'm looking for the bat.

2         *(Laughter.)*

3    THE CLERK:  Thank you.

4    THE WITNESS:  You're welcome.

5                   **DIRECT EXAMINATION**

6  BY MR. FORMAN:

7  Q.   Good afternoon, Mr. Escamilla.

8  A.   Good afternoon, Mr. Forman.

9  Q.   And you, sir, you are a licensed attorney in

10 California and in Arizona; is that correct?

11 A.   Yes, I am.

12 Q.   In 2020 Mr. Pablo Morales and Mr. Savino Morales

13 engaged you to review a contract, an employment contract

14 with IFS that they were presented, correct?

15 A.   Yeah.  As friends they did request I review a

16 contract, yes, approximately in 2020.  Yes.

17 Q.   And you provided them legal advice about that, right?

18 A.   I was very explicit with them and told them I am not

19 a contract attorney, but I am your friend.  I can review

20 it as your friend and take it from there.  They were

21 comfortable with that.

22 Q.   And you learned that they never agreed to that

23 written contract, correct?

24 A.   Yes.  That's what they communicated to me.  After we

25 reviewed it and they had time to think about it, they did

1   communicate to me that they decided not to sign it.

2   Q.   And you knew that they remained employed by IFS after

3   making that decision, right?

4   A.   I did not.  I did not know that they were employed.

5   They had also communicated to me that they were not

6   salaried employees, that they were 100-percent commission.

7   Q.   You knew they maintained a relationship where IFS was

8   paying them after they did not enter into that contract,

9   right?

10  A.   Yeah, I thought they were some sort of independent

11  contractor.  Yes.

12  Q.   And you never inquired of them in your advice as to

13  whether they are an independent contractor or a W-2

14  employee, correct?

15  A.   Well, again, they did communicate to me that they

16  had zero salary, that they were just 100-percent

17  commission.  And there was other factors that influence

18  that too.

19  Q.   Are salaried employees the only people who receive

20  W-2s, sir?

21  A.   I don't --

22          MR. GEBELIN:  Objection; calls for speculation,

23  legal conclusion, and relevance.

24          THE WITNESS:  I'm not -- I'm not an employment

25  contract attorney.  I don't know.

Day 2 of Jury Trial; July 12, 2023; P.M. Session

BY MR. FORMAN:

Q.   And you also employ people in your law firm, don't
you?

A.   Yes.

Q.   And are they all salaried employees or are some of
them hourly employees?

A.   I have several hourly employees and my attorneys are
salaried employees, yes.

Q.   Hourly employees are not salaried employees, right?

A.   No.  Those are hourly and everybody's W-2.

Q.   You also knew that Pablo and Savino, when you were
forming Legacy you knew that they had a lot of customers
at IFS, right?

A.   Yeah.  I knew that they had developed customers for
years even before IFS was IFS.  They've always maintained
that relationship with their customers.  When I lived in
LA, sometimes I would go with Pablo and visit his
customers.

Q.   And you understood that once Pablo and Savino Morales
signed up a customer with IFS that those customers
generally purchased the same thing over and over, and they
had -- well, over and over.  Let's leave it at that,
right?

A.   Did I know that?  No.

Q.   You understood that, didn't you?

```
1    A.   It makes sense that they would because once they're a
2    customer I'm sure they're going to go back to them to buy
3    the same things.
4                THE COURT:  Wait.  Stop one second.
5                You've been friends with them for a long time,
6    right?
7                THE WITNESS:  Yeah.
8                THE COURT:  Do you understand that the question
9    here is directed towards your understanding of the buying
10   habits of their customers?
11               THE WITNESS:  Yes, true.
12               THE COURT:  And do you know that?
13               THE WITNESS:  No, I don't.
14               MR. FORMAN:  I'm sorry.  I missed the answer,
15   Your Honor.
16               THE COURT:  No.  He doesn't know about the
17   buying habits of his friends' customers.
18               THE WITNESS:  True.
19               MR. FORMAN:  Let's go to --
20               I'd like to put in the video clip from
21   Mr. Escamilla's deposition at page 130, lines 6 through
22   11.
23               I don't know, do we have 6 on the video?
24               Sorry, 7 through 11, Your Honor.
25               THE COURT:  I don't know.
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
 1              THE CLERK:  Exhibit?

 2              MS. WILLIAMS:  It's the deposition.

 3              THE COURT:  Pablo Morales.

 4              MR. FORMAN:  We have it here, Your Honor.  I can

 5     bring it up front.

 6              THE COURT:  All right.  You are spoiling the

 7     flow.

 8              MR. GEBELIN:  The line numbers don't contain a

 9     question.  The question starts at 4.

10              THE COURT:  All right.  Do it again.

11              MR. FORMAN:  So, Your Honor, I'd like to read.

12              THE COURT:  No.  No.  Give me the page and line.

13              MR. FORMAN:  Yes, Your Honor, page 130, lines 7

14     through 11.

15              THE COURT:  Seven through 11, all right.  Let me

16     see.  Seven through 11, it starts in the middle of an

17     answer.

18              MR. FORMAN:  Yes, Your Honor.

19              THE COURT:  The question appears to be with

20     respect to how they spent their time.  And then apparently

21     this gentleman begins to freestyle into areas that he

22     doesn't really have any information about.

23              But you know what, there's one way of dealing

24     with this.  You show them what they said and ask about it

25     or --
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1            My problem is this.  The question is:

2            Okay.  You also said that they could do whatever

3    they wanted with their time.

4            And then our attention is called to a few lines

5    in the course of their answer to that question dealing

6    with their customers.

7            MR. FORMAN:  Yes, Your Honor.  I can go back

8    and read further -- go back further into that.

9            He just testified that he had no understanding

10   of what Pablo and Savino Morales' work with their

11   customers about whether they generally purchase the same

12   thing over and over.  And in this answer he's testifying

13   to the contrary.

14           THE COURT:  All right.

15           MR. GEBELIN:  Your Honor.

16           THE COURT:  Has anyone ever thought about

17   saying, how on earth would you know?

18           You're in Arizona, right?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  How do you know what these guys are

21   doing here in Southern California in terms of their

22   customers?

23           Are you in the same business that they're in?

24           THE WITNESS:  As an owner?  No, I'm not.

25           THE COURT:  At this point in time you hadn't

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1    gone into business with them, yes?

2              THE WITNESS:  Correct.

3              THE COURT:  But you're practicing law in

4    Arizona?

5              THE WITNESS:  Correct.

6              THE COURT:  And then you're good friends?

7              THE WITNESS:  Correct.

8              THE COURT:  Did you have a reason to know the

9    inner workings of their professional business practices

10   and relationships with their clients?

11             THE WITNESS:  No.  I made assumptions.

12             THE COURT:  How in the world would you be able

13   to give this answer?

14             Oh, you have not seen this, have you?

15             THE WITNESS:  I have not.

16             THE COURT:  Did anybody object to this?

17             MR. GEBELIN:  No, Your Honor.

18             THE COURT:  Was there a lawyer in the room?

19             MR. GEBELIN:  Yes, Your Honor.

20             THE WITNESS:  Thank you.

21             Yeah, I think this is my assumption.  But I

22   don't know as a matter of fact that this is exactly what

23   happens.  We can assume it.

24             THE COURT:  No.  We can't assume it.

25             THE WITNESS:  I don't know as a matter of fact.

1    BY MR. FORMAN:

2    Q.   So in your deposition when you stated, my

3    understanding was that they had several accounts.   Once

4    they sealed the deal with that that account, those

5    customers generally purchase the same thing over and over.

6          In your deposition that was an assumption, not

7    an understanding of yours?

8    A.   I think my understanding and assumption is the same

9    thing if that makes sense.

10   Q.   And did you understand that their job with IFS was

11   like a pyramid scheme but without a scheme?

12   A.   I think that's just a witty way to articulate my

13   assumption.

14         MR. FORMAN:   Move to strike as nonresponsive,

15   Your Honor.

16         THE COURT:   I don't know that it is.   He thought

17   he was being witty.

18   BY MR. FORMAN:

19   Q.   And in the formation of Legacy, did Pablo Morales and

20   Savino Morales tell you about how they did business for

21   IFS?

22   A.   I knew that they were in sales and they had their

23   customers.

24   Q.   And they told you --

25         You observed them working for IFS on vacations

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
1    that you went on with them, right?
2    A.   On the phone.  They would take breaks from our
3    vacation to talk to customers.
4    Q.   Is that a "yes"?
5    A.   I observed them on their phones talking to customers,
6    yes.
7              MR. FORMAN:  Move to strike everything before
8    "yes," Your Honor.
9              THE COURT:  Hang on a second.  Your question is:
10   And they told you --
11             THE WITNESS:  They did.
12             THE COURT:  -- you observed them working for IFS
13   on vacations.
14             Why is this non-responsive?
15             MR. FORMAN:  It's a yes-or-no question, Your
16   Honor.
17             THE WITNESS:  It's compound.
18             THE COURT:  All right.  His answer went beyond
19   that.  But I'm not going to strike it.
20             Next question.
21   BY MR. FORMAN:
22   Q.   And did Pablo Morales and Savino Morales tell you
23   that when they were working for IFS they could do whatever
24   they wanted with their time?
25   A.   I'm trying to answer it correctly because it's kind
```

1  of multifaceted.  But I knew that they didn't have hours

2  at IFS.  They would work on their own.

3          MR. FORMAN:  Move to strike as non-responsive,

4  Your Honor.

5          THE WITNESS:  I'm trying to answer your

6  question.

7          THE COURT:  We're not going to spend a lot of

8  time on this.  They've said over and over again that they

9  work solely on commissions.  You eat what you kill.  If

10  you don't kill anything, you don't eat.

11          Where are we going with this?

12          MR. FORMAN:  Your Honor, I think it's important

13  that the jury learns Mr. Escamilla's understanding of

14  their IFS business while they're planning a competing

15  business and putting one together and how that would play

16  out.

17          THE WITNESS:  And I'm explaining it.  And you're

18  objecting to it.

19          THE COURT:  His understanding of IFS's business,

20  why is that important in terms of them starting another

21  business?

22          MR. FORMAN:  It goes to claims relating to the

23  interference with contract, the interference and the

24  aiding and abetting of the breach of the duty of undivided

25  loyalty and what Mr. Escamilla was aware of and cognizant

1    of at the time.

2              THE COURT:  So he's cognizant of the fact that

3    when he vacations with them he sees them on their phone

4    taking care of IFS customers.

5              THE WITNESS:  And my other answer, Your Honor,

6    was that they did not have work hours.  I did know that.

7              I'm answering the question.

8              THE COURT:  I know.

9              Just ask another question.

10             THE WITNESS:  Maybe because he does not like my

11   answer.

12             MR. FORMAN:  Your Honor, move to strike.

13             THE COURT:  No.  No.  No.

14             MR. FORMAN:  Your Honor, Mr. Escamilla is a

15   witness here.

16             THE COURT:  I know.  Believe it or not, I know

17   the roles of everyone in the room including mine.

18             MR. FORMAN:  Thank you, Your Honor.

19   BY MR. FORMAN:

20   Q.   At some point after the formation of Legacy, sir, it

21   was agreed among the owners that Legacy would serve IFS's

22   customers in California, right?

23   A.   No.  I don't think we agreed to that ever.

24   Q.   Well, sir, did you decide that Legacy would sell to

25   IFS's customers in California?

1    A.    Absolutely not.

2            MR. FORMAN:  Your Honor, I'd like to read from

3    Mr. Escamilla's deposition on 56-11 through the first word

4    that's responsive on line 13.

5            THE COURT:  We've got to go back up and find out

6    who's being referred to as "those customers."

7            MR. FORMAN:  It's on page 55, Your Honor, at

8    lines 7 through 11.

9            THE COURT:  My problem is you're talking about

10   losing some customers, servicing some customers so that

11   they don't lose them.  And then we get to what you're

12   interested in.  And the question is:  So you decided that

13   Legacy would sell to "those customers," those customers.

14   And he says, "yes."

15           MR. FORMAN:  That's right.

16           THE COURT:  And I don't know who the hell "those

17   customers" are.

18           MR. FORMAN:  Okay.

19           THE COURT:  And I think it's fair game asking,

20   you know, to get into this because he's had an awful lot

21   to say about somebody else's business.  And now he finds

22   himself on the hot seat.  Ask him.

23           MR. FORMAN:  Thank you, Your Honor.

24   BY MR. FORMAN:

25   Q.    So at the time that you were setting up this

1    business, did you have discussions with Pablo and Savino?

2    And by "this business" I mean Legacy.

3           Did you have discussions with Pablo and Savino

4    about the fact that they had IFS customers in Southern

5    California?

6    A.    Yeah, we knew about that.  Uh-huh.

7    Q.    And you had discussions with them about problems they

8    were having servicing those customers through IFS, right?

9    A.    At some point.  I don't know if it was at the

10   beginning of the formation.  But it's a problem that

11   developed.  I can't tell you the exact timeline.

12   Q.    Okay.  But it was a problem that you discussed with

13   them, their problem servicing some of IFS's customers

14   before Legacy started selling products, right?

15   A.    I don't remember to be honest with you.  Again, it's

16   a timeline thing.

17   Q.    But at some point Legacy, and as an owner of Legacy,

18   you concurred that Legacy would sell products to IFS's

19   customers, right?

20   A.    I don't think I concurred.  I didn't like it.  But I

21   understood what they communicated to me.  But, again,

22   timeline-wise that was deep into passed the formation,

23   passed the start of Legacy.

24   Q.    Well, Legacy started in March of '21, right?

25   A.    It started.  Yes, yes, March of '21.

19

1    Q.    And by August of 2021 Legacy applied to purchase

2    products from IFS, right?

3    A.    I think we applied right around that time.  We hadn't

4    made a sale maybe.  I think we opened our doors right

5    around that time.  And we did need product, yes.

6    Q.    Right.  So March to August, five months, right?

7    A.    Yeah, five months of formation, looking for a

8    warehouse, getting staff, yes.

9    Q.    And at some point in those five months, sir, Legacy

10   and you as an owner of Legacy agreed that Legacy would

11   start selling products to IFS's customers, right?

12   A.    No.  I don't think so.

13   Q.    When did that happen?

14   A.    I think after we started the formation of Legacy and

15   things were moving along further down the line.  Again,

16   it's a timeline.

17   Q.    Like September 1st or September 2nd?

18   A.    I don't know. I really don't know.

19   Q.    Now, as an owner of Legacy, did you set any

20   parameters regarding what IFS customers Legacy would sell

21   to?

22   A.    I did not.  My parameter was I don't want to service

23   any IFS customers.  That was my parameter.

24          THE COURT:  Okay.  I'd like to read from

25   Mr. Escamilla's deposition transcript page 57, lines 1

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1   through 5, Your Honor.

2           MR. GEBELIN:  Your Honor, this is -- sorry for

3   interrupting.

4           THE COURT:  No.  Go ahead.

5           MR. GEBELIN:  This is the continuation of the

6   same set of questioning.  In context I think there's a lot

7   of context that we're missing from the two pages before

8   that that you just read.

9           MR. FORMAN:  Your Honor, I just asked him the

10  question at lines 1 and 2.  And that's a very different

11  response from what we heard at the deposition.

12          THE COURT:  It's a different subject, too.

13          MR. FORMAN:  It's exactly the same subject, Your

14  Honor.  The question that was asked and then the response

15  that was given was completely different.

16          THE COURT:  Struggling.

17          MR. GEBELIN:  Your Honor, I think they are

18  talking about different subjects as you can tell.

19          THE COURT:  I agree.  That's what this appears

20  to be.  That's the problem.  If what you were talking

21  about at the deposition mirrors what you're talking about

22  now and was different answers to the same question, then

23  we've got a problem.  Then this is appropriate

24  impeachment.

25          MR. FORMAN:  Yes.

```
 1              THE COURT:  But I'm not seeing the similarity
 2   here.
 3              MR. FORMAN:  It is the same thing.  It's
 4   authorizing Legacy to make sales to IFS's customers.
 5   That's what the topic is on the prior two pages of the
 6   deposition being discussed.  That was the question that I
 7   just asked Mr. Escamilla.  And he denied that there were
 8   any parameters.
 9              MR. GEBELIN:  Your Honor, I think as you can
10   see, it's a discussion about authorizing sales to
11   customers, struggling customers, not all IFS customers,
12   not IFS customers in general.
13              THE COURT:  While you were setting this up, I
14   suppose you could have asked about struggling customers.
15   And that would have brought some similarities between his
16   prior testimony and his in-court testimony.  I'm just not
17   seeing it.  But you can still do it.
18              MR. FORMAN:  Yes, Your Honor.
19   BY MR. FORMAN:
20   Q.   So, Mr. Escamilla, as we discussed, at some point
21   Legacy started to sell products to some of IFS's
22   customers, right?
23   A.   At some point, yes.
24   Q.   And were those customers, customers that you
25   understood were struggling customers of IFS struggling to
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1    get product through IFS?

2    A.   Yeah.  What my team communicated to me was that, yes,

3    they were struggling customers.  And if they didn't get

4    certain merchandise, IFS was going to lose a customer,

5    they were going to lose a commission, they didn't want to

6    do that.

7    Q.   Is that a "yes," sir?

8    A.   At some point, yes.  That's why I kept going back.

9    I'm not trying to be evasive.  But I don't remember the

10   timeline.  But at some point, yes.

11           MR. FORMAN:  Your Honor, this is a

12   611-examination.  And I would like to get my questions

13   answered.

14           THE COURT:  Now, do you see a difference between

15   the answer he just gave and his deposition?

16           MR. FORMAN:  I think they are consistent.

17   Q.   But it also establishes that parameters were set,

18   right, Mr. Escamilla?

19           Parameters were set on which customers Legacy

20   would sell products to, which customers of IFS Legacy

21   would sell products to.

22           THE WITNESS:  I'm sorry.  I did not pay

23   attention to your question because I know you and Your

24   Honor were having a discussion.  So I'm sorry.

25           May I answer the question.  Your Honor?

Day 2 of Jury Trial; July 12, 2023; P.M. Session

23

```
 1            THE COURT:  I don't know where we are.  You are
 2   trying to impeach this gentleman.  And all I'm saying is,
 3   is that I'm not seeing inconsistency in his earlier
 4   testimony and today's testimony.
 5            MR. FORMAN:  And, Your Honor, I'm just trying to
 6   let the jury know about how decisions were made by Legacy
 7   to sell to certain of IFS's customers.
 8            And so the question for Mr. Escamilla is whether
 9   he participated in that decision making.
10            THE COURT:  Why don't we just ask these
11   questions as opposed to trying to do a gotcha by trying to
12   find an irregularity or an inconsistency?
13            MR. FORMAN:  Well, I asked him that question,
14   Your Honor.
15            THE COURT:  Well, that's it.  We're done.
16   Right?
17            Did you get an answer?
18            MR. FORMAN:  I got an "I don't know."
19            THE COURT:  Well, that's the answer.  Okay.
20            THE CLERK:  We need a break.
21            THE COURT:  Yeah, we do need a break,
22   15 minutes.
23            THE CLERK:  All rise.
24                  (The jurors exited the courtroom.)
25                          (Recess.)
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

24

```
 1              (The jurors entered the courtroom.)

 2              THE CLERK:  You may be seated.  This Court is

 3    once again in session.

 4              THE COURT:  All right.  The jury's returned.

 5    All counsel are present.  And Mr. Escamilla has returned

 6    to the witness stand.

 7              Counsel, you may continue your examination.

 8              MR. FORMAN:  Thank you, Your Honor.

 9              A quick housekeeping matter, we've discussed

10    admitting 1068-8, 1078-11, and 1083-2 which are those

11    signatures.

12              Can you hear me?

13              THE CLERK:  Repeat.  I was moving when you were

14    saying them.  Can you repeat the numbers, please.

15              MR. FORMAN:  Yes.  The exhibits 1068, page 8;

16    and 1078, page 11; and 1083, page 2.  Counsel have agreed

17    that they will be admitted but that the substantive

18    paragraphs will be redacted.  Defense counsel will redact

19    those so that it's only the penalty of perjury and the

20    signatures that will be those exhibits.

21              THE COURT:  And the dates.

22              MR. FORMAN:  And the dates, yes, Your Honor.

23              May I proceed?

24              THE COURT:  Yes, please.

25              MR. FORMAN:  Thank you, Your Honor.
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
 1              THE CLERK:  All right.  They are going to be
 2    admitted?
 3              THE COURT:  Yes.  Yes.
 4    (Exhibit 1068-8, 1078-11, 1083-2 received in evidence.)
 5              DIRECT EXAMINATION (Continued)
 6    BY MR. FORMAN:
 7    Q.   Mr. Escamilla, in the formation of Legacy, you did
 8    not want Pablo Morales or Sergio Morales's names in the
 9    name of the company, right?
10    A.   You mean Savino?  I'm Sergio.
11    Q.   I did mean Savino Morales and Pablo Morales.
12    A.   Sure.  Just to clarify the record.  I know what you
13    meant.
14              But I recommended that we make a trust for them
15    as far as ownership was concerned.
16    Q.   The name of the company that became Legacy when you
17    were discussing a name --
18    A.   Uh-huh.
19    Q.   -- you did not want the Morales name as part of the
20    title of the company?
21    A.   I did not.
22    Q.   Am I correct?
23    A.   That's part of the reason.  I really wanted to keep
24    IFS stuff away from Legacy stuff.  And the Morales
25    brothers have -- you know, they have a reputation in
```

1   Southern California.  So I wanted to keep Legacy apart

2   from IFS.

3   Q.   And Exhibit 42-5, page 5, that's already in evidence,

4   do you see that, sir?

5   A.   Yes, I do.

6          MR. GEBELIN:  That's not redacted.

7          MR. FORMAN:  It's redacted.  I'm pretty sure it

8   was.  I was looking through a redacted copy.  I don't know

9   what you are looking at.  The one that was on the screen

10  is redacted per your request.  That's not the exhibit.

11         Can you show counsel what we have as Exhibit 42.

12         MR. TRAN:  Yes.

13         MR. FORMAN:  Show it to him.

14         Thank you, gentlemen.

15         (Discussion held off the record.)

16  BY MR. FORMAN:

17  Q.   Mr. Escamilla, this is page 5 of Exhibit 42 that's

18  already in evidence, and this is a text exchange that you

19  were part of; is that correct?

20  A.   It looks to be, yes.

21  Q.   And the exchange that's in the middle of the page, I

22  don't want your names on for the reasons we discussed, is

23  that your text to Pablo and Savino?

24  A.   Most likely it is, yes.

25  Q.   Well, is it the same person who texted the comment

1    about Oberlina slightly above it?

2    A.    I wouldn't know how to figure that out.

3    Q.    Okay.  And Oberlina is your wife?

4    A.    Yes, she is.

5    Q.    You don't have any reason to believe that Pablo or

6    Savino texted that communication to you, right?

7    A.    Which one?  Are you referencing Oberlina or the one

8    below that?

9    Q.    The one that states, I don't want your names on it

10   for the reasons we discussed?

11   A.    I'm pretty sure that's me.

12   Q.    And at the time when Legacy was formed and going to

13   do business, the plan was that Pablo and Savino would be

14   doing the sales efforts for the enterprise, right?

15   A.    Yeah, In Arizona, correct.

16   Q.    They were going to be the sales representatives for

17   Legacy, right?

18   A.    They were going to do sales in Arizona, correct.

19          MR. FORMAN:  Your Honor, this is a

20   611-examination.  And I should be entitled to an answer to

21   my question without additional commentary.

22          THE WITNESS:  It just needs a little

23   explanation.  That's all.  I just want to be clear in my

24   answer.  Sometimes a yes-no answer doesn't cover it.

25          MR. FORMAN:  Your Honor, I'm seeking a direction

```
 1   from the Court to the witness.
 2           THE COURT:  All right.  When you're examining a
 3   hostile witness, you're going to encounter a little of
 4   this.  If you want to lead, go ahead if you think that
 5   would be more effective.  But if he refuses to answer the
 6   question, we will deal with that.  If he gives entirely
 7   too much, we can have the excess stricken.  I mean, there
 8   are remedies.
 9           MR. FORMAN:  Thank you, Your Honor.
10   BY MR. FORMAN:
11   Q.   Okay.  So in the role of sales representatives of
12   Legacy, wherever they were going to do their sales,
13   initially, there were no plans to hire other sales
14   representatives, right?
15   A.   Not off the bat.  Eventually, yes.
16           So, again, timeline; initially no; down the
17   road, yes.
18   Q.   Initially?
19   A.   Yeah.
20   Q.   At opening, right?
21   A.   Right.
22   Q.   And at the time Legacy was not budgeting to purchase
23   or lease vehicles for them to do their sales work,
24   correct?
25   A.   No.  They had their personal vehicles, correct.
```

1  Q.   And it was your opinion that they should continue to

2  work for IFS.

3          Sorry.   Something's on the screen.   You can take

4  it down.

5          It was your opinion they should continue to work

6  for IFS so they could continue living in the lifestyle

7  that they were accustomed to, right?

8  A.   I guess what they proposed to me is, Sergio, we want

9  to keep our client base, our book of business that we

10  developed for all these years.   We just don't want to

11  leave our customers there in California and disappear.   We

12  want to continue servicing them.   And they were agreeing

13  that my idea to work out of Arizona would enable them to

14  do that without conflicting with their current customers

15  in California and IFS.

16          MR. FORMAN:   Move to strike as non-responsive,

17  Your Honor.

18          THE WITNESS:   I responded.   I had an answer.

19          THE COURT:   Why don't you just concentrate on,

20  it was your opinion, your opinion, that they should

21  continue to work for IFS so that they could continue

22  living that lifestyle.   Just concentrate on that.

23          Yes or no?

24          THE WITNESS:   So they can continue servicing

25  their clients?

```
 1              THE COURT:  No.  That wasn't the question.
 2              THE WITNESS:  Oh.
 3              THE COURT:  The question was that it would
 4    enable them to continue in that lifestyle.
 5              THE WITNESS:  Sure.  Fair.
 6    BY MR. FORMAN:
 7    Q.   They were going to be the first sales reps and your
 8    role was president, right?
 9    A.   Yeah, kind of the administrator.  I set up the
10    company.
11    Q.   And you also for the company were responsible for
12    leasing a warehouse, establishing banking relationships,
13    insurance, those kinds of things?
14    A.   That was my role, yes.
15    Q.   And one of those insurance relationships or
16    applications that you made for insurance was for insurance
17    from State Farm, right?
18    A.   Yes.
19    Q.   And if we can Publish 169.
20              169 is a copy of the application that you made
21    on behalf of Legacy for an insurance policy with State
22    Farm, correct?
23    A.   Yes.  It looks like it.  Uh-huh.
24    Q.   And in that policy on the third page down near the
25    bottom there's a section that says, ownership employee
```

```
 1   details.  Do you see that?
 2   A.   No.
 3          MR. FORMAN:  I think we're getting there.  There
 4   we go.  Ownership employee details.
 5   BY MR. FORMAN:
 6   Q.   Do you see that?
 7          MR. FORMAN:  Do you want to highlight it?
 8          THE WITNESS:  Yes, I do.
 9   BY MR. FORMAN:
10   Q.   And on that application you advised State Farm there
11   was one corporate officer or director, correct?
12   A.   Yeah, my understanding.  Yes, I did.  Uh-huh.
13          MR. FORMAN:  We'd like to admit 169, Your Honor.
14          THE COURT:  Any objection?
15          MR. GEBELIN:  Relevance, Your Honor.
16          THE COURT:  I do fail to see it, but we'll admit
17   it.
18          (Exhibit 169 received in evidence.)
19          MR. FORMAN:  Thank you, Your Honor.
20          And then one other part of this exhibit.  In the
21   portion where --
22          That's fine, Your Honor.  We'll move on.
23   BY MR. FORMAN:
24   Q.   You also filled out an application for Workers' Comp
25   for Legacy?
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1   A.    I did in anticipation of hiring employees.

2   Q.    In anticipation of hiring employees, is that what you

3   said?

4   A.    Yep.

5   Q.    Okay.  And you filled that out on August 31st of

6   2021?

7   A.    I don't remember the date to be honest with you.

8   Q.    Well, let's put up 175.

9   A.    It was around the time we hired employees.  I don't

10  know what came first, the chicken or the egg.  But it was

11  right there, uh-huh, yes.

12          MR. FORMAN:  We're putting up 175 for

13  publication.

14          MR. GEBELIN:  Your Honor, we also object to this

15  exhibit on relevance and potential prejudice grounds.

16          THE COURT:  I just thought we were going to have

17  one little business policy and that would be the end of

18  it.

19          What is the point to be made here?

20          MR. FORMAN:  It goes to the credibility of the

21  witnesses.  It goes to the -- what has been provided to

22  other -- to the insurance companies about their business

23  that was in formation or in action and that the facts are

24  different from what was put into this application, Your

25  Honor.

```
 1              THE COURT:  Show me.
 2              MR. FORMAN:  So 175.  Let's first go to the last
 3   page at the very bottom.  Scroll down.
 4   BY MR. FORMAN:
 5   Q.   And Mr. Escamilla, if you need to see other pages
 6   previously, we can certainly work through that.  But let
 7   me just ask you.
 8              Is this the application you submitted for
 9   Workers Comp insurance on behalf of Legacy where you
10   represent that the answers in it are true, correct, and
11   complete to the best of your knowledge?
12   A.   Yeah, to the best of my knowledge.  And I think they
13   prefilled it out for me.
14   Q.   So "yes" was your answer?
15   A.   To the best of my knowledge, yes.
16              MR. FORMAN:  Move to strike everything after
17   "yes," Your Honor.
18              THE COURT:  Well, it is kind of interesting to
19   know that they filled out the application.  But show me
20   the part that --
21              MR. FORMAN:  Yes, Your Honor, I'm getting right
22   to it.
23   BY MR. FORMAN:
24   Q.   Going back to page one on the bottom of the page,
25   there is a section that says:  Individuals included,
```

1  excluded.  And then it has a subcategory that says:

2  Partners, officers, relatives.

3          Do you see that, Mr. Escamilla?

4  A.   Yes, I do.

5  Q.   And in this application who is listed under that

6  category?

7  A.   You know, I noticed this after the fact when I was --

8  I noticed it after the fact and I made that correction

9  with my Workers Comp carrier.  It's a small error that we

10  did not catch.

11          MR. FORMAN:  Your Honor, move --

12          THE COURT:  What is the error?

13          MR. FORMAN:  Well, I asked Mr. Escamilla to tell

14  me who's listed in that category.  And he didn't answer

15  my question.

16          But his is the only name listed, right,

17  Mr. Escamilla?

18          THE COURT:  This is under partners, officers,

19  relatives?

20          MR. FORMAN:  Yes, Your Honor.

21          THE COURT:  It's got his name.

22          MR. FORMAN:  And then it has a category called

23  ownership on the third or fourth column over.

24          THE COURT:  Yes, 100 percent.

25          MR. FORMAN:  Yes.

1        THE COURT:  Okay.

2   BY MR. FORMAN:

3   Q.   That's your application, sir.  You put down that you

4   were the 100 percent owner of Legacy, right?

5             MR. GEBELIN:  Objection; misstates testimony.

6   The documents speaks for itself.

7             THE COURT:  It does.

8             Was that intentional?

9             THE WITNESS:  No, not intentional.  It was

10  accidental.  I even called them after it was pointed out

11  to me and let them know.

12            THE COURT:  And has there been a modification of

13  this document and do you have it?

14            THE WITNESS:  I called them and they told me

15  they noted it and they would update it on the next

16  application.

17            THE COURT:  Okay.  And I take it, we haven't had

18  the next application yet?

19            THE WITNESS:  No.  But they do have a notation

20  of my phone call.

21            THE COURT:  Okay.

22  BY MR. FORMAN:

23  Q.   And that correction was made after your deposition as

24  the 30(b)(6) witness for Legacy, correct?

25  A.   I don't think so.  I think it was made at a different

36

1    deposition.

2    Q.    December of 2022 is when you made the correction,

3    right?

4    A.    It sounds right.  But I don't have the date in front

5    of me.

6    Q.    Right.

7              And this application also indicated that the

8    nature of the business on page 3 of 4 at the top was for

9    delivery in the Metro Phenix area 50-mile radius, right?

10   That's what the application states.

11   A.    Yeah, again, this was during the formation.  And that

12   was just a guesstimate.

13   Q.    So it's during the formation?

14   A.    Well, at the genesis when we were going to need

15   Workers Comp.

16   Q.    Right.  And going back to page two, when you were

17   asked to apply for multiple states, you would attach an

18   additional page to the form.  Did you do that?

19   A.    No, because my intention was to operate in Arizona.

20   Q.    And so you only provided information about employees

21   in Arizona, right?

22   A.    Because that was true, yes.  Remember, at that time,

23   yes, absolutely.

24   Q.    And you also told the insurance company that

25   employees would not travel out of the State of Arizona,

1  right?

2  A.   Right.  At that time that was true.

3  Q.   And on the last page at the top of the last page they

4  asked you:  Do any employees perform work for other

5  businesses or subsidiaries?  And you answered that "no,"

6  correct?

7  A.   Yeah.  I was thinking of Pablo and Savino as kind of

8  members or what have you, not necessarily -- this policy

9  was intended to apply to people we hired as staff.

10       At this point we needed a secretary, a

11  receptionist, a warehouse guy.  I think that's where I

12  came up with the number three.  We needed at least three

13  employees.

14  Q.   But on the first page when you were offered an

15  opportunity to exclude them from coverage, exclude them

16  as employees, you did not list them, correct?

17  A.   That is correct.  It's an honest mistake.

18       MR. FORMAN:  You can take it down.

19  BY MR. FORMAN:

20  Q.   Have you ever told the carrier, the Workers Comp

21  carrier, that you have employees providing services for

22  Legacy in California?

23  A.   Not yet, no.

24  Q.   And Legacy did hire Jesus Trujillo, correct?

25  A.   Yes.  But under --

```
 1              Well, okay, he wasn't formally hired.  He came
 2    to assist with sales and figure out if it was for him in
 3    Arizona.
 4    Q.   And Jesus Trujillo serviced an IFS client that made
 5    purchases from Legacy in California, right?
 6    A.   I think it happened one time.
 7    Q.   But it happened that Jesus Trujillo on behalf of
 8    Legacy sold Legacy products to a customer in California,
 9    correct?
10    A.   Yes.  I think it happened one time, yes.
11    Q.   So it's your responsibility to keep Legacy's
12    financial records up to date amongst the owners?
13    A.   No.  We hire a CPA accounting firm to assist us with
14    that.  It can get hairy.
15    Q.   Okay.  But of the owners, that was your
16    responsibility to work with the accounting firm to keep
17    the financial records up to date, right?
18    A.   Yes, of course.  Uh-huh.
19              MR. FORMAN:  I'd like to publish 57B.
20              THE CLERK:  Are you going to move Exhibit 175
21    in?
22              MR. FORMAN:  Yes.  I was about to ask my
23    colleague whether we could admit Exhibit 175.
24              Thank you, Ms. English.
25              MR. GEBELIN:  Same objection, Your Honor.
```

```
 1   Relevance.
 2             THE COURT:  I'll permit it.
 3             (Exhibit 175 received in evidence.)
 4             MR. LESOWITZ:  I also note, Your Honor.  The
 5   document's not signed by anybody, 175.  There's no
 6   signature on it in the signature block.
 7             THE COURT:  I think it's only been offered as an
 8   application but not that it's evidence of coverage.
 9   That's my guess anyway.
10             MR. FORMAN:  Yes.  And Mr. Escamilla testified
11   that he submitted that application under the terms that it
12   requested that he do so.
13             MR. LESOWITZ:  I don't believe that was his
14   testimony.
15             THE WITNESS:  I think I said:  I think I did.
16   BY MR. FORMAN:
17   Q.  Well, do you have any reason to doubt that you did
18   not submit that application, sir?
19   A.   I don't know what the final version was.
20             THE COURT:  Well, you called to their attention
21   that there was a mistake.  And they said they would
22   correct it.  And you have not seen evidence of this
23   correction; is that it?
24             You haven't seen a subsequent copy.
25             THE WITNESS:  No.  He's asking the original -- I
```

40

```
1    mean, the one that he showed me here as an exhibit if
2    that's the one I submitted, right?
3              I'm confused.
4              THE COURT:  I am too.
5              THE WITNESS:  Help me out.
6    BY MR. FORMAN:
7    Q.   There was an objection from counsel this might not
8    be the one he submitted even though it was produced in
9    discovery as Legacy's application for this policy.
10             And so I think it's important that we have on
11   the record that this is the application that Mr. Escamilla
12   submitted where he told the insurance company that he/she
13   represents that the answers are true, correct, and
14   complete to the best of his or her knowledge.
15             MR. GEBELIN:  The record reflects that the
16   document doesn't have a signature next to that
17   representation.
18             THE WITNESS:  I can't remember.  I don't have a
19   photographic memory, Dan.  Mr. Forman, Sorry.  I
20   apologize.
21             THE COURT:  Are we done?
22             MR. FORMAN:  I wanted to find out whether the
23   Court will admit 175.
24             THE CLERK:  Yes.
25             THE COURT:  Oh, yes.
```

```
 1              (Exhibit 175 received in evidence.)
 2              MR. FORMAN:  I'm sorry, Your Honor.  We will
 3    move on.
 4              I'd like to publish what's been marked as 57B.
 5              MR. GEBELIN:  No objection to publication or
 6    admission.
 7              MR. FORMAN:  Thank you, Counsel.
 8              THE COURT:  Thank you.
 9              MR. FORMAN:  And counsel's indicated no
10    objection to admission.  So I will ask that it be admitted
11    for the record.
12              (Exhibit 57-B received in evidence.)
13    BY MR. FORMAN:
14    Q.   And Mr. Escamilla, is this, Exhibit 57B, an email
15    that you sent to the accounting firm you mentioned and
16    copied Legacy people with?
17    A.   Yes.  It appears to be that, Uh-huh.
18              MR. FORMAN:  And can you scroll to the third
19    page.
20    BY MR. FORMAN:
21    Q.   Attached to your email on the third and fourth pages
22    is an IFS invoice, correct?
23    A.   It's very faded on my monitor.  But it appears to be
24    an IFS invoice at least in the background.
25    Q.   It's an invoice to La Nueva Fuente, right?
```

```
1            And we can give you a hard copy which might be
2    easier to read.
3            THE COURT:  Not by much.  This is pretty
4    horrible.
5            THE CLERK:  Do you want to look at this?
6            THE COURT:  Turn the page.
7            Good luck, sir.
8            THE WITNESS:  Thank you.
9            THE CLERK:  Uh-huh.
10   BY MR. FORMAN:
11   Q.   Can you see?  Do you know that that's an IFS invoice
12   to La Nueva Fuente, sir?
13   A.   It's very faded.  But I do make out -- it appears to
14   say La Nueva Fuente on it somewhere.
15   Q.   And this was attached to this email that you sent to
16   the accountant, right?
17   A.   It appears to be so, yes.
18   Q.   And what are you communicating with the accountant?
19   What are you trying to accomplish with this 57B,
20   Mr. Escamilla?
21   A.   I'm trying to get this account paid.  It's very
22   frustrating for me.
23   Q.   And by this account, you mean you're trying to get
24   La Nueva Fuentes' bill paid to IFS, right?
25   A.    Yeah.  I didn't have any knowledge that this happened
```

1    until after it happened.  And it was very confusing to me.

2          MR. FORMAN:  Your Honor, I'd move to strike and

3    ask for an answer to my question.

4          THE COURT:  Is that the best you can do because

5    I'm trying to figure this out too?

6          THE WITNESS:  Yeah.  This La Nueva Fuente matter

7    confused the hell out of me.  And I didn't know anything

8    about it.

9    BY MR. FORMAN:

10   Q.  But in communicating with your accountants, you send

11   them an invoice from IFS to La Nuevo Fuente, right?

12   A.   If you read the email --

13   Q.   Correct, sir?

14   A.   I'm trying to add some clarity here, Mr. Forman.

15          But the email to me is, let me know if you need

16   help figuring this one out because I was hella confused.

17   I was new to this stuff.  And I was very confused.

18          MR. FORMAN:  Your Honor.

19          THE COURT:  Okay.  Keep going.

20          Did you ever get unconfused?  Was this ever

21   explained to you?  Did you ever figure it out?

22          THE WITNESS:  I asked Pablo, the salesman, and

23   he tried to explain it.  And I was just as confused.  And

24   I said, whatever happened here, don't ever do it again

25   because I was very confused by it.  And I didn't know what

1    was going on.

2    BY MR. FORMAN:

3    Q.    Okay.  And, Mr. Escamilla, you were trying to get an

4    account paid, the account being La Nuevo Fuentes' account

5    that it owed money to IFS, right?

6    A.    My only real understanding is that we owed money for

7    this account.  Now, did I understand why?  No.

8    Q.    But when you say "this account," you wanted to get

9    La Nueva Fuente's account with IFS cleared, correct?

10   A.    Because I was told that --

11   Q.    Is that correct?

12   A.    Yeah.  I wanted to get it cleared, yes.

13   Q.    Then if you'll go to the last two pages of this

14   exhibit, there's a purchase order from Legacy to IFS,

15   right?

16   A.    Yes.

17   Q.    And this purchase order reflects the same purchase

18   that La Nueva Fuente made from IFS, right?

19   A.    It does.  But I did not make that connection.

20   Q.    And you did tell your accountant, I can't mail in a

21   Legacy check to pay it since the buyer is La Nueva Fuente,

22   in your email 57B, correct?

23   A.    Because that's what I was told.

24   Q.    That's what you told the accountant, right?

25   A.    Yeah, I was conveying what information was handed to

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1    me.   Again, I was very confused.

2    Q.   And you told the accountant, Pablo is going to pay

3    cash to IFS from our Legacy cash to zero out the account.

4             That's in this Exhibit 57B, right?

5    A.   Yes.

6    Q.   And that was -- that was your idea as to how to clear

7    things up between La Nueva Fuente and IFS from your

8    perspective?

9    A.   No.  It wasn't my idea.  I did not understand the

10   whole concept.  Again, we're going back to the same thing.

11   Q.   But that was Legacy's method of solving the problem,

12   right?

13   A.   That was information that Pablo gave me.

14   Q.   Okay.  And you didn't say, oh, let's call up IFS and

15   make sure they understand that it was Legacy that

16   purchased these goods and Legacy will pay for them.

17             You didn't take that initiative, right?

18   A.   No.  I thought Pablo handled that.

19   Q.   You thought Pablo told IFS that Legacy had really

20   ordered those goods, not La Nueva Fuente?

21   A.   No.  I don't know.  I think La Nueva Fuente was one

22   of his customers.  And, again, I was hella confused just

23   being very honest.

24   Q.   You didn't tell Pablo, hey, tell IFS that that's not

25   really La Nuevo Fuente's purchase, it's Legacy's purchase,

1   did you?

2   A.   I didn't know that.  I told him, I'm not sure what

3   happened, I'm very confused, whatever happened don't ever

4   do this again.

5   Q.   But you know what a PO is in your vernacular in 57B,

6   right?

7   A.   I was learning, yeah.

8   Q.   Well, your email says, the invoice is for PO number 6

9   in our system?

10  A.   Yeah, that was very early on.  Yeah, that's why.

11  Q.   Can you tell the ladies and gentlemen of the jury

12  what PO number 6 means?

13  A.   Probably purchase order number 6.

14  Q.   And that's what's attached at the back of this

15  exhibit, right?

16  A.   Yeah.

17  Q.   And the invoice that's being referred to is the IFS

18  invoice for La Nueva Fuente, right?

19  A.   Yeah.  Honestly, I was trying to figure it out.

20          MR. FORMAN:  You can take it down.

21  BY MR. FORMAN:

22  Q.   Now, one of the issues in this case as you know are

23  trade secrets.  Does Legacy maintain any trade secrets?

24          MR. GEBELIN:  Objection; calls for speculation

25  and legal conclusion.

```
1              THE COURT:  Well, he is a lawyer.
2              MR. GEBELIN:  Your Honor, he's not a
3    trade-secret attorney.  And relevance.  Legacy's trade
4    secrets aren't at issue in this case.
5              THE COURT:  That's true.  All right.  That
6    objection is sustained.
7              MR. FORMAN:  If I may, Your Honor.
8              THE COURT:  You may move on to something that's
9    relevant.
10             MR. FORMAN:  Yes, Your Honor.
11   BY MR. FORMAN:
12   Q.   Did Legacy maintain its customer names, their contact
13   information, their cell phone information, and its
14   pricing, credit information about its customers in a
15   confidential manner?
16             MR. GEBELIN:  Objection; compound.
17             THE COURT:  It is.  But it's like I'd rather
18   have him do it this way than one at a time.  Go ahead.
19             Can you answer that?
20             THE WITNESS:  Yeah, when we set up our IT
21   system, I asked him to make sure, you know, that it was
22   password protected.  Yes.
23             THE COURT:  Okay.
24   BY MR. FORMAN:
25   Q.   And you wouldn't share that type of information with
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1   your competitors, right?

2   A.   Sometimes.

3          MR. FORMAN:  I'd like to have the video clip

4   from Mr. Escamilla's deposition 7720 to 22 played.

5          THE COURT:  Is this going to deal with Legacy's

6   proprietary or confidential information?

7          MR. FORMAN:  Yes.

8          THE COURT:  Why?  Why?

9          MR. FORMAN:  Well, Your Honor, because the

10  testimony that we've heard is that none of this

11  information is trade secret or confidential and Legacy

12  maintains it that way.

13         THE COURT:  Please, let's move on to issues in

14  this case, things that count, not things that offended us.

15  BY MR. FORMAN:

16  Q.   And you were the one who was responsible for

17  submitting an application for Legacy to become a customer

18  of IFS on behalf of Legacy?

19  A.   Yeah --

20         MR. FORMAN:  Can you put up Exhibit 40?

21         THE WITNESS:  -- as I did with all of our

22  vendors.

23  BY MR. FORMAN:

24  Q.   And when you completed that application, you

25  requested a 14-day net credit -- 14 days of net for

49

1    credit, right, on page 4?

2    A.    Yes.   That box is checked right below 20,000.

3    Q.    And you were seeking a credit line of 20,000

4    per month?

5    A.    Yep.   That's what it looks like, yes.

6    Q.    And you did not disclose to IFS that Pablo Morales

7    and Savino Morales also were owners or were involved with

8    Legacy, did you?

9    A.    Can we scroll up on that exhibit?

10   Q.    Sure.

11   A.    One more.   One more.

12   Q.    The second large box from the bottom up, I was very

13   clear with IFS and I wrote in, I'm a new business.

14            MR. FORMAN:   Move to strike as nonresponsive,

15   Your Honor.

16            THE COURT:   All right.   The answer is stricken.

17   BY MR. FORMAN:

18   Q.    So, Mr. Escamilla, it's accurate that you did not

19   indicate that Pablo Morales or Savino Morales had any

20   ownership or control or were doing any work for Legacy

21   when you applied to IFS?

22   A.    Not in this application, no.   But I was alerting them

23   that I was a new business.

24            MR. FORMAN:   Move to strike as nonresponsive,

25   Your Honor.

```
1              THE COURT:  Are you catching on, yet?
2              After you've answered the question just --
3              THE WITNESS:  Okay.
4              THE COURT:  Okay.
5              All right.  Stricken.
6              MR. FORMAN:  Thank you, Your Honor.
7    BY MR. FORMAN:
8    Q.   And from August of -- is it fair to say that from
9    August of 2021 at least until the end of January '22 that
10   IFS was Legacy's largest supplier of goods?
11   A.   From August '21 until March, until when?
12             Give me the dates.  I'm sorry.
13   Q.   I asked about from August until January of '22.
14   A.   Yeah, I think so.
15   Q.   Did something happen in late January that caused you
16   to be concerned that IFS might stop supplying Legacy with
17   products?
18   A.   My personal recollection, no.  But if there's
19   something that may refresh my recollection, I might be
20   able to speak towards that.
21             MR. FORMAN:  Okay.  Let's put up 1105.  Publish
22   that, please.
23   BY MR. FORMAN:
24   Q.   1105 is an email that you sent to Paolo Ruiz and
25   Sam Ruiz, correct?
```

51

```
 1   A.   Let me read it.
 2            MR. FORMAN:  Well, sure.
 3            THE WITNESS:  Yeah, I remember telling my
 4   partners that I wanted to rely on different vendors.
 5   BY MR. FORMAN:
 6   Q.   Sir, the question was whether this is an email that
 7   you sent to Paolo Ruiz and Sam Ruiz?
 8   A.   Yes.
 9   Q.   And that's Pablo Morales and Savino Morales?
10   A.   Yes.
11   Q.   And in this email that Ms. Williams showed the jury
12   during opening statements, it talks about to be prepared
13   and plan ahead instead of getting caught with our pants
14   down.  Those are your words, right, sir?
15   A.   Exactly my words in that email.
16   Q.   And were you concerned that if there was something
17   that happened that caused you to be concerned that IFS
18   would stop the flow of products to Legacy?
19   A.   No.  From the beginning I had consulted and told or
20   directed Pablo mainly to find me other vendors.  I did not
21   want to have all my ducks or my eggs in one basket.  So I
22   wanted to use other vendors.
23            MR. FORMAN:  And Your Honor, I'd like to admit
24   1105.
25            MR. GEBELIN:  No objection, Your Honor.
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

| | |
|---|---|
| 1 | THE COURT:  Its received. |
| 2 | (*Exhibit 1105 received in evidence.*) |
| 3 | BY MR. FORMAN: |
| 4 | Q.   In terms of the array of products that Legacy |
| 5 | purchased from IFS, are you familiar with the percentages |
| 6 | of the types of products that you purchased from IFS? |
| 7 | A.   No. |
| 8 | Q.   And you did agree that -- well, strike that. |
| 9 | Show Exhibit 53, please.  Request to publish 53. |
| 10 | MR. GEBELIN:  No objection. |
| 11 | THE COURT:  Okay. |
| 12 | BY MR. FORMAN: |
| 13 | Q.   Mr. Escamilla, is this a text chain that you were |
| 14 | part of? |
| 15 | A.   I think so. |
| 16 | Q.   And is it your contribution, that one word that says |
| 17 | "nice," exclamation point? |
| 18 | A.   There's a phone number there that doesn't correlate |
| 19 | to that line.  And I think I've typed "nice" on my cell |
| 20 | phone what appears to be a thousand times.  So it's |
| 21 | impossible for me to tell you from independent |
| 22 | recollection. |
| 23 | Q.   Were you cognizant that in September of 2021 someone |
| 24 | from Legacy has Jesus looking for business for Legacy at |
| 25 | that time? |

1    A.    I know Pablo had mentioned he was going to bring

2    Jesus.  And I met Jesus at Legacy and had a conversation

3    with him, yes.

4    Q.    And you knew that --

5              From your conversation with Jesus, you knew that

6    he was employed at IFS, right?

7    A.    No.

8    Q.    But you knew he had an economic relationship with

9    IFS, right?

10   A.    Yes.  I did ask Jesus if he had any contract.  First,

11   I asked Pablo.  And he said, no, he was just like him and

12   basically an independent contractor.  And I did ask Jesus

13   whether or not he had any signed contract or non-compete

14   clause or anything that worried him that I would need to

15   know.

16             So from what he told me he wanted to moonlight

17   and he had -- he could do it.  Apparently, he's done it

18   for other people too besides IFS.

19   Q.    Did Mr. Trujillo tell you he was an independent

20   contractor in those words?

21   A.    No.  But I did ask him.  And he told me he was

22   commission based and there was no signed relationship with

23   IFS.  That's basically it.

24   Q.    Do you have signed relationships with all of your

25   hourly employees, sir?

54

```
1   A.    No.  We're a new business and we're learning.  So,
2   no.
3   Q.    And Mr. Hugo Mesa, you also agreed that he should be
4   hired by Legacy in January 2022?
5   A.    He came out to Legacy -- basically, I don't know if
6   he spoke to Jesus or Savino -- and he told me he was
7   contemplating moving to Arizona.
8         I showed him around the warehouse.  And we had
9   product that IFS didn't have.  And he got excited and he
10  proposed, hey, maybe I could sell for Legacy out here in
11  Arizona.
12        MR. FORMAN:  Move to strike as nonresponsive,
13  Your Honor.
14        THE COURT:  No.  I'm going to let it stay.
15  BY MR. FORMAN:
16  Q.    And Pablo and Savino told you that they knew him as a
17  sales rep for IFS before you met him?
18  A.    Yeah.  I knew that, yeah.
19  Q.    Did you ask Mr. Mesa about his employment at IFS?
20  A.    Yeah, he said he was, again, commission based and no
21  contract, no non-compete.
22        MR. FORMAN:  Move to strike everything after
23  yes, Your Honor.
24        THE COURT:  All right.  Everything after yes is
25  stricken.
```

1  BY MR. FORMAN:

2  Q.   Did Mr. Mesa tell you he was an independent

3  contractor with IFS?

4  A.   I don't think he told me independent.  He did not use

5  the words independent contractor.

6  Q.   Did -- sorry.

7         Did Legacy ever provide a cell phone for Legacy

8  business to Jesus Trujillo?

9  A.   No.  I don't think we did.

10  Q.   Did legacy ever provide a laptop or other kind of

11  computer for Legacy business for Jesus Trujillo?

12  A.   Yeah, we provided him with our warehouse computers.

13  Q.   With your warehouse computers.  So he could -- he

14  would take those on calls to customers?

15  A.   No.

16  Q.   So but he could use the computers at Legacy's

17  warehouse.  Is that what that means?

18  A.   Yeah, he could log on and print stuff, yeah.

19  Q.   But you didn't provide him with a laptop that he

20  could work on for Legacy business in the field, correct?

21  A.   Correct.

22  Q.   And did Legacy ever provide a cell phone for Legacy

23  business to Hugo Mesa?

24  A.   No.

25  Q.   Did Legacy ever provide a laptop for Legacy business

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1  to Hugo Mesa?

2  A.   No, we did not.   No.

3  Q.   And one of your responsibilities for Legacy was to

4  have business cards made up for Legacy's employees, right?

5  A.   I ordered them, yeah.

6          MR. FORMAN:   Can you show 36.

7          And 36 I believe is in evidence.   If not, I'll

8  ask it be admitted.

9          MR. GEBELIN:   No objection.

10         *(Exhibit 36 received in evidence.)*

11         MR. FORMAN:   If you look at the card that was

12 made up for Mr. Trujillo --

13         If you could scroll up, please, to the top.

14 Scroll up and circle in on it.   Get closer.   Blow it up.

15 There you go.   That's fine.

16 BY MR. FORMAN:

17 Q.   Do you recognize the cell phone number that is on

18 Mr. Trujillo's business card?

19 A.   I don't recognize it.   But I'm assuming it's his

20 personal cell phone.

21 Q.   Did there ever come a time when you learned that it

22 was his IFS cell phone number?

23 A.   I think much later after we printed the cards, maybe

24 after this action was filed.   I'm not sure exactly when.

25 Q.   Did you ever contact IFS and say, oops, we put your

1    cell phone number on a Legacy business card for Jesus

2    Trujillo?

3    A.   I think you're assuming that I know that that's an

4    IFS number.  I don't know what their number sequences are

5    or all their phone numbers.

6    Q.   Did you ever ask Pablo or Savino Morales whether the

7    cell phone number on Mr. Trujillo's card was an IFS cell

8    phone number?

9    A.   I don't think I did.

10              MR. FORMAN:  All right.  Take it down.

11              I'd like to publish Exhibit 55.

12              THE CLERK:  Is 53 moved in?

13              Are you moving in 53?

14              MR. FORMAN:  Yes.  I'd like to admit 53.

15              MR. GEBELIN:  No objection to publication or

16   admission.

17              THE COURT:  All right.  Admitted.

18              *(Exhibit 53 received in evidence.)*

19   BY MR. FORMAN:

20   Q.   And my question is on -- if you scroll down to the

21   next page, please.  All right.

22              Okay.  Technology.

23              MR. FORMAN:  May we give the witness a hard

24   copy, please.

25              MR. TRAN:  Sure.

```
 1              MR. FORMAN:  I'm providing the witness with a
 2    hard copy, Your Honor.  It's 55, page two.
 3              THE WITNESS:  Thank you, counsel.  I've read it.
 4              MR. FORMAN:  Okay.  We've published it.  The
 5    Court's admitted it.
 6    BY MR. FORMAN:
 7    Q.    Sir, is this your message to other persons on this
 8    text chain?
 9    A.    It appears to be.  Again, I don't see the numbers.
10    But it's something I would write, yes.
11    Q.    You were directing Pablo to delete communications
12    from Legacy that were sent to his IFS email box, right?
13    A.    From the beginning I always told I don't want to use
14    Legacy resources.  I respect their email.  And I always
15    try to keep apples and oranges apart from each other.
16              The Same thing, I owned another business, my law
17    practice.  And I want to keep those emails away from
18    Legacy emails.  I've had conversations with people that
19    try to email me in the wrong place.  And that's what I was
20    trying to explain to them, different businesses, different
21    entities, don't confuse them.
22              MR. FORMAN:  Move to strike as nonresponsive,
23    Your Honor.  I'd like an answer to my question.
24              THE WITNESS:  Your question isn't a simple
25    answer.  So I wanted to make sure we're clear.
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
 1          MR. FORMAN:  Your honor, there's no question
 2   now.
 3          THE COURT:  I know.
 4          When are you going to catch on?  Short, sweet,
 5   to the point.  Those guys over there have a chance to ask
 6   you questions, and you can clarify.
 7          THE WITNESS:  Okay.
 8          THE COURT:  Let's get out of here by this
 9   weekend.
10          All right.  Stricken.
11   BY MR. FORMAN:
12   Q.  So one of the goals of this email, Mr. Escamillo, was
13   to instruct Pablo to delete Legacy business emails from
14   his IFS email box, right?
15   A.  Yes.
16   Q.  And not only did you want him to delete those from
17   his email box, but you wanted them deleted out of his
18   recycle bin, right?
19   A.  Yes.
20          MR. FORMAN:  You can take that down.
21          MR. TRAN:  Sorry.
22          MR. FORMAN:  At some point --
23          Well, why don't we put up 76 and see if we can
24   get through this.
25          And while we're getting that up, 55's been
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

60

1   admitted.

2           THE COURT:  Fifty-five dash two, yes.

3           THE CLERK:  Page two.

4           (*Exhibit 55-2 received in evidence.*)

5           MR. FORMAN:  Any objection to 76?

6           MR. GEBELIN:  No objections.

7           MR. FORMAN:  May we have that admitted?

8           THE COURT:  If there's no objection, sure.

9           THE CLERK:  Wait.  Wait.  Wait.  He's off.  No

10  76.  You were just talking about 55, right?

11          MR. FORMAN:  Just now, ma'am.

12          THE COURT:  Okay.  He just asked to put up 76.

13          THE CLERK:  But before we were still on 55.  I

14  think you were talking about that.

15          MR. FORMAN:  Okay.  Fifty-five's admitted, yes.

16          THE CLERK:  Fifty-five page two is admitted.

17          Okay.  Give me a second.  You are going too fast

18  now.  Your next one is 76.

19          MR. FORMAN:  Yes.  I'll slow down.

20          THE CLERK:  Yes.

21          MR. FORMAN:  And I believe 76 is now admitted.

22          THE CLERK:  No.

23          MR. FORMAN:  May I have 76 admitted.  There's no

24  objection.

25          THE COURT:  With no objection, it will be

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
1    admitted.
2            (Exhibit 76 received in evidence.)
3    BY MR. FORMAN:
4    Q.    And, Mr. Escamilla, this email that you sent, you
5    sent it on March 30th, 2022, right?
6    A.    Yes.
7    Q.    And on the second page of this exhibit you
8    wrote -- can you highlight it and get it spotted up here.
9            All right.  Well, we'll take that down.  It's
10   admitted.  We're looking for an exhibit to get a specific
11   date so we can have it flow nicely since we're not flowing
12   so nicely right this second.
13           But you indicated to Pablo and Savino Morales
14   that they could change their Legacy email signature blocks
15   from Paolo and Sam Ruiz.
16           And we have that up on the screen.  It is in 76.
17   I just had trouble finding it.
18           -- on the first page, correct?
19   A.    Yes, I did.
20   Q.    And why did you indicate that they were allowed to do
21   that at that time?
22   A.    It all goes back to me explaining that I want to keep
23   apple's from oranges.  But at that point IFS basically
24   sued me and Pablo and Savino.  So it didn't matter at that
25   point.
```

1  Q.   So there was a lawsuit pending on March 30, 2022.  Is
2  that your testimony?
3  A.   I think it was right around that time.  I'm assuming.
4  Q.   I'm trying to understand, sir.  You sent this email
5  you just testified because there was a lawsuit?
6            MR. GEBELIN:  Objection, argumentative.
7            THE WITNESS:  I'm not sure on the timing of it.
8  It could have been that.  It was a long time ago.  And it
9  might have been that they informed me that they were
10  terminated.  It might have been a termination.  It might
11  have been the lawsuit that was filed.  But there was
12  something impending or something that occurred that
13  changed.
14  Q.   And around this time when they were authorized to
15  use their real names on Legacy business, did you have a
16  conversation with them about apologizing to IFS for
17  opening Legacy and making misrepresentations and not
18  telling IFS about Legacy's business?
19  A.   I told them they better find counsel, yes.
20  Q.   But did you talk to them as owners of the business
21  about Legacy approaching IFS to apologize for the
22  misrepresentations?
23            MR. GEBELIN:  Objection; relevance, and
24  potentially some settlement communication privilege,
25  Your Honor.

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1        THE COURT:  Let's not get into this, please.

2   BY MR. FORMAN:

3   Q.    Now, were you the owner who is responsible for

4   Legacy's methodologies for making credit decisions about

5   Legacy's customers?

6        MR. GEBELIN:  Objection, vague.

7        THE COURT:  Do you understand what he's asking?

8        THE WITNESS:  If he could clarify.

9   BY MR. FORMAN:

10  Q.    Sure.  When legacy is talking to a potential

11  customer, there are many ways that customer might pay

12  Legacy, right?

13  A.    Yes.

14  Q.    And one of those might be cash on delivery, correct?

15  A.    Yes.

16  Q.    And one of those methodologies might be on some form

17  of credit where the customer pays sometime after the

18  delivery's made?

19  A.    Yes.

20  Q.    So were you the owner who was most responsible for

21  whatever procedures and policies there were for Legacy's

22  credit decisions to customers and potential customers who

23  wanted credit terms?

24  A.    Not necessarily.

25  Q.    Okay.  And that's because Legacy allowed Pablo and

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
1    Savino to decide what credit terms to extend to the
2    customers that they had experience with while working at
3    IFS, right?
4    A.   No.  We would look at invoices and try to compete
5    with whatever terms -- and I'm not talking about IFS.  It
6    could be other competitors had printed on invoices.
7            Maybe it happened once or twice.  I don't
8    remember.
9            MR. FORMAN:  I'd like to read from
10   Mr. Escamilla's deposition transcript, Your Honor,
11   Page 237, line 24, through 238, line 3.
12           THE COURT:  How far down on 238?
13           MR. FORMAN:  Line 3, 237-24.
14           THE COURT:  Okay.  Go ahead.
15           MR. GEBELIN:  Your Honor, it's not inconsistent
16   with the answer.
17           THE COURT:  "Yes" or "no" are inconsistent.
18           MR. GEBELIN:  I don't believe there was a "yes"
19   that this or "no" that this "yes" is inconsistent with.
20           THE COURT:  Oh, okay.
21           (Reading.)
22           That's because Legacy allowed Pablo and Savino
23   to decide what credit terms to extend to the customers
24   that they had experience with while working at IFS, right?
25           No.  We would look at invoices and try to
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1 compete with whatever terms --

2          MR. GEBELIN:  If you think it's close enough,

3 Your Honor.

4          THE COURT:  He sure makes a point.  But I'm not

5 sure what it is.

6          MR. FORMAN:  Okay.  We will play the video clip

7 and move forward.

8                    (The media was played.)

9          MR. FORMAN:  It's glitching.  I will just read

10 it:

11          "Did you extend credit for your customers?

12          "Answer from Mr. Escamilla:  Yeah, we give them

13 terms.

14          "Question:  Who decides what terms to extend to

15 customers?

16          "Answer:  I think Pablo and Savino do."

17          I'd like to put up 56, please.  Publish 56.

18          MR. GEBELIN:  No objection.

19          THE CLERK:  Are you going to move 76 in?

20          MR. FORMAN:  Yes.  I'll move 76 in.

21          THE COURT:  Uh-huh.  Okay.

22          (Exhibit 76 received in evidence.)

23          MR. FORMAN:  Counsel, may I move 56 in?

24          MR. GEBELIN:  No objection.

25          THE COURT:  I can't read it.

```
 1              Where are we focusing our attention, on 56?
 2              MR. FORMAN:  So 56.  I'd asked about
 3   Mr. Escamilla's email in the middle of page at 10:48 a.m.
 4              May I proceed, Your Honor?
 5              THE COURT:  Well, as soon as it stops moving,
 6   I'll try to read it.
 7              MR. FORMAN:  Okay.
 8              THE COURT:  10:43.
 9              MR. FORMAN:  10:43 at the last part.
10              THE COURT:  Don't touch it.
11              Okay.
12   BY MR. FORMAN:
13   Q.   And Mr. Escamilla, your email of October 27th was
14   part of the owner's discussion about whether or not to
15   engage with a credit service that would rate the credit of
16   potential customers, correct?
17   A.   The email on the bottom of that exhibit that starts
18   with "we would have to hit 40 pulls?"  That's what you're
19   talking about?
20   Q.   My question is whether that's part of the owners
21   making an evaluation of whether to engage a subscription
22   with a credit reporting agency.
23   A.   Yes.
24              Can I provide some context?
25   Q.   And you reached a conclusion that Legacy would have
```

1    to pull or pay for 40 individual reports to break even on

2    an annual subscription, right?

3    A.    Yes.  I was trying to figure out whether it was

4    worthwhile to buy like a subscription to a credit-pull

5    service.

6    Q.    And you read Mr. Ruiz's response above that at

7    11:39 a.m. where he wrote -- well, where it says:  Also,

8    lets only pull reports on accounts that are not IFS,

9    correct?

10   A.    What that says, yes.

11   Q.    Did you agree with that concept?

12   A.    Well, again, sometimes I would make the decisions,

13   not always.  I think even on one occasion I had a staff

14   member pull a credit report.  And then there was, also, we

15   made decisions because looking at invoices as discussed

16   earlier.  And then other times they knew customers.  They

17   had relationships with their customers that they had

18   developed over the years.  So if this guy is going to

19   their baptism and their communion or their weddings and

20   their funerals and he tells me, my guy is good, I have an

21   amazing relationship, I wouldn't overrule it.

22          MR. FORMAN:  Your honor, I'll move to strike

23   everything up to I wouldn't overrule it.

24          THE COURT:  I'm going to let it stand.

25

Day 2 of Jury Trial; July 12, 2023; P.M. Session

68

1    BY MR. FORMAN:

2    Q.   And the top email at the top of this page from

3    Susie Morales, do you see that?

4    A.   Yes.

5    Q.   And can you tell the jury who Susie Morales is in

6    this context?

7    A.   Yes.  She was helping us at the office and she's

8    Pablo's wife.

9    Q.   And she put on here her response, La Surtidora had

10   7 days, correct.

11   A.   Again, he's asking what terms are on La Surtidora's

12   invoices I guess to Sam.

13   Q.   Well, you saw what --

14        She doesn't say anything about invoices in this

15   email, does she?

16   A.   You would have to ask her.

17   Q.   And when you received this email, you understood that

18   that meant La Surtidora's credit terms with IFS, right?

19   A.   It could have been his relationship.  It might have

20   been different terms than IFS.  I have no idea.  It's

21   speculation.

22   Q.   Well, I'm asking you, sir, at the time that you were

23   deciding whether or not to subscribe to a credit reporting

24   service, you understood Ms. Morales's email and the

25   portion of it referring to La Surtidora had 7 days,

1  correct, to be a reference to their credit terms with IFS?

2  A.    I didn't reply to it as far as I know.

3  Q.    Were all Legacy customers required to fill out a

4  Legacy credit application?

5  A.    I tried my best, but no.

6  Q.    And who was authorized to make exceptions for when

7  you tried your best to have all new accounts prepare a

8  credit application for Legacy?

9  A.    Again, there's so many factors.  And, again,

10  sometimes it was a couple of times that it might have been

11  me.  A couple of times it might have been, hey, is that

12  invoice good?  All right.  That's fine.  We're good with

13  the competitor.  Or sometimes it was based on relationship

14  and personal knowledge.

15  Q.    Right.  So you, Pablo, and Savino were all authorized

16  to make exceptions from your desire to have all new

17  accounts prepare a credit application for Legacy, right?

18  A.    At the end of the day, yes.

19  Q.    It wasn't that Tablado's working in reception or

20  Jesus Trujillo or other sales representatives, right?

21  A.    Right.

22  Q.    And are you familiar with an IFS customer that became

23  a Legacy customer called Rongcheng?

24  A.    I'm not familiar.

25  Q.    And let's put up 163.

1    A.    Or maybe you can help me describe "familiar."

2              MR. FORMAN:  Well, we're showing --

3              THE CLERK:  Is that an exhibit?

4              MR. FORMAN:  I'm publishing 163.

5              THE CLERK:  Thank you.

6              MR. FORMAN:  Yes, Exhibit 163.

7              Any objections to admitting it?

8              MR. GEBELIN:  No objection.

9              MR. FORMAN:  We'd like to admit 163.

10             THE COURT:  All right.

11             (*Exhibit 163 received in evidence.*)

12   BY MR. FORMAN:

13   Q.    Mr. Escamilla, is 163 Rongcheng's credit application

14   with Legacy?

15   A.    The first page appears to be, so, yes.

16   Q.    Well, let's show you all the pages.  We don't want

17   any doubt in your mind.

18             Does that resolve any doubt, sir?

19   A.    No.  It appears to be a legitimate credit

20   application.

21   Q.    And Legacy gave Rongcheng credit, right?

22   A.    I'm pretty sure we did, yes.

23   Q.    And who is responsible for making that credit

24   decision?

25   A.    I think this was one relationship that Savino

1    developed.  So I let Sam make it.

2    Q.   So Savino made that credit decision for Legacy for

3    that customer Rongcheng, right?

4    A.   I'm pretty sure that's what happened.

5    Q.   And no credit check was run, correct?

6    A.   I think we only ran one credit check one time as best

7    as I can remember.  So most of our clients we did not run

8    credit checks.

9    Q.   And that includes Rongcheng, correct?

10   A.   Yes.  I believe so.

11   Q.   And let's see if we can do this quickly.  Let's

12   publish if we can 164.

13           This too is a --

14           Is this a credit application that La Surtidora

15   provided to Legacy?

16   A.   Yes.  It appears to be.

17   Q.   And who made the credit decision with respect to

18   La Surtidora?

19   A.   Maybe whoever developed the relationship with them.

20   Q.   And that would be either Pablo Morales or

21   Savino Morales?

22   A.   Yes.

23   Q.   There was no credit check run on La Surtidora, right?

24   A.   We only ran one credit check on all our customers.

25   And I don't know who that customer was.

1   Q.   Do you have any reason to believe it was

2   La Surtidora, sir?

3   A.   I don't have any reason to believe it was them.

4   Q.   All right.

5          Now, Legacy maintains its financial reporting on

6   what's called a cash basis, correct?

7   A.   Yes, I think so.  I think that's an accounting term,

8   right.

9   Q.   And Legacy calculates its margins based on the price

10  it sells goods for minus the cost that it purchased those

11  goods for, correct?

12  A.   Repeat that.  I'm sorry.

13  Q.   Legacy calculates what are called margins based on

14  the price it sells goods for, subtracting out the cost for

15  which it purchased those goods, right?

16  A.   Yes.

17  Q.   And ultimately, you and Pablo Morales and Savino

18  Morales will -- as owners will reap the profits that

19  Legacy makes, right?

20  A.   That's the idea of business.  It doesn't mean that

21  that's what was occurring, but, yes.

22  Q.   That's the concept?

23  A.   Yeah.

24          MR. FORMAN:  And let's put up 85, Exhibit 85 for

25  publication, please.

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
 1              THE CLERK:  164, is that in?
 2              MR. FORMAN:  Yes.  I believe it was admitted
 3    when we published it.
 4              THE CLERK:  You've got to be clear, counsel.
 5              MR. FORMAN:  163 and 164, request for admission.
 6              THE CLERK:  Thank you.
 7              MR. FORMAN:  May we admit 85?
 8              MR. GEBELIN:  No objection.
 9              THE COURT:  It's in.
10         (Exhibit 163 and 164 received in evidence.)
11              MR. FORMAN:  May we admit 85?
12              THE COURT:  Yes.
13         (Exhibit 85 received in evidence.)
14    BY MR. FORMAN:
15    Q.   Thank you.
16              Now, Mr. Escamilla, 85 is kind of a
17    financial-type document from Legacy, right?
18    A.   Yes.  I think we prepared this during the litigation.
19    Q.   All right.  And it identifies by year different --
20    year 2021 and year 2022 on those top, sort of close to the
21    top two rows, right?
22    A.   Yes, it does.
23    Q.   And then quantity is reflecting the quantity of goods
24    that Legacy sold, correct?
25    A.   Yes.
```

1  Q.   And the total without taxes is reflecting the dollars

2  that Legacy received for those sales for each of those

3  years, correct?

4  A.   Yes.  Yes.

5  Q.   And then the profits are what Legacy considered to be

6  the profits from the sales of those goods in that period

7  of time, correct?

8  A.   I have to categorize profit because I think that

9  should say gross profit, not the net profit.  It just says

10  profit.  But what I'm looking at appears to be gross

11  profit if that's what you're referring to.

12  Q.   And you can tell that because there's expenses that

13  are reflected on this spreadsheet?

14  A.   No.  I can tell that because I don't see expenses

15  reflected on that spreadsheet.

16  Q.   Okay.  And then it has something called margin.  Can

17  you explain what margin means on the spreadsheet?

18  A.   Yeah.  The margin's basically what we spoke about

19  earlier, the purchase price or the sale price, minus what

20  we purchased the item for yields our margin.

21  Q.   And then there's sort of a second part of this

22  exhibit that has a heading sales for IFS shared customers.

23  Do you see that?

24  A.   Yes.

25  Q.   Those are all customers that were IFS customers that

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1    Legacy sold goods to, right?

2    A.    They were folks that I know Savino and Pablo had

3    great relationships with and, yes, we sold goods to them,

4    uh-huh.

5              MR. FORMAN:  Move to strike everything up to,

6    yes, we sold goods to them.

7              THE COURT:  All right.  Everything else is

8    stricken.

9    BY MR. FORMAN:

10   Q.    Now IFS never agreed with Legacy that there was such

11   a thing as a shared customer, right?

12   A.    Not as far as I know.

13   Q.    You don't have an agreement with IFS whereby there is

14   some kind of share in the profits that legacy makes when

15   it sells goods to an IFS customer, correct?

16   A.    Again, we have different philosophies here.  I see it

17   as the customer I see was developed by Pablo and Savino.

18   It's in their book of business.  But there's no agreement,

19   if that's what you're asking, between Legacy and IFS.

20             MR. FORMAN:  Move to strike everything up to no

21   agreement, Your honor.

22             THE COURT:  No.  I think that it's necessary for

23   context.

24             MR. FORMAN:  Okay.  Your Honor.

25             THE COURT:  We'll leave it in.

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1  BY MR. FORMAN:

2  Q.    And this is for the period August 1st through

3  March 31st, 2022, correct?

4  A.    Yes, I think so.

5  Q.    And there's a list of customers that are on there,

6  correct?

7  A.    Yes.

8  Q.    And was legacy trying to convey that these were the

9  only customers to which it had sold products that were

10  also customers of IFS at the time this was created?

11  A.    Yeah.  When the litigation happened, I didn't know

12  the customers.  So I asked Pablo and Sam to put together

13  which customers we had in common and this is the result.

14        MR. FORMAN:  Your Honor, move to strike

15  everything other than "yes."

16        THE COURT:  Denied.

17  BY MR. FORMAN:

18  Q.    And you'd agree that of the total sales represented

19  on here, about 61 percent were sales to IFS' customers by

20  Legacy?

21  A.    I apologize, but I can't do math that quickly.  Is

22  that number reflected on here?  It sounds ballpark.  But I

23  didn't do the math in my head.

24  Q.    And Rongcheng's not on this list, correct?

25  A.    That may be missing Rongcheng, yes.

1   Q.   Fieros is not on that list, is it?

2   A.   Who?

3   Q.   Fieros.  F-I-E-R-O-S.

4   A.   Fieros, I don't see them on that list.

5   Q.   And your accounting firm, did they provide you a

6   monthly management report?

7   A.   Yes.

8           MR. FORMAN:  We would like to move into evidence

9   and have admitted Exhibit 85, please.

10          THE CLERK:  I think it's in.

11          MR. FORMAN:  And may I publish 1129.

12          THE COURT:  Any objection?

13          MR. GEBELIN:  No objection, Your Honor.

14          THE COURT:  Publish.

15          MR. FORMAN:  So I observed when I received this

16  that there were -- there's no reports for November or

17  December of 2021.

18          Can you scroll slowly through the first three to

19  eight?  Stop there.

20          MR. GEBELIN:  Your Honor, is there a question or

21  just Mr. Forman's observations?

22          MR. FORMAN:  I thought I asked a question.

23  Sorry, Your Honor.

24          Were there reports --

25          THE COURT:  -- for this period ending?

```
 1   BY MR. FORMAN:
 2   Q.   Yes.  Were there reports for November and December of
 3   2021, sir?
 4   A.   I'm sure there were.  Unless the accounting firm
 5   missed it and I missed to call them on it.
 6           MR. FORMAN:  Your Honor, we're having a little
 7   technical difficulty with this exhibit.
 8           THE CLERK:  So it's not in yet.
 9           MR. FORMAN:  No.  There's a problem here.
10           THE COURT:  Okay.  Can you move on to something
11   else.
12           MR. FORMAN:  Yeah, let me move on to ask for
13   publication of 1216.
14           Well, before I ask for that, let me just set up
15   a couple of questions.
16           Was there a time, Mr. Escamillo, when you
17   approached Mr. Sweder about resolution of this litigation?
18           MR. GEBELIN:  Objection, Your Honor.  Settlement
19   communication.
20           THE COURT:  Sustained.
21           MR. FORMAN:  It's between the parties,
22   Your Honor.
23           THE COURT:  Your Honor.
24           MR. FORMAN:  All right.
25           MR. LESOWITZ:  Your Honor, we move for a
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

1   mistrial on that.

2          THE COURT:  Let's take a break.

3          THE CLERK:  Yes.

4          All rise.

5             *(The jurors exited the courtroom.)*

6          THE COURT:  I have a motion from you.

7          MR. LESOWITZ:  Yes, Your Honor.  Defendants move

8   for a mistrial with prejudice due to the reference to the

9   settlement communications by counsel.

10          THE COURT:  Don't you think it can be cured with

11  a new jury?

12          MR. FORMAN:  Yes, Your Honor.

13          MR. LESOWITZ:  Cure what?

14          THE COURT:  We've got a problem.  This jury has

15  been fairly well and truly tainted.  But don't you think

16  that this little error can be cured with a new jury?

17          MR. LESOWITZ:  Your Honor, this was blatant.  I

18  mean, the exhibit he was referencing when he asked this

19  question, 1216, was a document that we had made an

20  objection to.  Defendant's object under FRE 408.

21          If someone is not liking how trial -- the

22  problem is that this was bad and needs to be remedied,

23  that adds extreme cost to us to have to go have another

24  trial, another jury.

25          You know, we have three small guys.  And Pablo

```
 1    already testified to the financial hardship of paying for
 2    legal fees and travel.  So I would say at least a mistrial
 3    and then with prejudice.
 4           And perhaps if, you know, counsel for IFS wants
 5    to move for reconsideration or something to that effect,
 6    but I think it should be with prejudice.  That was -- this
 7    is not like a close call.  And it was on an exhibit that
 8    we had objected under the privilege.
 9           THE COURT:  Wait a minute.  You said this was on
10    an exhibit?
11           MR. LESOWITZ:  So he was referencing
12    Exhibit 1216.
13           THE COURT:  What is 1216?  Because I don't -- I
14    didn't see anything that warranted --
15           MR. FORMAN:  We didn't publish anything, Your
16    Honor.
17           THE COURT:  -- an outburst about settlement
18    discussion.
19           MR. LESOWITZ:  No.  What I'm saying, Your Honor,
20    is that came up while he was introducing Exhibit 1216.
21    And on our exhibit list we objected under FRE 408.
22           MR. FORMAN:  Your Honor, we did not publish the
23    exhibit; B., I was trying to bring to the attention a
24    communication between the parties which was not referenced
25    or indicated it was under any privilege.  And that's what
```

1    we were coming to.  It should not -- this jury can be

2    cured.

3              THE COURT:  Oh, no.

4              MR. FORMAN:  It certainly should not be with

5    prejudice, Your Honor.

6              THE COURT:  You weren't even examining.  You

7    weren't discussing the document at all.  It's like, okay,

8    you indicated that you were having technical difficulties

9    with one of the exhibits.  I don't know if --

10             MR. GEBELIN:  That was 80, Your Honor.

11             THE COURT:  That was 1129, right?

12             MR. GEBELIN:  1129.

13             THE COURT:  Right.  So we were having trouble

14   with 1129.  And then you're going through -- we're having

15   trouble with that, being able to display that exhibit

16   without all of the optical distractions.

17             And I thought you were looking through your

18   notes, et cetera, and then as an aside or as a filler then

19   you want to bring up settlement discussions that had been

20   had.  And it wasn't connected with the document.  It also

21   seemed to have been disconnected with your earlier line of

22   questioning.  I don't know where that came from.

23             MR. FORMAN:  Yes, Your Honor.  We were having

24   trouble with the large Exhibit 12, the financial

25   statements.  And I made a note of that.  And I think Your

1    Honor asked me to move on to a different topic or to try a

2    different topic.  And so I was trying to move into a

3    different topic.  And that was -- we did not publish any

4    communication.  And that's how I started moving into the

5    topic --

6              THE COURT:  Yeah.

7              MR. FORMAN:  -- that's at issue.

8              THE COURT:  I have no idea what was to be

9    accomplished there.  But that happens often during the

10   course of this trial.

11             I'm going, where is this going?  How is this

12   relevant to any of the issues in this case?  It's like

13   just conversation, and I'm thinking this is going to last

14   two weeks, isn't it, because it's aimless.

15             And then all of a sudden we got serious and we

16   pulled out lethal weapons.  But we can't do that.  We

17   can't do that.  There's things we cannot talk about.  And

18   I know you know that.  So you were looking for an offramp

19   too.

20             MR. FORMAN:  No, sir, Your Honor.

21             THE COURT:  If you did not have so much gray

22   hair, I might believe that.  But I think you knew what you

23   were doing.  You know, if you were a kid, I might believe

24   that that was just an inadvertent screwup.  But you've

25   been around a minute.

```
 1              Anyway, I am absolutely granting the mistrial.
 2    Absolutely.  That's done.  You can send these people home.
 3              I am probably also at the same time going to
 4    move to recuse myself from further consideration.  And
 5    this case will go back on the wheel and be reassigned to
 6    someone else.  Something will be on the docket probably
 7    tonight.  Okay.
 8              But thank you, all.  You can pack up your stuff.
 9    And vaya con dios.
10              MR. LESOWITZ:  Thank you, Your Honor.
11              MS. WILLIAMS:  Thank you, Your Honor.
12              THE CLERK:  This Court is adjourned.
13
14         (At 2:17 p.m. proceedings were adjourned.)
15
16
17
18
19
20
21
22
23
24
25
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

```
1                          --oOo--

2                        CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United

11   States.

12

13   Date:  July 28, 2023

14

15

16                    /S/____WIL S. WILCOX_____

17                      U.S. COURT REPORTER
                          CSR NO. 9178
18

19

20

21

22

23

24

25
```

Day 2 of Jury Trial; July 12, 2023; P.M. Session

**1**

MR. FORMAN: [141]

MR. GEBELIN: [39]

MR. LESOWITZ: [9]

MR. TRAN: [3]  26/12 57/25 59/21

MS. WILLIAMS: [2]  10/2 83/11

THE CLERK: [30]

THE COURT: [148]

THE WITNESS: [49]

**'**

'21 [3]  18/24 18/25 50/11
'22 [2]  50/9 50/13

**-**

-- an [1]  80/17
-- as [1]  48/21
-- that's [1]  82/7
-- you [1]  25/19
--oOo [1]  83/15
-oOo [1]  5/2

**/**

/S [1]  84/16

100 [2]  34/24 35/4
100-percent [2]  7/6 7/16
1068 [1]  24/15
1068-8 [2]  24/10 25/4
1078 [1]  24/16
1078-11 [2]  24/10 25/4
1083 [1]  24/16
1083-2 [2]  24/10 25/4
10:43 [2]  66/8 66/9
10:48 [1]  66/3
11 [10]
1105 [4]  50/21 50/24 51/24 52/2
1129 [4]  77/11 81/11 81/12 81/14
11:05 [1]  5/1
11:39 a.m [1]  67/7
12 [4]  1/19 3/2 5/1 81/24
1216 [5]  78/13 79/19 80/12 80/13 80/20
13 [1]  17/4
130 [2]  9/21 10/13
14 [1]  48/25
14-day [1]  48/25
15 minutes [1]

155811 [1]  2/4
163 [8]  69/25 70/4 70/6 70/9 70/11 70/13 73/5 73/10
164 [4]  71/12 73/1 73/5 73/10
169 [4]  30/19 30/20 31/13 31/18
175 [9]
1st [3]  1/24 19/17 76/2

**2**

20 [1]  1/12
20,000 [2]  49/2 49/3
2020 [2]  6/12 6/16
2021 [7]  19/1 32/6 50/9 52/23 73/20 77/17 78/3
2022 [6]  36/2 54/4 61/5 62/1 73/20 76/3
2023 [4]  1/19 3/2 5/1 84/13
213 [1]  2/7
22 [1]  48/4
228853 [1]  2/5
237 [1]  64/11
237-24 [1]  64/13
238 [2]  64/11 64/12
24 [2]  64/11 64/13
261507 [1]  2/12

**2**

261759 [1]  2/11
27th [1]  66/13
28 [2]  84/6 84/13
2:17 [1]  83/14
2nd [1]  19/17
2s [1]  7/20

**3**

30 [2]  35/24 62/1
3072 [1]  2/14
30th [1]  61/5
310 [1]  2/14
31st [2]  32/5 76/3
341-3072 [1]  2/14
350 [1]  1/24
36 [3]  56/6 56/7 56/10

**4**

40 [3]  48/20 66/18 67/1
408 [2]  79/20 80/21
42 [2]  26/11 26/17
42-5 [1]  26/3

**5**

50-mile [1]  36/9
5150 [1]  2/6
53 [6]  52/9 52/9 57/12 57/13 57/14 57/18
55 [5]  17/7 57/11 58/2 60/10 60/13

**55** ...

55-2 [1]  60/4
56 [5]  65/17 65/17 65/23 66/1 66/2
56-11 [1]  17/3
57 [1]  19/25
57-B [1]  41/12
57B [7]  38/19 41/4 41/14 42/19 44/22 45/4 46/5

**6**

6 on [1]  9/23
61 [1]  76/19
611-examination [2] 22/12 27/20
612-6300 [1]  2/7
6300 [1]  2/7

**7**

7 days [1]  68/10
707 [1]  2/6
753 [1]  84/5
76 [12]
7720 [1]  48/4

**8**

80 [1]  81/10
800 [1]  2/13
8383 [1]  2/13
85 [7]  72/24 72/24 73/7 73/11 73/13 73/16 77/9

**9**

90012 [1]  1/24
90017 [1]  2/6
90211 [1]  2/13
9178 [2]  1/23 84/17

**A**

a.m [3]  5/1 66/3 67/7
abetting [1]  15/24
above [3]  27/1 67/6 84/8
above-entitled [1] 84/8
absolutely [4]  17/1 36/23 83/1 83/2
accidental [1]  35/10
accomplish [1] 42/19
accomplished [1] 82/9
account [10]
accountant [5] 42/16 42/18 44/20 44/24 45/2
accountants [1] 43/10
accounting [6] 38/13 38/16 41/15 72/7 77/5 78/4
accounts [4]  13/3 67/8 69/7 69/17
accustomed [1]

Case 2:22-cv-02120-MEMF-SK    Document 45-2    Filed 07/28/23    Page 87 of 103    Page ID
#:13007

# A

accustomed... [1]
29/7
action [2] 32/23
56/24
add [1] 43/14
adds [1] 79/23
adjourned [2]
83/12 83/14
administrator [1]
30/9
admission [4] 41/6
41/10 57/16 73/5
admit [9]
admitted [16]
admitting [2] 24/10
70/7
advice [2] 6/17 7/12
afternoon [2] 6/7
6/8
agency [1] 66/22
agreement [3]
75/13 75/18 75/21
aiding [1] 15/24
aimless [1] 82/14
alerting [1] 49/22
allowed [3] 61/20
63/25 64/22
ALPHABETICAL
[1] 3/7
amazing [1] 67/21
amongst [1] 38/12

Angeles [4] 1/18
1/24 2/6 5/1
annual [1] 67/2
answer [29]
answers [3] 20/22
33/10 40/13
anticipation [2]
32/1 32/2
apologize [3] 40/20
62/21 76/21
apologizing [1]
62/16
APPEARANCES
[1] 1/25
apple's [1] 61/23
apples [1] 58/15
application [26]
applications [1]
30/16
applied [3] 19/1
19/3 49/21
apply [2] 36/17
37/9
approached [1]
78/17
approaching [1]
62/21
area [1] 36/9
areas [1] 10/21
aren't [1] 47/4
argumentative [1]
62/6

Arizona [1] 3
array [1] 52/4
articulate [1] 13/12
as employees [1]
37/16
assist [2] 38/2 38/13
assume [2] 12/23
12/24
assuming [3] 56/19
57/3 62/3
assumption [4]
12/21 13/6 13/8
13/13
assumptions [1]
12/11
attach [1] 36/17
attached [3] 41/21
42/15 46/14
attorney [4] 6/9
6/19 7/25 47/3
attorneys [1] 8/7
August [8] 19/1
19/6 32/5 50/8 50/9
50/11 50/13 76/2
authorized [3]
62/14 69/6 69/15
authorizing [2]
21/4 21/10
awful [1] 17/20
awilliams [1] 2/5

# B

background [1]

**B**

background... [1] 41/24
ballpark [1] 76/22
banking [1] 30/12
baptism [1] 67/19
Bar [4] 2/4 2/5 2/11 2/12
base [1] 29/9
basis [1] 72/6
basket [1] 51/21
bat [2] 6/1 28/15
be the [1] 40/8
below [2] 27/8 49/2
BERNARD [2] 1/6 2/2
besides [1] 53/18
Beverly [1] 2/13
beyond [1] 14/18
bill [1] 42/24
bin [1] 59/18
blatant [1] 79/17
block [1] 39/6
blocks [1] 61/14
Blow [1] 56/14
book [2] 29/9 75/18
bottom [5] 30/25 33/3 33/24 49/12 66/17
Boulevard [2] 2/6 2/13
box [5] 49/2 49/12

breach [1] 15/24
brothers [1] 25/25
budgeting [1] 28/22
business [35]
businesses [2] 37/5 58/20
buyer [1] 44/21

**C**

CA [3] 2/6 2/13 5/1
calculates [2] 72/9 72/13
CALIFORNIA [15]

card [4] 56/11 56/18 57/1 57/7
cards [2] 56/4 56/23
carrier [3] 34/9 37/20 37/21
cash [4] 45/3 45/3 63/14 72/6
catch [2] 34/10 59/4
catching [1] 50/1
categorize [1] 74/8
category [3] 34/6 34/14 34/22
caught [1] 51/13
CDF [1] 2/3
cdflaborlaw.com [2] 2/4 2/5
cell [10]

CERTIFICATE [1] 84/2
certify [1] 84/5
cetera [1] 81/18
chain [2] 52/13 58/8
chance [1] 59/5
chicken [1] 32/10
CHRONOLOGICAL [1] 3/3
circle [1] 56/14
claims [1] 15/22
clarify [3] 25/12 59/6 63/8
clarity [1] 43/14
clause [1] 53/14
clear [5] 27/23 45/6 49/13 58/25 73/4
cleared [2] 44/9 44/12
client [2] 29/9 38/4
clients [3] 12/10 29/25 71/7
clip [3] 9/20 48/3 65/6
close [3] 65/2 73/20 80/7
closer [1] 56/14
Code [1] 84/6
cognizant [3] 15/25 16/2 52/23
colleague [1] 38/23

C

**column [1]** 34/23
**comfortable [1]** 6/21
**comment [1]** 26/25
**commentary [1]** 27/21
**commission [5]** 7/6 7/17 22/5 53/22 54/20
**commissions [1]** 15/9
**common [1]** 76/13
**communicate [2]** 7/1 7/15
**communicated [4]** 6/24 7/5 18/21 22/2
**communicating [2]** 42/18 43/10
**communication [5]** 27/6 62/24 78/19 80/24 82/4
**communications [2]** 58/11 79/9
**communion [1]** 67/19
**companies [1]** 32/22
**company [7]** 25/9 25/16 25/20 30/10 30/11 36/24 40/12
**compete [4]** 53/13

**competing [1]** 15/14
**competitor [1]** 69/13
**competitors [2]** 48/1 64/6
**COMPLAINANT [1]** 2/9
**complete [2]** 33/11 40/14
**completed [1]** 48/24
**compound [2]** 14/17 47/16
**computer [1]** 55/11
**computers [3]** 55/12 55/13 55/16
**con [1]** 83/9
**concentrate [2]** 29/19 29/22
**concept [3]** 45/10 67/11 72/22
**conclusion [3]** 7/23 46/25 66/25
**concurred [2]** 18/18 18/20
**Conference [1]** 84/10
**confidential [3]** 47/15 48/6 48/11
**conflicting [1]** 29/14

**conformance [1]** 84/9
**confuse [1]** 58/21
**confused [9]**
**confusing [1]** 43/1
**connected [1]** 81/20
**connection [1]** 44/19
**consideration [1]** 83/4
**consistent [1]** 22/16
**consulted [1]** 51/19
**contain [1]** 10/8
**contemplating [1]** 54/7
**context [5]** 20/6 20/7 66/24 68/6 75/23
**continuation [1]** 20/5
**Continued [2]** 4/2 25/5
**contract [11]**
**contractor [6]** 7/11 7/13 53/12 53/20 55/3 55/5
**contrary [1]** 11/13
**contribution [1]** 52/16
**control [1]** 49/20
**convey [1]** 76/8
**conveying [1]** 44/25
**corporate [1]** 31/11

Corporation [1] 1/10
correction [4] 34/8 35/23 36/2 39/23
correlate [1] 52/18
counsel's [1] 41/9
count [1] 48/14
COUNTER [1] 2/2
court [11]
Court's [1] 58/5
courtroom [3] 23/24 24/1 79/5
cover [1] 27/24
coverage [2] 37/15 39/8
CPA [1] 38/13
created [1] 76/10
credibility [1] 32/20
credit [34]
credit-pull [1] 67/4
CROSS [3] 2/9 3/4 3/9
CSR [2] 1/23 84/17
Cure [1] 79/13
cured [3] 79/10 79/16 81/2
customer [16]
customers [70]
CV [1] 1/8
CV-22-02120-ODW [1] 1/8

Dan [2] 2/4 40/19
dash [1] 60/2
DBA [1] 2/2
December [3] 36/2 77/17 78/2
decide [3] 16/24 64/1 64/23
decided [2] 7/1 17/12
decides [1] 65/14
decision [5] 7/3 23/9 70/24 71/2 71/17
decisions [5] 23/6 63/4 63/22 67/12 67/15
deep [1] 18/22
DEFENDANT [1] 2/2
Defendant's [1] 79/20
Defendants [3] 1/13 2/9 79/7
DEFENDANTS/CROSS-COMPLAINANT [1] 2/9
Defense [1] 24/18
delete [3] 58/11 59/13 59/16
deleted [1] 59/17
delivery [2] 36/9

delivery's [1] 63/18
denied [2] 21/7 76/16
deposition [14]
DESCRIPTION [2] 3/14 4/4
desire [1] 69/16
details [2] 31/1 31/4
developed [7] 8/14 18/11 29/10 67/18 71/1 71/19 75/17
dforman [1] 2/4
difference [1] 22/14
difficulties [1] 81/8
difficulty [1] 78/7
dios [1] 83/9
DIRE [2] 3/4 3/9
DIRECT [4] 3/4 3/9 6/5 25/5
directed [2] 9/9 51/20
direction [1] 27/25
director [1] 31/11
disclose [1] 49/6
disconnected [1] 81/21
discovery [1] 40/9
discussion [5] 21/10 22/24 26/15 66/14 80/18
discussions [4] 18/1 18/3 18/7 81/19

**D**

display [1] 81/15
distractions [1] 81/16
DISTRICT [3] 1/1 1/2 1/23
DIVISION [1] 1/3
docket [1] 83/6
document [20]
document's [1] 39/5
documents [1] 35/6
dollars [1] 74/1
doubt [3] 39/17 70/17 70/18
ducks [1] 51/21
duty [1] 15/24

**E**

E-S-C-A-M-I-L-L-A [1] 5/25
early [1] 46/10
earth [1] 11/17
easier [1] 42/2
eat [2] 15/9 15/10
economic [1] 53/8
effect [1] 80/5
effective [1] 28/5
efforts [1] 27/14
egg [1] 32/10
eggs [1] 51/21
eight [1] 77/19
else's [1] 17/21

email [28]
emails [3] 58/17 58/18 59/13
employ [1] 8/2
employee [3] 7/14 30/25 31/4
employees [19]
employment [3] 6/13 7/24 54/19
enable [2] 29/13 30/4
encounter [1] 28/3
engage [2] 66/15 66/21
engaged [1] 6/13
English [1] 38/24
enter [1] 7/8
enterprise [1] 27/14
entirely [1] 28/6
entities [1] 58/21
entitled [2] 27/20 84/8
error [3] 34/9 34/12 79/16
ESCAMILLA [29]
Escamilla's [7] 9/21 15/13 17/3 19/25 48/4 64/10 66/3
Escamillo [2] 59/12 78/16
establishes [1] 22/17
establishing [1]

et [1] 81/18
evaluation [1] 66/21
evasive [1] 22/9
everybody's [1] 8/10
everyone [1] 16/17
evidence [22]
examination [5] 6/5 22/12 24/7 25/5 27/20
examining [2] 28/2 81/6
Excamilla [1] 5/12
Excellent [1] 5/13
exceptions [2] 69/6 69/16
excess [1] 28/7
exchange [2] 26/18 26/21
excited [1] 54/9
exclamation [1] 52/17
exclude [2] 37/15 37/15
excluded [1] 34/1
Exhibit 1216 [1] 80/12
Exhibit 42 [1] 26/11
exited [2] 23/24 79/5

**E**

expenses [2]  74/12
74/14
experience [2]  64/2
64/24
explanation [1]
27/23
explicit [1]  6/18
extend [4]  64/1
64/23 65/11 65/14
extreme [1]  79/23

**F**

F-I-E-R-O-S [1]
77/3
fact [6]  12/22 12/25
16/2 18/4 34/7 34/8
factors [2]  7/17
69/9
facts [1]  32/23
faded [2]  41/23
42/13
fail [1]  31/16
Farm [3]  30/17
30/22 31/10
fast [1]  60/17
fees [1]  80/2
field [1]  55/20
Fieros [3]  77/1 77/3
77/4
Fifty [3]  60/2 60/15
60/16
Fifty-five [2]  60/2

Fifty-five's [1]
60/15
figure [6]  27/2 38/2
43/5 43/21 46/19
67/3
fill [1]  69/3
filled [3]  31/24 32/5
33/19
filler [1]  81/18
final [1]  39/19
financial [6]  38/12
38/17 72/5 73/17
80/1 81/24
financial-type [1]
73/17
five's [1]  60/15
flow [3]  10/7 51/18
61/11
flowing [1]  61/11
focusing [1]  66/1
folks [1]  75/2
FOODSERVICE
[1]  2/2
foregoing [1]  84/6
form [2]  36/18
63/16
formally [1]  38/1
Forman [4]  2/4 6/8
40/19 43/14
Forman's [1]  77/21
format [1]  84/9
formation [10]

41/21
FRE [2]  79/20
80/21
FRE 408 [1]  79/20
freestyle [1]  10/21
friend [2]  6/19 6/20
friends [3]  6/15 9/5
12/6
friends' [1]  9/17
front [2]  10/5 36/4
frustrating [1]
42/22
Fuente [11]
Fuente's [2]  44/9
45/25
Fuentes' [2]  42/24
44/4
funerals [1]  67/20

**G**

game [1]  17/19
GEBELIN [2]  2/10
2/12
general [1]  21/12
genesis [1]  36/14
gentleman [2]
10/21 23/2
gentlemen [2]
26/14 46/11
gives [1]  28/6
glitching [1]  65/9
gmail.com [1]  1/25

## G

goals [1]  59/12
God [1]  5/18
goods [13]
gotcha [1]  23/11
granting [1]  83/1
gray [1]  82/21
great [1]  75/3
gross [2]  74/9 74/10
grounds [1]  32/15
GROUP [2]  1/9 2/9
guesstimate [1]  36/12

## H

habits [2]  9/10 9/17
had zero [1]  7/16
hair [1]  82/22
hairy [1]  38/14
handled [1]  45/18
Hang [1]  14/9
hardship [1]  80/1
he/she [1]  40/12
hell [2]  17/16 43/7
hella [2]  43/16 45/22
hereby [1]  84/5
highlight [2]  31/7 61/8
Hills [1]  2/13
hire [3]  28/13 37/24 38/13
hired [4]  32/9 37/9

hiring [2]  32/1 32/2
hit [1]  66/18
home [1]  83/2
HON [1]  1/4
honest [4]  18/15 32/7 37/17 45/23
Honestly [1]  46/19
honor [101]
horrible [1]  42/4
hostile [1]  28/3
hot [1]  17/22
hourly [5]  8/6 8/7 8/9 8/10 53/25
hours [2]  15/1 16/6
housekeeping [1]  24/9
Hugo [3]  54/3 55/23 56/1
huh [10]

## I

I'd [16]
I'll [6]  39/2 56/7 60/19 65/20 66/6 67/22
I'm [54]
I've [3]  52/19 58/3 58/18
IDENTIFICATION [2]  3/14 4/4
IFS [91]
IFS' [1]  76/19

II [1]  1/4
impeach [1]  23/2
impeachment [1]  20/24
impending [1]  62/12
impossible [1]  52/21
inadvertent [1]  82/24
inclusive [1]  1/12
inconsistency [2]  23/3 23/12
inconsistent [3]  64/15 64/17 64/19
independent [8]  7/10 7/13 52/21 53/12 53/19 55/2 55/4 55/5
INDEX [2]  3/3 3/7
individual [5]  1/9 1/11 1/11 2/2 67/1
Individuals [1]  33/25
influence [1]  7/17
information [10]
informed [1]  62/9
initially [3]  28/13 28/16 28/18
initiative [1]  45/17
inner [1]  12/9
inquired [1]  7/12

# I

instead [1]  51/13
instruct [1]  59/13
insurance [9]
intended [1]  37/9
intention [1]  36/19
intentional [2]  35/8 35/9
interested [1]  17/12
interference [2] 15/23 15/23
interrupting [1] 20/3
introducing [1] 80/20
invoice [9]
invoices [6]  64/4 64/6 64/25 67/15 68/12 68/14
irregularity [1] 23/12
issue [2]  47/4 82/7
issues [3]  46/22 48/13 82/12
item [1]  74/20

# J

January [4]  50/9 50/13 50/15 54/4
Jesus [14]
job [1]  13/10
JUDGE [1]  1/4
Judicial [1]  84/10

Journey [1]  37/28
5/1 84/13
jurors [3]  23/24 24/1 79/5
jury [11]
jury's [2]  5/3 24/4

# K

kid [1]  82/23
kinds [1]  30/13

# L

LA [24]
La Nueva [1]  42/24
La Nueva Fuente [6]  42/12 42/14 43/6 44/18 44/21 46/18
La Nueva Fuente's [1]  44/9
La Surtidora [3] 71/14 71/18 72/2
LABOR [1]  2/3
ladies [1]  46/11
laptop [3]  55/10 55/19 55/25
large [2]  49/12 81/24
largest [1]  50/10
late [1]  50/15
Laughter [1]  6/2
law [4]  2/3 8/2 12/3 58/16
lawbylg.com [2]

lawsuit [3]  62/1 62/5 62/11
lead [1]  28/4
learned [2]  6/22 56/21
learning [2]  46/7 54/1
learns [1]  15/13
lease [1]  28/23
leasing [1]  30/12
least a [1]  80/2
legacy [115]
Legacy's [13]
legal [4]  6/17 7/23 46/25 80/2
legitimate [1]  70/19
LESOWITZ [2] 2/10 2/11
lethal [1]  82/16
lets [1]  67/8
Liability [1]  1/10
licensed [1]  6/9
lifestyle [3]  29/6 29/22 30/4
liking [1]  79/21
Limited [1]  1/10
lines [6]  9/21 10/13 11/4 17/8 19/25 20/10
list [6]  37/16 76/5 76/24 77/1 77/4 80/21

# L

litigation [3]  73/18 76/11 78/17
LLC [5]  1/6 1/9 2/2 2/2 2/9
LLP [2]  2/3 2/10
log [1]  55/18
Los [4]  1/18 1/24 2/6 4/9
losing [1]  17/10
loyalty [1]  15/25
luck [1]  42/7

# M

mail [1]  44/20
mainly [1]  51/20
maintain [2]  46/23 47/12
maintained [2]  7/7 8/15
maintains [2]  48/12 72/5
management [1] 77/6
manner [1]  47/15
March [7]  18/24 18/25 19/6 50/11 61/5 62/1 76/3
March 31st [1] 76/3
margin [3]  74/16 74/17 74/20
margin's [1]  74/18

margins [2]  72/9 72/13
math [2]  76/21 76/23
matter [7]  5/16 12/22 12/25 24/9 43/6 61/24 84/8
me who's [1]  34/14
media [1]  65/8
member [1]  67/14
members [1]  37/8
memory [1]  40/19
merchandise [1] 22/4
Mesa [5]  54/3 54/19 55/2 55/23 56/1
message [1]  58/7
method [1]  45/11
methodologies [2] 63/4 63/16
Metro [1]  36/9
microphone [1] 5/23
middle [3]  10/16 26/21 66/3
mile [1]  36/9
mine [1]  16/17
minus [2]  72/10 74/19
mirrors [1]  20/21
misrepresentations [2] 62/17 62/22
missed [3]  9/14

missing [2]  20/7 76/25
misstates [1]  35/5
mistake [2]  37/17 39/21
mistrial [4]  79/1 79/8 80/2 83/1
modification [1] 35/12
monitor [1]  41/23
month [1]  49/4
monthly [1]  77/6
months [3]  19/6 19/7 19/9
moonlight [1]  53/16
MORALES [31]
Morales' [1]  11/10
Morales's [2]  25/8 68/24
motion [1]  79/6
Mr [39]
Mr. [12]
Mr. Escamilla [5] 21/7 22/18 23/8 34/17 42/20
Mr. Escamilla's [5] 9/21 17/3 19/25 64/10 66/3
Mr. Trujillo [1] 56/12
Mr. Trujillo's [1] 56/18

# M

Ms [3]  38/24 51/11
68/24
multifaceted [1]
15/1
multiple [1]  36/17
my question [1]
34/15

# N

nature [1]  36/8
near [1]  30/24
necessary [1]  75/22
net [3]  48/25 48/25
74/9
nice [2]  52/17 52/19
nicely [2]  61/11
61/12
non [5]  14/14 15/3
29/16 53/13 54/21
non-compete [2]
53/13 54/21
non-responsive [3]
14/14 15/3 29/16
none [1]  48/10
nonresponsive [5]
13/14 49/14 49/24
54/12 58/22
notation [1]  35/19
noticed [2]  34/7
34/8
November [2]
77/16 78/2

# Nuevo [2]

Nuevo [3]  43/11
44/4 45/25
number [13]
numbers [4]  10/8
24/14 57/5 58/9

# O

Oberlina [3]  27/1
27/3 27/7
object [3]  12/16
32/14 79/20
objected [2]  80/8
80/21
objecting [1]  15/18
objection [29]
objections [2]  60/6
70/7
observations [1]
77/21
observed [4]  13/25
14/5 14/12 77/15
occasion [1]  67/13
October [1]  66/13
ODW [1]  1/8
offended [1]  48/14
office [1]  68/7
officer [1]  31/11
officers [2]  34/2
34/18
Official [1]  1/23
offramp [1]  82/18
oh [7]  5/7 12/14

64/20 81/3
oOo [2]  5/2 83/15
oops [1]  56/25
open [1]  5/3
opening [3]  28/20
51/12 62/17
operate [1]  36/19
opinion [4]  29/1
29/5 29/20 29/20
opportunity [1]
37/15
opposed [1]  23/11
optical [1]  81/16
oranges [2]  58/15
61/23
order [3]  44/14
44/17 46/13
original [1]  39/25
OTIS [1]  1/4
outburst [1]  80/17
overrule [2]  67/21
67/23
owed [2]  44/5 44/6
owned [1]  58/16
owner [7]  11/24
18/17 19/10 19/19
35/4 63/3 63/20
owner's [1]  66/14
owners [7]  16/21
38/12 38/15 49/7
62/20 66/20 72/18
ownership [5]

**O**

ownership... [5] 25/15 30/25 31/4 34/23 49/20

**P**

p.m [1]  83/14
PABLO [46]
Pablo Morales [4] 6/12 10/3 14/22 49/6
Pablo's [1]  68/8
pack [1]  83/8
page [35]
page 130 [1]  9/21
Page 237 [1]  64/11
pages [6]  20/7 21/5 33/5 41/21 44/13 70/16
pants [1]  51/13
Paolo [3]  50/24 51/7 61/15
paragraphs [1] 24/18
parameter [2] 19/22 19/23
parameters [4] 19/20 21/8 22/17 22/19
part [10]
participated [1] 23/9
parties [2]  78/21

80/24
partners [3]  34/2 34/18 51/4
passed [2]  18/22 18/23
password [1]  47/22
pay [6]  22/22 44/21 45/2 45/16 63/11 67/1
penalty [1]  24/19
pending [2]  5/16 62/1
people [7]  7/19 8/2 37/9 41/16 53/18 58/18 83/2
per month [1]  49/4
percentages [1] 52/5
perhaps [1]  80/4
period [3]  74/6 76/2 77/25
perjury [1]  24/19
permit [1]  39/2
PERRIN [2]  1/6 2/2
person [1]  26/25
personal [4]  28/25 50/18 56/20 69/14
persons [1]  58/7
perspective [1]  45/8
Phenix [1]  36/9
philosophies [1] 75/16

phone [15]
phones [1]  14/5
photographic [1] 40/19
place [1]  58/19
Plaintiff [2]  1/7 2/2
PLAINTIFF'S [3] 3/4 3/13 4/3
PLAINTIFF/COU NTER-DEFENDA NT [1]  2/2
plan [2]  27/13 51/13
planning [1]  15/14
plans [1]  28/13
play [2]  15/15 65/6
played [2]  48/4 65/8
pleases [1]  5/8
PM [2]  1/20 3/2
PO [3]  46/5 46/8 46/12
point [17]
policies [1]  63/21
policy [5]  30/21 30/24 32/17 37/8 40/9
potential [4]  32/15 63/10 63/22 66/16
potentially [1] 62/24
practice [1]  58/17
practices [1]  12/9

**P**

practicing [1]  12/3
prefilled [1]  33/13
prejudice [5]  32/15
 79/8 80/3 80/6 81/5
prepared [2]  51/12
 73/18
presence [1]  5/3
present [1]  24/5
president [1]  30/8
PRESIDING [1]
 1/4
price [4]  72/9 72/14
 74/19 74/19
pricing [1]  47/14
print [1]  55/18
printed [2]  56/23
 64/6
privilege [3]  62/24
 80/8 80/25
problem [11]
problems [1]  18/7
procedures [1]
 63/21
proceed [2]  24/23
 66/4
proceedings [2]
 83/14 84/8
product [3]  19/5
 22/1 54/9
products [13]
professional [1]

profit [5]  74/8 74/9
 74/9 74/10 74/11
profits [4]  72/18
 74/5 74/6 75/14
proposed [2]  29/8
 54/10
proprietary [1]
 48/6
protected [1]  47/22
publication [5]
 32/13 41/5 57/15
 72/25 78/13
publish [13]
published [2]  58/4
 73/3
publishing [1]  70/4
pull [4]  67/1 67/4
 67/8 67/14
pulled [1]  82/16
pulls [1]  66/18
purchase [11]
purchased [7]  8/21
 45/16 52/5 52/6
 72/10 72/15 74/20
purchases [1]  38/5
pursuant [1]  84/5
pyramid [1]  13/11

**Q**

quantity [2]  73/23
 73/23
question [38]
questioning [2]
 20/6 81/22
questions [4]  22/12
 23/11 59/6 78/15
quick [1]  24/9
quickly [2]  71/11
 76/21

**R**

radius [1]  36/9
rate [1]  66/15
reached [1]  66/25
reap [1]  72/18
reassigned [1]  83/5
reception [1]  69/19
receptionist [1]
 37/11
Recess [1]  23/25
recognize [2]  56/17
 56/19
recollection [3]
 50/18 50/19 52/22
recommended [1]
 25/14
reconsideration [1]
 80/5
record [6]  5/22
 25/12 26/15 40/11
 40/15 41/11
records [2]  38/12
 38/17
RECROSS [2]  3/4
 3/9

Case 2:22-cv-02120-MEMF-SK   Document 325-15   Filed 07/28/23   Page 100 of 103   Page ID #:13019

recuse [1]  83/4
recycle [1]  59/18
redact [1]  24/18
redacted [5]  24/18
26/6 26/7 26/8
26/10
REDIRECT [2]  3/4
3/9
reference [2]  69/1
79/8
referenced [1]
80/24
referencing [3]
27/7 79/18 80/11
reflected [3]  74/13
74/15 76/22
reflecting [2]  73/23
74/1
reflects [2]  40/15
44/17
refresh [1]  50/19
refuses [1]  28/5
regulations [1]
84/10
relationship [9]
relationships [6]
12/10 30/12 30/15
53/24 67/17 75/3
relatives [2]  34/2
34/19
relevance [6]  7/23

31/15 32/15 39/7
47/3 62/23
rely [1]  51/4
remained [1]  7/2
remedied [1]  79/22
remedies [1]  28/8
rep [1]  54/17
reply [1]  69/2
report [2]  67/14
77/6
Reporter [2]  1/23
84/17
REPORTER'S [1]
1/17
reporting [3]  66/22
68/23 72/5
reports [5]  67/1
67/8 77/16 77/24
78/2
representation [1]
40/17
representatives [4]
27/16 28/11 28/14
69/20
reps [1]  30/7
reputation [1]
25/25
request [4]  6/15
26/10 52/9 73/5
requested [2]  39/12
48/25
required [1]  69/3
resolution [1]  78/17

resolve [1]  70/18
resources [1]  58/14
response [4]  20/11
20/14 67/6 68/9
responsibilities [1]
56/3
responsibility [2]
38/11 38/16
responsive [4]
14/14 15/3 17/4
29/16
result [1]  76/13
review [3]  6/13
6/15 6/19
rise [2]  23/23 79/4
road [1]  28/17
role [3]  28/11 30/8
30/14
roles [1]  16/17
Rongcheng [5]
69/23 70/21 71/3
71/9 76/25
Rongcheng's [2]
70/13 76/24
room [2]  12/18
16/17
rows [1]  73/21
Ruiz [5]  50/24
50/25 51/7 51/7
61/15
Ruiz's [1]  67/6

**salaried [5]** 7/6
7/19 8/5 8/8 8/9
**salary [1]** 7/16
**sale [2]** 19/4 74/19
**sales [19]**
**salesman [1]** 43/22
**Sam [6]** 50/25 51/7
61/15 68/12 71/1
76/12
**Sam Ruiz [1]** 50/25
**SAVINO [34]**
**Savino Morales [6]**
6/12 14/22 49/7
49/19 61/13 71/21
**Savino Morales' [1]**
11/10
**scheme [2]** 13/11
13/11
**scott [2]** 2/11 2/11
**screen [3]** 26/9 29/3
61/16
**screwup [1]** 82/24
**scroll [7]** 33/3
41/18 49/9 56/13
56/14 57/20 77/18
**sealed [1]** 13/4
**seat [1]** 17/22
**second [7]** 9/4 14/9
49/12 60/17 61/7
61/12 74/21
**secret [2]** 47/3

**secretary [1]** 37/10
**secrets [3]** 46/23
46/23 47/4
**section [3]** 30/25
33/25 84/5
**seeking [2]** 27/25
49/3
**sees [1]** 16/3
**selling [2]** 18/14
19/11
**sense [2]** 9/1 13/9
**September [3]**
19/17 19/17 52/23
**sequences [1]** 57/4
**SERGIO [7]** 1/11
2/9 5/11 5/24 25/8
25/10 29/8
**serious [1]** 82/15
**serve [1]** 16/21
**service [4]** 19/22
66/15 67/5 68/24
**serviced [1]** 38/4
**services [1]** 37/21
**servicing [5]** 17/10
18/8 18/13 29/12
29/24
**session [3]** 1/20 3/2
24/3
**setting [2]** 17/25
21/13
**settlement [5]**
62/24 78/18 79/9

**Seven [2]** 10/15
10/16
**Shall [1]** 5/5
**share [2]** 47/25
75/14
**shared [2]** 74/22
75/11
**Short [1]** 59/4
**sign [1]** 7/1
**signature [4]** 39/6
39/6 40/16 61/14
**signatures [2]**
24/11 24/20
**signed [5]** 8/20 39/5
53/13 53/22 53/24
**similarities [1]**
21/15
**similarity [1]** 21/1
**simple [1]** 58/24
**slightly [1]** 27/1
**slow [1]** 60/19
**slowly [2]** 5/22
77/18
**small [2]** 34/9 79/25
**solely [1]** 15/9
**solemnly [1]** 5/15
**solving [1]** 45/11
**Something's [1]**
29/3
**sometime [1]** 63/17
**soon [1]** 66/5
**sounds [2]** 36/4

## S

sounds... [1]  76/22
Southern [3]  11/21 18/4 26/1
specific [1]  61/10
speculation [3]  7/22 46/24 68/21
Spell [1]  5/21
spend [1]  15/7
spent [1]  10/20
spoiling [1]  10/6
spoke [2]  54/6 74/18
spotted [1]  61/8
spreadsheet [3]  74/13 74/15 74/17
staff [3]  19/8 37/9 67/13
stand [2]  24/6 67/24
starting [1]  15/20
starts [3]  10/9 10/16 66/17
state [9]
stated [1]  13/2
statements [2]  51/12 81/25
states [6]  1/1 27/9 36/10 36/17 84/6 84/11
stay [1]  54/14
stenographically [1]  84/7

steven [2]  2/10 2/12
Street [1]  1/24
stricken [6]  28/7 49/16 50/5 54/25 59/10 75/8
struggling [6]  20/16 21/11 21/14 21/25 21/25 22/3
subcategory [1]  34/1
submit [1]  39/18
submitted [5]  33/8 39/11 40/2 40/8 40/12
submitting [1]  48/17
subscribe [1]  68/23
subscription [3]  66/21 67/2 67/4
subsequent [1]  39/24
subsidiaries [1]  37/5
substantive [1]  24/17
subtracting [1]  72/14
sudden [1]  82/15
sued [1]  61/24
Suite [2]  2/6 2/13
SUPOWITZ [2]  1/6 2/2
supplier [1]  50/10

supplying [1]  50/10
Surtidora [6]  68/9 68/25 71/14 71/18 71/23 72/2
Surtidora's [2]  68/11 68/18
Susie [2]  68/3 68/5
Susie Morales [1]  68/3
sustained [2]  47/6 78/20
swear [1]  5/15
Sweder [1]  78/17
sweet [1]  59/4
system [2]  46/9 47/21

## T

Tablado's [1]  69/19
tainted [1]  79/15
taxes [1]  74/1
team [1]  22/2
technical [2]  78/7 81/8
Technology [1]  57/22
Telephone [2]  2/7 2/14
term [1]  72/7
terminated [1]  62/10
termination [1]  62/10

terms [15]

testimony [9]

text [4] 26/18 26/23 52/13 58/8

texted [2] 26/25 27/6

thank [22]

thinking [2] 37/7 82/13

thought [8] 7/10 11/16 13/16 32/16 45/18 45/19 77/22 81/17

thousand [1] 52/20

time [32]

timeline [6] 18/11 18/16 18/22 19/16 22/10 28/16

timeline-wise [1] 18/22

times [4] 52/20 67/16 69/10 69/11

timing [1] 62/7

title [2] 25/20 84/6

today's [1] 23/4

tonight [1] 83/7

topic [5] 21/5 82/1 82/2 82/3 82/5

total [2] 74/1 76/18

touch [1] 66/10

towards [2] 9/9

trade-secret [1] 47/3

transcript [5] 1/17 19/25 64/10 84/7 84/9

travel [3] 5/14 36/25 80/2

trial [4] 1/17 79/21 79/24 82/10

trouble [4] 61/17 81/13 81/15 81/24

Trujillo [9]

Trujillo's [2] 56/18 57/7

trust [1] 25/14

truth [3] 5/17 5/17 5/18

twice [1] 64/7

typed [1] 52/19

## U

U.S [2] 1/23 84/17

uh [10]

uh-huh [10]

ultimately [1] 72/17

unconfused [1] 43/20

understanding [9]

undivided [1] 15/24

UNITED [3] 1/1 84/6 84/10

Unless [1] 78/4

us [4] 38/13 48/14 68/7 79/23

use their [1] 62/15

## V

vacation [1] 14/3

vacations [3] 13/25 14/13 16/3

vague [1] 63/6

vaya [1] 83/9

vehicles [2] 28/23 28/25

vendors [4] 48/22 51/4 51/20 51/22

vernacular [1] 46/5

version [1] 39/19

video [4] 9/20 9/23 48/3 65/6

visit [1] 8/17

VOIR [2] 3/4 3/8

VOL [4] 3/4 3/9 3/14 4/4

Volume [2] 1/20 3/2

vs [1] 1/8

## W

W-2 [2] 7/13 8/10

W-2s [1] 7/20

warehouse [7] 19/8 30/12 37/11 54/8 55/12 55/13 55/17

## W

warranted [1] 80/14
We'd [2] 31/13 70/9
weapons [1] 82/16
weddings [1] 67/19
Wednesday [2] 1/19 5/1
weekend [1] 59/9
welcome [1] 6/4
West [1] 1/24
WESTERN [1] 1/3
wheel [1] 83/5
wherever [1] 28/12
who's [2] 17/6 34/14
WHOLESALE [2] 1/9 2/9
why is [1] 15/20
Wil [2] 1/23 84/16
wil.wilcox [1] 1/25
Wilcox [2] 1/23 84/16
Williams [2] 2/5 51/11
Wilshire [2] 2/6 2/13
wise [1] 18/22
witnesses [3] 3/3 3/7 32/21
witty [2] 13/12 13/17

Workers [4] 33/9 34/9 36/15 37/20
Workers' [1] 31/24
workings [1] 12/9
world [1] 12/12
worried [1] 53/14
worthwhile [1] 67/4
WRIGHT [1] 1/4
wrote -- can [1] 61/8

## Y

Yep [2] 32/4 49/5
yes-no [1] 27/24
yields [1] 74/20
you'd [1] 76/18
Your Honor [3] 20/1 62/25 78/22
yours [1] 13/7

## Z

zero [2] 7/16 45/3